No. 2024-1606

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

SUPERNUS PHARMACEUTICALS, INC.,

*Plaintiff-Appellee*,

v.

AJANTA PHARMA LIMITED, AJANTA PHARMA USA INC.,

*Defendants*

TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,

*Defendants-Appellants*.

Appeals from the United States District Court for the District of New Jersey in
Case Nos. 21-cv-6964, 21-cv-14268,
Judge Georgette Castner.

# CORRECTED BRIEF FOR DEFENDANTS-APPELLANTS
# TORRENT PHARMACEUTICALS LTD. AND TORRENT PHARMA INC.

A. Neal Seth
Wesley E. Weeks
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
nseth@wiley.law

*Attorneys for Defendants-Appellants*
*Torrent Pharmaceuticals Ltd. and*
*Torrent Pharma Inc.*

June 6, 2024

# EXEMPLARY PATENT CLAIM

Claim 14 of U.S. Patent No. 8,992,989 recites:

A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate *in vivo* at 16 or more hours after a single initial dose.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2024-1606

**Short Case Caption** Supernus Pharmaceuticals, Inc. v. Ajanta Pharma Limited

**Filing Party/Entity** Torrent Pharmaceuticals Ltd., Torrent Pharma Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/06/2024

Signature: /s/ A. Neal Seth

Name: A. Neal Seth

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Torrent Pharmaceuticals Ltd. | | Torrent Private Ltd. |
| Torrent Pharma Inc. | | Torrent Pharmaceuticals Ltd.; Torrent Private Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Stone Conroy, LLC | Rebekah R. Conroy (Stone Conroy LLC | Kirby Drake (Wiley Rein LLP) |
| Lawrence M. Sung (Sung IP Law) | Corey Weinstein (Wiley Rein LLP) | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

EXEMPLARAY PATENT CLAIM ........................................................... i

CERTIFICATE OF INTEREST ............................................................. ii

TABLE OF CONTENTS .................................................................... iii

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF RELATED CASES .................................................... 1

STATEMENT OF JURISDICTION ........................................................ 2

INTRODUCTION ............................................................................... 3

STATEMENT OF THE ISSUES ............................................................ 6

STATEMENT OF THE CASE ............................................................... 7

    I.    The Asserted Claims ............................................................. 8

    II.    The Prosecution History ....................................................... 9

    III.    Claim Construction ............................................................. 13

    IV.    The District Court's Decision. .............................................. 13

SUMMARY OF THE ARGUMENT .................................................... 15

STANDARD OF REVIEW ................................................................. 19

ARGUMENT .................................................................................... 20

    I.    The District Court Erred In Finding That Torrent's ANDA
        Product Infringed The Asserted Claims Under The Doctrine of
        Equivalents. ...................................................................... 20

        A.    Prosecution History Estoppel Applies To Bar Application
            Of The Doctrine Of Equivalents To Torrent's ANDA
            Products. ................................................................ 20

        B.    Even If Prosecution History Estoppel Did Not Apply
            (Which It Clearly Does), Torrent's ANDA Products Do
            Not Infringe Under The Doctrine Of Equivalents. ................... 36

    II.    The District Court Erred In Holding That The Asserted Claims
        Were Not Invalid Under 35 U.S.C. § 112(a) For Lack of
        Enablement And Inadequate Written Description. ............................ 42

A.    The Asserted Patents Do Not Teach a POSA How to Make and Use the Full Scope of the Claimed Invention. .........43

B.    The Asserted Patents Do Not Provide a Written Description Sufficient For a POSA To Recognize the Inventors Were in Possession of the Full Scope of the Claimed Invention. ...................................................................56

CONCLUSION .........................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) ........................................................40

*Ajinomoto Co. v. ITC*,
   932 F.3d 1342 (Fed. Cir. 2019) ........................................................30

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014) ........................................................44

*ALZA Corp. v. Andrx Pharm., LLC*,
   603 F.3d 935 (Fed. Cir. 2010) ...................................................44, 55

*Amgen Inc. v. Amneal Pharmaceuticals LLC*,
   945 F.3d 1368 (Fed. Cir. 2020) ........................................................31

*Amgen v. Sanofi*,
   598 U.S. 594 (2023)..............................................................*passim*

*AquaTex Indus. v. Techniche Sols.*,
   479 F.3d 1320 (Fed. Cir. 2007) ......................................36, 38, 40, 41

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ..................................................57, 58

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) ..................................................19, 55

*Biagro Western Sales, Inc. v. Grow More, Inc.*,
   423 F.3d 1296 (Fed. Cir. 2005) ........................................................26

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 1365 (Fed. Cir. 2020) ..............................22, 27, 28, 31

*Biogen Int'l GMBH v. Mylan Pharms. Inc.*,
   18 F. 4th 1333 (Fed. Cir. 2021) ........................................................43

*Cephalon, Inc. v. Watson Pharms., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013) .........................................................44

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005) ..........................................................19

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
  480 F.3d 1335 (Fed. Cir. 2007) .....................................................21, 33

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  845 F.3d 1357 (Fed. Cir. 2017) .......................................19, 31, 32, 33

*Eli Lilly v. Hospira, Inc.*,
  933 F.3d 1320 (Fed. Cir. 2019) ......................................28, 29, 32, 33

*Felix v. American Honda Motor Co., Inc.*,
  562 F.3d 1167 (Fed. Cir. 2009) .........................................................26

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  344 F.3d 1359 (Fed. Cir. 2003) .....................................................21, 24

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002), *remanded in* 344 F.3d 1359 (Fed. Cir. 2003),
  *cert. denied*, 541 U.S. 988 (2004).....................................19, 20, 21, 35

*Funai Elec. Co. v. Daewoo Electcs. Corp.*,
  616 F.3d 1357 (Fed. Cir. 2010) .........................................................29

*Goeddel v. Sugano*,
  617 F.3d 1350 (Fed. Cir. 2010) .........................................................55

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
  339 U.S. 605 (1950).........................................................................37

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
  370 F.3d 1131 (Fed. Cir. 2004) (*en banc*).........................................25

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
  523 F.3d 1304 (Fed. Cir. 2008) .........................................................25

*Idenix Pharms. LLC v. Gilead Sciences Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) .........................................................63

*Immunex Corp. v. Sandoz Inc.*,
    395 F. Supp. 3d 366 (D.N.J. 2019), *aff'd*, 964 F.3d 1049
    (Fed. Cir. 2020) ................................................................................58

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
    385 F.3d 1360 (Fed. Cir. 2004) ...........................................................30

*Int'l Rectifier Corp. v. IXYS Corp.*,
    515 F.3d 1353 (Fed. Cir. 2008) ...........................................................31

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    734 F.3d 1352 (Fed. Cir. 2013) ....................................................24, 31

*Intervet Inc. v. Merial Ltd.*,
    617 F.3d 1282 (Fed. Cir. 2010) ....................................................29, 30

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) ...........................................................58

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012) ...........................................................43

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
    831 F.3d 1350 ......................................................................................35

*Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) ....................................................19, 59

*Pharma Tech Sols., Inc. v. LifeScan, Inc.*,
    942 F.3d 1372 (Fed. Cir. 2019) ....................................................20, 36

*Plastic Omnium Advanced Innovation & Rsch v. Donghee Am., Inc.*,
    943 F.3d 929 (Fed. Cir. 2019) .............................................................41

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) .............................................................30

*Reckitt Benckiser LLC v. Amneal Pharm. LLC*,
    276 F. Supp. 3d 261 (D.N.J. 2017) .....................................................40

*Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*,
    517 F.3d 1364 (Fed. Cir. 2008) ...........................................................29

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
 119 F.3d 1559 (Fed. Cir. 1997) ............................................................61

*Reiffin v. Microsoft Corp.*,
 214 F.3d 1342 (Fed. Cir. 2000) ...........................................................43

*Sitrick v. Dreamworks, LLC*,
 516 F.3d 993 (Fed. Cir. 2008) .............................................................45

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
 141 F. 3d 1084 (Fed. Cir. 1998) ..........................................................37

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
 212 F.3d 1377 (Fed. Cir. 2000) ...........................................................34

*Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*,
 520 U.S. 17 (1997)...............................................................................38

**Statutes**

28 U.S.C. § 1295(a)(1) .................................................................................2

28 U.S.C. § 1338 ..........................................................................................2

35 U.S.C. § 112(a) ........................................................................42, 43, 44

## STATEMENT OF RELATED CASES

No other appeals in or from the underlying district court proceedings were previously before this or any other appellate court.

**STATEMENT OF JURISDICTION**

The district court had subject matter jurisdiction over this patent infringement case under 28 U.S.C. § 1338. This Court has jurisdiction over this appeal from the district court under 28 U.S.C. § 1295(a)(1). Defendants-Appellants timely filed its notice of appeal on March 5, 2024, within 30 days of final judgment entered on February 22, 2024. Appx1-4. This appeal is taken from a final judgment that disposes of all parties' claims.

**INTRODUCTION**

This is a patent infringement case involving accused products for which

Defendants-Appellants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc.

(collectively "Torrent") filed an Abbreviated New Drug Application ("ANDA")

with the U.S. Food and Drug Administration ("the FDA") seeking approval for

generic topiramate extended release capsules. Plaintiff-Appellee Supernus

Pharmaceuticals, Inc. ("Supernus") holds a New Drug Application ("NDA") for

topiramate extended-release capsules, which are marketed as Trokendi XR®.

Supernus also owns U.S. patents, ten of which are listed in the FDA publication

titled "Approved Drug Products with Therapeutic Equivalence Evaluations"

(commonly known as the "Orange Book") as covering Trokendi XR®, and three of

which are at issue in this case.

Supernus did not invent topiramate, which has been marketed under the

name Topamax since 1996.  Rather, Supernus developed an extended-release

formulation of topiramate, which it markets as Trokendi XR.

Supernus, however, did not limit its patent claims to the formulations that it

had actually developed but instead sought to claim any extended release

formulation of topiramate "comprising a release controlling coating," a well-

known method for developing extended release formulations more generally.

Appx5815.  The Patent Office, however, rejected those claims for lack of written

description under 35 U.S.C. § 112 because they did not recite the "composition of the enhancing agents, complexing agents and release coatings[] which would result in the claimed release profiles over the claimed period of time."  Appx5835-36.

To overcome the rejection, Supernus amended the claims to narrow the scope of the claims from encompassing a general "release controlling coating" material to require "a coating material selected from the group consisting of cellulosic polymers and acrylic polymers."  Appx5847.

At trial, Supernus sought to expand the Asserted Claims to cover other formulations that Supernus had disclaimed during prosecution, arguing that Torrent's formulation using polyvinyl acetate infringed under the doctrine of equivalents.  The District Court held that the presumption of prosecution history estoppel was overcome because, in its view, the alleged equivalent was tangential to the reasons for the amendment.  This was legal error because the plain reason for the amendment, apparent from the objective record of the prosecution history, was to overcome the Examiner's § 112 rejection.

In effect, the District Court allowed Supernus to reclaim its original effort to claim the genus of undefined "release controlling coatings" by their function, rather than the specific categories supported by the written description.  Yet, the District Court also found that the Asserted Claims were enabled and supported by written description.  The record, however, shows that Supernus disclosed only 7

examples in its specification, which is insufficient to enable the full scope of the

claims.  Moreover, Supernus admitted that practicing the asserted claims would

require the POSA to conduct their own clinical trials, rather than relying on any of

the limited guidance provided by the specification.  This is exactly what the

Supreme Court instructed is not sufficient in the recent *Amgen v. Sanofi* case.  The

District Court's decisions on infringement and validity should both be reversed.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in holding that Supernus's claim amendment disclaiming coating materials other than "cellulosic polymers and acrylic polymers" fell within the "tangential relation" exception to prosecution history estoppel, and in finding that Torrent's ANDA Product infringed under the doctrine of equivalents.

2.      Whether the district court erred in holding that the Asserted Claims were not invalid under 35 U.S.C. § 112(a) for failing to enable a person of ordinary skill in the art ("POSA") to make and use the full scope of the claimed invention where the undisputed evidence showed a "near infinite" number of potential claimed embodiments whereas only a handful of examples were disclosed.

3.      Whether the district court erred in holding that the Asserted Claims were not invalid under 35 U.S.C. § 112(a) for failing to provide a written description sufficient for a POSA to recognize that the inventors were in possession of the full scope of the claimed invention where the undisputed evidence showed the disclosure of only a few, uninformative species.

## STATEMENT OF THE CASE

On March 26, 2021, Plaintiff-Appellee Supernus Pharmaceuticals, Inc.
("Supernus") sued Ajanta Pharma Limited and Ajanta Pharma USA Inc.
(collectively "Ajanta") for patent infringement (Civil Action No. 21-6964 or "the
Ajanta case"). Compl., 21-cv-6964, ECF No. 1.  On July 28, 2021, in Civil Action
No. 21-14268 (or "the Torrent case"), Supernus sued Defendants-Appellants
Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (collectively "Torrent") for
infringement of the same patents at issue in the Ajanta case. Appx350.  The district
court consolidated the Ajanta and Torrent cases on December 17, 2021. Appx740.
Supernus and Ajanta settled their dispute, and the district court dismissed the
Ajanta case on April 5, 2023. Stipulation & Order of Dismissal, 21-cv-6964, ECF
No. 104.  Ajanta is not a party to this appeal.

In the Torrent case, Supernus alleged in its complaint that ANDA No.
215918, which Torrent filed with the FDA seeking approval to engage in the
commercial manufacture, use, offer for sale, and/or sale in, and/or importation into,
the United States of generic topiramate extended release capsules containing 25
mg, 50 mg, 100 mg, and 200 mg of topiramate ("the Torrent ANDA Products"),
infringed ten U.S. patents owned by Supernus, including U.S. Patent No. 8,992,989
("the '989 Patent"), U.S. Patent No. 9,549,940 ("the '940 Patent"), and U.S. Patent

No. 9,622,983 ("the '983 Patent") (collectively, the "Asserted Patents").[1]

Appx255, Appx277, Appx299. These patents were listed in the Orange Book as covering Trokendi XR®, which is the subject of Supernus's New Drug Application ("NDA") No. 201635 approved by the FDA for the manufacture and sale of 25 mg, 50 mg, 100 mg, and 200 mg, topiramate extended-release capsules. Appx359-360, ¶¶ 33, 36. According to Supernus, Trokendi XR® is a once-daily administered antiepileptic drug indicated: "(i) as an initial monotherapy for the treatment of partial-onset or primary generalized tonic-clonic seizures in patients 6 years of age and older; (ii) as an adjunctive therapy for the treatment of partial-onset seizures, primary generalized tonic-clonic seizures, and seizures associated with Lennox-Gastaut syndrome in patients 6 years of age and older; and (iii) for the preventive treatment of migraine in patients 12 years of age and older." Appx359, ¶ 34.

## I.   The Asserted Claims

On April 11, 2023, the district court issued an order entering the joint stipulation by Supernus and Torrent to reduce the number of asserted claims. Appx1455.  As a result of that stipulation, the only claims asserted at trial were claim 14 of the '989 Patent, claim 14 of the '940 Patent, and claims 13 and 23 of

---

[1] In addition to the Asserted Patents, Supernus also alleged infringement of U.S. Patents No. 8,298,576, No. 8,298,580 ("the '580 Patent"), No. 8,663,683, No. 8,877,248, No. 8,889,191, No. 9,555,004, and No. 10,314,790, none of which are at issue in this appeal.

the '983 Patent") (collectively, the "Asserted Claims").  *Id.*  The Asserted Patents have the same title "Sustained-Release Formulations of Topiramate" and share a common specification.

Claim 14 of the '989 patent is representative and recites in relevant part:[2]

14. A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers,

wherein the XR component exhibits a maximum plasma concentration of topiramate *in vivo* at 16 or more hours after a single initial dose.  Appx273.

## II.    The Prosecution History

The Asserted Patents claim priority to U.S. Patent Application No. 11/941,475 ("the '475 application"). Appx255.  During prosecution of the '475 application, the Examiner rejected as obvious then-pending claims 34 and 92, which were directed to formulations comprising specific proportions of various extended release bead populations.  Appx5953, Appx5963, Appx5969.

---

[2] The Asserted Claims also have an optional intermediate release component element, which is not at issue in this case.

9

In rejecting these claims, the examiner noted that "the release-profile is considered a result-effective variable which is obvious to optimize . . . with combination of independent pellet populations which release topiramate at different layers." Appx5969.  In response, Supernus argued that the examiner assumed "that the number of populations of beads available to the pharmacologist is a fixed number, which may be simply 'plugged' into a computer algorithm, which algorithm can define the relative percentages of each population needed to achieve a certain release profile output. The Examiner fails to consider, however, that *th[e] number of possible populations of beads available to the pharmacologist is near infinite*."  Appx5969 (emphasis added).

The prosecution history of U.S. Patent 8,298,580 ("the '580 patent") is also relevant to this appeal.  The '580 patent is a continuation of U.S. Patent the '475 application.  As the District Court noted in its opinion, there is no dispute that the '580 patent prosecution history is relevant to asserted patents.  Appx72 n.48.

After cancelling all prior claims in the application leading to the '580 patent, Supernus added new claims 104-141, which were broadly directed to a "sustained release formulation of topiramate" comprising "at least two different extended release topiramate-containing components" and each component "compris[ing] a release controlling coating specific for its components."  Appx5815.  Claim 104

recited a generic "release controlling coating" for the extended release component. *Id.*

On August 8, 2012, the USPTO rejected claim 104 under 35 U.S.C. § 112. Appx5835-5836. The office action rejecting Supernus's claims states that claim 104 is clearly directed to sustained release formulations that "exhibit a particular release profile over a specific period of time," but the claim lacks adequate written description because it "does not recite the composition of the. . . release coatings which would result in the claimed release profiles over the claimed period of time." Appx5835. As the patent examiner explained, while "[t]he disclosure of a species may provide an adequate written description of a genus when the species disclosed is representative of the genus," claim 104 encompassed "any and all . . . release coatings that can exist." Appx5835. The examiner noted that there was "substantial variability" among the species of "release coatings encompassed within the scope of the claims," and that defining the release coatings "in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the . . . release coatings which would have the stated function." *Id.* In other words, the problem was that Supernus was trying to describe what the "release coatings do rather than what they are." *Id.*

As such, the examiner found that claim 104 failed to meet the written description requirement of 35 U.S.C. § 112 because describing the claimed release

11

coatings by their function "will not substitute for written description of the structure" of those release coatings. Appx5835.  Moreover, the examiner specifically found that the existing disclosure of several examples of release coatings "listed in the specification does not provide an adequate description of the claimed genus of . . . release coatings *because the claims are broader than the disclosure*."  Appx5836 (emphasis added).

In response to the examiner's § 112 rejection, Supernus amended subsection (a) of its pending claim 104 as follows (addition shown in underlined text):

"(a) at least two different extended release topiramate-containing components, wherein each component comprises a release controlling coating specific for its component <u>and comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers</u>.

In its remarks, Supernus first acknowledged that claim 104 "stand[s] rejected for failing to comply with the written description requirement" — "[i]n particular, . . . that the specification fails to adequately describe . . . [the] 'release controlling coating.'"  Appx5854.  Supernus then stated that "[a]lthough Applicants respectfully disagree, solely in the interest of compact prosecution, Applicants have amended the claims to now recite species of the noted genera."  Appx5854.

## III.    Claim Construction.

On December 2, 2022, the District Court issued a *Markman* Order, which defined the relevant POSA and construed certain terms in the Asserted Claims. The district court interpreted "immediately and continuously" to require "no construction – plain and ordinary meaning" and "[w]ithout delay and without interruption"; "extended release (XR) component" or "extended release component" to mean "[a] component that releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released *in vitro* in the predetermined period of time"; and "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers" to require "no construction – plain and ordinary meaning". Appx1428-1429.

## IV.    The District Court's Decision.

The district court held a four-day bench trial from July 31, 2023, through August 3, 2023.  On January 30, 2024, the district court issued an order and opinion that the Asserted Patents were not literally infringed by the Torrent ANDA products. Appx70.

The district court also found that the presumption of amendment-based prosecution history estoppel applied, but that this presumption was overcome by the tangential relation exception. Appx71-88.  The district court concluded that the Torrent ANDA products infringed the Asserted Patents under the doctrine of

13

equivalents. Appx89-99.   In addition, the district court held that the Asserted Claims were not invalid under 35 U.S.C. § 112(a) for either inadequate written description or lack of enablement. These rulings are the subject of Torrent's appeal.  Appx100-131.

## SUMMARY OF THE ARGUMENT

The district court erred in holding as a matter of law that Supernus's narrowing amendment during prosecution adding the limitation "a coating material selected from the group consisting of cellulosic polymers and acrylic polymers" was done for reasons that bear "no more than a tangential relation to the equivalent in question" – here, the vinyl polymer, polyvinyl acetate. The district court wrongly adopted a position, which Supernus never argued, that the claim amendment did not disclaim vinyl polymers generally, but surrendered only polyvinyl alcohol (which the district court recognized is a vinyl polymer), and thus concluded that the amendment bears no more than a tangential relation to polyvinyl acetate, another vinyl polymer.

Compounding this error, the district court undertook its own misguided mission of needing to divine a reason for Supernus' surrender, when Supernus never offered a contemporaneous explanation. The narrowing amendment speaks for itself – Supernus expressly disclaimed all polymers other than cellulosic polymers or acrylic polymers. Whether Supernus could have, or should have, made a different amendment was speculation on the district court's part that is unsustainable. While this Court has emphasized that the "tangential exception" is a case specific determination, to Torrent's knowledge, this Court has only ever applied the exception where, unlike here, there is a readily apparent reason for the

claim amendment that bears no more than a tangential relationship to the accused equivalent. The district court erred as a matter of law in searching for a rationale that Supernus itself never offered in order to find no more than a tangential relationship.

At trial, Supernus's sole basis for arguing that its claim amendment bears no more than a tangential relation to the equivalent in this case was that it made the admittedly narrowing amendment for purposes of patentability to overcome the patent examiner's rejection that "the claims, as then written, encompassed coatings that 'have widely differing structures and corresponding biological activities[]'" whereas polyvinyl acetate "has the same biological activity and a structure that is nearly identical to the structure of the exemplary acrylic polymers listed in the patent specification." Appx75-76. Even if this rationale were accepted as true, which it is not, the only objectively apparent reason for this amendment was to disclaim coverage of any coating materials containing polymers other than cellulosic and acrylic polymers, regardless of their structural or functional similarities and differences to cellulosic and acrylic polymers. Nothing in the intrinsic evidence of the Asserted Patents stands contrary.

Moreover, to hold otherwise would condone the injection of post hoc ambiguity into an otherwise clear surrender of subject matter, which undermines the public notice function of the prosecution history. Indeed, this is exactly what

Torrent relied upon in undertaking a legitimate design-around of the Asserted Patents in the lengthy, seven-year development of sustained release topiramate formulations with a coating that contained polyvinyl acetate instead of a cellulosic or acrylic polymer.

The district court also committed reversible error in holding that the Asserted Claims were not invalid under 35 U.S.C. § 112(a) for failing to enable a POSA to make and use the full scope of the claimed invention, or for failing to provide a written description sufficient for a POSA to recognize that the inventors were in possession of the full scope of the claimed invention. The district court acknowledged that the Asserted Patents undisputedly disclosed only a handful of examples, none of which actually taught a POSA how to achieve the substantial number of claimed sustained release topiramate formulations. The district court erred by crediting the disclosure of prior art techniques while glossing over the absence of key information about the claimed invention. In so doing, the district court failed to heed the simple, yet powerful, admonitions by the U.S. Supreme Court and this Court that a patent must disclose more than a "hunting license," "research assignment," or "advice to engage in 'trial and error,'" and moreover, that "[t]he more one claims, the more one must enable." *Amgen v. Sanofi*, 598 U.S. 594, 610 (2023). In addition, the Asserted Patents provided no "blazemarks" to explain what makes the desired species "effective, or why" in the extremely

17

broad genus that is claimed. On the trial record, the district court's § 112 rulings are unsustainable.

Accordingly, this Court should reverse the district court's judgment and hold that the tangential relation exception is not applicable here to overcome the presumption of prosecution history estoppel, which bars the assertion of the doctrine of equivalents in this case as a matter of law, and therefore, Torrent does not infringe the Asserted Patents, and that the Asserted Claims are invalid under 35 U.S.C. § 112(a) for lack of enablement and/or inadequate written description.

## STANDARD OF REVIEW

Infringement is a question of fact that this Court reviews, after a bench trial, for clear error. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017). Under the doctrine of equivalents, however, if the *Festo* presumption of prosecution history estoppel applies, as Supernus conceded below, the issue of whether a patent-holder has successfully rebutted the *Festo* presumption is a question of law, which this Court reviews de novo. *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005).

With respect to validity, whether a claim satisfies the enablement requirement under 35 U.S.C. § 112 is a question of law, reviewed de novo, with underlying factual findings reviewed for clear error. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007). And "on appeal from a bench trial, [this Court will] review a written description determination for clear error." *Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019). "Because a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence." *Auto. Techs.*, 501 F.3d at 1281.

# ARGUMENT

## I.    The District Court Erred In Finding That Torrent's ANDA Product Infringed The Asserted Claims Under The Doctrine of Equivalents.

### A.    Prosecution History Estoppel Applies To Bar Application Of The Doctrine Of Equivalents To Torrent's ANDA Products.

#### 1.    Legal Framework.

Prosecution history estoppel prevents a patent holder from recapturing through the doctrine of equivalents the subject matter that the applicant surrendered during prosecution. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002), *remanded in* 344 F.3d 1359 (Fed. Cir. 2003), *cert. denied*, 541 U.S. 988 (2004). "Prosecution history estoppel can occur in two ways: 'either (1) by making a narrowing amendment to the claim ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent examiner ("argument-based estoppel").'" *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013)) (quoting *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006)).

Thus, if a narrowing amendment has been made for a substantial reason relating to patentability, there is legal "presumption that the patentee has surrendered all territory between the original claim limitation and the amended

20

claim limitation." *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) (en banc) ("*Festo II*"). Indeed, "[a] patentee who narrows a claim as a condition for obtaining a patent disavows [its] claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Festo*, 535 U.S. at 737.

At trial, Supernus did not deny that its claim amendment was made for reasons of patentability and the District Court accordingly found that the presumption in favor of prosecution history estoppel applies. Appx74. Thus it was Supernus's burden to rebut the presumptive application of prosecution history estoppel by establishing that an exception to that presumption applies. *Festo*, 535 U.S. at 740.

The Supreme Court has recognized three exceptions to the *Festo* presumption: First, "[t]he equivalent may have been unforeseeable at the time of the application." *Id.* Second, "the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question." *Id.* Third, "there may be some other reason suggesting that the patentee could not reasonably be expected to have described the [equivalent]." *Id.* at 740-41. The only exception at issue in this case is the tangential relation exception.

As this Court has repeatedly held, "the tangential relation criterion for overcoming the *Festo* presumption is very narrow," *Cross Med. Prods., Inc. v.*

21

*Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1342 (Fed. Cir. 2007). And

critically, the "crux of the tangentiality inquiry remains 'the patentee's objectively

apparent reason for the narrowing amendment [as] discernible from the

prosecution history record." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d

1353 1365 (Fed. Cir. 2020) (quoting *Festo II*, 344 F.3d at 1369).

> **2.    During Prosecution Of The '580 Patent, Supernus Made A
> Narrowing Amendment Surrendering Subject Matter And
> The Presumption In Favor Of Prosecution History Estoppel
> Therefore Applies.**

During prosecution of the '580 patent, Supernus cancelled all previous

claims and added new claim 104, which comprised "at least two different extended

release topiramate-containing components" and each component "compris[ing] a

release controlling coating specific for its components." Appx5815. The examiner

rejected that claim under 35 U.S.C. § 112 for lack of written description because it

"does not recite the composition of the. . . release coatings which would result in

the claimed release profiles over the claimed period of time." Appx5835. As the

examiner explained, Supernus was trying to describe what the "release coatings do

rather than what they are," but this was unsupported because of the "substantial

variability" among the species of "release coatings encompassed within the scope

of the claims." Appx5835. Thus, defining the claimed release coatings "in terms

of functional features or elements does not suffice in the absence of a disclosure of

structure features or elements of the . . . release coatings which would have the

stated function." *Id.*

In response to the examiner's § 112 rejection, Supernus had the choice of

how to respond. It could have argued that the rejection was improper; it could

have requested an interview with the examiner; it could have amended its claims to

recite some specific structure for the "release coatings which would result in the

claimed release profiles over the claimed period of time." Appx5835. But instead,

Supernus chose to amend its claims to narrow the scope of claim 104 (which

issued as claim 1) from encompassing the broad "release controlling coating"

category to specifically require "a coating material selected from the group

consisting of cellulosic polymers and acrylic polymers." Appx5847. These are the

only two groups of polymers with support in the working examples of the

specification, Appx267 at 7:3-13, and thus by limiting its claims to cellulosic and

acrylic polymers, Supernus was directly addressing the examiner's concern that

that "***claims are broader than the disclosure***" of "several examples . . . of release

controlling coatings and others listed in the specification." Appx5836 (emphasis

added).

Nor is there any doubt that Supernus made this amendment narrowing its

claims to the "group consisting of cellulosic polymers and acrylic polymers" for

reasons related to patentability. In the Applicant Remarks submitted with its

amendment, Supernus acknowledged that Claim 104 "stand[s] rejected for failing
to comply with the written description requirement of the first paragraph of 35
USC § 112" because "the Examiner alleges that the specification fails to
adequately describe . . . release controlling coating." Appx5854. Instead of
contesting that rejection, Supernus told the USPTO that "in the interest of compact
prosecution" (in other words, to get the claims allowed), Supernus was
"amend[ing] the claims to now recite species of the noted genera." *Id.* The
presumption of prosecution history estoppel therefore applies to bar Supernus from
trying to reclaim any coating materials other than the "recite[d] species of the
noted genera," i.e, cellulosic and acrylic polymers.

### 3. The Tangential Relation Exception Does Not Apply.

The District Court erred in finding that Supernus had met its burden of
showing that the tangential relation exception applied in this case. "The tangential
relation exception is 'very narrow'" and only applies to equivalents not within the
original claim scope. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d
1352 (Fed. Cir. 2013) (reversing district court for denying judgment of
noninfringement as a matter of law on prosecution history estoppel). Just as an
"amendment made to avoid prior art that contains the equivalent in question is not
tangential," *Festo II*, 344 F.3d at 1369, an amendment to overcome a § 112
rejection by claiming specifically named polymer coatings identified in the

24

specification—and choosing not to claim others—cannot be called tangential.  *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 1142 (Fed. Cir. 2004) (*en banc*) ("A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112.").

Here, the clear purpose of Supernus's amendment was to overcome a § 112 rejection by claiming specific polymers (cellulosic and acrylic polymers) and surrendering other polymers.  As such, "the amendment bore a direct, not merely tangential, relation to the equivalent" and prosecution history estoppel firmly applies.  *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1316 (Fed. Cir. 2008) ("Because the alleged equivalent focuses on the IGV limitation, the amendment bore a direct, not merely tangential, relation to the equivalent. Tangentiality does not help Honeywell overcome the presumption of surrender.").

The District Court's finding that the tangential relation exception applies relies entirely on a single sentence from the prosecution history stating that "[t]here is substantial variability among the species of enhancing agents, complexing agents and release coatings encompassed within the scope of the claims because the enhancing agents, complexing agents and release coatings have widely differing structures and corresponding biological activities."  Appx5835.  But this argument

is entirely backwards.  The tangential exception looks to whether ***the rationale for***

***the amendment*** is tangential, not whether some statement in the examiner's

rejection is tangential to the equivalent.  *Biagro Western Sales, Inc. v. Grow More,*

*Inc.*, 423 F.3d 1296, 1306 (Fed. Cir. 2005) ("[S]ince the prosecution history shows

no reason for adding an upper limit to the concentration range, Biagro cannot claim

that the rationale for the amendment is merely tangential"); *Felix v. American*

*Honda Motor Co., Inc.*, 562 F.3d 1167, 1184 (Fed. Cir. 2009) ("Felix has identified

no explanation in the prosecution history for the addition of the gasket limitation,

and Felix therefore cannot meet his burden to show that the rationale for adding the

gasket limitation was tangential.").

 While it is true that the Court must consider the "context in which [the

amendment] was made," Appx80, there is nothing in the Applicant's Remarks

submitted with the amendment at issue here that would support Supernus's

tangential exception argument.  To the contrary, Supernus specifically told the

USPTO that the amendment was made "in the interest of compact prosecution" to

address the Examiner's concerns.  Appx5854.  Supernus mentions nothing about

structural features to the claimed coating materials, nor did it try to draft its

amendment to describe the specific coating materials Dr. Khan says are covered by

the claim.  Had it done so, Supremus would have risked another rejection for trying

to define the claimed release coatings "in terms of functional features or elements." Appx5835.

Thus, this case does not present an instance of inartful claim drafting or an ambiguous claim amendment. Had Supernus truly intended to limit its disclaimer to particular (non-cellulosic or non-acrylic) polymers, it was entirely able to do so. For example, Supernus could have made an express reservation in its claim amendment, or offered an explanation by way of argument along with its claim amendment, or drafted its amended claim to describe the structures that it now asserts are covered by its claims.  Yet Supernus did none of these things.

The plain language of the amendment restricts the claimed invention to cellulosic and acrylic polymers without any regard to the structure or corresponding biological activity of any polymer, and Supernus's remarks contemporaneous to its claim amendment place no condition or otherwise inject ambiguity into this clear disclaimer. The public is entitled to take Supernus at its word.

Although this Court has made clear that the tangentiality inquiry is always a case-specific analysis, *see Bio-Rad*, 967 F.3d at 1366, a review of this Court's precedents further supports Torrent's contention that the tangentiality exception should not attach in this case. Paramount is this Court's mandate that "the patentee's objectively apparent reason for the narrowing amendment" must be

"discernible from the prosecution history record." *Id.* at 1365. As described above, the district court eschewed this principle in favor of an erroneous search for a reason that ultimately was untethered from the prosecution history record.

To Torrent's knowledge, this Court has never upheld the application of the tangentiality exception where the prosecution history does not offer an apparent reason for the narrowing amendment. In the absence of a clear explanation for the narrowing amendment, this Court has concluded effectively that the exception is presumed to be unwarranted.

For example, where an applicant attempts to overcome a rejection based on cited prior art, this Court is able to identify an objectively apparent reason for the narrowing amendment. In *Bio-Rad*, this Court noted that the "***inventors argued*** that preventing droplets from sticking to the walls of the microchannels requires the surfactant to be chemically similar to the carrier fluid and chemically different from the channel walls" and that the "inventors therefore amended the claims to make clear that the carrier fluid and the microchannel wall should be chemically distinct." *Id*. at 1365 (emphasis added).

Similarly, in *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282 (Fed. Cir. 2010), this Court considered a case where the patent examiner had rejected the claim at issue, "noting that for purposes of the rejection '[t]he ORFs are assumed to be derived from porcine circovirus, but as written, the claims could encompass ORFs from

28

any organism.'" *Id*. at 1291-92. The patent examiner rejected the claim in view of ORFs from PK/15. The inventors disagreed that these ORFs could be derived from any other organism, and ***argued*** that the specification defined ORFs 1-13 based on the limits of the ORFs in the PCV-2 genome. *Id.* (emphasis added).

Indeed, the limited instances where this Court has upheld the application of the tangentiality exception are confined to cases where the prosecution history shows ***clearly*** whether the narrowing amendment addressed an aspect related to the accused equivalent. *See Funai Elec. Co. v. Daewoo Electcs. Corp.*, 616 F.3d 1357, 1369 (Fed. Cir. 2010) ("It is apparent that the nature of the insulating material was not a factor in the allowance of claim 4, for this aspect was not at issue during prosecution."); *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1378 (Fed. Cir. 2008) ("The prosecution history therefore reveals that in narrowing the claim to overcome the prior art rejections, the focus of the patentees' arguments centered on the method of blocking."); *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed. Cir. 2006) ("The patentee added the 'differentially spaced' limitation to distinguish the diaphragm mouth call from a prior art device."); *see also Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1353-56 (Fed. Cir. 2019); *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1370–71 (Fed. Cir. 2004).

In all of the cases described above, this Court was able to find an apparent reason for the narrowing amendment in the ***prosecution history*** regardless of whether or not that reason ultimately bore no more than a tangential relationship to the accused equivalent. Unlike in cases like *Intervet*, Supernus never countered the patent examiner's § 112 rejection nor offered any explanation for its narrowing amendment. To the contrary, Supernus specifically told the USPTO that the amendment was made "in the interest of compact prosecution" to address the Examiner's concerns. Appx5854. If Supernus's amendment to recite the specific cellulosic and acrylic polymer categories was based on some unrecited structure, it would have "fail[ed] to distinguish the compound from other molecules or agents that can perform the same functions" and thus failed to resolve the examiner's concerns. Appx5835.

In short, Supernus's post-hoc "interpretation of the prosecution history . . . is irrelevant" because it "must prove by a preponderance of the evidence that, based on the prosecution history, the '***objectively apparent reason for the narrowing amendment***' was only tangentially related to the equivalent." *Integrated Tech.*, 734 F.3d at 1359 (quoting *Festo II*, 344 F.3d at 1369). The Court should therefore disregard Supernus's arguments and focus on the clear record of the prosecution history made at the time, which clearly shows the amendment was made to overcome the examiner's § 112 rejection, and not for any other reason. *See Int'l*

*Rectifier Corp. v. IXYS Corp.*, 515 F.3d 1353, 1359 (Fed. Cir. 2008) (ruling that

because the amendment added specific structure to overcome a Section 112

rejection and the asserted equivalent related to the specific structure added by

amendment, the reason could not be deemed tangential).

The District Court, however, relied on its analysis of *Eli Lilly, Bio-Rad*, and

*Amgen Inc. v. Amneal Pharmaceuticals LLC*, 945 F.3d 1368 (Fed. Cir. 2020), in

determining that it could speculate about the unstated reasons for Supernus's

amendment based on the "spirit of the [examiner's] rejection." Appx77-81. The

District Court misreads these cases, however, because they all involved

obviousness or anticipation rejections over the prior art. Thus, the effort to

overcome the prior art provided a starting point for this Court to evaluate the

objective reason for the amendments. By contrast, the rejection at issue here was

made under § 112, because of the "substantial variability" among the species of

"release coatings encompassed within the scope of the claims," and the "absence of

a disclosure of structure features or elements of the . . . release coatings which

would have the stated function." Appx5835.

In particular, the District Court relied heavily on the *Eli Lilly* decision, but

that case does not support the conclusion the District Court attempted to draw from

it. The invention at issue in *Elli Lilly* was "an improved method of treatment with

antifolates, particularly pemetrexed disodium, through supplementation with a

methylmalonic acid lowering agent and folic acid." *Eli Lilly*, 933 F.3d at 1325.  It was known in the prior art that pemetrexed and its pharmaceutically acceptable salt were useful in treating cancer, *id.* at 1324-25, so the invention had nothing to do with whether to administer any particular salt form.  Thus, when Lilly narrowed its claims from claiming "methods of administering an antifolate" to an "improved method for administering pemetrexed disodium," to overcome prior art involving the use of an entirely different antifolate (methotrexate), this Court had no trouble concluding that the recitation of a particular salt form was "inartful" but entirely "prudential in nature and did not need or intend to cede other pemetrexed salts." *Eli Lilly*, 933 F.3d at 1332.  "Indeed, such a relinquishment would effectively dedicate the entirety of Lilly's invention to the public and thereby render the '209 patent worthless, and it would have been irrelevant for distinguishing the prior art." *Id.* at 1333-34.

In sharp contrast to the facts of *Eli Lilly* case, the acrylic and cellulosic polymer limitations are the critical elements to Supernus's patent claims.  The Asserted Claims all require specific results that are achieved through the choice and thickness of the polymer coating.  As the examiner explained in rejecting the original claims under § 112, defining the release coatings "in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the . . . release coatings which would have the stated

function."  Appx5835.  Thus, unlike in the *Lilly* case, there is no risk that holding

Supernus to its drafting choices would render its patents "worthless."

This Court's cases involving the application of the tangential relation

exception in the context of § 112 rejections illustrate the difference.  For example,

in *Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, this Court held that

"the district court erred in reliance on the tangential rebuttal principle to avoid the

doctrine of equivalents" where the "prosecution history explain[ed] that [a] thread

depth limitation was added to capture the manner in which the stabilizer aspect of

the invention operated and thereby overcome the 35 U.S.C. § 112 rejections."  480

F.3d 1335, 1343 (Fed. Cir. 2007).  As the Court explained, the tangential relation

exception could not apply because "the accused equivalent, which d[id] *not* include

threads extending 'to a depth below the top of the stabilizer,'" was within the scope

of the invention surrendered to overcome the § 112 rejection.  *Id.*  Likewise,

Supernus cannot rely on the tangential exception when the entire purpose of its

amendment was to overcome the examiner's § 112 rejection.

The District Court attempted to distinguish *Cross Medical Products and*

*International Rectifier* on the grounds that the structures recited in the claims at

issue in those cases were used to distinguish the invention, but that is equally true

of Supernus's amendment.  Appx87.  What the District Court overlooks is that in

choosing to claim the specific structures of cellulosic and acrylic polymers,

Supernus did create a binary classification, just like in *Cross Medical Products* and *International Rectifier*. The claims, as amended, cover cellulosic and acrylic polymers as distinguished from polymers that are not acrylic or cellulosic. This implication is further buttressed by the fact that Supernus chose to use the closed transition phrase "consisting of" in its amendment. "The phrase 'consisting of' is a term of art in patent law signifying restriction and exclusion." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382–83 (Fed. Cir. 2000). "In simple terms, a drafter uses the phrase 'consisting of' to mean '***I claim what follows and nothing else***,'" and its use "emphasizes the claim's specific limitation to" the recited elements. *Id.* As both Supernus's patent attorneys and the examiner were no doubt aware, "[t]he presumption that a claim term set off by the transitional phrase 'consisting of' is closed to unrecited elements is at least a century old and has been reaffirmed many times by our court and other courts," and by using that transition phrase, Supernus helped ensure that its amended claims would overcome the examiner's § 112 rejection. *See Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016).

Thus, the District Court's argument that the categories of acrylic and vinyl polymers may theoretically not be mutually exclusive is ultimately irrelevant to whether the tangential exception applies here because polyvinyl acetate, the

polymer used in the accused product, is not an acrylic polymer, as the District

Court correctly found. Appx70.

The prosecution history of a patent, including the applicant's claim

amendments and arguments, serves an important notice function upon which the

public may depend to understand the metes and bounds of the patentee's exclusive

rights. *See Festo*, 535 U.S. at 731. Indeed, this is exactly what Torrent relied upon

in undertaking a legitimate design-around of the Asserted Patents in the lengthy,

seven-year development of sustained release topiramate formulations with a

coating that contained polyvinyl acetate instead of a cellulosic or acrylic polymer.

Appx2313 at 239:23-240:3; Appx3947 ("Formulation strategies were proposed

based on the patent claims regarding polymer and three components system with

respect to different release profile. The patent claim restricts the use of polymer

from cellulose and acrylic acid category hence, polyvinyl acetate was used as

release controlling agent along with Povidone K-30 as pore former."). *Cf. Pharma*

*Tech. Sols, Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) ("The

relevant inquiry is whether a competitor would reasonably believe that the

applicant had surrendered the relevant subject matter."). Yet even now, after a full

trial, the public has no guidance as to the metes and bounds of Supernus's claim.

The district court's conclusion that the tangential relation exception applies

in this case to overcome the presumption of prosecution history estoppel is

unsustainable as a matter of law. Because the district court correctly concluded that

amendment-based prosecution history estoppel would otherwise bar Supernus's

assertion of the doctrine of equivalents to find infringement of the Asserted Patents

by the Torrent ANDA products, this Court should reverse the district court's

judgment regarding infringement under the doctrine of equivalents.

**B.      Even If Prosecution History Estoppel Did Not Apply (Which It Clearly Does), Torrent's ANDA Products Do Not Infringe Under The Doctrine Of Equivalents.**

Even if prosecution history estoppel did not apply here, Supernus's doctrine

of equivalents argument fails on the merits.  Supernus failed to "provide

particularized testimony and linking argument as to the 'insubstantiality of the

differences' between the claimed invention and the accused device or process, or

with respect to the function, way, result test." *AquaTex Indus. v. Techniche Sols.*,

479 F.3d 1320, 1328 (Fed. Cir. 2007) (quoting *Texas Instruments, Inc. v. Cypress

Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)).  Supernus cannot

show infringement under the doctrine of equivalents.

To show infringement under the doctrine of equivalents, Supernus must

show that the asserted equivalent "performs substantially the same function in

substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v.

Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). "Each element contained in a

patent claim is deemed material to defining the scope of the patented invention,

36

and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F. 3d 1084, 1089 (Fed. Cir. 1998) (quoting *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)). In other words, if a claim limitation must play a role in the context of the specific claim language, then an accused device which cannot play that role, or which plays a substantially different role, cannot infringe under the doctrine of equivalents. *Id.*

Supernus failed to meet this burden of proof. Supernus's expert, Dr. Mansoor Khan, testified that the function of the acrylic polymers described in the patent specification was "to control the release . . . of drug from the formulation" by creating a "barrier that will control the entry of aqueous fluid into the coated pellets and drug coating layer." Appx3275 at 362:13-25. As the specification makes clear, however, the "release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population." Appx264 at 2:28-34; Appx266 at 6:42-45. As the only required element of the extended release components, the recited cellulosic and acrylic polymer's function is to allow the active ingredient to be "released from the formulation at a sustained rate along a pre-determined release profile." Appx264 at 2:23-25.

37

Dr. Khan ignored this function, which is described in the Asserted Patents, and relied on his personal experience with polymer coatings. Appx3281 at 368:14-16 ("I know the way. I know the way. I know the both, the poly acetate way, I know the poly methacrylate way of --acrylate or methacrylate way –"). This argument, however, fails to "focus[] on an examination of the claim and the explanation of it found in the written description of the patent" as this Court has required. *See AquaTex*, 479 F.3d at 1326; *see also Warner–Jenkinson*, 520 U.S. at 40.

Moreover, Dr. Khan admitted that "[m]any of the acrylic polymers known to formulators do not function in the way that [he] described." Appx3286 at 373:18-21; *see also* Appx3289 at 376:10-16 (Q: "Eudragit® E is 'an acrylic polymer and it does not function in the way that you described, correct? A: Yes, it doesn't.'"). Thus, even though the language in the asserted claims just says, "acrylic polymers," Dr. Khan admitted that he excluded hundreds, or maybe thousands, of acrylic polymers that do not function in the way that he described in his function-way-result testimony. Appx3289-3290 at 376:10-377:6.

The specification also explains the "way" the identified function and result is achieved. The specification states that "there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% *in vitro* release time" and that "[p]re-determined target profiles can therefore be

38

achieved by the interpolation or extrapolation of the relationship curve" as shown in Figures 1 and 2 of the patents. Appx267 at 7:28-47. The specification also explains that to prepare the claimed sustained release formulations "wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile," the POSA must: (1) "determin[e] the desired release profile"; (2) "determin[e] specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile"; and (3) "incorporat[e]the specified amounts of the components into the formulation." Appx264 at 2:46-58.

Dr. Khan, however, did not analyze whether Torrent's ANDA Products obtained any predetermined release profile based on modifying the coating thickness in the way described in the patent because he thought the predetermined release profile was "not very important." Appx3280 at 367:11-20. Indeed, he did not even test Torrent's ANDA products. Appx3269-3270 at 356:20-357:1; Appx3490 at 577:4-8. Thus, because a "patentee must . . . provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test," Supernus cannot show infringement under the doctrine of equivalents. *See AquaTex*, 479 F.3d at 1328 (quoting *Texas Instruments*, 90 F.3d 1558).

To the extent the district court's conclusion may have been based on mere bioequivalency, this Court has held that it is improper to base a finding of infringement under the doctrine of equivalents on this aspect alone. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) ("[B]ioequivalency and equivalent infringement are different inquiries. . . . Different attributes of a given product may thus be relevant to bioequivalency but not equivalent infringement, and vice versa."). If bioequivalency were the standard, virtually all proposed ANDA products would be infringing the claims of the asserted patents. But they do not. *See, e.g., Reckitt Benckiser LLC v. Amneal Pharm. LLC*, 276 F. Supp. 3d 261, 2911 (D.N.J. 2017) (holding that initial rapid dissolution of guaifenesin from the surface of defendants' sustained-release tablets was not equivalent to an immediate-release portion even though the tablets were bioequivalent).

This Court has held that "the identification of the elements of the function, way, result test **solely** 'entails an examination of the claim and the explanation of it found in the written description of the patent,' as well as '[i]n some cases[ ] the patent's prosecution history.'" *AquaTex*, 479 F.3d at 1328 (quoting *Vehicular Techs.*, 141 F.3d at 1090). The District Court, however, reasoned that when the specification is "silent" as to the function, way, and result of the claim limitation, it is appropriate to rely on extrinsic evidence. Appx95. This was legal error because

the Asserted Patents clearly describe the intended function, way, and result of the claimed polymer coatings.   Thus, the District Court's analysis should have "focused on an examination of the claim and the explanation of it found in the written description of the patent." *Plastic Omnium Advanced Innovation & Rsch v. Donghee Am., Inc.*, 943 F.3d 929, 938 (Fed. Cir. 2019).

The District Court also erred in dismissing the significance of the claimed polymers.  The District Court reasoned that the polymers were just one of the elements that could influence the release rate of drug from the formulation. Appx93.  Though the specification points out that other factors can affect the rate of release of the drug from the formulation, the choice of polymer is the only one required by the claims.  Appx273.  Furthermore, the adjustment of polymer coating thickness, with and without a pore former, is the only method of adjusting the release rate of the formulation described in the working examples of the specification.  Appx267 at 7:4-47.

With respect to insubstantial differences, the District Court relied on a comparison of polymethacrylate and polyvinyl acetate rather than a comparison of polyvinyl acetate to the claimed acrylic polymer genus.  Appx97-98.  Dr. Khan, however, admitted at trial that he chose this particular comparison because the category of acrylic and methacrylic polymers is "so wide, there's so many of them," so he "wanted something similar to this one so that I can draw comparison

41

to say it doesn't make a big difference, and structurally, and they're not expected to show any biological difference." Appx3314-3315. Without expert testimony to support the conclusion that polyvinyl acetate is substantially similar to the claimed genus, rather than a single, cherry-picked example, the District Court's conclusion was clearly erroneous.

## II. The District Court Erred In Holding That The Asserted Claims Were Not Invalid Under 35 U.S.C. § 112(a) For Lack of Enablement And Inadequate Written Description.

The Asserted claims are invalid under § 112, which states that a patent's specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the [invention]." 35 U.S.C. § 112(a). There are two components to this requirement. First, the specification must contain a "written description" of the invention that "convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate[s] that by disclosure in the specification of the patent." *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F. 4th 1333, 1341-42 (Fed. Cir. 2021). Second, the specification must "enable" a POSA to "make and use" the full scope of the invention. 35 U.S.C. § 112(a).

Enablement serves the dual function in the patent system of preventing both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. *See MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). Similarly, the purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification. *See Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000). The Asserted Claims satisfy neither the enablement nor the written description requirements and are therefore invalid.

### A. The Asserted Patents Do Not Teach a POSA How to Make and Use the Full Scope of the Claimed Invention.

#### 1. Legal Framework

A patent is invalid if it cannot enable a POSA to "make and use" the claimed invention. 35 U.S.C. § 112(a). A "challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014). To determine if experimentation is "undue," courts consider the so-called *Wands* factors:

> (1) the quantity of experimentation necessary, (2) the amount of
>
> direction or guidance presented, (3) the presence or absence of

43

working examples, (4) the nature of the invention, (5) the state of the

prior art, (6) the relative skill of those in the art, (7) the predictability

or unpredictability of the art, and (8) the breadth of the claims.

*Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013)

(quoting *Wands*, 858 F.2d at 737). A reasonable amount of routine experimentation

is permissive. *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir.

2010).

"Enabling the full scope of each claim is part of the *quid pro quo* of the

patent bargain," and the "scope of the claims must be less than or equal to the

scope of the enablement" to "ensure[ ] that the public knowledge is enriched by the

patent specification to a degree at least commensurate with the scope of the

claims." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008) (citations

omitted). Importantly, if a patent claims "an entire class of . . . compositions of

matter," like the patents asserted in this case do, "the patent's specification must

enable a person skilled in the art to make and use the entire class." *Amgen*, 598

U.S. at 610. Thus, as the Supreme Court recently made crystal clear, "the

specification must enable the full scope of the invention as defined by its claims."

*Id.* In other words, "the more one claims, the more one must enable." *Id.*

44

## 2.    The Asserted Claims Are Not Enabled.

At trial, Dr. Khan acknowledged that the Asserted Patents are "pretty broad and pretty big patent[s]," that are "not just about formulation but also about how it performs." Appx3566 at 653:3-6. The Asserted Claims cover formulations intended to treat an incredibly broad variety of conditions, including "but are not limited to, epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourette's syndrome, infantile spasms, perinatal hypoxia ischemia and related damage, chronic neurodegenerative disorders, acute neurodegeneration, and ALS," as well as various psychiatric disorders such as "bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, ADHD, impulse control disorders, border line personality disorder, addiction, and autism." Appx270 at 13:26-14:9.

The claims cover single bead formulations, as well as multiple bead formulation, and require at least one extended release component with a coating materials "selected from the groups consisting of cellulosic polymers and acrylic polymers," and also allow optional immediate release components, pore formers, complexing agents, enhancing agents, and other ingredients, all of which will have an effect on the release rate of the drug.  Appx267, Appx273.

Under the district court's claim construction, the extended release component must release 80% of the active ingredient within a "predetermined period of time," i.e., "the period of time necessary to achieve the 'predetermined release profile' for the particular 'sustained release' formulation," which will "differ based on the purpose of the dosage administration." Appx1413-1414. In short, Supernus "seeks to monopolize an entire class of things defined by their function," in this case, sustained release formulations that achieve a predetermined release profile. *See Amgen*, 143 S. Ct. at 1256 ("For if our cases teach anything, it is that the more a party claims, the broader the monopoly it demands, the more it must enable.").

Thus, in order to be enabled for the full scope of the claims, a POSA must be able to make and use formulations of topiramate that achieve the appropriate "predetermined release rate" for these diverse conditions, as well as the *in vivo* "maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose." Appx274. The patents, however, provide just one set of *in vitro* experiments (Figures 1 & 2) and one example with *in vivo* results (Example 6). As explained below, these examples do not enable the breadth of the claims.

To start, Supernus admitted during prosecution that the "number of possible populations of beads available to the pharmacologist is ***near infinite***." Appx5969. Dr. Khan and Dr. Bhatt both agreed that as a result, one could make "literally

46

hundreds and thousands of formulations, and it can take years and years to do that." Appx3047; Appx3584-85. Despite this incredible breadth, Supernus's sole fact witness conceded that Supernus could have disclosed hundreds of similar examples, but chose to only disclose seven formulations in the asserted patents. Appx3039 at 126:15-18, Appx3048 at 135:6-14. This stark disconnect between what the asserted patents claim (near infinite number of formulations) and what the asserted patents actually teach (seven formulations) should compel the conclusion that the Asserted Claims are invalid for lack of enablement.

The District Court dismissed Supernus's comment that the number of beads is near infinite, suggesting that it was "taken out of context" because it came from the prosecution of the '475 application which was "not asserted or even directly related to this case." Appx103. Yet all of the Asserted Patents are continuations of the '475 application, and Supernus's own witnesses did not dispute the truth of this statement. *See* Appx255; Appx3047 at 134:3-9. The District Court also mistakenly believed that the claims at issue in the'475 application "differ from those at issue in a meaningful way" because they "recite specific combination-ratios of multi-bead formulations as opposed to single-bead formulations, which the Patents-in-Suit describe." Appx103 (internal citations omitted).

This conclusion is clearly erroneous, as the Asserted Claims cover multi-bead formulations. *See, e.g.*, Appx274. Moreover, the District Court's reasoning

here is directly at odds with its conclusion that a POSA could rely on Example 6 of the specification to make and use the claimed formulation, as Example 6 concerns the selection of the relative proportions of the bead populations needed to arrive at a target formulation. Appx107. The District Court also cites to the specification's instruction to determine the appropriate proportions of the bead population necessary to arrive at the targeted release profile. Appx108 (quoting Appx269 at 11:25-36). Because the District Court erroneously believed that the claims were limited to single bead formulations, it vastly underestimated what would be required to enable the full scope of the claims.

Moreover, Torrent's expert, Dr. Linda Felton, explained at trial that the specification not only omitted specific critical information that might have guided a POSA but contained unhelpful and confusing information that would have required a POSA to undertake a similar or greater amount of effort (in particular, *in vivo* clinical trials) as the inventors took to achieve the claimed inventions. Appx3523 at 610:13-21.

Most critically, without specific information about the dissolution parameters and method that Supernus used to generate the *in vitro* data in Figures 1 and 2, a POSA could not rely on that information to determine which formulations described in Example 1 might be acceptable under Example 6 (the only example in the specification providing in vivo results). Appx3515-3516 at 602:25-603:5. As

Dr. Felton explained, the results a POSA obtained from trying to follow the patent would be "meaningless" if the POSA is "not using the exact same methodology" because "it would be like comparing apples and oranges." Appx3514-3516 at 601:23-603:5. While both Dr. Bhatt and Dr. Khan claimed that a POSA could look up the appropriate dissolution method, tellingly neither one of them testified as to the actual method that should be used. Indeed, Dr. Bhatt only testified that Supernus "carried out dissolution [studies] to calculate the release profiles from the beads using appropriate media and using appropriate dissolution bath." *Id.* (quoting Appx3031 at 118:8-14).

Dr. Felton's testimony that without knowing the exact dissolution methodology that Supernus used, the data in Figures 1 and 2 would be meaningless, and therefore, a POSA would have been unable to follow (much less replicate) the examples in the patents, was unrebutted. Appx3515-3516 at 602:25-603:5. Instead, at trial, Supernus ignored this critical deficiency and testified only that a POSA could figure out his or her own methodology when developing a new formulation. *See* Appx3022 at 109:5-10, Appx3023 at 110:9-24, Appx3024 at 111:2-8. But it is undisputed that the patents do not disclose the dissolution methodology that Supernus used. *See* Appx3031 at 118:6-14.

The District Court dismissed the importance of the lack of meaningful information as to the dissolution method used in Figures 1 and 2 and Example 6,

faulting "Dr. Felton's refrain that using another dissolution methodology would produce "meaningless" data and "be like comparing apples and oranges." Appx123. Dr. Felton's point, however, did not require extensive elaboration. Just as tea or sugar will dissolve slower in cold water than in hot water, and will dissolve faster if stirred, the method of dissolution will clearly affect the time it takes to achieve dissolution as a matter of common sense.

Moreover, Dr. Khan conceded that the choice of dissolution media will affect the release rate of a drug from formulation. Appx3571. Thus, as Dr. Felton testified, "while the person of ordinary skill is familiar with the dissolution test and could recreate his or her own test, if they're not using the exact same methodology, they're not going to get an equivalent T80 [time to 80 percent dissolution] to be able to compare. As I said, it would be like comparing apples and oranges." Appx3515; *see also* Appx3516 ("If I have to create my own dissolution test method and I do that and I come up with a T80 for some beads that I made, that T80 is meaningless in reference to this patent, because I'm not comparing apples to apples.").

Dr. Felton also testified that the asserted patents lacked any connection between the formulations of the two critical examples, Examples 1 and 6. Appx3511 at 598:13-17. These are the only two examples in the patent that involve *in vitro* or *in vivo* experiments. The other examples merely describe well-known

50

methods of preparing extended release beads that are not the alleged novel aspects of the invention. In other words, the Asserted Patents provided no working examples to help inform a POSA, who instead would have had to undertake substantial, unguided development efforts, including *in vivo* pharmacokinetics clinical studies well beyond the skill of a POSA. Appx3516-3517 at 603:23-604:4; *see also* Appx3576-3585 at 663:8-672:6. As Dr. Felton testified, that "would be the equivalent of creating an entire new drug delivery system and testing that system *in vivo*" and is clearly undue under any reasonable definition of that term. Appx3517 at 604:20-22, Appx3516-3517 at 603:23-604:4. The application of the *Wands* factors to this case also weighs in favor of a finding of undue experimentation, as Dr. Felton testified. *See* Appx3519 at 606:14-16, Appx3519-3521 at 606:20-608:14. Dr. Felton testified that the complexity of the invention coupled with the minimal and confusing teaching of the asserted patents all weighed in favor of a finding of undue experimentation, especially in view of the near infinite claim scope. *Id.*

In the most recent Supreme Court case to address enablement, *Amgen Inc. v. Sanofi*, the patent owner tried "to claim for itself an entire universe of antibodies," arguing that "scientists can make and use every undisclosed but functional antibody if they simply follow the company's roadmap or its proposal for conservative substitution." *Amgen*, at 598 U.S. at 613.  The Supreme Court

rejected those arguments, reasoning that the so-called roadmap "amount[s] to little more than two research assignments, . . . describ[ing] step-by-step Amgen's own trial-and-error method for finding functional antibodies" and a substitution method would require a POSA to "test the resulting antibodies to see if they" did work. *Id.* That is not enablement, "it is a hunting license." *Id.* at 614–15 (likening this approach to a brute force method to find successful combinations to a combination lock).

Similar to *Amgen*, the undisputed facts here make clear that the Asserted Claims include a functional limitation and encompass an enormous number of possible formulations. Despite this claim breadth, Supernus chose to describe only seven exemplary formulations. And as Dr. Felton testified, the patents disclosed only generic (and already known) methods for making coated beads and for *in vivo* testing but withheld the critical information a POSA would need to make use of the *in vitro* data in the patent or to understand the relationship between Examples 1 and 6.

Supernus did not dispute the substantial time and cost of a drug formulation development program requiring *in vivo* human trials, admitting that Supernus's own efforts took "years and years," Appx3019 at 106:17-25, Appx3047 at 134:3-9, and acknowledging that Torrent took seven years to develop its product. Appx2313 at 239:23-240:3. Moreover, a POSA could not rely on the *in vitro* data provided in

Figures 1 and 2 because the "release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population," Appx264 at 2:28-34; Appx266 at 6:42-45, and as Dr. Khan acknowledged, there are many variables that would impact the release rate of the drug from the formulation. Appx3566-3574 at 653:16-661:11. Indeed, although he attempted to walk back his deposition testimony that it is hard for anybody to know what variables and factors affect the release of drug from the coated pellets or beads, *see* Appx3570 at 657:5-6 ("Counsel, it's likely that I didn't hear that 'asserted patents' words very clearly at the time it's likely."), *id.* at 657:11 ("So either I didn't understand the question very well, . . .")—despite never serving any errata—Dr. Khan did concede that he could not predict the rate of release for a given formulation without running his own experiments. Appx3572-3574 at 659:5-661:11.

Instead, Dr. Khan suggests that a POSA should simply invent and develop his or her own formulation, Appx3574-3576 at 661:7-663:7. Moreover, the District Court's suggestion performing an *in vivo* clinical study is within the skill of the POSA is not supported by the evidence. *See* Appx127. As Dr. Khan conceded, three of his students got their Ph.D.s just from working on the individual variables impacting dissolution, Appx3567 at 654:6-21, and Dr. Khan himself only conducted *in vivo* work as part of his own Ph.D. research. Appx3546. Of course,

53

the POSA, as defined by the Court here, does not have a Ph.D., but rather a bachelor's degree with approximately three to five years of experience in a drug delivery technology or related field, Appx1397, and as such would not be able to conduct a clinical trial. As Dr. Felton testified, "using the definition of a POSA in this particular case, the POSA with a bachelor's degree and a few years' experience making drug products, that is not a person who is capable of doing a clinical study, and, therefore, it's outside their skill set. I would hold myself out and have held myself out as a person of more than the skill for this case, and I have never conducted a clinical trial." Appx3526 at 613:7-20.

The District Court distinguished *Amgen* on the ground that "unlike *Amgen's* claim, the Asserted Claims do not claim an 'entire genus' of release-controlling coatings regardless of physical characteristics or chemical properties," instead "[t]hey claim sustained release formulations of topiramate comprising an XR component with cellulosic or acrylic polymers." Appx125. But the District Court's own doctrine of equivalents analysis expands the claims to any polymer that does not have a "widely differing structure" or biological activity. Appx82

The District Court also distinguished *Amgen* on the ground that the "Patents-in-Suit do not require 'painstaking experimentation to see what works' as Amgen's patent required, relying on Dr. Khan's testimony that he would be able to perform

his own dissolution tests.  Appx125.  Relying again on Dr. Khan, the District Court concluded that a POSA could also conduct an *in vivo* clinical trial.

Even if this were true, it was legal error to hold that the Asserted Claims were enabled by the skills of a POSA.   It is not enough that a POSA "might have been able to produce [the invention] by building upon the teachings of the [specification]." *Goeddel v. Sugano*, 617 F.3d 1350, 1356 (Fed. Cir. 2010). Rather, "[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Auto. Techs.*, 501 F.3d at 1283.  Thus, as this Court has repeatedly held, a patentee "cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification." *ALZA*, 603 F.3d at 941.  Moreover, even if a POSA could rely on Example 6 as the District Court suggests, that example provides guidance for targeting only a single release profile.  *See* Appx272-73 (comparing the example formulation to twice-a-day dosed Topamax).

Fundamentally, to make and use the full scope of the claimed inventions, Dr. Khan's approach, which the District Court erroneously endorsed, amounts "to little more than two research assignments," the *in vitro* and *in vivo* experiments, mirroring Supernus's owns "trial-and-error method for finding" suitable sustained release formulations of topiramate.  *Amgen*, 598 U.S. at 614. As the Supreme

Court recently emphasized, "Section 112 of the Patent Act reflects Congress's judgment that if an inventor claims a lot, but enables only a little, the public does not receive its benefit of the bargain." *Id.* at 616. The application of the law to the facts here compels a ruling of invalidity for all the asserted patent claims because Supernus failed to enable the admittedly "near infinite" breadth of these claims.

### B.    The Asserted Patents Do Not Provide a Written Description Sufficient For a POSA To Recognize the Inventors Were in Possession of the Full Scope of the Claimed Invention.

The district court also committed reversible error in concluding that the Asserted Patents were not invalid under 35 U.S.C. § 112(a) for inadequate written description. Under § 112(a), a patent's "description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (internal citation, quotation marks, and brackets omitted).

Although enablement and written description are distinct requirements under 35 U.S.C. § 112, "written description and enablement often rise and fall together" on the same facts. *See Ariad Pharms., Inc.*, 598 F.3d at 1352 (en banc). Indeed, the District Court incorporated its discussion of enablement into its written description analysis. Appx129 ("Much of the Court's enablement discussion also applies to Torrent's written-description challenge."). Thus, for much the same

reasons that the asserted claims are invalid for lack of enablement, they are also

invalid for lack of written description.

> **1.    The Written Description Requirement Requires A Description Showing That the Inventors Had Possession of the Claimed Invention.**

"To satisfy the written description requirement, a patent's specification

must 'reasonably convey[ ] to those skilled in the art that the inventor had

possession of the claimed subject matter as of the filing date.'" *Novartis Pharms.*

*Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (quoting

*Ariad Pharms.*, 598 F.3d at 1351). "[W]hether a patent complies with the written

description requirement will necessarily vary depending on the context.

Specifically, the level of detail required . . . varies depending on the nature and

scope of the claims and on the complexity and predictability of the relevant

technology." *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 380 (D.N.J.

2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020) (quoting *Ariad Pharms.*, 598 F.3d at

1351). The party challenging a patent's written description must do so through

clear and convincing evidence. *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d

1052, 1072 (Fed. Cir. 2005).

The touchstone of written description is whether a POSA may reasonably

conclude from the patent specification that the inventors had possession of the full

scope of the claimed invention when the patent application was filed. *See Ariad*

*Pharms*, 598 F.3d at 1350 ("[M]erely drawing a fence around the outer limits of a purported genus is not an adequate substitute for describing a variety of materials constituting the genus and showing that one has invented a genus and not just a species.").

### 2. The District Court Clearly Erred By Finding That The Asserted Claims Were Supported By Adequate Written Description.

The specification teaches that to prepare the claimed sustained release formulations "wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile," a POSA must: (1) "determin[e] the desired release profile"; (2) "determin[e] specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile;" and (3) "incorporat[e]the specified amounts of the components into the formulation." Appx264 at 2:46-58. A POSA must also prepare the individual extended release components themselves. The specification teaches "the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating)." Appx266 at 6:42-45 at 6:39-42. The "release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population." *Id.* at 2:28-34.

Finally, the Asserted Claims require that the formulations achieve certain *in vitro* and *in vivo* results. Under the Court's claim construction, the extended release component "releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released ***in vitro*** in the predetermined period of time." Appx1421. The Asserted Claims also require that the extended release component exhibits a specific ***in vivo*** result, i.e., a "maximum plasma concentration of topiramate *in vivo* at 16 or more hours after a single initial dose." Appx274 at claim 14.

This Court has made clear that "when the inventor expressly claims [a] result, . . . that result must be supported by adequate disclosure in the specification." *Nuvo Pharms.*, 923 F.3d at 1384. However, the only *in vivo* results in the entire specification are provided in Example 6. Appx272-273; Appx3509 at 596:7-9. Example 6, however, does not contain any *in vitro* results for the tested formulations and therefore cannot show that the extended release components used in Example 6 were "adjusted in such a way that 80% of the active ingredient is released *in vitro* in the predetermined period of time." Appx1421. Indeed, Example 6 expressly disclaims the need for the extended release components to achieve any *in vitro* results, stating that the extended release components were "selected in such a way as to be defined by ***at least one of the three following sets of conditions***,"

listing two *in vivo* criteria and one *in vitro* criteria based on the time required for 80% of the active ingredient to be released *in vitro*. Appx272 at 18:36-56.

Instead, the specification shows that the beads chosen met one of the *in vivo* criteria—not the *in vitro* requirement. *Id.* at 18:29-30 ("The single dose topiramate plasma concentration profiles for XR1, XR2 and XR3 are shown in FIG. 3."). And while Figures 1 and 2 provide some *in vitro* data for a very limited set of extended release beads, the "release controlling coating is specific for every population of beads," Appx264 at 2:28-34; Appx266 at 6:42-45, and the composition of the extended release components tested in those figures is not given in the patent.

In fact, the only place in which the composition of extended release beads are described is in Table 1 of Example 1, which Dr. Khan concedes will not match the release profile of the components in Example 6 designated as XR1, XR2, and XR3 because "their slope and the intercept value, and even the relationship will change" when the POSA makes any changes to the bead formulation. Appx3617-3621 at 704:16-708:8 ("You cannot apply one going to the other set."); Appx107 ("No one disputes that none of the 13 exemplary beads in Table 1 directly corresponds to any of the three beads designated as XR1, XR2, and XR3 in Example 6").

Moreover, the claimed invention is much broader than the single *in vitro* release profile achieved (but not shown) in Example 6. As described above, the

patents assert that the claimed formulations "can be selectively adjusted, respectively, to release the active ingredient along a pre-determined release profile." Appx255. The Asserted Patents suggest that this can be achieved using a "mathematical relationship [that exists] between the release controlling coating level among the cured beads and the 80% *in vitro* release time." Appx267 at 7:28-31. But even if the specification provided support for such a relationship using one particular coating material (ethyl cellulose), it does not show that the relationship would hold for all claimed coating materials. This Court has recognized that "[t]he description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997). Thus, there is no written description support for the broader invention claimed in the Asserted Patents.

Likewise, while the Asserted Claims encompass formulations that use a single extended release component, there is no support in the specification showing that a single-component formulation could be used to achieve a target predetermined release profile. As the specification describes, the predetermined release profile is achieved by "determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile," Appx264 at 2:46-58; Appx269 at 11:25-36, and all

of the formulations tested in the patent contained either two extended release bead formulations or an extended release bead and an immediate release bead. Appx273 at 19:13-19. Moreover, during prosecution of the parent application, Supernus specifically distinguished prior art based on the fact that the prior art references "disclose topiramate preparations that comprise a uniform XR component (e.g., a single bead or granule population)." Appx5967.

Moreover, even if a POSA could assume that the in vitro results described in Figures 1 & 2 correlated to the XR1, XR2, and XR3 bead population criteria described in Example 6, Example 6 does not show that any of those bead populations could be used on their own to create a successful formulation as no single-bead formulations were ever tested *in vivo*. According to the specification and the District Court's claim construction, the claimed invention allows the POSA to target the predetermined release profile.  Example 6, however, only targeted a single release profile – an extended release profile bioequivalent to a twice-day-dose immediate release formulation.  Appx272 at 18:33-36; Appx273 at 19:13-18. There is no support in Example 6 that a single bead formulation would have been able to achieve even that targeted release profile, let alone the breadth of release profiles a POSA could select to target.

Similar to the case in *Idenix Pharms. LLC v. Gilead Sciences Inc.*, 941 F.3d 1149, 1160-63, 1165 (Fed. Cir. 2019), where the asserted patents disclosed 18

formulas of the claimed genus and were found to lack written description, the

asserted patents here disclosed only 7 formulations meeting the *in vivo*

requirements of the claims. Supernus told the USPTO that the possible

combinations were "near infinite." Appx5969.  Supernus also admitted that it could

have disclosed hundreds of similar examples, but apparently chose not to do so.

Appx3039 at  126:15-18. Thus, the Asserted Patents do not reasonably convey that

the inventors had possession of the full breadth of the claimed subject matter.

Citing this Court's precedents teaching that there are no "bright-line rules

governing, for example, the number of species that must be disclosed to describe a

genus claim" the District Court wholesale dismissed this deficiency.  The extent of

the District Court's reasoning was that a "patent's disclosing a handful of examples

for farreaching claims is not in itself improper."  Appx130.  While true enough, the

question before the District Court was whether the seven examples disclosed in the

specification of the Asserted Patents was sufficient written description given the

breadth of the Asserted Claims.  The District Court's failure to meaningfully

engage with this analysis was clear error.

## CONCLUSION

This Court should reverse the district court's judgment and hold that

prosecution history estoppel bars the application of the doctrine of equivalents in

this case as a matter of law, and therefore, Torrent does not infringe the Asserted

Patents, and that the Asserted Claims are invalid under 35 U.S.C. § 112(a) for lack

of enablement and inadequate written description.

Respectfully submitted,

June 6, 2024

<div style="margin-left:50%">

*/s/ A. Neal Seth*
A. Neal Seth
Wesley E. Weeks
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Attorneys for Defendants-Appellants*
*Torrent Pharmaceuticals Ltd. and*
*Torrent Pharma Inc*

</div>

# ADDENDUM

## TABLE OF CONTENTS
## ADDENDUM

No. 2024-1606

| Description | Appx Pages |
|---|---|
| Final Judgment (Feb. 22, 2024) (Dkt. No. 189) | Appx1–4 |
| Order (Jan. 30, 2024) (Dkt. No. 187) (21-6964) | Appx5–6 |
| Order (Jan. 30, 2024) (Dkt. No. 37) (3:21-cv-14268) | Appx7–8 |
| Opinion (Jan. 30, 2024) (Dkt. No. 186) (21-6964) | Appx9–131 |
| Opinion (Jan. 30, 2024) (Dkt. No. 36) (3:21-cv-14268) | Appx132–254 |
| United States Patent No. 8,992,989 (Mar. 31, 2015) | Appx255–276 |
| United States Patent No. 9,549,940 (Jan. 24, 2017) | Appx277–298 |
| United States Patent No. 9,622,983 (Apr. 18, 2017) | Appx299–321 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**SUPERNUS PHARMACEUTICALS, INC.,**

          **Plaintiff,**

    v.

**TORRENT PHARMACEUTICALS LTD. and
TORRENT PHARMA INC.,**

          **Defendants.**

**Civil Action No. 21-6964 (GC)(DEA)
Civil Action No. 21-14268 (GC)(DEA)
(consolidated)**

**(Filed Electronically)**

## FINAL JUDGMENT

WHEREAS, Plaintiff Supernus Pharmaceuticals, Inc. ("Supernus") asserted that the submission of Abbreviated New Drug Application ("ANDA") No. 215918 by Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (collectively "Torrent," and together with Supernus, the "Parties") for generic topiramate extended-release capsules, 25 mg, 50 mg, 100 mg, and 200 mg ("Torrent's ANDA Products") infringed United States Patent Nos. 8,992,989 ("the '989 patent"), 9,549,940 ("the '940 patent"), and 9,622,983 ("the '983 patent");

WHEREAS, Supernus further asserted that the commercial manufacture, use, offer to sell, sale, or importation of Torrent's ANDA Products, if approved by the United States Food and Drug Administration ("FDA") prior to the expiration of the '989 patent, the '940 patent, and the '983 patent, would infringe those patents;

WHEREAS, this action was tried before the Court on July 31, 2023, August 1, 2023, August 2, 2023, and August 3, 2023;

WHEREAS, following trial, the parties submitted post-trial briefs and proposed findings of fact (ECF Nos. 169, 170, and 171);

WHEREAS, after reviewing the parties' post-trial submissions and hearing closing arguments on October 4, 2023, the Court issued its Opinion (ECF No.186) and Order (ECF No. 187) on January 30, 2024, finding that all of the asserted claims of the '989 patent, the '940 patent, and the '983 patent were infringed and not invalid;

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.      This Court has jurisdiction over the Parties and subject matter of this action.

2.      Final Judgment is entered in favor of Supernus and against Torrent on all claims and counterclaims with respect to the '989 patent.  Torrent's ANDA Products that are the subject

1

Appx2

of Torrent's ANDA No. 215918 infringe claim 14 of the '989 patent. Claim 14 of the '989 patent is not invalid.

3.       Final Judgment is entered in favor of Supernus and against Torrent on all claims and counterclaims with respect to the '940 patent. Torrent's ANDA Products that are the subject of Torrent's ANDA No. 215918 infringe claim 14 of the '940 patent. Claim 14 of the '940 patent is not invalid.

4.       Final Judgment is entered in favor of Supernus and against Torrent on all claims and counterclaims with respect to the '983 patent. Torrent's ANDA Products that are the subject of Torrent's ANDA No. 215918 infringe claims 13 and 23 of the '983 patent. Claims 13 and 23 of the '983 patent are not invalid.

5.       Pursuant to 35 U.S.C. § 271(e)(4)(A) the effective date of any approval of Torrent's ANDA No. 215918 shall be no earlier than the latest of the expiration date of the '989 patent, the expiration date of the '940 patent, and the expiration date of '983 patent, including any extensions under 35 U.S.C. § 156.

6.       Pursuant to 35 U.S.C. § 271(e)(4)(B) Torrent and its officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with any of them, are hereby enjoined from commercially manufacturing, using, offering to sell, or selling within the United States, or importing into the United States Torrent's ANDA Products until the expiration of the '989 patent, the '940 patent, and the '983 patent, including any extensions under 35 U.S.C. § 156.

7.       Torrent shall (i) promptly inform the U.S. Food and Drug Administration of this Final Judgment and that, for ANDA No. 215918, a final judgment has been entered that all of the asserted claims of the '989 patent, the '940 patent, and the '983 patent are infringed and not

2

Appx3

invalid; and (ii) provide confirmation of such communication to Supernus within seven days thereof.

8.      If any party appeals from this Final Judgment, any Bill of Costs, motion as to prevailing-party status, or motion for attorneys' fees or costs shall be filed and served within thirty days after issuance of the mandate from any such appeal (which filing shall be considered timely); otherwise, if neither party appeals, any Bill of Costs, motion as to prevailing party status, or motion for attorneys' fees or costs shall be considered timely if filed and served within thirty days after the time to file a notice of appeal has expired.

9.      All pending motions and other outstanding requests for relief not specifically addressed herein are DENIED.

10.     The Clerk of Court is ordered to enter this Final Judgment.

**IT IS SO ORDERED** this _22nd_ day of _February_ 2024.

_____
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

3

Appx4

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPERNUS PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TORRENT PHARMACEUTICALS LTD., *et al.*, <br><br> Defendants. | Civil Action No. 21-06964 (GC) (DEA) <br> Civil Action No. 21-14268 (GC) (DEA) <br><br> **ORDER** |

**THIS MATTER** comes before the Court upon a Hatch-Waxman patent-infringement action brought by Plaintiff Supernus Pharmaceuticals, Inc. (Supernus) against Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (Torrent), stemming from Torrent's Abbreviated New Drug Application seeking approval to market a generic version of Supernus's drug product. Supernus alleges that Torrent's ANDA Products infringe claims of three patents in suit: claim 14 of U.S. Patent No. 8,992,989; claim 14 of U.S. Patent No. 9,549,940; and claims 13 and 23 of U.S. Patent No. 9,622,983.[1]  The Court held a bench trial on Supernus's infringement claims and Torrent's invalidity defenses.  Following trial, the parties submitted joint proposed findings of fact along with their respective post-trial briefs.  After reviewing the papers, the Court heard closing arguments.  For the reasons set forth in the accompanying Opinion, and other good cause shown,

**IT IS** on this 30th day of January 2024 **ORDERED** as follows:

---

[1]       Collectively, the "Asserted Claims" of the "Patents-in-Suit."

1. Torrent's oral trial motion under Federal Rule of Civil Procedure 52(c) is **DENIED**.

2. The issue of Supernus's pretrial motion *in limine* (ECF Nos. 126, 127) on which the Court reserved (ECF No. 151) is **DENIED**.

3. The issues of Torrent's pretrial motions *in limine* (ECF Nos. 128, 129) on which the Court reserved (ECF No. 151) are **DENIED**.

4. Torrent's ANDA Products **INFRINGE** on the Asserted Claims of the Patents-in-Suit.

5. The Patents-in-Suit are **VALID**.

6. The Clerk of Court is directed to file an unredacted version of the Court's Opinion **UNDER TEMPORARY SEAL**.

7. Within 21 days after the entry of this Order, the parties shall meet and confer and submit to the Court the following:

    a. A joint application under Local Civil Rules 5.3(c) and 7.1 to (i) permanently seal the unredacted version of the Court's Opinion, and (ii) file a redacted version of the Court's Opinion on the public docket, setting forth the proposed portions to be redacted and the bases for the redactions, and attaching a proposed version of the redacted Opinion.

    b. A proposed Judgment or, if any outstanding issues preclude the entry of judgment, a letter advising how the parties wish to proceed on any outstanding issue.

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPERNUS PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TORRENT PHARMACEUTICALS LTD., *et al.*, <br><br> Defendants. | Civil Action No. 21-06964 (GC) (DEA) <br> Civil Action No. 21-14268 (GC) (DEA) <br><br> **ORDER** |

**THIS MATTER** comes before the Court upon a Hatch-Waxman patent-infringement action brought by Plaintiff Supernus Pharmaceuticals, Inc. (Supernus) against Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (Torrent), stemming from Torrent's Abbreviated New Drug Application seeking approval to market a generic version of Supernus's drug product. Supernus alleges that Torrent's ANDA Products infringe claims of three patents in suit: claim 14 of U.S. Patent No. 8,992,989; claim 14 of U.S. Patent No. 9,549,940; and claims 13 and 23 of U.S. Patent No. 9,622,983.[1] The Court held a bench trial on Supernus's infringement claims and Torrent's invalidity defenses. Following trial, the parties submitted joint proposed findings of fact along with their respective post-trial briefs. After reviewing the papers, the Court heard closing arguments. For the reasons set forth in the accompanying Opinion, and other good cause shown,

**IT IS** on this 30th day of January 2024 **ORDERED** as follows:

---

[1] Collectively, the "Asserted Claims" of the "Patents-in-Suit."

1. Torrent's oral trial motion under Federal Rule of Civil Procedure 52(c) is **DENIED**.

2. The issue of Supernus's pretrial motion *in limine* (ECF Nos. 126, 127) on which the Court reserved (ECF No. 151) is **DENIED**.

3. The issues of Torrent's pretrial motions *in limine* (ECF Nos. 128, 129) on which the Court reserved (ECF No. 151) are **DENIED**.

4. Torrent's ANDA Products **INFRINGE** on the Asserted Claims of the Patents-in-Suit.

5. The Patents-in-Suit are **VALID**.

6. The Clerk of Court is directed to file an unredacted version of the Court's Opinion **UNDER TEMPORARY SEAL**.

7. Within 21 days after the entry of this Order, the parties shall meet and confer and submit to the Court the following:

    a. A joint application under Local Civil Rules 5.3(c) and 7.1 to (i) permanently seal the unredacted version of the Court's Opinion, and (ii) file a redacted version of the Court's Opinion on the public docket, setting forth the proposed portions to be redacted and the bases for the redactions, and attaching a proposed version of the redacted Opinion.

    b. A proposed Judgment or, if any outstanding issues preclude the entry of judgment, a letter advising how the parties wish to proceed on any outstanding issue.

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPERNUS PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TORRENT PHARMACEUTICALS LTD., *et al.*, <br><br> Defendants. | Civil Action No. 21-06964 (GC) (DEA) <br> Civil Action No. 21-14268 (GC) (DEA) <br><br> **OPINION** <br> **FILED UNDER TEMPORARY SEAL** |

## **APPEARANCES**

Charles M. Lizza
William C. Baton
Sarah A. Sullivan
SAUL EWING LLP
One Riverfront Plaza
1037 Raymond Blvd., Ste. 1520
Newark, NJ 07102

Edgar H. Haug
Nicholas F. Giove
Richard F. Kurz
Andrew S. Wasson
Jason A. Kanter
Anna N. Lukacher
Jessica M. Stookey
Chinmay P. Bagwe
HAUG PARTNERS LLP
745 Fifth Ave.
New York, NY 10151

*Counsel for Plaintiff*
*Supernus Pharmaceuticals, Inc*

Rebekah R. Conroy
STONE CONROY LLC
25a Hanover Rd., Ste. 301
Florham Park, NJ 07932

Neal Seth (*pro hac vice*)
Wesley Weeks (*pro hac vice*)
Lawrence Sung (*pro hac vice*)
Corey Weinstein (*pro hac vice*)
WILEY REIN, LLP
2050 M St. NW
Washington, DC 20036

*Counsel for Defendants*
*Torrent Pharmaceuticals Ltd. and*
*Torrent Pharma Inc.*

**CASTNER, District Judge**

This matter comes before the Court upon a Hatch-Waxman patent-infringement action brought by Plaintiff Supernus Pharmaceuticals, Inc. (Supernus) against Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (Torrent), stemming from Torrent's Abbreviated New Drug Application seeking approval to market a generic version of Supernus's drug product. Supernus alleges that Torrent's ANDA Products infringe claims of three patents in suit: claim 14 of U.S. Patent No. 8,992,989 ('989 patent); claim 14 of U.S. Patent No. 9,549,940 ('940 patent); and claims 13 and 23 of U.S. Patent No. 9,622,983 ('983 patent).[1]

The Court held a bench trial on Supernus's infringement claims and Torrent's invalidity defenses. In this Opinion, the Court resolves disputes over infringement and validity of the Patents-in-Suit, including reserved decisions on motions *in limine* and trial objections and motions. The Court discusses the procedural history and trial record, and then makes findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure ("Rule") 52(a). The findings of fact are based on the Court's observations at trial, credibility judgments, and review of all admissible record evidence.

For the reasons set forth below, and other good cause shown, the Court finds that Torrent's ANDA Products **INFRINGE** on the Patents-in-Suit and that the asserted patents are **VALID**.[2]

---

[1] Collectively, the "Asserted Claims" of the "Patents-in-Suit." The '989 patent's trial exhibit is PTX058; the '940 patent's, PTX059; the '983 patent's, PTX061.

[2] When Supernus rested its case-in-chief, Torrent moved for judgment as a matter of law on infringement. (Tr. 420:10-19.) Rule 52(c) states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any

## I.      FACTS ESTABLISHED

The following facts are stipulated, not disputed, or established by undisputed record evidence in the Final Pretrial Order, the Joint Proposed Findings of Fact, or both[3]:

### A.      The Parties

1.      Plaintiff Supernus is a corporation organized and existing under the laws of Delaware, having its principal place of business at 9715 Key West Avenue, Rockville, Maryland 20850.  (PFF ¶ 1 (citing ECF No. 133 ¶ 29).)

2.      Defendant Torrent Pharmaceuticals Ltd. is a corporation operating and existing under the laws of India, with its principal place of business at Torrent House, Off. Ashram Road, Ahmedabad, Gujarat, 380009, India.  (PFF ¶ 2 (citing ECF No. 133 ¶ 30).)

3.      Defendant Torrent Pharma Inc. is a Delaware limited liability company having its principal place of business at 150 Allen Road, Suite 102, Basking Ridge, NJ 07920. (PFF ¶ 3 (citing ECF No. 133 ¶ 31).)

4.      Defendant Torrent Pharmaceuticals Inc. is a subsidiary of Torrent Pharmaceuticals Ltd.  (PFF ¶ 4 (citing ECF No. 133 ¶ 32).)

---

judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

The Court reserved on Torrent's motion.  For the reasons set forth in this Opinion, Torrent's motion is **DENIED**.

[3]      The Final Pretrial Order is at ECF No. 133, and the Joint Proposed Findings of Fact (PFF) is at ECF No. 169.  For several proposed facts, Torrent disputes their relevance but not their veracity.  (*See* PFF ¶¶ 22-24, 26-27 (Def.) (asserting that facts are "not relevant to the litigation and therefore . . . not relevant to the proposed findings of fact").)  The Court recites facts that it finds are both relevant under Federal Rule of Evidence 401 and established through undisputed, credible, and admissible evidence.

3

B. **Background**

5.      This is a civil action for patent infringement that is brought by Supernus against Torrent arising under the patent laws of the United States, Title 35, United States Code.[4] (PFF ¶ 5 (citing ECF No. 133 ¶ 21).)

6.      Supernus asserts that Torrent infringes claims of three patents — United States Patent Nos. 8,992,989 ('989 patent); 9,549,940 ('940 patent); and 9,622,983 ('983 patent) (collectively, the "Patents-in-Suit").  (PFF ¶ 6 (citing ECF No. 133 ¶ 23).)

7.      This case involves the drug product Trokendi XR®, which is sold by Supernus and is indicated for treatment of epilepsy: initial monotherapy for the treatment of partial-onset or primary generalized tonic-clonic seizures in patients 6 years of age and older; adjunctive therapy for the treatment of partial-onset, primary generalized tonic-clonic seizures, or seizures associated with Lennox-Gastaut syndrome (LGS) in patients 6 years of age and older; and preventive treatment of migraine in patients 12 years of age and older.  (PFF ¶ 7 (citing ECF No. 133 ¶ 22).)

8.      Supernus owns the FDA approved New Drug Application (NDA) No. 201635 for Trokendi XR®, topiramate extended-release capsules, 25 mg, 50 mg, 100 mg, and 200 mg.  (PFF ¶ 8 (citing ECF No. 133 ¶¶ 28, 33).)

9.      Pursuant to 21 U.S.C. §§ 355(b)(1) and 355(c)(2), FDA's publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book") lists ten (10) patents as covering Supernus's Trokendi XR®. The Orange Book lists the Patents-in-Suit and also the following patents, which are no longer asserted against

---

[4]      This Court thus has subject-matter jurisdiction over all claims and counterclaims in this action under 28 U.S.C. §§ 1331 and 1338.  The parties do not dispute this Court's personal jurisdiction over them.  (ECF No. 133 ¶ 2.)

Torrent: United States Patent Nos. 8,298,576 ('576 patent), 8,298,580 ('580 patent), 8,663,683 ('683 patent), 8,877,248 ('248 patent), 8,889,191 ('191 patent), 9,555,004 ('004 patent), and 10,314,790 ('790 patent).  (PFF ¶ 9 (citing ECF No. 133 ¶ 34).)

        10.    The inventors assigned ownership of all Orange Book Patents to Supernus. (PFF ¶ 10 (citing ECF No. 133 ¶ 36).)

        11.    Torrent filed Abbreviated New Drug Application No. 215918 (Torrent's ANDA) with the FDA seeking approval to engage in commercial marketing of a generic version of Trokendi XR® (Torrent's ANDA Products).  (PFF ¶ 11 (citing 133 ¶ 55).)

        12.    On or about June 15, 2021, Torrent sent a letter pursuant to 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95 regarding the Torrent ANDA Products and the '576, '580, '683, '248, '191, '989, '940, '004, '983, and '790 patents (the "June 15 Notice Letter") to Supernus.  (PFF ¶ 12 (citing ECF No. 133 ¶ 56).)

        13.    Torrent's ANDA references Trokendi XR® (topiramate extended-release capsules) as the reference listed drug, or "RLD."  (PFF ¶ 13 (citing ECF No. 133 ¶ 57).)

        14.    The Torrent ANDA Products are extended release formulations of topiramate.  (PFF ¶ 14 (citing ECF No. 133 ¶ 59).)

        15.    The Torrent ANDA Products are topiramate extended-release capsules, 25 mg, 50 mg, 100 mg, and 200 mg.  (PFF ¶ 15 (citing ECF No. 133 ¶ 58).)

        16.    Torrent has asserted affirmative defenses stating that the Patents-in-Suit are invalid and not infringed, directly or indirectly.  (PFF ¶ 17 (citing ECF No. 133 ¶ 24).)

        17.    Torrent Pharmaceuticals Ltd. also brought counterclaims for a declaratory judgment of non-infringement with respect to the Patents-in-Suit.  (PFF ¶ 18 (citing ECF No. 133 ¶ 25).)

18.     Supernus asserted affirmative defenses stating that, among other things, the Patents-in-Suit are valid and enforceable, and infringed by Torrent's ANDA Products.  (PFF ¶ 19 (citing ECF No. 133 ¶ 26).)

## C.     The Accused Product

19.     The composition of Torrent's ANDA Products is disclosed in the Quality Overall Summary (QOS) that Torrent submitted to the FDA.  (PFF ¶ 20 (citing PTX106.3-5; Patel Tr. 65:12-66:2, 75:11-17, 75:20-22; Tr. 240:22-242:24, 232:2-237:24.).)[5]

20.     Torrent's ANDA Products comprise gelatin capsules that are filled with beads where each bead comprises (i) sugar sphere coated with a seal coating, (ii) a topiramate drug coating layer coated on top of each sugar sphere, and (iii) a release controlling polymer coating layer coated on top of the topiramate-coated beads.  (PFF ¶ 21 (citing Patel Tr. 21:18-24, 22:5-15; Tr. 240:22-242:24, 232:2-237:24; PTX106.3-5).)

21.     At the core of the Torrent ANDA Products beads is an inert sugar sphere.  (PFF ¶ 22 (Pl.) (citing PTX106.3; Patel Tr. 66:3-12; Tr. 240:22-241:8).)

22.     A seal coating suspension is coated on top of the sugar sphere.  (PFF ¶ 23 (Pl.) (citing PTX106.3; Patel Tr. 66:13-16; Tr. 240:22-241:18).)

23.     A drug coating suspension is coated on top of the seal coating suspension layer.  The drug coating suspension layer contains the active pharmaceutical ingredient (API), topiramate, along with various excipients.  The beads coated with the drug coating suspension are

---

[5]     Yogesh Patel, Assistant General Manager at Torrent, oversaw the formulation and development of Torrent's ANDA Products.  (PFF ¶ 133 (citing Patel Tr. 18:4-19, 19:4-20:4).)  In lieu of live testimony, excerpts of Mr. Patel's video deposition were played at trial.  (*See* ECF No. 166.)

also referred to as "drug coated pellets." (PFF ¶ 24 (Pl.) (citing PTX106.3; Patel Tr. 67:2-5, 67:19-22; Tr. 240:17-242:2).)

24.     Torrent's ANDA Products comprise polyvinyl acetate dispersion as a release controlling polymer. (PFF ¶ 25; PTX106.3-4.)

25.     The common polymer coated beads are filled into capsules, and each capsule may contain hundreds of beads. (PFF ¶ 26 (Pl.) (citing PTX106.4-5; Patel Tr. 21:18-24; Tr. 240:17-241:5; Tr. 61:19-62:2).)

26.     Torrent developed a formulation "to mimic the physiochemical characteristics of RLD [i.e., Supernus's Trokendi XR® product]. No other formulations were explored." (PFF ¶ 27 (Pl.) (citing Patel. Tr. 302:8-17; PTX106.29).)

27.     Torrent represented to the FDA that its ANDA Product is bioequivalent to Supernus's Trokendi XR®. (PFF ¶ 28 (citing Patel Tr. 55:3-7, 251:1-11).)

**D.     The Patents-in-Suit and the Asserted Claims**

28.     Supernus is asserting claim 14 of the '989 patent, claim 14 of the '940 patent, and claims 13 and 23 of the '983 patent (the "Asserted Claims") against Torrent in this action. (PFF ¶ 29 (citing ECF No. 133 ¶ 49).)

29.     The '989 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 30 (citing ECF No. 133 ¶ 37).)

30.     The '989 patent issued on March 31, 2015. (PFF ¶ 31 (citing ECF No. 133 ¶ 38).)

31.     The '989 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006. (PFF ¶ 32 (citing ECF No. 133 ¶ 39).)

32.     The '989 patent issued from U.S. Patent Application No. 14/499,462.  (PFF

¶ 33 (citing ECF No. 133 ¶ 40).)

33.     Claim 14 of the '989 patent reads:

14. A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 34 (citing ECF No. 133 ¶ 50).)]

8

34.     The '940 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 35 (citing ECF No. 133 ¶ 41).)

35.     The '940 patent issued on January 24, 2017.  (PFF ¶ 36 (citing ECF No. 133 ¶ 42).)

36.     The '940 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006.  (PFF ¶ 37 (citing ECF No. 133 ¶ 43).)

37.     The '940 patent issued from U.S. Patent Application No. 15/259,841.  (PFF ¶ 38 (citing ECF No. 133 ¶ 44).)

38.     Claim 14 of the '940 patent reads:

14. A sustained release formulation of topiramate comprising between 0.5% to 85%, by weight of the formulation, topiramate, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate,

9

crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 39 (citing ECF No. 133 ¶ 51).)]

39. The '983 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 40 (citing ECF No. 133 ¶ 45).)

40. The '983 patent issued on April 18, 2017. (PFF ¶ 41 (citing ECF No. 133 ¶ 46).)

41. The '983 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006. (PFF ¶ 42 (citing ECF No. 133 ¶ 47).)

42. The '983 patent issued from U.S. Patent Application No. 15/259,856. (PFF ¶ 43 (citing ECF No. 133 ¶ 48).)

43. Claim 13 of the '983 patent reads:

13. A sustained release formulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, which topiramate is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

10

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 44 (citing ECF No. 133 ¶ 52).)]

44.     Claim 23 of the '983 patent, which depends from claim 13, reads:

23. The formulation according to claim 13 reads: wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly(a-w)alkylenediols, alkali metal salts, alkaline earth metal salts, and combinations thereof.

[(PFF ¶ 45 (citing ECF No. 133 ¶ 53).)]

E.    **Claim Construction**

45.    For purposes of this litigation, the Parties have agreed upon, and the Court

has adopted, the following definition of a person of ordinary skill in the art (POSA):

> [S]omeone in the 2006 time frame with at least a Bachelor of
> Science degree in Pharmaceutical Sciences or a related field,
> approximately three to five years of experience in a drug delivery
> technology or related field, and working knowledge regarding
> pharmacokinetics (or a person of commensurate education and
> experience).
>
> [(PFF ¶ 57 (citing ECF No. 88 at 9; ECF No. 133 ¶ 60).)]

46.    As per the Court's December 2, 2022 *Markman* Order, the following

constructions apply to the Asserted Claims:

| Patent Claim Term | Court's Construction |
|---|---|
| "immediately and continuously"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claim 13) | Requires no construction—plain and ordinary meaning<br><br>"Without delay and without interruption" |
| "extended release (XR) component" or "extended release component"<br><br>"extended release (XR) topiramate-containing component(s)" or "extended release topiramate-containing component(s)"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claims 13 and 23) | "A component that releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time" |
| "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claim 13) | Requires no construction—plain and ordinary meaning |

[(PFF ¶ 58 (citing ECF No. 89 at 3-4; ECF No. 88 at 33; ECF No. 133 ¶ 61).)]

12

## F. Witnesses Presented at Trial

47. Supernus's expert witness Mansoor A. Khan, R.Ph., Ph.D., was admitted as an expert in the field of pharmaceutical formulations and drug delivery — specifically, the development, evaluation, and characterization of sustained release formulations and the ingredients in such formulations. (PFF ¶ 59 (citing Tr. 221:20-24, 231:22-24; PTX119).)

48. Supernus's expert witness David R. Taft, Ph.D., was admitted as an expert in pharmacokinetics and pharmacodynamics. (PFF ¶ 71 (citing Tr. 162:8-17).)

49. Supernus's fact witness, Padmanabh Bhatt, Ph.D., is one of the inventors of the Patents-in-Suit. (PFF ¶ 124 (citing Tr. 56:8-17; PTX058.2; PTX059.2; PTX061.2).).) Dr. Bhatt is a founding executive of Supernus. (PFF ¶ 126 (citing Tr. 52:22-24).) When Supernus was founded in December 2005, Dr. Bhatt was the head of pharmaceutical sciences and was involved in the development of Trokendi XR®. (PFF ¶ 127 (citing Tr. 52:22-24, 55:4-19).) At present, Dr. Bhatt is the Chief Scientific Officer and a senior vice president of intellectual property at Supernus. (PFF ¶ 128 (citing Tr. 53:13-15).) As a senior vice president of intellectual property at Supernus, Dr. Bhatt is responsible for managing outside counsel for intellectual property related matters both in the U.S. and worldwide. (PFF ¶ 130 (citing Tr. 54:13-25).) Dr. Bhatt is not an attorney. (PFF ¶ 131 (citing Tr. 54:11-12).) Dr. Bhatt earned an undergraduate degree and a master's degree in pharmacy from the University of Bombay. He also earned a Master of Science degree and a Ph.D. in pharmaceutical chemistry from the University of Kansas. (PFF ¶ 132 (citing Tr. 52:6-16).)

50. Torrent's expert witness Linda Felton, Ph.D., was admitted as an expert in drug formulation and modified drug delivery systems. (PFF ¶ 82 (citing Tr. 553:16-17).)

51. Torrent's expert witness David P. Rotella, Ph.D., was admitted as an expert in structural chemistry and organic chemistry. (PFF ¶ 96 (citing Tr. 449:22-23).).

52.     Torrent's fact witness, Yogesh Patel, is Assistant General Manager at Torrent, and oversaw the formulation and development of the Torrent ANDA Products.  (PFF ¶ 133 (citing Patel Tr. 18:4-19, 19:4-20:4).)  Mr. Patel has a master's degree in pharmaceutics.  (PFF ¶ 134 (citing Patel Tr. 11:18-23).)  Mr. Patel is Torrent's designated Rule 30(b)(6) witness.  (PFF ¶ 135 (citing Patel Tr. 23:4-16, 24:13-19, 26:7-27:16, 28:16-29:15, 31:10-32:10; PTX067).)

## II.    BACKGROUND

### A.    Procedural History

Supernus filed separate infringement actions against Torrent and Ajanta Pharma Limited and Ajanta Pharma USA Inc.  (ECF No. 1; ECF No. 43.)[6]  The two actions were later consolidated.  (ECF No. 43.)  Torrent counterclaimed for declaratory judgments of noninfringement and asserted an affirmative defense that Supernus's patents were invalid.[7]  Torrent's basis, according to its noninfringement contentions,[8] was that "Torrent's ANDA Products do not comprise any claimed controlling coating material including cellulosic and Acrylic polymer in composition" in the Asserted Claims of the Patents-in-Suit.  (ECF No. 127-1 at 7-13.[9])

---

[6]     Civil Action No. 21-14268 (Torrent); Civil Action No. 21-6964 (Ajanta).

[7]     (Defs.' Answer to Complaint, Affirmative Defenses, & Counterclaim, *Supernus Pharmaceuticals, Inc. v. Torrent Pharmaceuticals Ltd., et al.*, Civil No. 21-14268 (D.N.J. Sept. 29, 2021), ECF No. 11.)

[8]     This District's local patent rules required Torrent to serve "Non-Infringement Contentions" describing its basis for opposing Supernus's infringement assertion.  L. Pat. R. 3.6(e).  The contentions needed to "include a chart identifying each claim at issue in the case and each limitation of each claim at issue" and "specifically identify[ing] for each claim which claim limitation(s) is/(are) literally absent from" Torrent's ANDA.  *Id.*  Torrent's noninfringement contentions also covered other patents that Supernus no longer asserts.

[9]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

14

At the *Markman* stage, the Court held a hearing and construed certain of the patents' claim terms — namely, the definition of a person of ordinary skill in the art, or "POSA"; "immediately and continuously"; "extended release (XR) component"; and "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (ECF Nos. 88, 89.)[10]

Supernus and the Ajanta defendants eventually dismissed their claims against each other. (ECF No. 104.) Shortly after, Supernus and Torrent stipulated to reducing their claims and defenses: Supernus agreed to pursue only the Asserted Claims; Torrent agreed to withdraw reports of two experts; and both parties agreed to withdraw their requests to strike certain portions of each other's expert reports. (ECF No. 106.)

In early July 2023, the Court entered the Final Pretrial Order. (ECF No. 133.) The Final Pretrial Order detailed, among other things, the legal issues, stipulated facts, contested facts, and potential fact and expert witnesses. (*Id.*)

Leading up to trial, the Court addressed three motions *in limine* — one from Supernus and two from Torrent. (ECF Nos. 126, 127, 128, 129.) The Court partially granted Supernus's motion, precluding Torrent "from eliciting from its expert testimony about the absence of evidence or Supernus's alleged failure to prove that Torrent's ANDA products contain an extended release (XR) topiramate-containing component." (ECF No. 151 at 7.) The Court permitted Torrent, however, to cross-examine Supernus's expert "about the absence of such evidence or Supernus's satisfaction of its burden of proof," reserving on deciding whether that cross-examination testimony would ultimately be admissible. (*Id.* at 8.)

As to Torrent's motions, the Court reserved on deciding (1) whether to preclude certain testimony of Supernus's expert Mansoor A. Khan, and (2) whether to preclude Supernus from

---

[10]     A transcript of the *Markman* hearing is at ECF No. 87.

15

asserting infringement under the doctrine of equivalents at trial. (*Id.*) The latter issue, the Court ruled, was "tantamount to a request for summary judgment of noninfringement" and should thus be resolved after trial. (*Id.* at 7.)

The Court then held a four-day bench trial on Supernus's infringement claims and Torrent's invalidity defenses. Following trial, the parties submitted Joint Proposed Findings of Fact along with their respective post-trial briefs. (ECF Nos. 169, 170, 171.) After reviewing the papers, the Court heard the parties' closing arguments.

### B.  Summary of the Arguments

Supernus argues that Torrent's ANDA Products infringe every limitation of the Asserted Claims, literally and under the doctrine of equivalents. (PFF ¶¶ 136-139; ECF No. 170.) Although, to prevail, Supernus must prove infringement of every claim limitation, the chief infringement dispute is whether Torrent's ANDA Products meet the claim limitation requiring "an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers."

Torrent's literal-infringement defense is twofold. First, for its ANDA Products' coating material, Torrent uses polyvinyl acetate, which Torrent contends is not an acrylic polymer.[11] Second, Torrent asserts that Supernus has not shown that Torrent's ANDA Products contain an *extended-release component* within the Court's construction of that term. As to the doctrine of equivalents, Torrent argues that the prosecution history estops Supernus from recapturing what it disclaimed in a narrowing amendment. But even if Supernus is not so estopped, Torrent still contests that its ANDA Products are equivalent. In addition, Torrent asserts that the Asserted Claims are invalid because they are not enabled and they lack written description.

---

[11]     Supernus does not assert that polyvinyl acetate is, or is equivalent to, a cellulosic polymer.

## III.  ISSUES TO BE DECIDED

The Court must resolve three main issues: *first*, whether Supernus has proven by a preponderance of the evidence that Torrent's ANDA Products infringe the Asserted Claims of the Patents-in-Suit, either literally or under the doctrine of equivalents; *second*, whether Torrent has proven by clear and convincing evidence that the Asserted Claims of the Patents-in-Suit are not enabled; and *third*, whether Torrent has proven by clear and convincing evidence that the Asserted Claims of the Patents-in-Suit lack adequate written-description support.  (ECF No. 133 ¶¶ 15, 441-484.)

If there is no literal infringement, the Court must decide whether the doctrine of prosecution history estoppel bars Supernus from asserting that Torrent's use of polyvinyl acetate infringes the *acrylic polymers* claim term under the doctrine of equivalents.  (*Id.* ¶ 442.)  To get there, the Court must first decide whether Supernus's claim amendment during the prosecution of an earlier patent was narrowing such that a presumption of estoppel applies.  And if one does apply, Supernus must have rebutted the presumption by a preponderance of the evidence.[12]

## IV.  DISCUSSION

The Court will discuss the relevant legal standards and how they apply to key parts of the trial record.

---

[12] The Final Pretrial Order included two more issues: (1) whether Supernus is entitled to recover its costs and expenses in this action; and (2) whether Torrent has demonstrated that under the disclosure-dedication doctrine, the mention of *polyvinyl alcohol* in the specification would prevent a finding that polyvinyl acetate infringes the *acrylic polymers* claim term under the doctrine of equivalents.  (ECF No. 133 ¶¶ 443, 451-452.)  But Supernus's trial briefs did not mention costs-expenses recovery, and Torrent's trial briefs did not mention the disclosure-dedication doctrine.  (ECF Nos. 139 & 170 (Supernus), 140 & 171 (Torrent).)  As a result, the Court need not address either issue in this Opinion.

17

A.       **Literal Infringement**

Patent infringement occurs when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). "To prove infringement, a patentee" — here, Supernus — "must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting *Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999)). "If any claim limitation is absent from the accused [product], there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Supernus must demonstrate infringement by a preponderance of the evidence. *Eli Lilly*, 933 F.3d at 1328 (citation omitted). A preponderance of the evidence means "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *Hale v. Dep't of Transp., F.A.A.*, 772 F.2d 882, 885 (Fed. Cir. 1985); *see In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (defining a preponderance of evidence as "the existence of a fact is more probable than its nonexistence"). "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement," and "circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal citations omitted).

1.       <u>Asserted Claim Limitations Not in Dispute</u>

Though Torrent challenges only two elements of the Asserted Claims, Supernus still must show that Torrent's ANDA Products contain every limitation of the Asserted Claims. Therefore,

the Court will first consider Supernus's proof of each limitation not in dispute.[13]  The undisputed

claim limitations are as follows:

- The *sustained release formulation of topiramate* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation "a sustained release formulation of topiramate."  (PFF ¶ 140.)

- The *topiramate as an active ingredient* limitation: claim 14 of the '989 patent recites the limitation "comprising topiramate as an active ingredient."  (PFF ¶ 147.)

- The *released immediately and continuously* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation "[topiramate is] released immediately and continuously upon administration from the formulation."  (PFF ¶ 149.)

- The optional *immediate release topiramate-containing component* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation: "optionally, an immediate release (IR) topiramate-containing component . . . ."  (PFF ¶ 255.)

- The *maximum plasma concentration ('$T_{max}$) of topiramate in vivo at 16 or more hours* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation: "wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose."  (PFF ¶ 257.)[14]

- The *0.5% to 85% by weight of the formulation, topiramate* limitation: claim 14 of the '940 patent recites the limitation: "comprising between 0.5% to 85%, by weight of the formulation, topiramate."  (PFF ¶ 297.)

---

[13]  The Court's discussion of undisputed elements will be expeditious.  *See LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, 759 F. App'x 917, 925 (Fed. Cir. 2019) ("The [Patent Trial and Appeal Board] is 'not required to address undisputed matters' or arguments about limitations with which it was never presented." (quoting *In re NuVasive, Inc.*, 841 F.3d 966, 974 (Fed. Cir. 2016))); *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1380 n.8 (Fed. Cir. 2006) (deeming arguments waived where a party "conceded that the dispute with respect to the doctrine of equivalents was limited to the 'way' prong of the analysis").

[14]  $T_{max}$ is the time at which the maximum level of the drug within a dosage form has been released from the dosage form.  (*See* Tr. 84:2-8 (Bhatt) (defining $T_{max}$ as "the time it takes for the plasma concentration to reach its highest point," recorded "in units of hours or minutes"); Tr. 169:17-22 (Taft) (defining $T_{max}$ as the "time point during the experiment [that] you see the peak plasma level," or $C_{max}$).)

- The *topiramate in the form of micronized particles* limitation: claim 13 of the '983 patent recites the limitation: "topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size." (PFF ¶ 299.)

- The *pore former* limitation: claim 23 of the '983 patent, which depends from claim 13, recites the limitation: "The formulation according to claim 13, wherein the XR component further comprises a pore former selected from the group consisting of . . . polyvinylpyrrolidone . . . ." (PFF ¶¶ 303-304.)

To prove infringement of these claim limitations, Supernus offered testimony of two expert witnesses, who explained how Torrent's ANDA submissions to the FDA supported their opinions; highlighted testimony of Torrent's Rule 30(b)(6) witness admitting that Torrent's ANDA Products contain these claim limitations; and cited, for some limitations, the parties' stipulated facts. (*See generally* PFF ¶¶ 136-155, 255-308; ECF No. 170 at 13-15.) The experts' testimony is well-reasoned and credible, and the Torrent witness's admissions are straightforward. In addition, Supernus's proposed findings of fact for these claim limitations — although not necessarily stipulated — are not disputed. (*See* PFF ¶¶ 136-155, 255-308 (Def.) (stating throughout that "Torrent is not disputing this element of the claims").) And Torrent did not offer evidence to the contrary at trial. All told, the Court finds that Supernus has established by a preponderance of the evidence that Torrent's ANDA Products contain the claim limitations not in dispute.

2.     Asserted Claim Limitations in Dispute

Now to the disputed limitations: "an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (ECF No. 171 at 7; ECF No. 88 at 29.)

> a. *The* extended release (XR) topiramate-containing component *limitation*

The Court starts with the *XR component* element: "an extended release (XR) topiramate-containing component." ('989 patent col. 21 ll. 5-6; '940 patent col. 21 ll. 64-65; '983 patent col. 21 ll. 37-38.)[15]

***Supernus's motion* in limine.** Before trial, the Court ruled that Torrent could not offer rebuttal evidence of Supernus's failure to prove that Torrent's ANDA Products contain an XR component. (ECF No. 151 at 7.) At trial, Supernus restated its objection to Torrent's cross-examining Supernus's experts about the *XR component* limitation. (Tr. 409:10-22.) The Court will now resolve the reserved issue: whether the testimony that Torrent elicited on cross-examination about the XR component is admissible. The Court rules that it is.

Supernus argues that a party cannot challenge claim limitations that the party did not identify in its noninfringement contentions. The problem with Supernus's proposition is that it would shift the ultimate burden of proving infringement of every claim limitation from the patentee to the accused infringer. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004) ("Comparison of the claims to the accused device requires a factual determination that every claim limitation or its equivalent is found in the accused device."). The United States Supreme Court has rejected such a burden shift. *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 203 (2014) (reversing a "change in the ordinary rule imposing the burden of proving infringement upon the patentee" in declaratory judgment actions).[16] The burden of proof stays with the patentee even for limitations that the accused infringer did not identify in noninfringement

---

[15] The claims and specification of the Patents-in-Suit use *extended release* and *XR* interchangeably. The Court does the same here.

[16] For a collection of authorities "establish[ing] that the burden of proving infringement generally rests upon the patentee," see *Medtronic*, 571 U.S. at 198-99.

contentions.  *See Medtronic Inc. v. Bos. Sci. Corp.*, 558 F. App'x 998, 1000 (Fed. Cir. 2014) ("This court agrees with the district court that Medtronic's noninfringement contentions based on certain elements alleged to be missing from its devices do not relieve [the patentee's infringement expert] of the requirement to opine on the presence of structure meeting every claim limitation . . . .").[17] The Court will not relieve Supernus of its burden here.

To be sure, proper stipulations help expedite litigation, *see SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1131 (Fed. Cir. 1985) ("[T]rial judges . . . discourage unnecessary pleadings and encourage stipulation of undisputed matters."), and a party's decision to dispute overwhelmingly established facts, just because it can, would be in poor judgment.  But here, there was little prejudice or surprise to Supernus that its expert's opinions must sustain scrutiny. Besides, Torrent's examination on this limitation was relatively brief.  (*See* Tr. 388:2-393:9.)  The Court therefore rules that in these circumstances, the testimony that Torrent elicited on cross-examination about the XR component is admissible for Torrent's argument that Supernus has not met its burden of proof for this element.  That part of Supernus's motion is denied.

**Torrent's motion in limine.**  The Court denies Torrent's motion *in limine* to preclude Dr. Khan's opinion about this limitation's *predetermined period of time*.  (ECF No. 128.)

Torrent's motion highlights a discrepancy between the Court's claim construction and the Asserted Claims.  At the *Markman* stage, the Court construed *extended release component* to

---

[17]      In analogous contexts, courts have refused to apply local rules in ways that would modify pleading standards under national rules.  *See Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 904 (E.D. Pa. 2011) ("A local rule must be consistent with—but not duplicate—[the national] federal statutes and rules . . . ." (quoting Fed. R. Civ. P. 83(a)(1)) (alteration in *Tyco*)); *TSMC Tech., Inc. v. Zond, LLC*, 2014 WL 7498398, at *7 n.12 (D. Del. Jan. 8, 2014) ("Regardless of what internal procedures a court deploys for patent cases, such procedures could not modify the pleading requirements set forth in the Federal Rules of Civil Procedure, nor allow for disposing with such requirements.").

mean, "as stated expressly in the specification, a component that 'releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the *predetermined period of time*.'" (ECF No. 88 at 25; '989 patent col. 6 ll. 30-33 (emphasis added).)[18] The *predetermined period of time*, the Court continued, "refers to the period of time necessary to achieve the 'predetermined release profile' for the particular 'sustained release' formulation." (ECF No. 88 at 25.) The Court reasoned that "[t]his construction is consistent with the sentence following the definition for 'XR component,' which states, '[b]y way of example, and by no means limiting the scope of the invention, the period of time may be not more than 24 hours, not more than 16 hours, not more than 12 hours, not more than 8 hours, or not more than 4 hours, depending on desired attributes of the final product." (*Id.*; '989 patent col. 6 ll. 33-38.)

The discrepancy is that unlike other, no-longer-asserted claims, the Asserted Claims do not expressly recite predetermined periods of time. For example, claim 14 of the unasserted '248 patent recites the following as its final clause: "wherein the XR component releases topiramate in a continuous manner and such that greater than or equal to about 80% of the topiramate is released in vitro in less than or equal to about 12 hours." ('248 patent col. 22 ll. 12-15, ECF No. 1-4 at 21 (emphasis added).) That claim language recites a predetermined period of "about 12 hours." Compare that with the final clause of the Asserted Claims, which concerns not the $T_{80\%}$[19] but the

---

[18]    At the *Markman* stage, the Court referred to the specification of the '580 patent. (ECF No. 88 at 3 n.2.) That patent is no longer in suit. So now, references to the *specification* mean the '989 patent's specification, which the parties agree is identical to the '580 patent's specification. (Tr. 49:3-50:9.)

[19]    $T_{80\%}$ is "[t]he time at which [80%] of the drug within a dosage form has been released from the dosage form . . ., where [80%] is the percent of drug that has been released." (*See* '989 patent col. 3 ll. 61-64 ("The time at which a specified percentage of the drug within a dosage form has

$T_{max}$: "wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose." ('989 patent col. 21 ll. 33-35; '940 patent col. 22 ll. 25-27; '983 patent col. 21 ll. 65-67.)

Based on this, Supernus contends that the period of time for each "particular" sustained release formulation depends on the context of each individual claim. (ECF No. 170 at 16.) Since the Asserted Claims do not recite a predetermined period of time in which 80% of the active ingredient is released, Dr. Khan sought guidance in the specification's definitions of *immediate release formulation* and *sustained release*. (Tr. 250:10-251:3 (Khan).) *Immediate release formulation* is defined as "a formulation that releases greater than or equal to about 80% of the pharmaceutical agent in *less than or equal to about 1 hour*." ('989 patent col. 3 ll. 33-35 (emphasis added).) *Sustained release* is defined as "release of a pharmaceutical agent in a continuous manner over a *prolonged period of time*." ('989 patent col. 3 ll. 44-46 (emphasis added).) And *prolonged period of time* is defined as "a continuous period of time of greater than about 1 hour, preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours." ('989 patent col. 3 ll. 47-52.) So Dr. Khan selected "about 1 hour" as "a default in the definition" of *prolonged period of time*. (Tr. 251:2-3 (Khan).)

Dr. Khan then reviewed the in-vitro dissolution studies in Torrent's ANDA. (PTX109.39.) A dissolution profile shows that Torrent's ANDA Products release 80% of the drug between about eight to 10 hours. (PTX109.39; Tr. 252:9-253:7 (Khan).) Other data in Torrent's ANDA show that its ANDA Products release on average 11% of the drug in one hour and 80% in eight hours.

---

been released from the dosage form is referred to as the 'T.sub.x' value, where 'x' is the percent of drug that has been released.").)

24

(PTX109.38-39.) Given this data, Dr. Khan opined that Torrent's ANDA Products infringe the *XR component* limitation. (Tr. 249:24-25 (Khan).) Supernus adds that the parties stipulated that Torrent's ANDA Products are "extended release formulations of topiramate." (ECF No. 170 at 18 (citing ECF No. 133 ¶ 59, which states, "The Torrent ANDA Products are extended release formulations of topiramate").) In Supernus's Request for Admission No. 4, however, Torrent denied that its "ANDA Products include an extended-release component." (ECF No. 170-1 at 6.)

Torrent does not deny that its ANDA Products are extended release formulations. (PFF ¶¶ 171-172.) Rather, Torrent argues that Supernus did not meet the burden of proving that the ANDA Products contain an *XR component* "as construed by the Court." (PFF ¶¶ 171-172 (Def.) (citing ECF No. 88 at 33); Tr. 750:25-751:1).) Torrent attacks Dr. Khan's selection of about one hour as the so-called default *prolonged period of time*, for three reasons. (ECF No. 171 at 20.)

First, Dr. Khan selected a *predetermined period of time* based on the different term *prolonged period of time*. (ECF No. 171 at 21.) Torrent says the *prolonged period of time* concerns *exceeding* a period of time for releasing topiramate, whereas the *predetermined period of time* concerns releasing topiramate in vitro *within* a period of time. (ECF No. 171 at 21.)[20] Torrent asserts that Dr. Khan simply applied the same definition and analysis for both the *XR component* and *sustained release* claim elements. (ECF No. 171 at 21.)

---

[20]     (*Compare* '989 patent col. 3 ll. 47-52 (defining *prolonged period of time* as "a continuous period of time of *greater than* about 1 hour, preferably, *greater than* about 4 hours, more preferably, *greater than* about 8 hours, more preferably, *greater than* about 12 hours, more preferably still, *greater than* about 16 hours up to *more than* about 24 hours"), *with* '989 patent col. 6 ll. 30-39 (describing *predetermined period of time*, "[b]y way of example, and by no means limiting the scope of the invention," as "*not more than* 24 hours, *not more than* 16 hours, *not more than* 12 hours, *not more than* 8 hours, or *not more than* 4 hours, depending on desired attributes of the final product") (emphasis added).)

Second, the Court construed the *predetermined period of time* as referring to "the period of time necessary to achieve the 'predetermined release profile' *for the particular 'sustained release' formulation*" (ECF No. 171 at 21 (quoting ECF No. 88 at 25) (emphasis added by Torrent)), yet Dr. Khan did not consider "the specifics of Torrent's ANDA formulation in determining the appropriate 'predetermined period of time' to use in his analysis" (ECF No. 171 at 21-22). Dr. Khan merely selected the lowest period of time described in the *prolonged period of time* definition regardless of the other, more preferable time periods listed there — "preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours." (ECF No. 171 at 22 (quoting '989 patent col. 3 ll. 47-52).)

Third, Dr. Khan's analysis is contrary to the Court's *Markman* Opinion, which rejected a proposed construction "seeking to construe 'extended release component' as the inverse of 'immediate release component.'" (ECF No. 171 at 22 (quoting ECF No. 88 at 26).)

The Court finds that several facts dictate that more likely than not, Torrent's ANDA Products meet the *XR component* limitation. Although not dispositive, Torrent's ANDA submission describes its ANDA Products as "extended-release" products. (PTX106.2; PTX161.4.) Indeed, the invention's novelty is the sustained release formulation that requires a continuous release of topiramate over a prolonged period of time beyond about one hour. Torrent omitted this element from its noninfringement contentions, and Torrent did not seek to amend its noninfringement contentions even after the Court issued its *Markman* Opinion. In consequence, Dr. Khan's opinion on this element is unrebutted.

The Court does not rely solely on Dr. Khan's opinion. For one thing, the in-vitro dissolution data in Torrent's ANDA show that its ANDA Products release 80% of topiramate

within eight to 10 hours, which far exceeds Dr. Khan's "about 1 hour" selection. For another, the ANDA Products' in-vitro release rate appears to be consistent with the specification's conditions for a bead population whose $T_{max}$ in vivo is at least 16 hours. Torrent's ANDA Products' in-vitro dissolution $T_{80\%}$ of eight hours, for instance, meets the in-vitro dissolution "conditions" for the XR2 bead population in Example 6 of the Patents-in-Suit. (*See* '989 patent Example 6.) According to Example 6, a bead population that exhibits an in-vitro dissolution $T_{80\%}$ at five to eight hours also exhibits a $T_{max}$ "for a single initial dose in-vivo" at ">=16 h" — that is, "a maximum plasma concentration . . . in vivo at 16 or more hours after a single initial does." (*Id.*)

The Court therefore concludes that Supernus has proven infringement of this limitation by a preponderance of the evidence.

### b. *The* acrylic polymers *limitation*

Next, the *acrylic polymers* limitation: "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (PFF ¶ 174.) At the *Markman* stage, the Court ruled that this limitation needed no further construction — "the plain meaning of this phrase governs the meaning of the disputed term." (PFF ¶ 178; ECF No. 88 at 30.) But that ruling concerned the entire limitation; the parties did not seek construction of the term *acrylic polymers*. Since then, the parties have disagreed over the plain meaning of *acrylic polymers*. The issue is thus whether the polyvinyl acetate dispersion that Torrent uses as the coating material in its ANDA Products falls within the plain and ordinary meaning of *acrylic polymers*.[21] Supernus says that it does; Torrent says that it does not.

---

[21]     The parties agree that Torrent's ANDA Products' coating material comprises polyvinyl acetate. (PFF ¶ 25; *see also* ECF No. 171 at 11 ("For infringement, the only question before the Court is '*whether polyvinyl acetate is or is not an acrylic polymer*.'").) They also agree that "a POSA viewing the 'acrylic polymers' claim term would agree that 'no construction [is] necessary because a POSA knows what the polymer is' because a 'POSA uses [them] all the time.'" (ECF No. 171 at 11 (quoting PFF ¶ 248 (Pl.)).)

27

When courts say that a term requires no construction, they mean that further elaboration is unnecessary because the term is common parlance and its meaning is clear. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *see Schumer v. Lab'y Computer Sys., Inc.*, 308 F.3d 1304, 1312 (Fed. Cir. 2002) ("These are not technical terms or art, and do not require elaborate interpretation." (quoting *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001))). But here, the term *acrylic polymers* is more technical, and the parties clash over its plain and ordinary meaning. Indeed, both parties called experts to present their competing knowledge of the term's "special meaning and usage in the field" of the invention. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). It follows that the Court must also measure the experts' testimony against the written record. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (noting that "the ordinary meaning of the term" is viewed not "in a vacuum" but "in the context of the written description and the prosecution history" (quoting *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir. 2001))); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.'" (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998))); *see also Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1362 (Fed. Cir. 2022) (noting critically that a party arguing the plain and ordinary meaning of a claim term "offers no intrinsic evidence for this position, only extrinsic dictionary definitions and attorney argument").

This is all to say, the Court cannot resolve the issue without engaging in further claim construction. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (noting that consulting extrinsic evidence to understand "the background science or the meaning of a term in

the relevant art during the relevant time period" may necessitate *Markman*-type factfinding "where

those subsidiary facts are in dispute"); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

*Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to 'determin[e]

the meaning and scope of the patent claims asserted to be infringed.'" (quoting *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *a'f'd*, 517 U.S. 370 (1996))). For

clarity, the Court will discuss the type and priority of evidence that it will consider.[22]

"[T]he ordinary and customary meaning[23] of a claim term is the meaning that the term

would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as

of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. To ascertain that

meaning, the Court first considers the intrinsic evidence: the claims, specification, and prosecution

---

[22]    Other courts have found it necessary to provide additional claim construction as part of infringement rulings following bench trials. *See, e.g.*, *NobelBiz, Inc. v. Glob. Connect, L.L.C.*, 701 F. App'x 994, 997 (Fed. Cir. 2017) ("The district court had the responsibility to determine the scope of the asserted claims, and '[a] determination that a claim term "needs no construction" or has the "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute.'" (quoting *O2 Micro Int'l*, 521 F.3d at 1361)); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 n.7 (Fed. Cir. 1993) (noting with approval the trial court's interpretation of a term "after a full bench trial"); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1369 (Fed. Cir. 2003) (reviewing an infringement ruling after a bench trial where the district court first construed disputed limitations and then found no infringement); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248, 1253 (Fed. Cir. 1998) (affirming district court's construction following a bench trial); *Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, — F. Supp. 3d —, 2023 WL 3254117 (D. Del. May 4, 2023) (engaging in claim construction following a bench trial).

[23]    The Federal Circuit Court of Appeals has used the phrases *plain and ordinary meaning* and *ordinary and customary meaning* interchangeably. *See, e.g.*, *Laitram, LLC v. Ashworth Bros.*, 2023 WL 3449148, at *3 (Fed. Cir. May 15, 2023); *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1002-03 (Fed. Cir. 2016); *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

history.  *Markman*, 52 F.3d at 979 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991))).[24]

If the intrinsic record is not telling enough, the Court must consider extrinsic evidence: "expert and inventor testimony, dictionaries, and learned treatises."  *Id.* at 980; *see Teva Pharms.*, 574 U.S. at 331 ("In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.").[25]  An expert may testify as to "how those skilled in the art would interpret the claims."  *Markman*, 52 F.3d at 979 (citation omitted).[26]

To be sure, a dispute among experts testifying about a claim term's meaning is factual for the Court to resolve.  *Teva Pharms.*, 574 U.S. at 332.  Indeed, "'[e]xperts may be examined to explain terms of art, and the state of the art, at any given time,' but they cannot be used to prove

---

[24]    *See also Phillips*, 415 F.3d at 1313 ("[POSA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); *Blazer v. Best Bee Bros. LLC*, 2022 WL 16954848, at *4 (Fed. Cir. Nov. 16, 2022) ("The specification is especially significant when a claim term possesses 'a range of possible ordinary meanings in context' or otherwise features 'genuine uncertainties.'" (quoting *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015))).

[25]    *See also Actelion Pharms. LTD v. Mylan Pharms. Inc.*, 85 F.4th 1167, 1173-74 (Fed. Cir. 2023) (noting that district courts must consult extrinsic evidence when the intrinsic evidence is not telling enough for claim construction); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims." (quoting *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995))).

[26]    Though "expert testimony can be useful to . . . establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," of no use are "conclusory, unsupported assertions by experts as to the definition of a claim term" or "any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Phillips*, 415 F.3d at 1318 (internal citations and quotation marks omitted).

30

'the proper or legal construction of any instrument of writing.'" *Id.* (quoting *Winans v. New York & E.R. Co.*, 62 U.S. 88, 100-01 (1858)). After resolving the factual dispute, the Court turns to the legal issue: it must "interpret the patent claim in light of the facts as [the Court] has found them." *Id.*

     *The intrinsic evidence.* The Court begins with the intrinsic record, starting with the claims. The Asserted Claims require a "sustained release formulation." (*See, e.g.,* '989 patent col. 21 l. 1.) This requirement indicates that the claimed acrylic polymers must be suitable for sustained release formulations. Other than that, the Asserted Claims shed little light on the meaning of *acrylic polymers*, so the Court turns to the specification for guidance. *Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1563-64 (Fed. Cir. 1994).

     The specification tells us more. It says "[t]he coating material is preferably selected from a group comprising cellulosic polymers, such as ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, and cellulose acetate phthalate; polyvinyl alcohol; acrylic polymers such as polyacrylates, polymethacrylates and copolymers thereof, and other water-based or solvent-based coating materials." ('989 patent col. 7 ll. 4-13.) From this the Court gathers a few things. The use of *such as* indicates that the claimed acrylic polymers are not limited to the examples listed. Indeed, the specification later describes an exemplary copolymer not expressly included in that list: the XR8 formulation in Table 1, "Acrylic polymers (Eudragit® RL30D/RS30D)," which Dr. Felton described as an "ammonio methacrylate copolymer." ('989 patent Table 1; Tr. 556:14-17 (Felton).) The specification likewise uses *such as* to list non-exhaustive examples of claimed cellulosic polymers. It does not do the same for *polyvinyl alcohol*, which is in the singular form unlike *cellulosic polymers* and *acrylic polymers*.

31

In addition, the specification uses semicolons to offset *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers*. (ECF No. 171 at 9.) This punctuation indicates that for this specification, these polymers are "separate and distinct" from one another. *See In re Affinity Labs of Texas, LLC*, 856 F.3d 902, 907 (Fed. Cir. 2017) (finding that semicolons offsetting each of five steps of a method claim "strongly indicates that each step is separate and distinct"); *In re Pelz*, 379 F. App'x 975, 978 (Fed. Cir. 2010) (noting that using "semicolons to separate the particulars for that list . . . indicates that the three positions are exemplary subsets").

But the Patents-in-Suit neither define these scientific terms nor disclaim a certain meaning. As a result, a POSA's understanding of the terms' plain and ordinary meaning is still unclear. The Court thus turns to the prosecution history.

"The prosecution history, in particular, may be critical in interpreting disputed claim terms, and even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Univ. of Massachusetts v. L'Oreal S.A.*, 36 F.4th 1374, 1379 (Fed. Cir. 2022) (quoting *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020)) (internal quotation marks omitted); *see Canopy Growth Corp. v. GW Pharma Ltd.*, 2023 WL 3048243, at *5 (Fed. Cir. Apr. 24, 2023) (opting not to decide whether amendments amounted to disavowal or disclaimer where the prosecution history showed that the patent "discloses three non-overlapping embodiments while claiming only one of them" (citing *L'Oreal S.A.*, 36 F.4th at 1379)).

Relevant here is the applicants' August 2012 amendment during the prosecution of U.S. Patent Application No. 12/926,931 ('931 application). (ECF No. 170 at 33; PTX233.1.) An earlier version of subsection (a) of claim 104 in the '931 application read: "(a) at least two different extended release topiramate-containing components, wherein each component comprises a release

controlling coating specific for its component . . . ." (PTX233.210.)  The examiner rejected this claim for inadequately describing the claimed release controlling coating.  (ECF No. 170 at 33; PTX233.230.)  The applicants responded that they disagreed but would amend "solely in the interest of compact prosecution."  (PTX233.249.)  Their amendment added that the release controlling coating must "comprise[] a coating material selected from the group consisting of cellulosic polymers and acrylic polymers."  (PTX233.242; ECF No. 170 at 34.)  The applicants remarked that the amended claims "now recite species of the noted genera."  (PTX233.249.)  The specification also discloses *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers*, though this amendment added only *cellulosic polymers* and *acrylic polymers*.  (*Compare* '989 patent col. 7 ll. 4-13 (specification), *with* PTX233.242 (amendment).)

Still, nothing in the prosecution history disclaims a plain meaning of *acrylic polymers* or prescribes it a special definition.

All intrinsic evidence considered, including a reading of the entire Patents-in-Suit, the Court would benefit from considering extrinsic evidence.  The Court, in its discretion, turns to the experts who testified at trial about how a POSA would understand the plain and ordinary meaning of *acrylic polymers* and whether that meaning covers polyvinyl acetate.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012) (noting the district court's "sound discretion" to use extrinsic evidence to learn about "the field of the invention" and what a POSA "would understand claim terms to mean" (quoting *Phillips*, 415 F.3d at 1319)).

***The infringement experts.***  Supernus's infringement expert Mansoor A. Khan, R.Ph., Ph.D., was admitted as an expert in the field of pharmaceutical formulations and drug delivery — specifically, the development, evaluation, and characterization of sustained release formulations and the ingredients in such formulations.  (PFF ¶¶ 59, 69; Tr. 231:22-24.)

Torrent called two experts for its infringement rebuttal — David P. Rotella, Ph.D., an expert in structural chemistry and organic chemistry; and Linda Felton, Ph.D., an expert in drug formulation and modified drug delivery systems. (PFF ¶¶ 82-95, 96.) Both were admitted as experts. But in post-trial submissions, Supernus challenged Dr. Rotella's qualification as a POSA. The Court will now address that challenge.

During claim construction, the Court adopted an undisputed definition of *POSA*:

> [S]omeone in the 2006 time frame with at least a Bachelor of Science degree in Pharmaceutical Sciences *or a related field*, approximately three to five years of experience in a drug delivery technology *or related field*, and working knowledge regarding pharmacokinetics (or a person of commensurate education and experience).
>
> [(PFF ¶ 57; ECF No. 88 at 9 (emphasis added).)]

This definition requires "at least a Bachelor of Science degree in Pharmaceutical Sciences or a related field"; Dr. Rotella received a bachelor's degree in pharmacy in 1981 and an advanced degree in medicinal chemistry in 1985. (Tr. 447:23-448:2; DTX025.) The definition also requires "experience in a drug delivery technology or related field"; Dr. Rotella has experience in medicinal chemistry and drug discovery, which he testified are fields related to "a drug delivery technology" field. (Tr. 447:25-448:2; *see* Tr. 446:8-11 (Rotella) (testifying that organic chemistry is "essentially the same thing" as drug-delivery technology).) And Dr. Rotella testified that he has a working knowledge of pharmacokinetics. (Tr. 446:12-22, 447:24-25.)

On these credentials, Dr. Rotella was admitted as an expert in the fields of structural chemistry and organic chemistry. (Tr. 448:6-449:23.) In qualifying Dr. Rotella, Torrent made clear that he would offer his opinions from a POSA's perspective. (Tr. 447:17-448:5.) Specifically, Torrent asked Dr. Rotella if he was familiar with the Court's construction of the term

*POSA*, if he considered himself to be a POSA, and if he applied a POSA standard in forming his opinions — to all of which Dr. Rotella responded affirmatively. (Tr. 447:17-448:5.)

At that time, Supernus objected, but not to Dr. Rotella's opining as a POSA:

> MR. SETH (ATTORNEY FOR TORRENT). Okay. Your Honor, at this time we offer Dr. Rotella as an expert witness qualified to testify as an expert in the fields of structural chemistry, organic chemistry, and to testify about non-infringement.

> THE COURT. Any objection by Supernus?

> MR. KURZ (ATTORNEY FOR SUPERNUS). Your Honor, Supernus doesn't object to the extent that they're offering Dr. Rotella as an expert in medicinal chemistry or organic chemistry or perhaps structural chemistry. I'm not quite sure what counsel is getting at with the rest of what he asked for.

> THE COURT. At this point in the trial there should be no objections to the parties offering an expert opinion as what their witness is going to provide expert testimony on, so I'm not sure of the disconnect here.

> MR. KURZ. Anyway, Your Honor, Supernus has no objection to them offering Dr. Rotella as an expert in medicinal chemistry or organic chemistry.

> THE COURT. Is there -- I'm not sure I'm following. Is there a disconnect here, Mr. Seth?

> MR. SETH. If I'm understanding correctly, there's no objection; is that right?

> MR. KURZ. For medicinal chemistry and organic chemistry. I'm not quite sure. He said something else, I thought.

> THE COURT. Yeah, let's go back. What are you offering Dr. Rotella as an expert in?

> MR. SETH. I think I said structural chemistry, organic chemistry, and to testify about non-infringement.

> THE COURT. So offering as an expert in structural chemistry, organic chemistry, and offering an opinion with respect to infringement.

35

MR. SETH.  Non-infringement.

THE COURT.  Non-infringement, correct, right.  Any objection with respect to Dr. Rotella as an expert in that area?

MR. KURZ.  With respect to offering testimony in organic chemistry and structural chemistry, there's no problem.  I'm not quite sure what it is to be an expert in non-infringement, Your Honor.  But as far as offering that to prove or to testify about non-infringement, we have no objection to that.

THE COURT.  Okay.  So the Court accepts Dr. Rotella as an expert in structural chemistry and organic chemistry.

MR. SETH.  Okay.

MR. KURZ.  Thank you, Your Honor.

[(Tr. 448:6-449:25.)]

Nor did Supernus previously move *in limine* to preclude Dr. Rotella's opinions as a POSA. Yet in its post-trial brief, Supernus argued that "Dr. Rotella's testimony from the perspective of a POSA is legally improper and substantively incorrect," because Dr. Rotella is a medicinal chemist without the requisite experience in drug-delivery technology.  (ECF No. 170 at 22-23 (emphasis omitted).)

The Court sees two reasons not to disqualify Dr. Rotella as a POSA.  First, Supernus had plenty of notice of Dr. Rotella's background and qualifications, and the Final Pretrial Order described how he would rebut Dr. Khan's opinion.  (ECF No. 133 at 83.)  That Supernus waited until post-trial briefing to object to Dr. Rotella's status as a POSA is enough for the Court to find that Supernus waived its objection.  *See Kreɛpy Krauly U.S.A., Inc. v. Sta-Rite Indus., Inc.*, 152 F.3d 949 (Fed. Cir. 1998) (ruling that by failing to object when the court qualified a witness as an expert, the party "waived any objection to the court's decision to qualify the expert").

36

Second, since Supernus waived its challenge to Dr. Rotella's experience as being "a related field," the Court views Supernus's arguments against Dr. Rotella's POSA status as truly credibility attacks on his qualifications. For instance, Supernus argues that medicinal chemistry (Dr. Rotella's field) is not a field related to drug delivery. (ECF No. 170 at 23-24.) Supernus reasons that unlike the pharmaceutical science of drug delivery, medicinal chemistry studies biologically *active* substances (here, topiramate), not *inactive* ingredients or excipients (here, polymer coatings). (PFF ¶ 110; ECF No. 170 at 23; *see* Tr. 496:24-25 (Rotella) ("Medicinal chemistry is the study of the chemistry of biologically active substances.").) Supernus also cites Dr. Felton's testimony that the *POSA* definition "doesn't include a medicinal chemist," who "is somebody who would synthesize a chemical entity, and that's not what these patents are about." (Tr. 584:7-18.)[27]

Supernus also asserts that Dr. Rotella admittedly has never designed a sustained-release formulation, is not involved in conducting formulation research, and has never developed a drug with FDA approval. (ECF No. 170 at 24 (citing Tr. 497:8-18, 499:10-13, 498:5-7 (Rotella)).) And Supernus contests that Dr. Rotella's experience working with formulators "for an unspecified period of time" qualifies him as a POSA. (ECF No. 170 at 24.) These attacks may raise credibility issues, but at this stage, the Court finds that Dr. Rotella's testimony as a POSA should not be stricken from the trial record.[28]

---

[27]     Dr. Felton's opinion that the *POSA* definition "doesn't include a medicinal chemist" might carry more weight if Dr. Rotella were only a medicinal chemist. But as mentioned, Dr. Rotella's bachelor's degree in pharmacy and professional experience, which Supernus delinquently challenged, meet the broad *POSA* definition requiring a "Bachelor of Science degree in Pharmaceutical Sciences" and experience in a field related to drug delivery technology. (*See also* Tr. 750:7-10 (Torrent arguing that Dr. Felton was correct that being a medicinal chemist is not by itself enough to be a POSA but that Dr. Rotella has the requisite experience).)

[28]     The Court also agrees with Torrent that Supernus opened the door to testimony about chemistry when Dr. Khan included an empirical formula as part of his definition of *acrylic polymers* and consulted a chemistry webbook in forming his definition. (Tr. 747:13-19.) The Court discusses Dr. Khan's definition next.

The Court turns to the parties' dispute over a POSA's understanding of *acrylic polymers*.

***Dr. Khan's definition of acrylic polymers.*** Supernus's expert Dr. Khan first testified that a POSA would agree that the claim term *acrylic polymers* needs no construction, "because a POSA knows what the polymer is," a "POSA knows what function it plays," a "POSA uses [them] all the time." (Tr. 257:6-15.) But because the parties dispute the term's meaning, Dr. Khan sought "to come up with something so that everybody understands." (Tr. 257:16-24; *see* Tr. 255:10-11 (Khan) ("I was trying to get at the intent of the developer here, the formulator here.").) The challenge for Dr. Khan, he said, was that *acrylic polymers* represent a broad group, so broad that he knew of no single definition encompassing all of them. (*See* Tr. 257:19-21 (Khan) ("There's no single definition that I'm aware of that covers all [the] acrylic polymers."); Tr. 262:3-4 (Khan) ("[B]ut I haven't seen a single definition that covers all the acrylic polymers.").)[29]

So, trying to conceptualize what a POSA would understand *acrylic polymers* to mean here, Dr. Khan fashioned his own "operative definition": "A polymer containing a monomer from the series of olefin acids with the general formula $[C_nH_{2n-2}O_2]$ or their derivatives." (Tr. 258:1-4 (cleaned up); PFF ¶ 181.) At closing arguments, Supernus explained that "to be helpful, to have some words that Your Honor could utilize to do your infringement analysis, Dr. Khan put some meat on the ruling that is plain and ordinary meaning[,] and this is what he arrived at." (Tr. 723:1-4.) To get this definition, Dr. Khan drew from a POSA's "general understanding" based on

---

[29]     (*See also* Tr. 256:2-8 (Khan) ("So I was trying to look at what the acrylic polymer means. It may mean different things to different people. It's a pretty broad term. Some people may use a very narrow definition of that. Some people may use a broad definition of that. In the excipient world we use broad, so many different types of acrylic polymers in the pharmaceutical development.").)

everyday usage of *acrylic polymers*. He also consulted Torrent's ANDA submission, the specification, and several extrinsic sources.

Starting with the intrinsic record, Dr. Khan testified that a POSA reading the patents would understand that the plain and ordinary meaning of *acrylic polymers* must encompass at least the polymers exemplified in the specification: here,[30] "polymers *such as* polyacrylates, polymethacrylates and copolymers thereof" and the "Acrylic polymers (Eudragit® RL30D/RS30D)."[31] (ECF No. 170 at 11; PFF ¶ 55 (Pl.) (citing Tr. 254:6-255:11, 258:8-259:4, 263:2-264:5 (Khan)); PFF ¶¶ 187-189, 251 (Pl.).) Eudragit® RL 30 D and Eudragit® RS 30 D are the tradenames of two polymethyl methacrylates listed in the *Handbook of Pharmaceutical Excipients* as pharmaceutically acceptable acrylic polymers. (PFF ¶ 184 (Pl.) (citing Tr. 272:6-14, 312:6-21 (Khan); PTX113.3; PTX115.5; Tr. 556:12-17, 628:18-21 (Felton).) They are used for extended-release applications. (PFF ¶ 185 (citing Tr. 627:18-21 (Felton)).)

But other grades of Eudragit® polymers, Dr. Khan explained, would not be suitable acrylic polymers for the Patents-in-Suit. (PFF ¶ 186 (Pl.) (citing Tr. 375:2-376:23 (Khan)).) For example, Eudragit L®, an enteric polymer, is delayed release and thus does not release "immediately and continuously" as the claims require. For another, Eudragit E®, an organic polymer, is not a

---

[30]    Mindful of the rule that "[e]xperts may be examined to explain terms of art, and the state of the art, at any given time, but they cannot be used to prove the proper or legal construction of any instrument of writing," *Teva Pharms.*, 574 U.S. at 332 (internal quotations omitted), the Court considers expert testimony only to find how a POSA would understand the plain and ordinary meaning of *acrylic polymers* in a similar context.

[31]    The Federal Circuit "has cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the intrinsic record." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007)); *see Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1211 (Fed. Cir. 2007) (rejecting a definition of the term *pharmaceutically acceptable polymer* because the "definition would not cover some of the very polymers listed" in the specification).

dispersion and is used in organic solutions. (PFF ¶ 186 (Pl.).) The difference in available acrylic polymers indicates that *acrylic polymers*, as used here, must include not all acrylic polymers — only ones suitable for extended-release applications.

In fashioning his definition, Dr. Khan also reviewed Torrent's ANDA submission and supporting data. Specifically, Dr. Khan analyzed what ingredient Torrent used, whether it fit into his definition, and whether it had the same properties and "chemistry related to the functioning of this polymer." (Tr. 256:20-23 (Khan).) Dr. Khan clarified that he focused not on the "pharmacological action" but on "the use as an excipient." (Tr. 256:23-257:1.) "Based on all that," Dr. Khan testified, "I knew that it's the same polymer, acrylic polymer." (Tr. 257:2-3.)

Dr. Khan also reviewed "some of the scientific literature" — "for example, the National Institute of Standards and Technology," or "NIST," "chemistry workbook."[32] (Tr. 256:15-17.) The problem, according to Dr. Khan, was that "a lot of chemistry handbooks do not define things," and instead "have structures." (Tr. 260:3-8.) This touches a critical theory of Supernus's case: when classifying a polymer, a pharmaceutical scientist focuses on the polymer's function, not its structure. (PFF ¶ 55 (Pl.) (citing Tr. 345:17-346:1, 355:56-20 (Khan)).) It is where pharmaceutical scientist and chemists diverge, according to Dr. Khan:

> That's where the difference between chemist and pharmaceutical scientist come. A chemist would look at it as an ester because . . . yeah, as a structure you would see it as an ester. But a pharmaceutical scientist will not see that as a difference because the function doesn't change.
>
> [(Tr. 345:17-21.)]

---

[32] The parties describe the NIST as "a Federal Government organization that sets standards." (PFF ¶ 229.)

Dr. Khan ultimately landed on the *Webster's New World Dictionary of the American Language, Second College Edition*,[33] which offers two definitions of the word *acrylic*. The first definition is "designating or of a colorless, pungent acid, $CH_2:CHCOOH$, obtained by the oxidation of acrolein." (PTX116.3.) Dr. Khan testified that this first definition is too narrow, as it does not even cover polymethacrylates, one of the acrylic polymers listed in the specification. (PFF ¶¶ 203-204 (Pl.) (citing Tr. 260:25-263:13 (Khan); PTX116.3; '989 patent col. 7 ll. 6-13)).)

Dr. Khan then turned to the second definition: "designating or of a series of olefin acids with the general formula $C_nH_{2n-2}O_2$." (PTX116.3.) He felt that this definition was better but still not broad enough to cover all acrylic polymers in the specification — namely, "Acrylic polymers (Eudragit® RL30D/RS30D)" in Table 1, which are derivatives of "a polymer containing a monomer from the series of olefin acids with the general formula $C_nH_{2n-2}O_2$." (PFF ¶ 55 (Pl.) (citing Tr. 257:4-259:4, 261:25-264:5, 325:7-19 (Khan); PTX116.3; '989 patent Table 1).) And so, Dr. Khan added to the second definition the words *or their derivatives*.[34]

Dr. Khan's definition also includes the phrase "a polymer containing a monomer." A polymer is made of many monomers bonded together through a chemical reaction called polymerization. (PFF ¶¶ 193-194 (citing Tr. 265:3-266:25 (Khan), 467:6-9 (Rotella)).) But not all monomers can form polymers. (*See* Tr. 539:22-540:11 (Rotella) ("[S]ome of these molecules may not be able to form polymers.").) So to meet Dr. Khan's definition, a compound must be a

---

[33]     Dr. Khan added that because this dictionary was copyrighted in 1986, it would have "a definition . . . that I thought was closest to what's there in the patent," whose priority date is in 2006. (Tr. 259:14-19.) *Webster's* was copyrighted in 1986 and was therefore a reference that was available to a POSA before the 2006 priority date. (PFF ¶ 200 (Pl.).)

[34]     Dr. Khan also testified that he "had to include the word[s] 'or their derivatives' to encompass the acrylic polymers listed in the specification, . . . because those polymers are not acids." (Tr. 347:16-20.)

41

polymer, which means that it must have monomers that can form a polymer. (PFF ¶¶ 194, 196-197 (Pl.).)

Thus, for a polymer to meet Dr. Khan's definition of *acrylic polymers*, the monomer must meet "the general formula $C_nH_{2n-2}O_2$" or be a derivative of such a compound. (PFF ¶ 214 (Pl.) (citing 257:4-258:6 (Khan)).) The general formula $C_nH_{2n-2}O_2$ indicates the ratio of carbon atoms (C) to hydrogen atoms (H) to oxygen atoms (O). (PFF ¶ 215 (Pl.) (citing Tr. 267:23-268:16 (Khan)).) The monomer must also be "a monomer from the series of olefin acids." (PFF ¶ 216 (Pl.) (citing 267:4-15, 268:16-17 (Khan)).) For a monomer to be an *olefin acid*, it must have "an olefin component and an acid component." (PFF ¶ 217 (Pl.) (citing Tr. 267:4-15, 268:16-17 (Khan)).) An *olefin* is a double-bonded structure. (PFF ¶ 218 (Pl.) (citing Tr. 267:11-15 (Khan)).)

According to Dr. Khan, polyvinyl acetate fits within his *acrylic polymers* definition. The monomer that is used to make polyvinyl acetate is vinyl acetate. (PFF ¶ 195.) Vinyl acetate satisfies the general formula in Dr. Khan's definition: $C_nH_{2n-2}O_2$. (PFF ¶ 226 (Pl.) (citing Tr. 267:4-268:25 (Khan)).) Vinyl acetate's chemical formula is $C_4H_6O_2$ — that is, four carbon (n = 4), six hydrogen ($2_{n-2}$ = 6), and two oxygen atoms. (ECF No. 170 at 27 (citing PTX117.1; PTX113.3 at Heading 4; Tr. 268:2-16 (Khan)).) Vinyl acetate is also "a monomer from the series of olefin acids." (*Id.*) Dr. Khan testified that an olefin acid has "an olefin component and an acid component." (Tr. 267:4-15, 268:16-14.) The following table illustrates vinyl acetate's structure in two ways — on the left as a line drawing, and on the right showing all of the atoms, with arrows included to identify each component:

42



| NIST Workbook (PTX 117.1) | PDX 3.34 |

[(ECF No. 170 at 27.)]

Dr. Khan testified that the term *olefin* refers to the double-bonded structure, which is also known as a *vinyl group*. (Tr. 267:11-15; *see* Tr. 270:6 (Khan) ("The vinyl is olefin.").)[35] Dr. Khan identified the olefin group in vinyl acetate as the "CH, double-bond CH2," or "CH=CH2," group. (PTX117; ECF No. 170 at 28 (citing Tr. 267:19-20, 270:18-20, 271:12-13 (Khan)).) For the acid component, Dr. Khan identified the "CH3CO" portion of the structure. (PTX117; ECF No. 170 at 28 (citing Tr. 267:20-21, 270:17-18, 271:10-11 (Khan)).) In fact, according to the *NIST WebBook*, vinyl acetate is also known as "acetic acid vinyl ester,"[36] whose structure includes olefin (the vinyl group) and acid (acetic acid) components. (ECF No. 170 at 28 (citing PTX117; Tr. 269:11-270:4 (Khan)); PFF ¶¶ 230-231 (Pl.)).)

---

[35] (*See* PFF ¶ 227 (Def.) ("The terms 'olefin' and 'vinyl' both refer to a carbon-carbon double bond (C=C), also known as a functional group, found in molecules." (citing Tr. 460:22-24, 469:16-19 (Rotella)).)

[36] Dr. Khan testified that "an ester is a derivative of an acid," given that "acid and alcohol react to make an ester." (Tr. 346:13-16.) Dr. Khan also testified that vinyl acetate is an ester that forms from acetic acid, thus making vinyl acetate a derivative of acetic acid. (Tr. 346:21-347:3.) But Dr. Khan testified that "acetic acid is different from acrylic acid," because acrylic acid has acid and olefin components, whereas "acetic acid doesn't have the olefin." (Tr. 347:4-9.) "That's why vinyl acetate is" acrylic "but acetic acid is not." (Tr. 347:9-10.)

43

Thus, if the Court accepts Dr. Khan's definition as the plain and ordinary meaning of *acrylic polymers*, Torrent's use of polyvinyl acetate in its ANDA Products literally infringes the Patents-in-Suit.

**Torrent's response.** Torrent rejects what it calls Dr. Khan's "Frankenstein" definition, claiming that he invented a self-serving definition by modifying a definition in a general-purpose dictionary that Supernus gave him. Torrent argues that Dr. Khan's definition is erroneous for several reasons. For starters, *Webster's* is not the type of technical resource that a POSA would ever consult. In fact, a POSA reading the specification would not feel the need to find a so-called special definition of *acrylic polymers*. This is because, as Dr. Khan conceded, a POSA would consult a dictionary only for unfamiliar terms. (Tr. 335:24-336:4 (Khan).) Yet, as Dr. Khan opined, a POSA would be familiar with the term *acrylic polymers*. (Tr. 336:5-8 (Khan).) So instead of being based on a general-purpose dictionary definition, a POSA's understanding of the plain and ordinary meaning of *acrylic polymers* is reflected in the myriad of technical literature in the field. And none of the technical literature in evidence refers to or classifies polyvinyl acetate as an acrylic polymer. Indeed, Dr. Khan has never seen vinyl acetate described *by name* as an acrylic polymer. (ECF No. 171 at 11 (citing Tr. 312:22-25, 314:22-24 (Khan)).)

Torrent attacks Dr. Khan's motive in crafting his definition. Torrent first asserts that Dr. Khan approached his POSA task with the wrong lens: he testified that he "was trying to get at the intent of the developer here, the formulator here," and "the intent of this author of that patent." (ECF No. 171 at 14 (citing Tr. 255:10-11, 322:17-19 (Khan)).)[37] Indeed, "the focus in construing

---

[37]     (*See also* Tr. 313:11-19 (Khan) ("I would say that vinyl acetate has vinyl background. Vinyl acetate has vinyl background. Methacrylates and acrylates also have vinyl background, as a polymer, when I look at the background, both have vinyl structures, so for me it is an acrylic polymer, but in terms of somebody specifically using the word, I don't know.").)

44

disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term"; it "is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman*, 52 F.3d at 986. The exception to this rule is the parties' subjective intent "as documented in the prosecution history." *Id.* at 985.

Torrent also asserts that Dr. Khan added the words *or their derivatives* to the *Webster's* definition "after a long discussion and conversation" with Supernus's counsel to give him flexibility to apply that definition to other polymers outside the scope of the *Webster's* definition. (ECF No. 171 at 14 (quoting Tr. 262:2-10, 347:16-20 (Khan)).)[38]

---

[38]     Torrent also asserts that Dr. Khan's trial testimony conflicts with his deposition testimony, where Torrent says Dr. Khan agreed that "absent the addition of the words 'or their derivatives,' the *Webster's* definition does not cover vinyl acetate." (ECF No. 171 at 14 (quoting Tr. 343:12-344:4 (Khan)); Tr. 339:11-340:3 (Khan).) At his deposition, when asked if he agreed that the monomer "vinyl acetate does not fit within either definition of acrylic provided in *Webster's*," Dr. Khan responded as follows: "Yeah, I thought I indicated that just the definition acrylic has nothing to do with acrylic polymers, just the definition of acrylic. If you're asking for vinyl, vinyl acetate, not polyvinyl, vinyl acetate, vinyl acetate is not an acid." (Tr. 343:12-21.) Dr. Khan's response makes sense, as Supernus submits, because "[v]inyl acetate is a monomer, and thus would not be described as a polymer." (ECF No. 170 at 28.)

At trial, Torrent confronted Dr. Khan with this deposition testimony. (Tr. 336:21-344:17.) Dr. Khan then clarified that he responded "Yeah" not to Torrent's question but to counsel's "asked and answered" objection, insisting that he "repeatedly said it does fall into it, and that's an acrylic polymer." (Tr. 344:6-17.) On redirect, Supernus read into the trial record excerpts of Dr. Khan's deposition testimony that "polyvinyl acetate does fall into" *Webster's* second definition of *acrylic*. (Tr. 394:2-396:9.) Torrent objected to Supernus's reading, and the Court reserved on its ruling. (Tr. 396:11-14.)

The Court now overrules Torrent's objection. Under Federal Rule of Evidence 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Torrent's use of a small part of Dr. Khan's deposition transcript created confusion about whether Dr. Khan believes that polyvinyl acetate, as opposed to the monomer vinyl acetate, fit *Webster's* second definition of *acrylic* before Dr. Khan added the phrase *or their derivatives*. In fairness, Supernus was entitled to repair the record by

***The technical literature.*** For coating materials, according to Torrent's expert Dr. Felton, formulators "categorize the polymers in three different categories: Cellulosic polymers, acrylic polymers, and vinyl polymers." (ECF No. 171 at 8 (citing Tr. 554:7-10 (Felton)).) For its part, Torrent relies on excerpts from a variety of technical literature that "uniformly refer to polyvinyl acetate as a vinyl polymer, not an acrylic polymer." (*Id.* at 11.)

First is a table from *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*, which Dr. Felton co-edited. (*Id.* at 8 (citing Tr. 554:9-10 (Felton); DTX019 at TORTOP_00127212).) Table 1.2, titled *Polymers Used for Aqueous-Based Coating as Solution or Dispersion*, lists three "[t]ype[s]" of polymers: "Cellulose derivatives"; "Acrylic resin, poly(meth) acrylates"; and "Polyvinyl derivatives." (DTX019 at TORTOP_00127212.) Polyvinyl acetate is in the *polyvinyl derivates* category and not the *acrylic* category. (ECF No. 171 at 8.) Dr. Felton testified that this table is consistent with how a POSA would classify polymers. (Tr. 557:17-24.) But Dr. Felton also testified that she does not consider the three categories to be "definitional." (Tr. 578:22-579:4.) Dr. Khan, for his part, testified that the table includes "[o]nly a small subset of acrylic polymer" and "exclude[s] a lot of acrylic polymers." (Tr. 302:4-12.)

Second is chemical manufacturer BASF's technical information bulletin for Kollicoat SR 30 D, the exact brand of polyvinyl acetate that Torrent uses in its ANDA Products. (DTX020; *see* Tr. 493:19-555:25 (Rotella).) The bulletin refers to Kollicoat SR 30 D as a vinyl polymer. (ECF No. 171 at 9 (citing Tr. 294:12-296:7 (Khan); DTX020).) Dr. Rotella noted that the bulletin "connotes directly the structure of the polymer" and includes "no mention . . . of anything being related to an acrylic polymer" or acrylate derivatives. (Tr. 494:6-25; *see* DTX020 at

---

reading other excerpts of Dr. Khan's deposition transcript giving context to the allegedly conflicting testimony.

TORTOP_001126491 (depicting the structural formula).) Dr. Khan agreed that BASF did not describe polyvinyl acetate as an acrylic polymer, but he insisted that it "do[es]n't necessarily have to" describe it that way. (Tr. 295:19-24.)

Third is the *Handbook of Pharmaceutical Excipients*, a source that provides descriptions and properties of pharmaceutical excipients. (PTX113.3; PFF ¶ 232.)[39] The parties agree that the *Handbook* is a "reliable source that is widely used by formulators." (PFF ¶ 232 (citing Tr. 271:15-272:3 (Khan)); Tr. 298:25-299:3 (Khan).) The *Handbook* describes polyvinyl acetate dispersion as a vinyl polymer. (ECF No. 171 at 9 (citing Tr. 296:9-21, 297:6-10 (Khan); PTX113.3).) Confronted with this description, Dr. Khan testified that, like BASF's bulletin, the *Handbook* need not describe the polymer as within the "broad group" that is acrylic polymers, adding that the *Handbook* does not say that polyvinyl acetate is *not* an acrylic polymer. (Tr. 296:22-297:2.) And, as Dr. Khan noted, the *Handbook* cites as a specific reference BASF's technical information bulletin for Kollicoat SR 30 D. (Tr. 297:15-298:9; PTX113.4.) So, it makes sense that the *Handbook* and BASF's bulletin describe polyvinyl acetate similarly.

Fourth is *Remington: The Science and Practice of Pharmacy.* (DTX207 at 932.) *Remington* notes that "[a]lternatives to the cellulose ethers are acrylic copolymers (eg, methacrylate and methyl methacrylate copolymers) and vinyl polymers (eg, polyvinyl alcohol)." (ECF No. 171 at 10 (citing DTX207 at 932).) Dr. Khan testified that this excerpt of *Remington*, like Table 1.2 in *Aqueous Polymeric Coatings*, is "just one description by one author," is "not all inclusive," and "doesn't encompass a lot of broad acrylic polymers that I used." (Tr. 307:15-22.)

---

[39]     Dr. Khan relied on the *Handbook* during his direct examination. (*See* Tr. 271:19-25 (Khan) ("This is a handbook that we routinely use, I think every formulator uses.").)

47

Fifth is the *NIST Chemistry WebBook* entry for *Acetic acid ethenyl ester*, which Dr. Khan referenced during direct examination. (PTX117; Tr. 308:6-15 (Khan).) The entry lists "[o]ther names" for the compound acetic acid ethenyl ester, including "acetic acid vinyl ester" and "vinyl acetate." (PTX117.) Dr. Khan testified that although the *NIST WebBook* does not identify the compound as "acrylic," it describes the compound in a way such that a pharmaceutical scientist would consider the compound acrylic. (Tr. 309:13-23.)[40] Dr. Khan explained that he would not expect a chemistry book like the *NIST Chemistry WebBook* to use the specific name *acrylate* when describing vinyl compounds, because chemists view compounds more narrowly than do pharmaceutical scientists. (Tr. 310:6-16.) Still, Dr. Khan conceded that he did not know any source that uses the word *acrylic* as part of the chemical name for vinyl acetate; only "[t]he use effect." (Tr. 310:17-20, 312:22-313:3.) This includes his own publications. (Tr. 312:22-313:3 (Khan).)

Sixth is *Polymer Science: A Textbook for Engineers and Technologists* — specifically, section 2.5 of Chapter 2 titled *Classification of Polymers*. (DTX027 at TORTOP_00126557.) In the subsection titled *Acrylic Polymers*, it notes that "[i]n this class, the polymers are derived from acrylic acid $CH_2=CH–CO–OH$ and methacrylic acid $CH_2=C(CH_3)–CO–OH$." (DTX027 at TORTOP_00126561; *see* Tr. 489:1-8 (Rotella).) In a separate subsection titled *Polyvinyl Esters*, it notes that "[p]olyvinyl acetate (PVA) belongs to this class, widely used in the form of aqueous emulsions for the manufacture of paints." (DTX027 at TORTOP_00126562; *see* Tr. 489:9-12 (Rotella).) Torrent's expert Dr. Rotella noted that *Polymer Science*'s method of classifying polymers matches the way in which *Remington* and *Aqueous Polymeric Coatings* classify

---

[40]    Torrent attacks Dr. Khan's testimony, "For me it's an acrylic polymer," as conveying his personal opinion rather than a POSA's understanding. (ECF No. 171 at 10 (quoting Tr. 308:6-20).) The Court disagrees. Dr. Khan made clear that he opined from a POSA's perspective.

polymers: by the polymers' structure. (Tr. 489:13-17.) He added that he was "unaware of any textbook that illustrates that polyvinyl acetate is an example of an acrylic polymer." (Tr. 489:18-19.)

Last is *Hawley's Condensed Chemical Dictionary*. (DTX033.) In *Hawley's*, the definition of *acrylic polymers* refers readers to *acrylic resins*, which "is another word for acrylic polymers," according to Dr. Rotella. (Tr. 491:21-25; DTX033.) The definition also notes that acrylic resins include "acrylonitrile." (Tr. 491:21-492:6.) Dr. Rotella testified that acrylonitrile "does not fit the empirical formula" of Dr. Khan's definition of *acrylic polymer*. (Tr. 492:3-6.) In addition, *Hawley's* defines *acrylic acid* using a structure. (Tr. 490:24-491:20; DTX033.) Dr. Rotella acknowledged, however, that *Hawley's* also refers to acrylonitrile as "vinyl cyanide," though he added that "nobody calls it that" (PFF ¶ 238 (Pl.); Tr. 508:15-509:23).

**Dr. Rotella's rebuttal opinion.** Torrent's expert Dr. Rotella disagrees with Dr. Khan's use of "the general formula $C_nH_{2n-2}O_2$" and the functional groups "olefin acids" to define *acrylic polymers*. Dr. Rotella opined that chemical compounds are defined by their structure, and that a POSA would not define a compound's structure based on its empirical formula or "functional groups that might be present in [the] structure." (Tr. 464:16-24 (Rotella).) An empirical formula describes "the number and type of atoms that exist in a molecule" — for example, in Dr. Khan's definition, "how many carbon atoms there are, how many hydrogen atoms there are, how many oxygen atoms there are." (Tr. 453:19-22, 456:2-18 (Rotella).) But according to Dr. Rotella, an empirical formula is "imprecise" and "confers no information about structure." (Tr. 453:19-22, 456:2-18.) In fact, an empirical formula does not determine or describe chemical structure; "[t]he bonding of atoms to other atoms is what describes it." (Tr. 537:24-538:8 (Rotella).) "The point here," Dr. Rotella said, "is that structure is unique and empirical formula is not. . . . And, therefore,

49

using empirical formula to help define structure is inappropriate, incomplete, and insufficient." (Tr. 538:7-11; *see* Tr. 465:2 (Rotella) ("Structure is unique; empirical formula is not."); Tr. 540:13-19 (Rotella) ("Empirical formula, in my opinion, as a person of skill in the art, is irrelevant. It simply is being employed here to define something. And that definition is, as I said, inappropriate, incomplete, and imprecise.").)

Dr. Rotella opined that "vinyl acetate is not an acrylic derivative[,] because the structures are different." (Tr. 471:22-23.) Indeed, Dr. Rotella testified, "vinyl polymers such as polyvinyl acetate polymers are characterized and classified differently" from acrylic polymers, "because they have different chemical structures." (Tr. 484:15-18.) He testified that the two terms and their descriptions in *Hawley's* are "mutually exclusive." (Tr. 493:7-10.) Acrylic polymers and vinyl polymers are "chemically and structurally distinct." (Tr. 506:19-23.)

Dr. Rotella testified that molecules could have the same empirical formula but have different chemical structures.[41] (Tr. 458; *see* Tr. 460:7-8 (Rotella) ("These two molecules have the same empirical formula but a different chemical structure.").) To illustrate, Dr. Rotella testified that acrylic acid, for example, has an olefin, which is "also sometimes called a vinyl group." (Tr. 460:21-24.) He then compared acrylic acid with another, unidentified molecule that has the same empirical formula, including the olefin, but has a different chemical structure. (Tr. 461:4-10.) Dr.

---

[41]     Dr. Rotella taught some chemistry fundamentals. "[M]olecules are made up of atoms. . . . And those atoms are connected to each other by bonds." (Tr. 458:24-459:3.) "A polymer . . . is a large molecule with a collection of monomeric units. And those monomeric units can be the same or they can be different." (Tr. 467:3-5.) "Polymerization is simply a general term for the chemical reaction by which monomers are connected to each other to make a polymer, and that's a chemical reaction that is, in many cases, very well established. It can be carried out by machines and it can be carried out by technicians according to recipes." (Tr. 467:7-12.) A "carbonyl functional group" is written as "C=O." (Tr. 468:10-15.) "[Y]ou need the elements of that . . . olefinic bond to make new bonds with other units in the structure," and so when polymerization occurs, the olefin "disappears." (Tr. 469:18-25 (cleaned up).)

Rotella's point was this: "[E]mpirical formula is not a determinant of structure. Structure determines structure, and how atoms are bonded to each other determines structure. Empirical formulas are not unique; structure is, and structure can be different." (Tr. 460:9-14.)

Dr. Rotella then compared the polymerization of an acrylic derivative with that of a vinyl acetate. (Tr. 467.) He explained that in the demonstratives, *R* "represents a variable group in the structure" — "[i]t can be changed to other atoms." (Tr. 470:8-11.) When *R* is hydrogen (H), the molecule is acrylic acid; when *R* is a "CH3 group," the molecule is a "methyl group." (Tr. 470:11-15.) Though the molecules are different, both "are acrylic derivatives because they are derived from acrylic acid or . . . structurally associated with acrylic acid." (Tr. 470:16-20.) But "regardless of what this R is," Dr. Rotella testified, a POSA would never "confuse an acrylic derivative . . . with vinyl acetate, because the structures are different" and "[t]hose differences in structure in the monomers are relayed faithfully into the polymers." (Tr. 471:24-472:3.)

Dr. Rotella then discussed examples of acrylic monomers that derive from acrylic acid. The examples were acrylic esters, which are "a family of molecules"; methyl methacrylate; acrylamides, which are also "a family of molecules"; and acrylonitrile. (Tr. 475:9-476:25.) He testified that although acrylamides and acrylonitrile "contain a vinyl group" — that is, an olefin — and "are used in polymers," these two molecules' formulas do not fit the empirical formula in Dr. Khan's *acrylic polymers* definition, because the molecules have a nitrogen atom and no oxygen atom. (Tr. 477:1-18, 478:1-4.) This illustrates, according to Dr. Rotella, "the imprecise, imperfect, and incomplete nature of using an empirical formula as a means for defining the term 'acrylic polymers.'" (Tr. 477:15-18.)

51

Dr. Rotella also testified that not all acrylic polymers have the same structure. (Tr. 477:21-23.) And "depending on the specifics of structure," Dr. Rotella continued, "these molecules can have distinct empirical formulas." (Tr. 477:24-478:1.)

Having discussed the "acrylic polymer family," Dr. Rotella shifted to describing vinyl acetate monomer and polymer units. (Tr. 478:5-9.) He explained that the vinyl acetate monomer's structure includes an olefin, which is where the "monomer undergoes polymerization . . . to create the polyvinyl acetate polymer." (Tr. 478:21-24.) He testified that "this monomer and this polymer are structurally distinct from the acrylic monomers and acrylic polymers." (Tr. 479:11-13.)

Dr. Rotella also described the structural differences between an acrylic derivative monomer and a vinyl acetate monomer. Starting with acrylic derivatives, Dr. Rotella testified that "by definition of acrylic derivative," its structure must have an olefin unit (*i.e.*, two carbon atoms double-bonded together, or "C=C"), with one of the double-bonded carbon atoms bonded to another carbon atom ("C–C"), with that other carbon atom bonded to either an oxygen or a nitrogen atom. (Tr. 480:13-481:13.) He testified that the "one tiny exception to this" is "acrylonitrile," whose second of the single-bonded carbon atoms is triple-bonded to a nitrogen atom. (Tr. 481:14-18.)

Turning to vinyl acetate, Dr. Rotella testified that vinyl acetate's structure has the same olefinic unit, and that "a vinyl polymer is defined, first off, by this olefinic unit," and "then there is another atom," which can be an oxygen or a carbon atom. (Tr. 482:7-24.) "The acrylic derivative," by contrast, "is defined by that olefin functional group, a carbon and then either an oxygen or a carbon." (Tr. 482:24-483:1.) Dr. Rotella also testified, referencing a demonstrative exhibit, that "where these molecules are similar is in the olefin functional group . . . . [I]t's identical in both." (Tr. 480:6-7.)

52

Asked to respond to "Dr. Khan's position that these two molecules" — the acrylic derivative and vinyl acetate — "are nearly identical or don't have widely differing structures," Dr. Rotella testified as follows:

> Well, you know, depending on your definition of widely different or not widely different, you might say, well, okay, that's a possibility, but they are different. It doesn't matter if there's one atom or several atoms that are different. The fact that the basic units in the two structures are different makes these molecules different. And it prevents a person of skill in the art from confusing them. They are mutually exclusive.

[(Tr. 483:7-18.)]

Dr. Rotella then compared the chemical structures of polymethyl acrylate and polyvinyl acetate polymers that Dr. Khan had discussed:



[(PTX195 (polymethyl acrylate) (left); PTX196 (polyvinyl acetate) (right).)]

Dr. Rotella contended that the depiction of the polymethyl acrylate structure "could have been cherrypicked because it happens to have the same empirical formula as polyvinyl acetate." (Tr. 484:1-5.) By "cherrypicked," Dr. Rotella meant that both structures depicted the empirical formula of Dr. Khan's definition, though "a different acrylic polymer could have been picked" as the comparison. (Tr. 484:21-485:24.) But still, Dr. Rotella testified, "these two structures are different," and despite their similarities, "a [POSA] would not confuse them[,] because they are structurally distinct." (Tr. 484:8-12, 485:17-21.)

53

Dr. Rotella was then asked why these differences are important. He responded that "the differences in structure lead to differences in clarification and description of polymers," adding that "polymers are often described in terms of structural classes, as was done in the patent, for example." (Tr. 486:10-20.) Dr. Rotella testified that "the patent uses the terminology 'cellulosic polymers' and 'acrylic polymers.' And both of those terms refer to a wide family of structural units that are structurally distinct from each other." (Tr. 486:21-24.) Dr. Rotella further testified that the term *vinyl polymers* "is a distinct structural class of molecules that have distinct chemical structures from either of the two claimed in the patents-in-suit here. And those structures are different. And those vinyl polymers are not -- are specifically not mentioned and not claimed in the claims in the patents-in-suit." (Tr. 486:25-487:5.)

On cross-examination, some concerns were raised about the reliability of Dr. Rotella's opinions. As to his experience, Dr. Rotella has collaborated with people "who have designed [sustained-release] formulations," but he has never designed one himself or developed a drug that received FDA approval. (Tr. 497:8-498:7.) In his work from 2006 and earlier, he had not used the *Handbook of Pharmaceutical Excipients*, because he was not involved with carrying out formulation research. (Tr. 498:24-499:13.) He has no personal experience developing a product using polyvinyl acetate or polymethacrylate. (Tr. 499:14-21.) And he has no "direct experience with" or "personal knowledge about whether poly methacrylate" or polyvinyl acetate "can be used as a coating material for release-controlling coatings and in an extended-release formulation of a drug," which Dr. Rotella testified is "outside the scope of my expertise." (Tr. 501:2-17.)

Another concern stems from two errors that Dr. Rotella made in his expert report. First, Dr. Rotella acknowledged that just two weeks before trial, he submitted an errata sheet to his expert report, revising the name "hydroxypropyl methyl cellulose" to "methyl cellulose," an error that he

chalked up to a typo. (Tr. 502:13-18.) But when confronted with the error, Dr. Rotella testified that his errata sheet was incorrect — "I made a mistake in correcting a mistake." (Tr. 505: 2-506:17.) Second, in the report's sentence "A direct comparison of the structure of polyvinyl acetate and polyvinyl acrylate polymers are shown below," Dr. Rotella erroneously wrote "polyvinyl acrylate polymers" instead of "acrylate polymers." (Tr. 520:17-521:8.)

Perhaps most important, Dr. Rotella conceded that there are circumstances where "acrylic compounds" and "vinyl compounds" are not mutually exclusive. (Tr. 517:12-15.) The concession came from a series of questions about the book *Polymer Chemistry*, on which Dr. Rotella relied in his expert report. (PTX192; Tr. 512:20-22.) Figure 1.4 of *Polymer Chemistry* shows the "[p]olymerization of an olefinically unsaturated compound."



[(PTX192.17.)]

Dr. Rotella first acknowledged that both the structure of the unit depicted in Figure 1.4 and the structures of the polyacrylonitrile, polyvinyl acetate, polymethyl acrylate units depicted, respectively, in PTX198 share a "similar functional group": the olefin, which "is necessary for the polymerization reaction." (Tr. 515:23-516:13.)

55

[(PTX198 (from left to right: polyacrylonitrile, polyvinyl acetate, polymethyl acrylate); *see also* Tr. 510:4-511:14 (Rotella) (identifying the structures)).]

Supernus then confronted Dr. Rotella with this excerpt from *Polymer Chemistry*: "Vinyl compounds can often be polymerized by a chain-growth mechanism. Here, the double bond is converted into two single bonds (see Fig. 1.4)." (PTX192.16; Tr. 516:20-24.) Dr. Rotella testified that the book uses the term *vinyl* to refer to the olefinic unit that is common among the structures of the polymers depicted in PTX198. (Tr. 516:25-517:6.) Still, Dr. Rotella testified, a POSA "recognizes that there is variability in that R and that the polymers derived therefrom can be characterized and should be characterized differently because they are structurally distinct, depending on what you're comparing." (Tr. 517:7-11.) But ultimately, Dr. Rotella testified that "acrylic compounds contain a vinyl unit. They contain an olefinic unit." (Tr. 517:12-15.) Dr. Rotella nevertheless contested that the existence of a vinyl unit dictates how a POSA characterizes polymers. (Tr. 517:17-19.)[42]

In the same light, Supernus confronted Dr. Rotella with a 2004 article by D. Jones titled *Pharmaceutical Applications of Polymers for Drug Delivery* — excerpts of which were read into the record.[43] (Tr. 521:17-19, 522:23-24.) In section 1.2 titled *Examples of Pharmaceutical*

---

[42]     Torrent offered a cleaned-up version of this testimony in its proposed findings of fact: "References may use bond nomenclature [to] describe a molecule, but again, this nomenclature does not mean that anything with a vinyl bond, for instance, is automatically a vinyl polymer." (PFF ¶ 243 (Def.) (citing Tr. 517:2-6 (Rotella)).) At closing arguments, Supernus argued that "every acrylic polymer has a vinyl backbone. . . . So the acrylic polymers are vinyl polymers" (Tr. 737:16-18); Torrent countered that "just because a molecule has a vinyl bond doesn't make it a vinyl polymer" (Tr. 748:19-20).

[43]     Under Federal Rule of Evidence 803(18)(B), a "statement contained in a treatise, periodical, or pamphlet" is not hearsay if "(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." The rule permits admissible statements to "be read into

*Polymers*, it states, "As described previously, there are a wide range of polymers that are used as components of pharmaceutical formulations." (Tr. 521:23-522:22.) Underneath section 1.2 is subheading 1.2.1 titled *vinyl polymers*. (Tr. 523:2-5.) And underneath that section is subheading 1.2.1.1 titled *poly methacrylates*. (Tr. 523:6-8.) Based on this limited review of the article, Dr. Rotella surmised that the author "characterize[d] polymers based on the existence of a vinyl group, as we've seen in others." (Tr. 523:16-18.) He reasoned that "the characterization here goes from the so-called vinyl polymers, that is, polymers that contain an olefin, to cellulose polymers, and it breaks those down structurally as well." (Tr. 523:18-21.) "And so," Dr. Rotella concluded, "I think what he's referring to here is -- if I look at this in context -- is the functional unit in a molecule that undergoes the polymerization reaction, not in terms of structural characterization which he does differently." (Tr. 523:22-25.)

Also underneath the *vinyl polymers* subsection is subheading 1.2.1.2 titled *polyvinyl alcohol*. (Tr. 524:13-21.) Dr. Rotella testified that polyvinyl alcohol is "structurally distinct from polyvinyl acetate because . . . the polymer contains a different structure." (Tr. 524:22-525:1.)

The next line of questions fielded a well-made objection. While cross-examining Dr. Rotella, Supernus tried to run a Google search of "popular types of acrylic polymers." Supernus anticipated that the search would return a link to a chemical manufacturer's website showing that "at least some people who are in the chemical arts would understand that polyvinyl acetate is an acrylic polymer." (Tr. 526:17-527:2.) Supernus's idea was to contradict Dr. Rotella's opinion that a POSA "would not confuse and not mistake polyvinyl acetate for an acrylate polymer because they are structurally distinct." (Tr. 526:9-15.) Torrent argued that this was not a proper basis for

---

evidence but not received as an exhibit." Fed. R. Evid. 803(18). Supernus used the D. Jones article on cross-examination. Although Dr. Rotella had never seen the article before, Torrent did not object to Supernus's reading it into the record.

impeachment and challenged the search results' authenticity and evidentiary value. (Tr. 527:7-11.) Supernus responded that the search would rebut Dr. Rotella's opinion that "no one or no POSA would consider polyvinyl acetate as being a kind of acrylic polymer." (Tr. 528:17-25.)

Impeachment by contradiction is a permissible theory of impeachment. *Primus v. Target Corp.*, 532 F. App'x 314, 315 (3d Cir. 2013) (citing *United States v. Gilmore*, 553 F.3d 266, 271 (3d Cir. 2009); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 n.8 (9th Cir. 2009)). But here, the Internet marketing materials, which Supernus offers for their substantive truth, are hearsay. For the Court to admit them, they must meet a hearsay exception. *See Pernix Ireland Pain Dac v. Alvogen Malta Cperations Ltd.*, 316 F. Supp. 3d 816, 826 (D. Del. 2018) ("An effort to impeach a witness with an out-of-court statement made by another person necessarily relies on the truth of the out-of-court statement and, consequently, requires a hearsay exception for admission." (quoting 30B Charles Alan Wright, et al., Fed. Prac. & Proc. Evid. § 6728 (2018 ed.))).[44] Supernus cited no hearsay exception. More important, as Torrent correctly asserted, "people on the internet [are] not a [POSA]." (Tr. 529:4-5.) As a result, the Internet materials do not in fact contradict Dr. Rotella's testimony about a POSA's understanding. *See Primus*, 532 F. App'x at 315 ("Absent an actual contradiction, the evidence could not impeach by contradiction."). The Court therefore finds that the Internet materials are unreliable and inadmissible, and it will not consider the related testimony in its decision.

---

[44]     *C.f. Huzinec v. Six Flags Great Adventure, LLC*, 2023 WL 1433633, at *3 (3d Cir. Feb. 1, 2023) (ruling that YouTube videos offered to prove that Six Flags was on notice of a danger, not the truth of the matter asserted, were not hearsay); *Express Homebuyers USA, LLC v. WBH Mktg. Inc.*, 323 F. Supp. 3d 784, 789 n.3 (E.D. Va. 2018) (finding that results of the Internet search "we buy houses" were not hearsay where they were offered to show not that "companies advertising home-buying services in fact buy houses" but that "many third parties currently use and have used the 'we buy houses' phrase").

Finally, when confronted with the claim limitations at issue, Dr. Rotella agreed that "for any structure to fit within the claim language, it would need to be able to form a polymer." (Tr. 539:17-20 (referencing DTX170 ¶ 45).) He acknowledged that some of the molecules that he used to demonstrate the notion that molecules can have the same empirical formula but different structures "may not be able to form polymers." (Tr. 539:22-540:11; *see* Tr. 466:3-25.)[45]

**_The Court's conclusions._** The Court finds that Supernus has not shown by a preponderance of the evidence that a POSA would understand the plain and ordinary meaning of *acrylic polymers* to include polyvinyl acetate.

Supernus contends that the term *acrylic polymers* needs no construction, as Dr. Khan testified, "because a POSA knows what the polymer is," "knows what function it plays," and "uses [them] all the time." According to Supernus, pharmaceutical scientists focus on a polymer's function, not on its structure. (PFF ¶ 55 (Pl).)[46] As Dr. Khan sees it, if a pharmaceutical scientist knows that a polymer functions like an acrylic polymer, the scientist need not consult a definition to know that it is an acrylic polymer. By Dr. Khan's analogy, people who have seen an elephant know what an elephant is; his definition was purposed to "describe an elephant to people who haven't seen" one before. (Tr. 322:2-12.)

The problem for Supernus is that a purely function-based description — such as "a release controlling coating" (PTX233.210) — is something the PTO examiner rejected during the patent prosecution:

---

[45]    At trial, Supernus objected to Torrent's use of DDX107, which depicted chemical structures that were not disclosed in Dr. Rotella's report. (*See* Tr. 421-435.) Because neither DDX107 nor Dr. Rotella's related direct-examination testimony meaningfully influenced the Court's decision, the Court need not resolve the objection.

[46]    (*See* Tr. 314:10-12 (Khan) ("So within acrylic, there is vinyl set of polymers that are separated out from acrylic, but they work the same way. They work as acrylic polymer.").)

Defining . . . release coatings in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the . . . release coatings which would have the stated function.

Applicants are describing what . . . release coatings do rather than what they are. Describing a compound by its functions [(release coatings)] will not substitute for written description of the structure of the compound. Describing the function of a compound fails to distinguish the compound from other molecules or agents that can perform the same functions.

[(PTX233.230.)]

Hoping to solve that problem, Dr. Khan crafted a definition that he believed both covered the acrylic polymers in the Patents-in-Suit and included a structure feature: the olefin acid. (Tr. 267:8-268:22 (Khan).) Indeed, Dr. Rotella also referred to an olefin as a "functional group" and to an acid as "a different functional group." (Tr. 455:16-19, 480:5-7, 482:22-25, 516:6-13 (Rotella).)

But the Court is not satisfied that a POSA would more likely than not read the specification and arrive at Dr. Khan's exact definition. The Court expects that if a pharmaceutical scientist viewed the olefin acid as the structure feature that, coupled with the empirical formula, defined a polymer as acrylic, vinyl, or both, that view might oft appear in technical literature. Yet Dr. Khan's definition is not in any of the technical literature in evidence. Even in *Webster's*, the source from which Dr. Khan drew his definition, the *acrylic* definition needed Dr. Khan's modification to cover the claimed acrylic polymers.[47] And, as Torrent established through cross-examination, Dr. Khan

---

[47]     The Court rejects Torrent's argument that general-use dictionaries cannot be used to define scientific terms. The Federal Circuit has cited similar dictionaries for definitions of chemical compounds. *See, e.g.*, *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) (noting the definition of *anhydrite* from *Webster's Third New International Dictionary of the English Language Unabridged* (1986)). General-use dictionaries are unhelpful when a claim term has a different meaning in the art than it has in common, lay usage. *See Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004) ("[A] general-

is "not aware of any references that discuss or describe vinyl acetate as an acrylic polymer." (Tr. 314:22-24.)

On the other hand, the record supports that no all-encompassing definition of *acrylic polymers* may exist. That explains the, as Torrent put it, "Frankenstein" nature of Dr. Khan's definition. But record evidence also shows that acrylic polymers and vinyl polymers are not always mutually exclusive. For instance, *Hawley's* refers to *acrylonitrile*, an acrylic polymer, as "vinyl cyanide," showing that acrylic polymers can be described as vinyl polymers. For another, Dr. Rotella acknowledged that the 2004 D. Jones article characterizes polymers with vinyl groups as vinyl polymers. The article supports Dr. Khan's opinion that a pharmaceutical scientist prioritizes a polymer's function and thus focuses on its functional group — that is, the olefin, also called the vinyl group.

In addition, Dr. Rotella offered nothing but his testimony to support his "definitions" of vinyl polymers and acrylic polymers, which were vague and overly sensitive to structure:

> DR. ROTELLA. And a vinyl polymer is defined, first off, by this olefinic unit. And then there is another atom here in this example. It happens to be oxygen. But in other examples it can be a carbon atom, but that carbon atom then is bonded in different ways to other carbon atoms present in this structure. But in this specific example, so vinyl acetate is defined by the oxygen atom and the olefin functional group here. The acrylic derivative is defined by that olefin functional group, a carbon and then either an oxygen or a carbon. And those are different. And that's why the term "acrylic" means something. That's why the term "vinyl" means something. Those terms confer structure. And the word "acrylic" confers the structure as I have just outlined it for you and illustrated it for you.
>
> [(Tr. 482:17-483:5.)]

---

usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term."). Torrent has not argued that *acrylic polymers* means something different in the drug-delivery context than in lay usage.

The Court does not find that a POSA would view structural differences as narrowly as Dr. Rotella views them. Dr. Rotella's testimony highlights his sensitivity to even slight differences between structures. He testified that polyvinyl alcohol and polyvinyl acetate are "structurally distinct" because they contain different structures. He also testified that "[i]t doesn't matter if there's one atom or several atoms that are different. The fact that the basic units in the two structures are different makes these molecules different. And it prevents a person of skill in the art from confusing them. They are mutually exclusive." (Tr. 483:7-18.)

In addition, as knowledgeable as Dr. Rotella is about organic chemistry and drug discovery, he lacks experience in drug formulation and delivery. Yet Dr. Felton, an expert in the field of drug formulation and modified drug delivery systems (Tr. 553:10-17 (Felton)), did not provide testimony corroborating Dr. Rotella's narrow view of classifying polymers. On the topic, Torrent established only her opinion that *Aqueous Polymeric Coatings*'s depicting cellulosic, acrylic, and vinyl polymers separately is consistent with how formulators classify polymers. (Tr. 557:17-21.) Even so, Dr. Felton testified that the depiction was not definitional. Beyond that, her infringement testimony concerned only the doctrine of equivalents.

In sum, the Court finds that there may be more than one way to classify a polymer, and that there are times when acrylic polymers and vinyl polymers may overlap. That said, Supernus has not proven by a preponderance of the evidence that a POSA would apply Dr. Khan's definition to conclude that polyvinyl acetate falls within the plain and ordinary meaning of *acrylic polymers*. The Court therefore rules that Torrent's ANDA Products do not literally infringe the Asserted Claims.

### B.    Doctrine of Equivalents

Next, the Court decides whether Supernus proved by a preponderance of the evidence that Torrent's ANDA Products infringe the *acrylic polymers* limitation under the doctrine of equivalents.  "Under [the doctrine of equivalents], a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1375 (Fed. Cir. 2022) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)).

But first, Supernus must prove by a preponderance of the evidence that its prosecution history does not estop it from asserting infringement by equivalence.

### 1.    Prosecution History Estoppel

"Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013)).  "Prosecution history estoppel can occur in two ways: 'either (1) by making a narrowing amendment to the claim ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent examiner ("argument-based estoppel").'" *Id.* (quoting *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006)).

An amendment is narrowing if it is necessary to satisfy a requirement of the Patent Act and secure the patent. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736-37 (2002).  Indeed, "[a] patentee who narrows a claim as a condition for obtaining a patent disavows

[its] claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Id.* at 737. In contrast, "[i]f a § 112 amendment is truly cosmetic, then it would not narrow the patent's scope or raise an estoppel." *Id.* at 736-37. A "patentee's decision to narrow [its] claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting *Festo*, 535 U.S. at 725). This is often called the "*Festo* presumption."

Torrent invokes amendment-based estoppel. It argues that during the prosecution of the '580 patent,[48] the applicants made a narrowing amendment surrendering polyvinyl acetate as a release controlling polymer. (ECF No. 171 at 24-27; *see* PTX233.1 ('931 application).) The Court must therefore analyze the prosecution history.

An earlier version of subsection (a) of claim 104 in the '931 application read "(a) at least two different extended release topiramate-containing components, wherein each component comprises a release controlling coating specific for its component. . . ." (PTX233.210.)

In an August 8, 2012 Office Action, the examiner rejected claim 104 of the '931 application for "failing to comply with the written description requirement" under § 112. (PTX233.229.) The examiner reasoned as follows:

> The disclosure of a species may provide an adequate written description of a genus when the species disclosed is representative of the genus. The present claims encompass any and all enhancing agents, complexing agents and release coatings that can exist. There is substantial variability among the species of enhancing agents, complexing agents and release coatings encompassed within the scope of the claims because the enhancing agents, complexing agents and release coatings have widely differing structures and

---

[48]    The '580 patent was prosecuted under U.S. Patent Application No. 12/926,931 ("the '931 application"). (PTX233.1.) In the *Markman* Opinion, the Court found that "[t]he parties also agree that, because the patents in suit are part of the same patent 'family,' the 'prosecution history of related patents is relevant to all patents in that family.'" (ECF No. 88 at 8 (citations omitted).) Thus, the '580 patent prosecution history is relevant to the Patents-in-Suit.

corresponding biological activities. Defining the enhancing agents, complexing agents and release coatings in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the enhancing agents complexing agents and release coatings which would have the stated function.

Applicants are describing what the enhancing agents, complexing agents and release coatings do rather than what they are. Describing a compound by its functions (enhancing agents, complexing agents and release coatings) will not substitute for written description of the structure of the compound. Describing the function of a compound fails to distinguish the compound from other molecules or agents that can perform the same functions.

A description of a genus may be achieved by means of a recitation of a representative number of species falling within the scope of the genus or of a recitation of structural features common to the members of the genus, which features constitute a substantial portion of the genus. Regents of the University of California v Eli Lilly Co., 119 F3d 1559, 1569, 43 USPQ2d 1398, 1406 (Fed Cir 1997). Consequently, the Examiner notes that the claimed invention which is drawn to a genus of enhancing agents, complexing agents and release coatings may be adequately described if there is a (1) sufficient description of a representative number of species, or (2) by disclosure of relevant, identifying characteristics sufficient to describe the claimed invention in such full, clear, concise and exact terms that a skilled artisan would recognize applicant was in possession of the claimed invention. Here, the specification discloses only a few common structural features shared by the members of the claimed genus. Since the claimed genus encompasses compounds yet to be discovered, the disclosed structural feature does not constitute a substantial portion of the claimed genus.

Therefore, the disclosure of several examples of enhancing agents, complexing agents and release coatings and others listed in the specification, does not provide an adequate description of the claimed genus of enhancing agents, complexing agents and release coatings because the claims are broader than the disclosure.

[(PTX233.230-231.)]

In response, the applicants amended subsection (a) of claim 104, adding this underlined clause: "(a) at least two different extended release topiramate-containing components, wherein

65

each component comprises a release controlling coating specific for its component <u>and comprising</u> <u>a coating material selected from the group consisting of cellulosic polymers and acrylic polymers</u>. . . .” (PTX233.242.)  In their remarks, the applicants first acknowledged that claim 104 “stand[s] rejected for failing to comply with the written description requirement” — “[i]n particular, . . . that the specification fails to adequately describe . . . ‘release controlling coating’.”  The applicant then stated that “[a]lthough Applicants respectfully disagree, solely in the interest of compact prosecution, Applicants have amended the claims to now recite species of the noted genera.” (PTX233.249.)

Supernus does not deny that the amendment was narrowing for patentability reasons. Indeed, the examiner rejected the original claim for written-description shortcomings.  The responsive amendment was purposed to address the examiner’s concerns about compliance with § 112.  And given the examiner’s note that the original claim encompassed “any and all . . . release coatings that can exist,” including “compounds yet to be discovered” (PTX233.230-231), the original claim covered polyvinyl acetate.  *C.f. Intendis GMBH v. Glenmark Pharms. Inc., USA*, 822 F.3d 1355, 1365-66 (Fed. Cir. 2016) (holding that where the claims as originally written could not have included the accused equivalent, the amendment was made for clarification, not patentability).  For these reasons, the Court finds that there is a presumption of prosecution history estoppel.[49]

### 2. Tangential Relation

The issue, then, is whether Supernus has rebutted the presumption.  There are three ways to overcome the presumption: “(1) the rationale underlying the amendment bears no more than a

---

[49]     In support of estoppel, Torrent asserts that “Supernus chose to use the closed transition phrase ‘consisting of’ in its amendment.”  (ECF No. 171 at 26.)  Because the Court finds that the *Festo* presumption applies regardless of this argument, the Court need not analyze it.

tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1364 (Fed. Cir. 2020) (citing *Festo*, 535 U.S. at 740-41). The standard to rebut the presumption is a preponderance of the evidence. *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1359 (Fed. Cir. 2013).

Supernus invokes only the "tangential relation" exception: that "the rationale underlying the amendment . . . bore no more than a tangential relationship to the alleged equivalent (i.e., polyvinyl acetate)." (ECF No. 170 at 33.) "The tangential relation inquiry 'focuses on the patentee's objectively apparent reason for the narrowing amendment,' which 'should be discernible from the prosecution history record.'" *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting *Integrated Tech.*, 734 F.3d at 1358). Courts considering the tangential relation exception ask "whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1354 (Fed. Cir. 2019) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003)).[50]

Supernus argues that "the objectively apparent reason for the amendment was to alleviate the Patent Office's explicitly stated concern that the claims, as then written, encompassed coatings that 'have widely differing structures and corresponding biological activities.'" (ECF No. 170 at 34.) Polyvinyl acetate, Supernus says, "has the *same biological activity* and a *structure that is*

---

[50] Tangential means "touching lightly or in the most tenuous way." *Eli Lilly*, 933 F.3d at 1331 (quoting *Webster's* Third New International Dictionary (2002)).

67

*nearly identical* to the structure of the exemplary acrylic polymers listed in the patent specification." (*Id.*)

Torrent counters that "the clear purpose of Supernus's amendment was to overcome a § 112 rejection by claiming specific polymers (cellulosic and acrylic polymers) and surrendering other polymers (vinyl polymers)." (ECF No. 171 at 28.) Torrent asserts that Supernus puts all of its weight behind one sentence from the prosecution history: that "[t]here is substantial variability among the species of enhancing agents, complexing agents and release coatings encompassed within the scope of the claims because the enhancing agents, complexing agents and release coatings have widely differing structures and corresponding biological activities." (*Id.*)

The Court must resolve whether the objectively apparent reason for Supernus's amendment narrowing the release coatings to cellulosic polymers and acrylic polymers was more than tangentially related to polyvinyl acetate.

"[W]hether the patentee has established a merely tangential reason for a narrowing amendment is [a question of law] for the court to determine from the prosecution history record without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record." *Festo*, 344 F.3d at 1370. "[T]he reason for an amendment, where the tangential exception is invoked, cannot be determined without reference to the context in which it was made." *Eli Lilly*, 933 F.3d at 1332. The Federal Circuit has described this analysis as "case-specific," cautioning that "analogies to other cases [are] less helpful than a direct consideration of the specific record . . . and what it shows about the reason for amendment and the relation of that reason to the asserted equivalent." *Id.* at 1332 n.5. Indeed, prosecution history estoppel has not applied "in similar circumstances, where the prosecution

68

record differed." *Id.* at 1333; *see Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010) ("[T]here is no hard-and-fast test for what is and what is not a tangential relation.").

That said, it is helpful to understand how the Federal Circuit has addressed the tangential exception in comparable circumstances.

In *Eli Lilly & Co. v. Hospira, Inc.*, the patent owner narrowed claims during prosecution to recite "pemetrexed disodium" instead of "an antifolate." 933 F.3d at 1325-26, 1330-31. The accused equivalent was pemetrexed ditromethamine, which is functionally identical to pemetrexed disodium. *Id.* at 1327. The Federal Circuit concluded that "[t]he reason for Lilly's amendment . . . was to narrow original claim 2 to avoid Arsenyan, which only discloses treatments using methotrexate, a different antifolate," and "not to cede other, functionally identical pemetrexed, salts." *Id.* at 1331. Thus, claiming the functionally equivalent pemetrexed salts was only tangential to overcoming prior art disclosing an antifolate other than pemetrexed.

There is more to take from the *Eli Lilly* decision. First, the Federal Circuit does not "demand perfection from patent prosecutors." *Id.* at 1332. Even "inartful" amendments may be saved depending on the context. *See id.* ("The prosecution record implies that Lilly's amendment, inartful though it might have been, was prudential in nature and did not need or intend to cede other pemetrexed salts.").

Second, a patentee invoking the tangential exception need not "prove that it could not have drafted a claim that literally encompassed" the accused equivalent. *Id.* at 1332. The patentee must show that the accused equivalent was "'peripheral, or not directly relevant,' to its amendment." *Id.* (quoting *Festo*, 344 F.3d at 1369). And "the reason for an amendment . . . cannot be determined without reference to the context in which it was made." *Id.*

Finally, the Federal Circuit rejected the "bright-line rule" that "where the reason for the amendment and the equivalent in question both relate to the same claim element, the tangential exception does not apply." *Id.* at 1333. The unanimous panel made clear that "an amendment that narrows an existing claim element" often "evinces an intention to relinquish that claim scope" — but that "this consideration is not dispositive." *Id.* (citing *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315-16 (Fed. Cir. 2008), as an example of where the intention to relinquish was so evinced)); *see Honeywell*, 523 F.3d at 1322 (Newman, J., dissenting) ("It does not suffice to say that by narrowing a claim by adding an element, *ipso facto* the relation to the accused equivalent element is not tangential. This criterion relates to why an amendment was made; it does not become irrebuttable simply when the accused equivalent concerns the same element that was added by amendment."). Even though the narrowing amendment and the accused equivalent both related to the particular type of salt in the invention, the Federal Circuit held that "the particular type of salt to which pemetrexed is complexed relates only tenuously to the reason for the narrowing amendment, which was to avoid" the prior art. *Eli Lilly*, 933 F.3d at 1331.

By contrast, in *Amgen Inc. v. Amneal Pharmaceuticals LLC*, the Federal Circuit rejected use of the tangential exception. 945 F.3d 1368 (Fed. Cir. 2020). There, the accused product used "pregelatinized starch" as a binder, yet the asserted claim did not list pregelatinized starch in its Markush group reciting binders. *Id.* at 1380. In the prosecution history, the patent owner had revised the claim's binder limitations to be in Markush group format to overcome prior art references that taught the use of pregelatinized starch as a binder. *Id.* at 1382. Thus, the Federal Circuit concluded that the amendment — made to avoid prior art that contains the accused equivalent — was more than tangential to the accused equivalent. *Id.* Because the prior art

70

references taught the use of the alleged equivalent for the claimed function, the tangential exception to prosecution history estoppel could not apply.  *Id.*

In *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, the inventors amending claims specified that their invention uses "non-fluorinated microchannels" that are chemically distinct from "fluorinated surfactant" carrier fluid so that "the carrier fluid and the microchannels in the claimed invention would not react with each other."  967 F.3d at 1365.  "In amending the claims," the Federal Circuit noted, "the patentees sought to distinguish the claimed invention from [the prior art], which disclosed fluorinated microchannel wall coatings that would react with the carrier fluid."  *Id.*  The accused equivalent was microchannels containing a nominal amount of fluorine that is "not chemically distinct from the carrier fluid" but still "cannot react with the carrier fluid."  *Id.*  The Federal Circuit concluded that "the inventors surrendered microchannels coated with fluorine '*for a purpose*—not those containing *de minimis* amounts of fluorine that have no effect on how the microchannel functions in the system.'"  *Id.*  Thus, the narrowing amendment had only a tangential relation to the equivalent — "negligibly fluorinated microchannels, or, put differently, microchannels with non-fluorinated properties."  *Id.* at 1366.

In reaching that decision, the Federal Circuit in *Bio-Rad* measured its facts against those in *Amgen* and *Eli Lilly*.  In *Amgen*, the amendment was more than tangential, because it was "made to avoid prior art that contains the equivalent in question"; in *Bio-Rad*, by contrast, the prior art "did not teach the use of the alleged equivalent—negligibly fluorinated microchannels or those with no fluorinated properties."  *Bio-Rad*, 967 F.3d at 1366 (citing *Amgen*, 945 F.3d at 1382).  And in *Eli Lilly*, the amendment was tangential, in part because it was made to avoid prior art, which did not disclose the accused equivalent; likewise, in *Bio-Rad*, the prior art disclosed fluorinated

microchannels and not the accused equivalent "microchannels with no fluorinated properties." *Bio-Rad*, 967 F.3d at 1366 (citing *Eli Lilly*, 933 F.3d at 1325-27, 1331).

In this case, no one disputes that the applicants' remarks show that the amendment was made to address the examiner's concerns. (*See* ECF No. 170 at 35 ("[T]he applicants amended claim 104 of the '931 Application to address the Examiner's concerns."); ECF No. 171 at 29 ("Supernus specifically told the USPTO that the amendment was made 'in the interest of compact prosecution' to address the Examiner's concerns." (quoting PTX233.249)) (cleaned up); Tr. 563:12-16 (Felton) ("It says that the applicants have amended the claims in a manner that ought to address the examiner's concerns.").) Torrent argues that the Court, in discerning the rationale for the amendment, should focus not on the examiner's reasons for its rejection, but on the applicants' remarks. (ECF No. 171 at 28-29.) Based on those remarks, Torrent asserts, the objectively apparent reason for the amendment could not have been to respond to the examiner's *widely differing structures and corresponding biological activities* comment, because the applicants did not specifically identify that comment in their response. In essence, Torrent proposes that the Court focus on what the applicants did not say rather than what they responded to.

The Court cannot do so. Again, the Court's inquiry "focuses on the patentee's objectively apparent reason for the narrowing amendment" based on "the prosecution history record." *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting *Integrated Tech.*, 734 F.3d at 1358). This focus does not make the tangential exception unavailable just because the applicants did not neatly recite a particular sentence from the examiner's opinion, despite what Torrent would prefer. Indeed, divorcing the examiner's reasons from the applicants' response would disregard "the context in which [the amendment] was made." *Eli Lilly*, 933 F.3d at 1332; *accord Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 2023 WL 7171484, at *8 (Fed. Cir. Nov. 1, 2023) (considering

72

how "a reasonable reader" could interpret the prosecution history (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009))).

In context, the prosecution history shows that the applicants amended the claim to address the examiner's concerns that "the scope of the claims" encompassed "any and all . . . release coatings that can exist" or have "yet to be discovered," including coatings with "widely differing structures and corresponding biological activities." (PTX233.230-231.) The examiner explained that by "describing the function of a compound" — here, release control — the original claims "fail[ed] to distinguish the compound from other molecules or agents that can perform the same functions." (PTX233.230.) The examiner advised that the applicants had to disclose "structure features or elements of the . . . release coatings which would have the stated function." (PTX233.230.) The examiner noted that the specification disclosed "several examples of . . . release coatings," but that disclosure did "not provide an adequate description of the claimed genus of . . . release coatings because the claims" — which then lacked the species of genus disclosed in the specification — "are broader than the disclosure." (PTX233.231.) In response, the applicants amended the claim to include the "species of the noted genera" that were disclosed in the specification. (PTX233.249.)

Dr. Felton testified that the objectively apparent reason was to address the examiner's concerns that the language "was just too broad." (Tr. 563:15-22.) But Dr. Felton's opinion ignores the context of the examiner's rejection. The spirit of the rejection is captured by the examiner's position that the claim as originally written included "widely differing structures and corresponding biological activities." Hence why Dr. Khan testified that a POSA would interpret the objectively apparent reason for the amendment as "to obtain a . . . claims scope that includes

polymers that are *not* widely differing, in structures that are *not* widely different in their biological properties." (Tr. 286:7-18 (emphasis added).)

The Court here, like the Federal Circuit in *Eli Lilly*, finds it unlikely that a competitor would have been justified in assuming that if it used a release coating polymer "with the same biological activity" and "a structure that is nearly identical" to the structure of the specific acrylic polymers exemplified in the patent specification, it would not infringe the Patents-in-Suit. *See Eli Lilly*, 933 F.3d at 1332 ("[I]t is unlikely that a competitor would have been 'justified in assuming that if he [made an equivalent pemetrexed salt], he would not infringe [the '209 patent].'" (quoting *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed. Cir. 1984)) (alterations in *Eli Lilly*)). The Court therefore concludes that Supernus's proposed objectively apparent reason for the amendment — "to obtain a . . . claims scope that includes polymers that are not widely differing, in structures that are not widely different in their biological properties" — is more likely than not the true reason.

Torrent's arguments to the contrary are unpersuasive. Torrent argues that "[i]f Supernus's amendment to recite the specific cellulosic and acrylic polymer categories was based on some unrecited structure, it would have 'fail[ed] to distinguish the compound from other molecules or agents that can perform the same functions' and thus failed to resolve the examiner's concerns." (ECF No. 171 at 30 (quoting PTX233.230).) In other words, including *acrylic polymers* does not adequately convey a distinct structure. But as the Court found earlier, a POSA reading the specification would understand that the plain and ordinary meaning of *acrylic polymers* included the exemplary acrylic polymers described in the specification. In fact, opposing literal infringement, Torrent argued that the term *acrylic* confers structure. (*See* Tr. 483:1-5 (Rotella) ("And that's why the term 'acrylic' means something. That's why the term 'vinyl' means

something.  Those terms confer structure.  And the word 'acrylic' confers the structure as I have just outlined it for you and illustrated it for you.").)  *See Eli Lilly*, 933 F.3d at 1332 ("It does not follow . . . that [an] amended claim becomes so perfect in its description that no one could devise an equivalent." (quoting *Festo*, 535 U.S. at 738) (alterations in *Eli Lilly*)).

Torrent also argues that "Supernus clearly had the language to describe vinyl polymers, including polyvinyl acetate, and the 'the original application once embraced' those polymers, yet Supernus ultimately chose not to claim them."  (ECF No. 171 at 30 (citing PTX233.242; quoting *Festo*, 535 U.S. at 734); *see* Tr. 559:10-12 (Felton) (testifying that the term "release-controlling coating" captures "all three categories of polymers").)  Torrent is correct that the original claim covered, in the examiner's words, "any and all . . . release coatings that can exist," which would include polyvinyl acetate.  (PTX233.230.)  But that fact is not dispositive.  In similar cases where an original claim theoretically encompassed the accused equivalent, the Federal Circuit opted not to apply "[s]uch a draconian preclusion . . . beyond a fair interpretation of what was surrendered." *Intervet*, 617 F.3d at 1292; *see, e.g.*, *Eli Lilly*, 933 F.3d at 1330-31 (holding that a narrowing amendment was only tangential to the accused equivalent even though the equivalent was within "the territory between the original claim and the amended claim").[51]  The objectively apparent reason for the amendment here was not to disclaim polyvinyl acetate or some attribute of polyvinyl acetate; it was to disclaim release coatings that have widely differing structures and corresponding biological activities.  In fact, the amendment was "peripheral, or not directly relevant," to polyvinyl acetate.  *Eli Lilly*, 933 F.3d at 1332 (quoting *Festo*, 344 F.3d at 1369).

---

[51]     "After all, the tangential exception only exists because applicants over-narrow their claims during prosecution."  *Eli Lilly*, 933 F.3d at 1332.

Torrent cites three cases that are compelling but ultimately inapposite. (ECF No. 171 at 30-31.) First, in *Duramed Pharmaceuticals, Inc. v. Paddock Laboratories, Inc.*, at the examiner's suggestion, Duramed amended its independent claim from tablets "coated with a moisture barrier coating" to tablets with a "moisture barrier coating compris[ing] ethylcellulose." 715 F. Supp. 2d 552, 556 (S.D.N.Y. 2010), *aff'd*, 644 F.3d 1376 (Fed. Cir. 2011). The district court ruled that "[b]ecause Duramed's amendment concerned the type of [moisture barrier coating] to be used, and the alleged equivalent [polyvinyl alcohol] is another type of moisture barrier coating, Duramed's narrowing amendment was not tangential to the alleged equivalent." *Id.* at 565. In other words, the tangential exception did not apply, because the amendment and the accused equivalent both related to the moisture barrier coating.

The Federal Circuit held that Duramed did not meet the unforeseeability exception because the prior art application's disclosure of the accused equivalent moisture barrier coating established that the accused equivalent was known in the field of pharmaceutical compositions as of the time of Duramed's narrowing amendment. *Duramed Pharms., Inc. v. Paddock Lab'ys, Inc.*, 644 F.3d 1376, 1381 (Fed. Cir. 2011). But the tangential exception was not discussed on appeal. Had it been, the Federal Circuit may have rejected the above-mentioned "bright-line rule" that it later rejected in *Eli Lilly*: "where the reason for the amendment and the equivalent in question both relate to the same claim element" — in *Duramed*, the moisture barrier coating — "the tangential exception does not apply." *Eli Lilly*, 933 F.3d at 1333. Indeed, "such a bright-line rule is both contrary to the equitable nature of prosecution history estoppel . . . and inconsistent with the equitable spirit that animates the doctrine of equivalents." *Id.* (internal citations omitted).[52]

---

[52]     Torrent notes that in *Duramed*, Supernus's counsel's firm opposed applying the tangential exception. (ECF No. 171 at 31.) That counsel has been on both sides of this issue matters less given that each case depends on its unique prosecution history. *See Eli Lilly*, 933 F.3d at 1333

This Court has the benefit of *Eli Lilly*'s guidance. Here, the applicants amended the claim to better describe the release controlling coating. That may be — indeed it is — enough to create a presumption of estoppel. *See Cross Med. Prod., Inc. v. Medtronic Scfamor Danek, Inc.*, 480 F.3d 1335, 1341 (Fed. Cir. 2007) ("[I]f a § 112 amendment is necessary and narrows the patent's scope—even if only for the purpose of better description—estoppel may apply." (quoting *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1142 (Fed. Cir. 2004))).[53] But following *Eli Lilly*, that alone does not bar Supernus from invoking the tangential exception to accuse an equivalent release controlling coating (here, polyvinyl acetate) of infringement. *See Eli Lilly*, 933 F.3d at 1333-34 (concluding that the consideration "that an amendment that narrows an existing claim element evinces an intention to relinquish that claim scope" "is not dispositive because the rest of the prosecution history, and the '209 patent itself, show that it is implausible that the reason for Lilly's amendment was to surrender other pemetrexed salts").[54]

Second, in *Cross Medical Products, Inc. v. Medtronic Scfamor Danek, Inc.*, the applicant told the examiner that to overcome § 112 rejections, it added a "thread depth limitation" to capture the way that the "stabilizer aspect of the invention operated": with "threads extend[ing] toward the channel to a depth below the top of the stabilizer." 480 F.3d at 1343. The accused equivalent, however, did "*not* include threads extending 'to a depth below the top of the stabilizer'" and thus

---

(collecting cases showing that "prosecution history estoppel d[id] not apply in similar circumstances" "where the prosecution record differed").

[53]    Again, "these circumstances create a presumption of estoppel" that "the patentee may still rebut." *Cross Med. Prod.*, 480 F.3d at 1341 (citation omitted).

[54]    *Compare Pharma Tech Sols.*, 942 F.3d at 1381, 1383-84 (rejecting the tangential exception where the inventors' remarks "distinguish[ing] the prior art based on the newly added sequential 'converting' and 'comparing' limitations" surrendered the accused equivalent's systems, which did not have a "comparing" limitation, because the "comparing" limitation "was integral to the inventors' . . . amendment" and "necessary to overcome the prior art").

did "*not* capture this aspect of the invention." *Id.* Because the accused equivalent "relate[d] to the amendment as shown even by the applicant's own statements," the tangential exception did not apply. *Id.*

Critical to the *Cross Medical Products* decision was that an invention either had the threads or did not, and the applicant made clear that the inclusion of threads is what distinguished the invention from prior art. Here, the amendment was not so polarizing. Patentability did not depend on, nor was it influenced by, *polyvinyl acetate*'s absence from the claim. And nothing in the prosecution history indicates that the applicants amended the claim to distinguish their formulation from release controlling coatings in prior art. Rather, the amendment addressed the need for "a disclosure of structure features or elements of the . . . release coatings which would have the stated function." (PTX233.230.)

Third, and finally, Torrent cites *International Rect.fier Corp. v. IXYS Corp.*[55] for the proposition that "because the amendment added specific structure to overcome a Section 112 rejection and the asserted equivalent related to the specific structure added by amendment, the reason could not be deemed tangential." (ECF No. 171 at 29-30.) The Court disagrees with Torrent's framing of that case's holding. In *International Rect.fier*, the amendment adding the limiting term *ac;joining* more than tangentially related to the specific structure because it "recited precisely the structure it disclosed," which did not include the opposite non-adjoining structure. 515 F.3d at 1359; *see Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335, 1346 (Fed. Cir. 2023) ("While we have recognized that literal failure to meet a claim limitation does not necessarily constitute a 'specific exclusion,' we have found 'specific exclusion' where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation."

---

[55]    515 F.3d 1353, 1359 (Fed. Cir. 2008).

(quoting *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014)) (internal citations omitted)); *see, e.g.*, *Cross Med. Prod.*, 480 F.3d at 1343 (finding that an invention whose distinguishing feature was its threads could not be equivalent to an invention that had no threads); *Integrated Tech.*, 734 F.3d at 1355, 1359 (holding that because the patentee relied on physical contact to overcome prior art, it could not "prove by a preponderance of the evidence that . . . the 'objectively apparent reason for the narrowing amendment' was only tangentially related to the [no-touch] equivalent" (quoting *Festo*, 344 F.3d at 1369)).

In contrast, here the Court has already found that vinyl polymers and acrylic polymers are not mutually exclusive and can overlap. (*See* § IV.A.2.b above.) Recall, as Dr. Rotella testified, both vinyl polymers and acrylic polymers are at least somewhat defined by their "identical" vinyl groups. (*See* Tr. 480:6-7 (Rotella) ("[W]here these molecules are similar is in the olefin functional group here. You see it's identical in both."); Tr. 482:17-483:5 (Rotella) (defining vinyl polymer, "first off, by this olefinic unit," and acrylic polymer "by that olefin functional group").) Thus, unlike the *adjoining-not adjoining* components in *International Rectifier*, the *threads-no threads* components in *Cross Medical Products*, or the *touch-no touch* components in *Integrated Technology*, here vinyl polymers and acrylic polymers are not necessarily "the opposite of, or inconsistent with," each other.

The Court's finding that vinyl polymers and acrylic polymers are not mutually exclusive undermines Torrent's argument that where there are only three categories of polymers (cellulosic, acrylic, and vinyl), the omission of one of them is disclaiming. Even so, the Court finds that the Patents-in-Suit do not disclaim all vinyl polymers. As mentioned, the specification's use of semicolons to offset *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers* indicates that these polymers are separate from one another. Dr. Khan agreed with this reading. (Tr. 318:22-

319:3.)  He also agreed that polyvinyl alcohol is a vinyl polymer.  (Tr. 317:5-13, 319:4-5.)  Using that testimony, Torrent contends that the Patents-in-Suit distinguish between three categories of polymers — cellulosic polymers; vinyl polymers, with polyvinyl alcohol as the representative example; and acrylic polymers.  If Torrent is correct, the omission of *polyvinyl alcohol* in the Asserted Claims may prevent Supernus from claiming any vinyl polymer.

But that is neither what Dr. Khan said nor what the specification says.  Dr. Khan was careful not to concede that the list represents "distinct categories" of polymers.  (*See* Tr. 319:6-14.)  Dr. Khan's carefulness makes sense.  The specification's word choice makes clear that when it intends to identify a polymer category, it states a polymer category.  Cellulosic polymers and acrylic polymers are categories of polymers.  Polyvinyl alcohol is not; it is a specific vinyl polymer.  In fact, Dr. Rotella testified that polyvinyl alcohol and polyvinyl acetate are different polymers.  (Tr. 524:22-525:1.)  So construing "polyvinyl alcohol" as representing all vinyl polymers would not only alter the plain text and ignore that the specification treats categories of polymers and specific polymers as different, but also ignore the differences between polyvinyl alcohol and other vinyl polymers.  (*See* Tr. 524:22-525:1 (Rotella) (testifying that polyvinyl alcohol and polyvinyl acetate are "structurally distinct").)  For this specification, polyvinyl alcohol is not a cellulosic polymer or an acrylic polymer.  That's all.

The Court therefore finds that Supernus qualifies for the tangential exception and has rebutted the *Festo* presumption.  As a result, the Court need not address Supernus's argument that "[b]ecause the Asserted Claims do not recite the claim term that was amended in the '931 Application, there is no prosecution history estoppel."  (ECF No. 170 at 36 n.14.)  Nor must the Court address Supernus's preemptive strike against the disclosure-dedication doctrine (*id.* at 36-37), as Torrent did not assert that doctrine in defense.

3.    Equivalence Tests

Having found that Supernus rebutted the presumption of prosecution history estoppel, the Court turns to the issue whether Torrent's ANDA Products infringe under the doctrine of equivalents.

There are two tests for evaluating equivalence. The first is the "function-way-result," or "FWR," test: "whether the accused product performs 'substantially the same function in substantially the same way to obtain the same result.'" *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608 (1950)). The second is the "insubstantial difference" test: "whether the accused product or process is substantially different from what is patented." *Id.* (citing *Graver Tank*, 339 U.S. at 608).

The Federal Circuit has said that for "non-mechanical" cases involving the "chemical arts," the "[in]substantial differences test may be more suitable than FWR for determining equivalence." *Id.* at 869. For example, "[h]ow a particular component of a composition, or substituent of a compound, functions in a human or animal body, or in what way, may not be known or even knowable (although, as technology evolves, that may change)." *Id.* at 867. In that scenario, the patentee could not prove that each limitation satisfies the FWR test. Thus, courts must decide which test is "better suited to the particular facts of th[e] case." *Id.* at 867-70.

a.    *Function-Way-Result Test*

The Court starts with FWR.

**Function.** Supernus alleges that both polyvinyl acetate and the acrylic polymers listed in the specification "function as release controlling polymers as part of a release controlling coating." (ECF No. 170 at 29 (citing Tr. 276:1-24 (Khan)).) In support, Supernus first notes how the '989

81

patent describes the coating: "In one embodiment, the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating)." (PTX058.13 col. 6 ll. 39-42.) This description tells us, as Dr. Khan said, that the function of the coating material is "the release controlling coating polymer." (Tr. 276:17-24.) Supernus then compares the '989 patent specification to Torrent's ANDA, which says the "Pharmaceutical Function" of "Polyvinyl acetate dispersion" is "Release controlling polymer." (PTX106.4.) Dr. Khan testified that the function described in the '989 patent specification and the function disclosed in Torrent's ANDA are "[i]dentical, virtually identical." (Tr. 277:1-13.)

Supernus also asserts that Torrent's own witnesses confirm Dr. Khan's opinion. Dr. Felton "admitted that the function of polyvinyl acetate and 'acrylic polymers' that are expressly listed in the patent specification (e.g., polymethacrylates) 'is to control the release of drug.'" (PFF ¶ 326 (Pl.).) The admission came when Supernus read this excerpt from Dr. Felton's edition of *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*: "The water-insoluble polymers (e.g., ethylcellulose, polyvinyl acetate, neutral or quaternary poly(meth)acrylates) can be applied for controlled drug delivery, especially for prolonged and sustained release." (Tr. 579:6-17 (quoting DTX019 at TORTOP_00127213).) Dr. Felton agreed that these polymers are used "to control the release of drug." (Tr. 579:18-21.) And Yogesh Patel, who oversaw the formulation and development of Torrent's ANDA Products (PFF ¶ 133), testified that Torrent uses polyvinyl acetate as a release-controlling polymer in its ANDA product (Patel Tr. 72:2-12, 75:24-76:5, 77:6-78:14, 169:25-170:8; PTX106.29).

Torrent makes two counterarguments. Torrent first counters that it is not enough that the release controlling coating controls the release of the active ingredient; the coating must do so in

such a way that achieves an 80% drug release at a predetermined period of time. (PFF ¶¶ 231-327 (Def.) (citing Tr. 575:14-22 (Felton)).)[56] In support, Torrent cites three specification excerpts. First, "[t]he release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population." (ECF No. 171 at 32-33 (quoting '989 patent col. 6 ll. 42-45).) Second, "wherein the active ingredient is released from the formulation at a sustained rate along a pre-determined release profile." ('989 patent col. 2 ll. 23-25.) Third, "there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve." ('989 patent col. 7 ll. 28-33.)

Based on these excerpts, Torrent asserts that "[a]s the only required element of the extended release components, the recited cellulosic and acrylic polymers['] function is to allow the active ingredient to be 'released from the formulation at a sustained rate along a *pre-determined* release profile.'" (ECF No. 171 at 32-33 (quoting '989 patent col. 2 ll. 23-25) (emphasis added by Torrent).) In other words, "the function of the claimed acrylic polymers is to control the release of the active ingredient such that 80 percent of the drug [has been] release[d] at the predetermined period of time." (PFF ¶¶ 231-327 (Def.) (citing Tr. 573:14-22 (Felton)).)

Torrent argues that Dr. Khan ignored this *pre-determined release profile* aspect of the function. (ECF No. 171 at 33.) Instead, Dr. Khan "relied on his personal experience with polymer coatings." (*Id.*) In doing so, Torrent asserts, Dr. Khan disregarded that the FWR test "focuses on

---

[56] Dr. Felton testified that based on "the Court's construction and the context of the patent," she understood the function of the claimed acrylic polymers to be "controlling the release of the active ingredient, the topiramate, . . . in such a way as to achieve a T80, 80 percent drug release at a predetermined period of time." (Tr. 575:10-19.)

an examination of the claim and the explanation of it found in the written description of the patent." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007) (internal citation and quotation marks omitted).

Torrent next counters that Dr. Khan admitted that many acrylic polymers do not function as he described. (ECF No. 171 at 33 (citing Tr. 373:18-21, 376:10-377:6 (Khan)).) This is problematic, according to Torrent, because although the Asserted Claims recite only *acrylic polymers*, Dr. Khan admittedly excluded "hundreds, or maybe thousands, of acrylic polymers." (*Id.* (citing Tr. 376:10-377:6 (Khan)).)

Supernus contests that "the claimed acrylic polymers must alone function to achieve '80 percent drug release at a predetermined period of time.'" (ECF No. 170 at 30 (quoting Tr. 575:14-19 (Felton)).) Supernus argues that Dr. Felton conflated the function of the *acrylic polymers* with the Court's construction of the *extended release (XR) topiramate-containing component*. (*Id.*) Recall, once more, the Court construed *extended release (XR) topiramate-containing component* to mean "[a] component that releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time." (*Id.* (quoting ECF No. 88 at 33).) Supernus asserts that "[n]either the Court's Markman Order nor the patent specification requires that the 'acrylic polymers'—by themselves—function to achieve 80% drug release in a predetermined period of time." (*Id.*) In fact, Supernus adds, "the specification discloses that the release rate of topiramate is controlled by a combination of factors, including, for example, the 'type and concentration of a pore former' and the 'process parameters.'" (*Id.* (quoting '989 patent col. 7 ll. 13-24).)

The Court agrees with Supernus. At trial, Torrent argued that "there's a relationship between the polymer thickness and the T80 time, the time when the 80 percent releases," and that

84

a POSA "can use that mathematical relationship and determine how to coat their beads and achieve" a "release time . . . of 80 percent of the T80 within the predetermined period of time." (Tr. 369:13-370:3 (rearranged for clarity).) In so arguing, Torrent referenced this part of the specification: "For example, with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve." ('989 patent col. 7 ll. 28-33.)

But as Supernus submits, the acrylic polymers are only part of the relationship. The patent specification discloses that several factors affect the rate of release of topiramate:

> The release-controlling coating is population-specific in the sense that the rate of release of topiramate from every bead population is controlled by at least one parameter of the release controlling coating, such as the nature of the coating, coating level, type and concentration of a pore former, process parameters and combinations thereof. Thus, changing a parameter, such as a pore former concentration, or the conditions of the curing, . . . allows to change the release of topiramate from any given bead population and to selectively adjust the formulation to the pre-determined release profile.
>
> [('989 patent col. 7 ll. 13-24.)]

In addition, although Dr. Khan admittedly excluded many acrylic polymers that function differently, he testified that he excluded ones that "are not used for sustained release." (Tr. 376:20-21.) Indeed, the Asserted Claims require a "sustained release formulation." (*See, e.g.*, '989 patent col. 21 l. 1.)

Thus, the Court finds that the specification coupled with the experts' and Mr. Patel's testimony establish that both polyvinyl acetate and the acrylic polymers listed in the Patents-in-Suit function as release-controlling polymers.

*Way.*  Supernus next alleges that "[p]olyvinyl acetate functions in the same way as the polymers listed in the specification—by creating a barrier that controls the entry of aqueous fluid into the coated pellets."  (ECF No. 170 at 30 (citing Tr. 277:14-280:2, 280:20-281:11, 279:7-280:2 (Khan); PTX113.3).)  According to the *Handbook of Pharmaceutical Excipients*, Eudragit® RL and RS, tradenames of two polymethacrylates, which are exemplary acrylic polymers recited in the Patents-in-Suit, "are used to form water-insoluble film coats for sustained-release products." (PTX115.5.)  Consistent with that text, Dr. Khan testified that the acrylic polymers listed in the patent work by forming "a water insoluble film coating on the bead" such that "the drug diffuses out" of the water-insoluble film coating.  (PFF ¶ 329 (Pl.) (citing Tr. 278:6-279:6 (Khan); PTX115.5).)

Here, too, Supernus asserts that Torrent's witnesses confirm Dr. Khan's opinion.  Supernus says "Dr. Felton admitted that the way both polymethacrylates and polyvinyl acetate function in sustained release formulations is by acting as a 'diffusional barrier[].'"  (ECF No. 170 at 31; Tr. 580:2-12 (Felton).)  After asking Dr. Felton about the polymers' function, Supernus confronted her with more text from *Aqueous Polymeric Coatings*: "The water-insoluble polymers (e.g., ethylcellulose, *polyvinyl acetate*, neutral or quaternary *poly(meth)acrylates*) . . . are insoluble in the entire gastrointestinal tract and act as a diffusion barrier as long as the coating remains intact. The API is released by a diffusion-controlled mechanism through the polymer film itself (often after swelling) or through pores."  (DTX019 at TORTOP_00127213 (emphasis added).)  Dr. Felton agreed that this text explained the way in which those polymers work, adding that "[t]hey are diffusional barriers, and that's why they're used as coating materials to control the release of drug."  (Tr. 580:2-12.)

86

Torrent advances a different *way* theory. As it did for the polymers' *function*, Torrent argues that Supernus must show the way in which a POSA achieves the *pre-determined release profiles*. (ECF No. 171 at 33-34.) Torrent asserts that "[t]he patent provides no support to show that the acrylic polymers listed in the patent achieve the results claimed in the patents." (PFF ¶¶ 330-332.) Though not dispositive, Torrent cites no expert testimony in support. Torrent only attacks Dr. Khan's position that "it's not very important" "whether Torrent's ANDA Products obtained . . . any pre-determined target release profile based on modifying the coating thickness in the way described in the patent." (Tr. 367:11-20.)

It is true, as mentioned, that the FWR test focuses on "an examination of the claim and the explanation of it found in the written description of the patent," as well as, "[i]n some cases, the patent's prosecution history." *AquaTex Indus.*, 479 F.3d at 1326, 1328 (quoting *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998)). "But this, of course, does not mean that discussion of the equivalence of the function, way, or result between a claimed invention and an accused product is irrelevant when the claims and specification of a patent are silent on the subject." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007). "When the claims and specification of a patent are silent as to the result of a claim limitation, . . . we should turn to the ordinarily skilled artisan." *Id.*; *see Intendis*, 822 F.3d at 1362 ("We have never held that a patent must spell out a claim element's function, way, and result in order for the doctrine of equivalents to apply as to that element."). In *Intendis*, the Federal Circuit rejected that "a determination of the claimed element's function is limited to a review of the intrinsic record." 822 F.3d at 1362. "The relevant inquiry," the Federal Circuit added, "is what the claim element's function in the claimed composition is to one of skill in the art, and a fact finder may rely on

extrinsic evidence in making this factual determination." *Id.* (citing *Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 (Fed. Cir. 1994)).

In its literal-infringement rebuttal, Torrent argued that the textbook *Aqueous Polymeric Coatings* — on which Supernus relies for the *way* prong — was "reflective of, and consistent with, how a POSA would view the categories of polymers available for use as a release control coating in sustained release formulations." (ECF No. 171 at 8 (citing Tr. 557:17-24 (Felton)).) The literature *Aqueous Polymeric Coatings* is reliable here too. Thus, the Court may use it to determine how a POSA understands the way in which the release-controlling polymers function.

Considering Dr. Khan's and Dr. Felton's testimony and the scientific literature, along with the lack of support for Torrent's argument, the Court finds that both the polyvinyl acetate in Torrent's ANDA Products and the acrylic polymers listed in the specification function in the same way: by creating a barrier that controls the entry of aqueous fluid into the coated pellets.

***Result.*** Supernus last alleges that the polyvinyl acetate in Torrent's ANDA Products achieves the same result as the polymers listed in the specification — controlled release of topiramate. (ECF No. 170 at 31; *see* Tr. 280:3-11 (Khan) (testifying that the result is "you control the release of the drug" topiramate).) Once again, Supernus points to Dr. Felton's testimony. After covering the *function* and *way* prongs, Supernus confronted Dr. Felton with one more excerpt from *Aqueous Polymeric Coatings*: "The release rate of the drug can mainly be influenced by the type of polymer, the thickness of the film, and the addition of excipients, such as pore formers." (Tr. 580:17-19 (Felton) (quoting DTX019 at TORTOP_00127213).) Asked if she agreed that "this is the result of how those three polymers" — that is, "ethylcellulose, polyvinyl acetates, neutral or quaternary poly(meth)acrylates" — "are used, being that you can adjust the release rate of the drug," Dr. Felton testified as follows:

88

I think that's something that a person of ordinary skill would understand, that the release rate of the drug can be influenced by the type of polymer that's used, the thickness, which is how much coating is added to the substrate, and the addition of other excipients, including pore formers.

[(Tr. 580:22-581:4.)]

Satisfied with the *result* prong, the Court concludes that Supernus has provided "particularized testimony and linking argument as to the" function, way, and result of the claimed acrylic polymers and the polyvinyl acetate in Torrent's ANDA products. *AquaTex Indus.*, 479 F.3d at 1328 (quoting *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)).

### b. Insubstantial Differences Test

The insubstantial-differences test asks "whether the substitute element plays a role substantially different from the claimed element." *Warner-Jenkinson*, 520 U.S. at 40; *see, e.g.*, *Mylan Institutional*, 857 F.3d at 869 ("But the court failed to consider whether the key reagent in the process, manganese dioxide, was *substantially different from* the claimed reagent, silver oxide, and hence whether the substitution for, and omission of, silver oxide left the accused infringer outside of the bounds of the claims."). Here, the issue is whether polyvinyl acetate in Torrent's ANDA Products is substantially different from the claimed acrylic polymers.

Supernus says it is not. Dr. Khan testified that from a pharmaceutical scientist's perspective, the polymers in the Patents-in-Suit and the polyvinyl acetate dispersion in Torrent's ANDA Products are insubstantially different. (Tr. 281:14-24.) To illustrate, Dr. Khan compared polymethacrylate, one of the polymers listed in the patent, to Torrent's polyvinyl acetate:

polyacrylate (i.e., polymethyl acrylate)          polyvinyl acetate

[(PTX195 (left);[57] PTX196 (right).)]

Dr. Khan testified that the two polymers have "very, very close" structures — "[t]hey do not have widely differing structures" — specifically, the same vinyl structure. (Tr. 281:19-21, 286:19-288:1.) He also testified that they have the same biological properties, that they both release drug in the entire gastrointestinal tract, and that they are both used for the same purpose. (Tr. 286:19-288:1.)

Perhaps most telling, Dr. Rotella thrice refused to testify that the two polymers have "widely differing" structures. Asked on direct examination to respond to "Dr. Khan's position that these two molecules" — comparing an acrylic derivative monomer with vinyl acetate — "are nearly identical or don't have widely differing structures," Dr. Rotella testified as follows: "Well, you know, depending on your definition of widely different or not widely different, you might say, well, okay, that's a possibility, but they are different." (Tr. 483:7-13.)

---

[57]     The parties have referred to *polymethacrylate*, *poly acrylate*, and *polymethyl acrylate* interchangeably. (*See* ECF No. 170 at 32 (describing PTX195 as *polymethacrylate* and *polymethyl acrylate*); Tr. 402:12-17 (Khan) (accepting counsel's statement "poly acrylate, i.e., poly methacrylate").)

On cross-examination, Dr. Rotella avoided two more opportunities to testify unequivocally that the structures of polyacrylonitrile, polyvinyl acetate, and polymethyl acrylate are widely differing:

> MR. KURZ (ATTORNEY FOR SUPERNUS). And just so I'm clear on your testimony, because I remember your counsel brought up whether these are widely differing structures or at least two of the structures on the screen are widely differing. And is it your testimony that these three have widely differing structures?
>
> DR. ROTELLA. I would say that these three structures are different. And I would also repeat what I said previously that the one on the left and the one on the far right are representatives of acrylic polymers. The structures are clearly different from each other. And as I have stated previously, the polymer derived from acrylonitrile and the polymer derived from methyl acrylate are representative examples of acrylic polymers. The polymer in the middle derived from vinyl acetate is not, because of those structural differences.
>
> Q. Okay. And just so the record is clear, is it your opinion that these are widely differing structures?
>
> A. I said that they are different structures.
>
> [(Tr. 511:24-512:15 (referencing PTX198).)]

During his examination, Dr. Rotella implored the Court to "[b]elieve your eyes, because they're right." (Tr. 460:6-7, 471:12-13, 480:6-7.) The Court finds that these structures are not widely differing, and Dr. Rotella's reluctance to testify otherwise further supports that the structures' differences are insubstantial. Because the structural differences between polyvinyl acetate and the claimed acrylic polymers are insubstantial, and because the polymers pass the FWR test, the Court concludes that Torrent's use of polyvinyl acetate in its ANDA Products infringes the Asserted Claims under the doctrine of equivalents.

### C.    Invalidity

A patent is presumed valid.  35 U.S.C. § 282(a).  The party asserting invalidity of a patent

or claim bears the burden of establishing its invalidity.  *Id.*  Rebutting the validity presumption

requires clear and convincing evidence of invalidity.  *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d

1253, 1260 (Fed. Cir. 2012) (citing 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S.

91, 95 (2011)).  "Clear and convincing evidence places in the fact finder 'an abiding conviction

that the truth of [the] factual contentions are highly probable.'"  *Procter & Gamble Co. v. Teva*

*Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Colorado v. New Mexico*, 467

U.S. 310, 316 (1984)).  This is a "high burden of proof created by the necessary deference to the

PTO."  *Sciele*, 684 F.3d at 1260.  To be sure, the burden does not require "extremely clear and

convincing evidence" or "crystal clear and convincing evidence."  *Id.*

### 1.    Enablement

A patent is invalid if it cannot enable a POSA to "make and use" the claimed invention.

35 U.S.C. § 112(a).  To win on a lack of enablement theory, "a challenger must show by clear and

convincing evidence that a person of ordinary skill in the art would not be able to practice the

claimed invention without 'undue experimentation.'"  *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745

F.3d 1180, 1188 (Fed. Cir. 2014) (citing *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988));

*ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) ("To be enabling, the

specification of a patent must teach those skilled in the art how to make and use the full scope of

the claimed invention without undue experimentation." (citations omitted)).

"[A]n enablement determination is made retrospectively, *i.e.*, by looking back to the filing

date of the patent application and determining whether undue experimentation would have been

required to make and use the claimed invention at that time."  *Enzo Biochem, Inc. v. Calgene, Inc.*,

188 F.3d 1362, 1371-72 (Fed. Cir. 1999).  To determine if experimentation is "undue," courts consider the so-called *Wands* factors:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.
>
> [*Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (quoting *Wands*, 858 F.2d at 737)[58]]

A reasonable amount of routine experimentation is permissive.  *ALZA*, 603 F.3d at 940.

Torrent submits that for the Patents-in-Suit "to be enabled for the full scope of the claims, a POSA must be able to make and use formulations of topiramate that achieve the appropriate 'predetermined release rate' for" the "incredibly broad variety of conditions" that the claims-covered formulations intend to treat.  (ECF No. 171 at 36-37.)  Yet for claims so broad and an invention so complex, Torrent argues, the Patents-in-Suit teach too little.  Torrent first argues that the patents claim a "near infinite number of formulations" yet give examples of only seven formulations.  (*Id.* at 37; PFF ¶ 467 (Def.).)  Next, the patents do not disclose the exact dissolution methodology that Supernus used.  (ECF No. 171 at 38.)  Finally, the patents lack "any connection between the formulations of the two critical example[s], Examples 1 and 6."  (*Id.* (citing Tr. 598:13-17 (Felton)).)

The Court will discuss each of Torrent's challenges and the *Wands* factors it implicates.

---

[58]     "[I]t is not necessary that a court review all the *Wands* factors to find a disclosure enabling. They are illustrative, not mandatory." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (quoting *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991)).

93

a.     *Seven examples for infinite formulations*

Torrent's first challenge implicates the *breadth of the claims* and *amount of direction presented* factors.  Torrent argues that the Patents-in-Suit do not provide enough information to teach what they claim.  For its part, Torrent first relies on remarks from the prosecution of the '475 application that led to a patent not in suit.  The applicants remarked that "the number of possible populations of beads available to the pharmacologist is near infinite."   (DTX015 at 29.) Confronted with these remarks at trial, Supernus's witness Padmanabh Bhatt, Ph.D., a founding executive of Supernus and one inventor of the Patents-in-Suit, testified that the remarks meant that "we can make literally hundreds and thousands of formulations," and "[i]t can take years and years to do that."  (PFF ¶¶ 124, 126-128; Tr. 134:3-9.)  Dr. Bhatt testified that they "could have done hundreds, if not thousands, of examples for table 1," though they disclosed only seven.  (Tr. 126:15-21, 135:6-14.)[59]  Thus, Torrent argues that there is a "disconnect between what the asserted patents claim (near infinite number of formulations) and what the asserted patents actually teach (7 formulations)."  (ECF No. 171 at 37.)

In further support, Torrent cites testimony of Dr. Felton, who felt that "the breadth of the claims is quite large," also highlighting the "near infinite" remark.  (Tr. 608:11-14; DTX015 at 29.)  Dr. Felton testified that there are "numerous different types of polymers that are acrylic polymers, and there's also a number of cellulosic polymers," and that there are "a lot of different polymers that could be used to coat the beads in order to get the desired release profiles of those beads."  (Tr. 609:16-22.)  "And within each of the polymers," she added, "there's different weight

---

[59]     In its invalidity discussion, the Court cites Dr. Bhatt's factual, nonexpert testimony only as to his personal knowledge of "the claimed invention and its development."  *Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1340 (Fed. Cir. 2010) (citing *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999)).

gains, there's different plasticizers and other excipients that might be added to the coatings to get them to adhere to the dosage form and function like they're supposed to." (Tr. 609:23-610:1.)

Supernus calls Torrent's "near infinite" argument misleading and taken out of context. (ECF No. 170 at 46.) The Court agrees. The remark concerned claims in an application for a familial patent that is indisputably not asserted or even "directly related in this case." (ECF No. 170 at 46 (citing PFF ¶¶ 396, 467); Tr. 620:23-621:2 (Felton).) That application is not useful here, as its claims differ from those at issue in a meaningful way. The '475 application remark relates to claims that recite specific combination-ratios of multi-bead formulations (ECF No. 170 at 37 (citing PFF ¶¶ 396, 467; Tr. 621:13-16, 621:25-622:7, 622:21-23, 623:16-24 (Felton); DTX015 at 13, 23-24, 29)), as opposed to single-bead formulations, which the Patents-in-Suit describe (PFF ¶¶ 396, 410-411, 445, 448-449, 457-458, 462, 493-494, 501-502, 506, 512 (Pl.)). In fact, the claims' only single-bead formulation, designated as Formulation 7, had been crossed out. (DTX015 at 13, 23-24; Tr. 621:17-62324.)

By contrast, Formulation 7 in Example 6 of the '989 patent discloses a sustained-release formulation that contains only one population of extended-release beads. ('989 patent Table 5.) Example 6 also reports the in-vivo pharmacokinetic testing of three single-bead populations, designated as XR1, XR2, and XR3, with the data for each bead's population reported in Figure 3. (ECF No. 170 at 41; '989 patent Fig. 3, Example 6.) The Patents-in-Suit's description of single-bead formulations makes the unrelated application and its remarks less meaningful here.

In addition, the remark was part of a disagreement over the claims' obviousness, not its enablement or written description. In making the remark, the applicants stated that they were responding to the examiner's allegation that "the release-profile is considered a result-effective variable which is obvious to optimize . . . with a combination of independent pellet populations

which release topiramate at different layers." (DTX015 at 29, SUPTXR0002277.) The applicants then remarked in relevant part as follows:

> [T]he Examiner has not explained what would have guided the ordinary artisan to specifically select the bead populations as identified in items 1-3 of claims 34 and 92. Indeed, . . . there is no teaching in the art that would have led the ordinary artisan to the *populations* of beads *per se* identified by the present inventors.
>
> [(DTX015 at 29.)]

In this context, the "near infinite" remark addressed allegations of obviousness — it did not relate to the claims' scope.

For these reasons, the Court does not give weight to the "near infinite" remark. This challenge does not support a non-enablement finding.

### b. *Dissolution test methodology*

Torrent's next challenge implicates the *amount of direction presented*, *relative skill of a POSA*, and *predictability of the art* factors. There is no dispute that the Patents-in-Suit do not disclose the inventors' exact dissolution methodology. The issue is whether they needed to disclose it for enablement.

As a rule, "a patent need not teach, and preferably omits, what is well known in the art." *Streck*, 665 F.3d at 1288 (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986)). That rule, however, is "merely a rule of supplementation, not a substitute for a basic enabling disclosure." *ALZA*, 603 F.3d at 940-41 (quoting *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1283 (Fed. Cir. 2007)). Indeed, "the specification, not the knowledge of those skilled in the art, 'must supply the novel aspects of an invention' to satisfy the enablement requirement." *Streck*, 665 F.3d at 1289 (quoting *Auto. Techs.*, 501 F.3d at 1283).

96

Torrent argues that the patents needed to disclose the exact dissolution methodology. Dr. Felton testified that if a POSA does not use the "exact same methodology" as the one used in the patent, the POSA's $T_{80\%}$ results will be "meaningless in reference to this patent," because "it would be like comparing apples and oranges." (Tr. 602:20-603:5.) Without that information, Dr. Felton continued, a POSA "would have to conduct the equivalent of a clinical trial," which "is a huge undertaking, and certainly more than routine experimentation." (Tr. 610:18-21.)

Dr. Felton testified that she found only "one small[,] generalized statement about the dissolution methodology" in the specification:

> The release rates referred to herein are determined by placing a dosage form to be tested in a medium[60] in an appropriate dissolution bath. Aliquots of the medium, collected at pre-set intervals, are then injected into a chromatographic system fitted with an appropriate detector to quantify the amounts of drug released during the testing intervals."

> [(Tr. 601:12-602:7; '989 patent col. 3 ll. 65-67, col. 4 ll. 1-3.)]

Dr. Felton testified that this statement does not say "what dissolution methodology was used" or "what type of equipment to use." (Tr. 602:8-11.) Although "[t]here's a number of different standardized pieces of equipment that are used for dissolution testing," Dr. Felton added, "that's not disclosed here, so I don't know which is used." (Tr. 602:11-13.) "So while the person of ordinary skill is familiar with the dissolution test and could recreate his or her own test," Dr. Felton concluded, "if they're not using the exact same methodology, they're not going to get an equivalent T80 to be able to compare." (Tr. 602:20-24.)

Dr. Bhatt agreed that the Patents-in-Suit disclose "no specific information about the parameters or the equipment that's used in order to generate data." (Tr. 118:8-11.) But Dr. Bhatt

---

60      The *medium* is "the liquid that we're going to put the product in." (Tr. 602:2-3 (Felton).)

insisted that they did not need to include specific information; it is enough to say that the methodology "was a dissolution study." (Tr. 110:23-24.) This is because the standard dissolution methodologies are publicly available. The United States Pharmacopeia (USP) publishes guidance on the dissolution apparatuses and media to use for a given purpose. Dr. Bhatt described USP as "a standard reference book for conducting testing of pharmaceutical products." (Tr. 110:16-18.) "For solid dosage forms," Dr. Bhatt testified, the guidance "detail[s] USP dissolution bath number two apparatus as a standard dissolution testing in vitro testing method." (Tr. 109:11-16.) The FDA also publishes guidance on how to test extended-release products. (Tr. 110:19-20.) So pharmaceutical scientists doing formulation development, including testing formulations in vitro, know to visit USP and FDA guidance. (Tr. 109:5-110:24.)

Echoing Dr. Bhatt, Dr. Khan testified that for dissolution methodology, "[e]verybody knows [to] go to USP." (Tr. 634:20-21.) In fact, there are only seven approved USP methods, and "most of them use USP apparatus one or apparatus two, because others are used for other purposes, not for tablets and capsules." (Tr. 634:11-635:5.) Even his "simple laboratory" has "full dissolution equipment." (Tr. 634:16-18.) Dr. Khan also testified that the "FDA routinely publishes . . . product-specific guidance," including a "topiramate dissolution method." (Tr. 635:10-14.) And if a method is not available, "sponsors submit a controlled correspondence to FDA," requesting "a method for dissolution." (Tr. 635:14-22.)

For reasons discussed after further factfinding below, the Court finds that Torrent did not meet its burden to prove that the Patents-in-Suit needed to describe the inventors' exact dissolution methodology.

98

c.  *Connection between Examples 1 and 6*

Torrent's final challenge implicates the *quantity of experimentation*, *amount of direction presented*, *working examples*, *relative skill of a POSA*, and *predictability of the art* factors.  Torrent argues that there is no connection between Example 1's and Example 6's bead formulations.  (ECF No. 171 at 38 (citing Tr. 598:13-17 (Felton)).)  Example 1, Table 1, lists three XR1 beads (XR1a, XR1b, XR1c), four XR2 beads (XR2a, XR2b, XR2c, XR2d), and one bead each for XR3 to XR8.  ('989 patent Table 1; Tr. 597:22-598:1 (Felton).)  Dr. Felton testified that she "could not understand how the compositions in table 1 related to" Example 6, which lists only three beads, designated as XR1, XR2, and XR3, and does not state their compositions.  (Tr. 598:8-12, 606:22-607:3, 610:15-18; '989 patent col. 18 l. 26.)  So Dr. Felton concluded that "the examples in table 1 do not correspond at all to examples in example 6."  (Tr. 598:13-14.)  She opined that without that connecting information, a POSA "would have to test the product in vivo.  They would have to create beads, test them in vivo.  It would be like an entire drug development project, a huge undertaking."  (Tr. 603:23-604:4.)

No one disputes that none of the 13 exemplary beads in Table 1 directly corresponds to any of the three beads designated as XR1, XR2, and XR3 in Example 6.  Rather, Supernus argues that "[b]ased on the teachings in Example 1 and Figures 1 and 2, a POSA would have understood how to make XR formulations that match the parameters listed in Example 6 to achieve Tmax . . . in vivo at 16 or more hours after a single initial dose."  (PFF ¶ 444 (Pl.).)

The Court analyzes the specification to determine whether a POSA would draw a connection between Examples 1 and 6.

Along with describing several embodiments, the specification describes a multi-step method of preparing bead formulations:

99

The current invention additionally encompasses a method of preparing formulations of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile.  The method comprises the following steps:

    1.  determining the desired release profile;

    2.  determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

    3.  incorporating the specified amounts of the components into the formulation.

[('989 patent col. 11 ll. 25-36.)]

Example 1, titled *Extended Release Beads Preparation*, teaches how to prepare the beads contained in the product capsule.  ('989 patent col. 14 l. 15; Tr. 61:21-62:23 (Bhatt).)  Relevant here, the disclosure teaches the "Coating of the Core with a Release Controlling Coating."  ('989 patent col. 14 l. 33.)  To that end, Table 1, titled *Composition and process parameters for the extended Release*, exemplifies 13 different beads that Supernus developed and designated as follows: XR1a, XR1b, XR1c, XR2a, XR2b, XR2c, XR2d, XR3, XR4, XR5, XR6, XR7, and XR8. (*See* '989 patent Table 1, col. 14 ll. 40-43 ("The release controlling coating dispersion is sprayed onto the bed to evenly coat the core to a desired coating level as exemplified in Table 1."); Tr. 63:7-11, 64:19-23 (Bhatt).)

100

TABLE 1

Composition and process Parameters for the extended Release

|  | XR1a | XR1b | XR1c | XR2a | XR2b | XR2c | XR2d |
|---|---|---|---|---|---|---|---|
| RC* coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) |
| Pore-former | — | — | Opadry ® Clear | — | — | Opadry ® Clear | Opadry ® Clear |
| RC coating material to pore-former ratio | — | — | 80:20 | — | — | 60:20 | 80:20 |
| RC coating level | 2% | 4% | 3% | 3% | 3% | 6.5% | 6.5% |
| Product temperature during coating | 20° C.-50° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-50° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-seal material | — | Opadry ® AMB White | Opadry ® AMB White | — | Opadry ® AMB White | — | Opadry ® AMB White |
| Over-seal coating level | — | 1.5% | 1.5% | — | 1.5% | — | 1.5% |
| Curing method | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven |

TABLE 1-continued

Composition and process Parameters for the extended Release

Topiramate Beads

|  | XR3 | XR4 | XR5 | XR6 | XR7 | XR8 |
|---|---|---|---|---|---|---|
| RC coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Acrylic polymers (Eudragit ® RL30D/RS30D) |
| Pore-former | — | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | — |
| RC coating material to pore-former ratio | — | 80:20 | 80:20 | 80:20 | 85:15 | — |
| RC coating level | 3.7% | 5.1% | 5.2% | 9.5% | 15% | 15% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | — | — | — | — | — |
| Over-coat coating level | — | — | — | — | — | — |
| Curing method | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, or oven | Fluid bed/water, fluid bed/5% alcohol-water, or oven | Fluid bed/water, fluid bed/5% alcohol-water, or oven |

*RC—Release Controlling

[('989 patent Table 1.)]

In each bead's column, the top row discloses the name of the release-controlling polymer, or "RC coating material," sprayed onto that bead. All but one bead uses ethylcellulose. ('989 patent Table 1; Tr. 598:3-7 (Felton).) The one bead, XR8, uses an acrylic-polymer combination of Eudragit® RL 30 D and RS 30 D. ('989 patent Table 1; Tr. 598:3-5 (Felton).) Some beads also use a "pore former," which helps speed up the drug's release.[61] (Tr. 66:15-67:15 (Bhatt).) If the bead uses a pore former, the second and third rows disclose the pore former's name and the ratio of the RC coating material to the pore former. ('989 patent Table 1; Tr. 63:23-64:3 (Bhatt).)

---

[61]     For examples of suitable pore formers, see '989 patent col. 7 ll. 48-67.

101

The fourth row shows the bead's *RC coating level*, which discloses how much RC coating material to use relative to the bead's total weight. (Tr. 74:4-9 (Bhatt).) The fifth row, *Product temperature during coating*, discloses the temperature of air flowing through the equipment as the beads are coated. (Tr. 74:14-24 (Bhatt); *see* '989 patent col. 14 ll. 31-33 ("Inlet airflow rate and product temperature are adjusted to keep the batch from spray-drying the coating material or over-wetting the spheres.").) The sixth and seventh rows, *Over-coat material* and *Over-coat coating level*, respectively, disclose the "nonfunctional coating" that rounds and smoothens the bead's surface "so that the beads can then be easily filled into a capsule." (Tr. 74:25-75:12 (Bhatt).)[62]

The bottom row, *Curing method*, discloses the equipment used for curing. (Tr. 75:17-78:3 (Bhatt).) More details on the curing process are provided in Example 5. ('989 patent col. 17 ll. 45-67, col. 18 ll. 1-10; Tr. 78:5-19 (Bhatt).) Example 5 discloses, for instance, "assisting solvents" that "dramatically reduce[] the curing time necessary to produce a desired release profile and a level of stability" from "up to two weeks" to "several hours." ('989 patent col. 11 ll. 58-67; *see* '989 patent col. 13 ll. 1-6 ("In most instances, less than 4 hours of solvent-assisted curing resulted in more complete curing of the extended release dosage forms than 2 weeks of heat-only oven curing of the same dosage forms.").)

Dr. Bhatt testified that Table 1 does not describe every detail, as some details are known in the art. (Tr. 65:4-8.) Dr. Felton did not take issue with Example 1 and Table 1; she understood them just fine. (*See* Tr. 607:5-8 (Felton) ("So, in example 1, we saw that the inventors disclosed how to make compositions. But the person of ordinary skill knew how to make and coat beads. So that's not what's novel.").) Her issue remained that the 13 beads in Table 1 "don't relate at all to what's shown in example 6." (Tr. 607:12-14 (Felton).)

---

[62]     For more information on overcoats, see '989 patent col. 8 ll. 4-13.

102

Example 6, titled *Sustained Release Formulations of Topiramate*, "gives a plan of study for the human subjects" to see how formulations "perform in the body in vivo." ('989 patent Example 6; Tr. 79:10-11, 80:8-9 (Bhatt).) Example 6 describes the inventors' "6-way crossover study," where volunteers underwent six stages of testing, receiving a different bead each stage so that every volunteer receives every bead over the course of the study. ('989 patent col. 18 l. 23; Tr. 79:10-80:2 (Bhatt); PFF ¶ 443 (Pl.).) The study included administration of "three extended release compositions, designated here" — in Example 6 — as XR1, XR2 and XR3," each representing a single-bead formulation. ('989 patent col. 18 ll. 24-30; Tr. 80:22-25 (Bhatt).) The study also included administration of "two immediate release compositions ((Topamax®, Ortho-McNeil Neurologics, Inc.) (25 mg BID), and an immediate release bead formulation) and an enhanced immediate release (IR) bead composition." ('989 patent col. 18 ll. 26-30.) Data from the Example 6 in-vivo study are shown in Figures 3 and 4. (*See* '989 patent col. 18 ll. 30-33 (referencing Figures 3 and 4).)

Figure 3 shows the "single dose topiramate plasma concentration profiles for XR1, XR2 and XR3." ('989 patent Fig. 3, col. 4 ll. 53-54, col. 18 ll. 30-31; Tr. 82:19-22 (Bhatt).) Each bead has its own data-curve. The X axis is time in hours over 72 hours starting from the participant's swallowing the capsule, and the Y axis is the plasma concentration of topiramate at different times over 72 hours. (Tr. 83:3-20 (Bhatt); Tr. 167:24-168:1 (Taft).) The apex of each bead's curve reflects that bead's $T_{max}$. (Tr. 84:2-3 (Bhatt).) For XR2 and XR3 each, the $T_{max}$ is about 25 hours, which is "obviously greater than 16 hours," as the Asserted Claims require. (Tr. 85:1-5 (Bhatt); '989 patent col. 21 ll. 33-35.)

103



Fig. 3

Mean (n= 16) PK Profiles from Bead Populations XR1, XR2 and XR3

[('989 patent Fig. 3.)]

Figure 4 also shows topiramate plasma concentration profiles, this time for the IR formulations — two of Supernus's IR beads and, as the control formulation, Topamax. ('989 patent Fig. 4, col. 4 ll. 55-56, col. 18 ll. 31-33; Tr. 85:6-25 (Bhatt).)

104



Fig. 4
Mean (n= 16) PK Profiles from the Immediate Release Formulations

[('989 patent Fig. 4.)]

Circling back, Example 6 further states,

The extended release populations XR1, XR2 and XR3, and an immediate release (IR) population are selected in such a way as to be defined by at least one of the three following sets of conditions:

1. for the steady state,
for XR1, $1.70C_{maxIR}>=C_{maxXR1}>=1.30C_{maxIR}$
for XR2, $0.40C_{maxIR}>=C_{maxXR2}>=0.20C_{maxIR}$
for XR3, $0.25C_{maxIR}>=C_{maxXR3}>=0.05C_{maxIR}$

2. for in-vitro dissolution,
for XR1, $1.5$ h$<=T_{80\%}<=4$ h
for XR2, $5$ h$<=T_{80\%}<=8$ h
for XR3, $8$ h$<T_{80\%}<=10$ h

3. for a single initial dose in-vivo,
for XR1, $4$ h$<=T_{max}<=8.5$ h
for XR2, $T_{max}>=16$ h
for XR3, $T_{max}>=16$ h.

105

[('989 patent col. 18 ll. 36-55.)]

Dr. Felton understood these conditions. She confirmed that "for in-vitro dissolution," "the desire is that the XR1 needs to have a T80 of between 1.5 and four" hours; the XR2 bead, "a T80 of between five and eight hours"; and the XR3 bead, "greater than eight hours or equal to or less than ten hours." (Tr. 617:11-618:8; PFF ¶ 454 (Pl.).) Though emphasizing that the inventors' exact dissolution methodology is critical, Dr. Felton agreed that regardless of the methodology, the conditions dictate that "the XR2 dissolution for T80 is slower than the XR1 dissolution" and faster than the XR3 dissolution. (Tr. 619:7-620:2.) But still, Dr. Felton's issue was that she could find "no data in here that . . . say what the XR1 is or that that XR1 had that dissolution data that met this criteria." (Tr. 617:21-23.)

Both sides agree that a POSA would conduct in-vitro dissolution testing before in-vivo testing. (*See* Tr. 600:11-16 (Felton) ("I don't want to go to a clinical test until I've tested something in the lab."); Tr. 79:4-9 (Bhatt) (testifying that the process requires testing formulations in vitro to identify formulations for human clinical study).) They also agree that in-vitro dissolution testing is relatively simple. (*See* Tr. 600:1-5 (Felton) (testifying that the "in-vitro dissolution" test "just means testing the drug and measuring the release of the drug in a beaker," which involves "a lot of parameters" but is "the simplest test"); Tr. 620:11-15 (Felton) (agreeing that "develop[ing] a dissolution test, coat[ing] beads with different weight gains, conduct[ing] the dissolution test, and analyz[ing] the data" "would be normal, everyday skills that a POSA could do"); Tr. 634:11-636:8 (Khan) (testifying that in-vitro dissolution testing is "very standard" and "very routine").) Therefore, the Court finds that the specification provides enough direction for a POSA to understand that to carry out Example 6, the POSA must first identify beads that meet the $T_{80\%}$ conditions "for in-vitro dissolution."

Figures 1 and 2 of the Patents-in-Suit show the results of in-vitro dissolution testing.  ('989 patent Fig. 1, Fig. 2; *see* '989 patent col. 4 ll. 47-52 (describing Figures 1 and 2 as showing "the time of release of 80% of the drug vs. % wt. gain of release controlling coating for" specific "coated extended release beads"); '989 patent col. 7 ll. 28-45 (describing Figures 1 and 2 as "in-vitro dissolution test[s]").)

Figure 1 graphs the results of in-vitro experiments calculating how long it took for 80% of topiramate to release from three different sets of beads, each coated with Surelease® ethylcellulose in varying thickness, into the dissolution media.  ('989 patent Fig. 1; Tr. 68:22-12 (Bhatt).)  In simpler terms, the test measured how fast topiramate released from the beads and dissolved in surrounding liquid, depending on how much Surelease® RC coating was on the beads.  When plotted in log scale, which is used to scale down data that increase exponentially, the datapoints formed a nearly straight line sloping upward.  (Tr. 69:16-19, 71:19-72:2 (Bhatt).)



[('989 patent Fig. 1.)]

Figure 2 shows the results of other in-vitro experiments like Figure 1's but with a few differences. ('989 patent Fig. 2.) First, the beads were coated with ethylcellulose along with a pore former. (Tr. 72:6-9 (Bhatt); *see* Tr. 661:3-5 (Khan) ("That's the difference between figure 1 and Figure 2. One of them has pore former and the other one doesn't have a pore former.").) Second, the Y axis reflects time in hours, but it is not converted into a log scale. (Tr. 72:11-15 (Bhatt); *see* Tr. 661:5-6 (Khan) ("So one is log relationship. The other one is non-log relationship.").) Finally, Figure 1 plots three datapoints, whereas Figure 2 plots four datapoints. (Tr. 72:22-23 (Bhatt).) But as in Figure 1, Figure 2's datapoints form a nearly straight line sloping upward. (Tr. 72:16-21 (Bhatt).) Dr. Felton understood that Figure 2 "is a summary of the dissolution data" for "four different release-controlling coating weight gains," estimating that "the

individual dissolution data was probably plotted, and the T80, the time for 80 percent release, was then calculated."  (Tr. 615:20-616:8.)



[('989 patent Fig. 2.)]

Both figures have equations representing the slope formula of the datapoints.  The closer $R^2$ is to 1.0, the straighter the line.  (Tr. 70:9-16 (Bhatt).)  The nearly straight lines in both figures reflect the linear co-relationship between RC coating thickness and release time: the thicker the RC coating, the longer it takes to release 80% of the drug.  (Tr. 69:19-21, 70:9-16 (Bhatt); *see* Tr. 616:9-14 (Felton) ("The higher the amount of polymer that was applied, the longer it took to get to the T80.").)  Indeed, the specification refers to Figures 1 and 2 as exemplifying that, "with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time."  ('989 patent col. 7 ll. 28-47.)

109

Critical in these experiments, the only parameter varying between the beads was the amount of RC coating. (Tr. 70:22-71:15 (Bhatt); Tr. 653:21-654:5 (Khan).) Thus, Supernus says, a POSA can use the linear equation to find the $T_{80\%}$ of any amount of coating along the line. (Tr. 73:3-14 (Bhatt).)

The parties disagree about the usefulness of the figures' exemplifying the linear co-relationship. The disagreement manifested during a late-trial objection, which the Court will now resolve.

On the invalidity issue, the parties agreed to present evidence in the following order: Torrent calls Dr. Felton in its case-in-chief, Supernus calls Dr. Khan in rebuttal, and Torrent recalls Dr. Felton in reply. (ECF No. 133 ¶ 506.) During Torrent's case-in-chief, when Dr. Felton opined on the disconnect between Examples 1 and 6, she specifically mentioned the "mathematical models" in Figures 1 and 2 as follows:

> MR. SUNG (ATTORNEY FOR TORRENT). And in addition to the lack of that information, was there anything else that you found in your analysis?
>
> DR. FELTON. Well, there's other -- there's some other things related to the mathematical models that are used in figures 1 and 2. And the patent makes clear that those mathematical models which would allow a person of ordinary skill to predict how much coating I would need to apply to achieve a specific T80, those mathematical relationships don't hold for all of the compositions. So a person of ordinary skill would have to recreate, again, recreate these types of mathematical models. But again, without the dissolution methodology that was used, finding a T80 using these mathematical models is meaningless.
>
> [(Tr. 603:06-18.)]

At that time, Dr. Felton did not elaborate on her opinion that "those mathematical relationships don't hold for all of the compositions." In Supernus's rebuttal, Dr. Khan explained step by step how a POSA would use the patent to arrive at the formulations described in the

110

Asserted Claims, once mentioning that "all the information is there very easily." (*See generally* Tr. 637:7-646:3.) In reply, Torrent presented — for the first time — a demonstrative exhibit showing Dr. Felton's failed attempt at using the mathematical equation in Figure 1 to predict the $T_{80\%}$ of five exemplary beads from Table 1. (Tr. 679:4-681:5.) The demonstrative was in Dr. Felton's binder of direct-examination exhibits, though it was not referenced in Torrent's case-in-chief.

Supernus objected, arguing that Dr. Felton's calculations went to the heart of Torrent's case-in-chief. (Tr. 681:6-682:13.) Torrent countered that it "opted not to do this on direct," but that Dr. Felton's calculations rebutted Dr. Khan's opinion "that someone could easily follow from example 1 to example 6, and that it was simple for a POSA to be able to go through the entire patent." (Tr. 681:13-16, 682:14-22, 683:12-17, 688:3-21.) Torrent told the Court that Dr. Khan's rebuttal testimony was "the first time that he ha[d] provided information from his perspective," and that "prior to that point during the trial proceedings, there was no information that Dr. Khan was going to say that a person of ordinary skill in the art could easily walk from example 1 to example 6." (Tr. 683:21-684:1.) Supernus responded that Torrent's representation was verifiably inaccurate based on Dr. Khan's expert report and deposition, Torrent's preparation and disclosure of the demonstrative in advance, and Supernus's pretrial disclosure of "the exhibits and everything we would be using on direct with Dr. Khan." (Tr. 684:8-16.)

For expediency, the Court let Torrent finish questioning Dr. Felton about her calculations and let Supernus recall Dr. Khan in another rebuttal, reserving on both Supernus's objection to Torrent's reply-examination and Torrent's subsequent objection to the Court's modifying the order of evidence presentation. (Tr. 700:9-701:21.)

The spirit of the federal rules on rebuttal testimony applies to Torrent's reply-examination. The "purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party." *Vay v. Huston*, 725 F. App'x 112, 116 (3d Cir. 2018) (quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). "At trial, rebuttal evidence is limited 'to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief.'" *Crowley v. Chait*, 322 F. Supp. 2d 530, 550 (D.N.J. 2004) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 752 F. Supp. 181, 193 (E.D. Pa. 1990), *aff'd in part, rev'd in part on other grounds*, 939 F.2d 91 (3d Cir. 1991)). It is not "an opportunity for the correction of any oversights in the [party-proponent]'s case in chief." *Smithkline Beecham Corp. v. Ranbaxy Lab'ys, LTD.*, Civ. No. 03-2158, 2006 WL 8459047, at *4 (D.N.J. Feb. 23, 2006) (quoting *Crowley*, 322 F. Supp. 2d at 551). "[E]vidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected, so as to avoid prejudice to the [party-opponent] and to ensure the orderly presentation of proof." *Vay*, 725 F. App'x at 117 (quoting *Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d 19, 22 (3d Cir. 1984)).

The Court finds that Dr. Felton's calculations exceeded the purpose of Torrent's reply. The notion that Torrent could not anticipate, or that "there was no information" suggesting, what Dr. Khan would testify as to the connection between Examples 1 and 6 is undermined by the record. Dr. Khan's opinion was no surprise. Before trial, Torrent was on notice that Dr. Khan would testify that the specification (1) "teaches a POSA how to make and use the claimed inventions," citing Example 1, and (2) "provides clear guidance on how to create sustained release formulations containing one or more XR components that deliver topiramate with the claimed pharmacokinetic parameters," citing Example 6. (ECF No. 139 at 25-26.) That Dr. Khan used the word *easily* changes nothing.

What's more, Dr. Felton's calculations are not purposed merely to rebut Dr. Khan's testimony. They are the entire basis for her opinion that "those mathematical relationships don't hold for all of the compositions" — which Torrent elicited in its case-in-chief. The "punchline," Torrent argued, was that "based on the calculations from Dr. Felton, only one example of the 13 [beads] that are in table 1 . . . even fits example 6. And as a result of that, even the examples that [Supernus] points to as supporting their written description or enablement begins to collapse." (Tr. 688:6-14.) In other words, Dr. Felton's calculations are the proof that undermines the usefulness of the Patents-in-Suit's examples and thus their enablement and written description. It was the "sum and substance of the evidence" that Torrent presented in its case-in-chief on invalidity. *Step-Saver*, 752 F. Supp. at 193.

Contrary to Dr. Felton's suggestion in her reply testimony, the equations in Figures 1 and 2 are not meant to apply universally to all 13 beads in Table 1. Indeed, changing an in-vitro dissolution parameter — namely, the RC coating material or pore former — would make "a similar graph, but the equation, the slope of the line will be different." (Tr. 71:10-15 (Bhatt); *see* Tr. 659:18-660:3 (Khan) (testifying that changing the polymer will change the slope and intercept value but not the relationship).) In Supernus's surrebuttal, Dr. Khan testified that Dr. Felton had "taken a bead population that probably is belonging to that log population" in Figure 1 and "try[ed] to fit [it] into a non-log. So obviously those numbers will look very, very high." (Tr. 706:15-19.) Dr. Felton's "fundamental problem," as Dr. Khan put it, was that she tried to apply "the equation and the data" for one bead population to all 13 exemplary beads. (Tr. 706:20-25.) But in fact, each of the 13 exemplary beads requires its own set of in-vitro dissolution experiments. (*See* Tr. 704:25-705:4 (Khan) ("Each one of the columns [in Table 1] that we have, . . . we have to perform

113

an experiment, that different coating thicknesses. Each one of them [is] different. So you can perform experiment for column one, get that, column two.").

Thus, the takeaway from Figures 1 and 2 is not their particular datapoints or slope formula. Nor is it that a POSA could plug data from other experiments into the figures' equations to calculate other formulations' release times. It is that they exemplify (1) how to analyze in-vitro dissolution data to find beads' $T_{80\%}$, and (2) that the RC coating thickness or the presence of pore formers correlates with release time. So although many variables affect release time, the Patents-in-Suit teach that to modulate release time, a POSA need only modulate the amount of RC coating or use of a pore former, leaving all other parameters equal.

Based on the Patents-in-Suit's direction and evidence of a POSA's skillset, the Court draws the connection between Examples 1 and 6 as follows. Example 1 teaches how to prepare the beads. Figures 1 and 2 show that a POSA can modulate thickness of an RC coating material or a pore former to achieve a $T_{80\%}$ that meets the conditions "for in-vitro dissolution" in Example 6. Upon completing in-vitro dissolution experiments and preparing single-bead XR formulations that satisfy those in-vitro conditions in Example 6, the POSA designates each formulation as the XR composition whose $T_{80\%}$ range matches the formulation's $T_{80\%}$: XR1 ($1.5$ h$<=T_{80\%}<=4$ h), XR2 ($5$ h$<=T_{80\%}<=8$ h), or XR3 ($8$ h$<T_{80\%}<=10$ h) in Example 6. After that, Dr. Khan testified, the POSA can simply rely on the bead-designations' $T_{max}$ data "for a single initial dose in-vivo" provided in Example 6. (*See* Tr. 642:23-643:10 (Khan) ("[I]f I coat the beads, get the dissolution between five to ten hours, I know I get the Tmax value because the patent already shows me that thing.").)

With these findings, the Court revisits Torrent's claim that the specification must describe the inventors' exact dissolution methodology for in-vitro testing. Torrent argues that "without specific information about the dissolution parameters and method that Supernus used to generate

the in-vitro data in Figures 1 and 2, a POSA could not rely on that information to determine which formulations described in Example 1 might be acceptable under Example 6." (ECF No. 171 at 37 (citing Tr. 602:25-603:5 (Felton)).) Torrent attacks Supernus's contention that "a POSA could look up the appropriate dissolution method," flagging that neither Dr. Bhatt nor Dr. Khan "testified as to the actual method that should be used." (*Id.* at 37-38 (citing PFF ¶ 54 (Pl.)).) Torrent argues that without the inventors' exact methodology, "the data in Figures 1 and 2 would be meaningless," and a POSA could not follow or replicate the examples. (*Id.* at 38 (citing Tr. 602:25-603:5 (Felton)).)

It was incumbent upon Torrent, who bears the burden to prove invalidity, to make clear why the data would be "meaningless." The Court is not satisfied that Torrent has done so. Torrent repeatedly cites Dr. Felton's refrain that using another dissolution methodology would produce "meaningless" data and "be like comparing apples and oranges." For this assertion, Torrent offers only Dr. Felton's calculations showing that the equations in Figures 1 and 2 do not apply universally to all polymers — an undisputed fact that misses the point of the figures. Torrent presented nothing to show, for instance, in what ways the differences among dissolution methodologies make the results meaningless or untranslatable from Example 1 to Example 6, or that a POSA does not have access to the apparatuses that USP or FDA recommends for this type of in-vitro dissolution testing. And again, that different dissolution methods "have different parameters" (Tr. 602:14-19 (Felton)) matters less given the specification's showing that, with those parameters being equal, a POSA can modulate release time by modulating only the thickness of the RC coating or a pore former (*see* Tr. 655:16-22 (Khan) (asking "why would I want to know all the variables?" if modulating coating thickness alone enables a POSA to achieve the desired $T_{80\%}$)).

Therefore, Torrent's *dissolution methodology* and *connection between Examples 1 and 6* challenges, which implicate the *amount of direction presented*, *relative skill of a POSA*, and *predictability of the art* factors, do not support a non-enablement finding.

Torrent likens this case to *Amgen Inc. v. Sanofi*.[63]  In *Amgen*, the United States Supreme Court rejected Amgen's "functional" claim to "an entire class of things" — there, antibodies — "defined by their function" rather than their "physical characteristics or chemical properties."  598 U.S. at 602, 610, 613.[64]  Specifically, Amgen did not claim "any particular antibody described by amino acid sequence," which is how a particular antibody is commonly identified; it claimed "'the entire genus' of antibodies" that performed two particular functions.  *Id.* at 600, 602 (citation and some internal quotation marks omitted).  The challenge for Amgen, the Supreme Court said, was that its described methods for making other antibodies forced a scientist "to engage in 'painstaking experimentation' to see what works."  *Id.* at 614 (citation omitted).

But the Supreme Court qualified its holding in two ways.  First, a specification need not always "describe with particularity how to make and use every single embodiment within a claimed class."  *Id.* at 610-11.  "For instance," the Supreme Court said, "it may suffice to give an example (or a few examples) if the specification also discloses 'some general quality . . . running through' the class that gives it 'a peculiar fitness for the particular purpose.'"  *Id.* (quoting *Consol. Elec. Light Co v. McKeesport Light Co.*, 159 U.S. 465, 475 (1895)).  Second, "a specification may call for a reasonable amount of experimentation to make and use a patented invention," such as when "some small difference in the proportions" of the claimed ingredient are required.  *Id.* at 611-

---

[63]     598 U.S. 594 (2023).

[64]     Supernus distinguishes the functional claim in *Amgen* from the Asserted Claims here. (ECF No. 170 at 43.)  Because the Court ultimately rejects *Amgen*'s applicability for other reasons, it need not address the asserted distinction.

12 (citing, *e.g.*, *Wood v. Underhill*, 46 U.S. 1 (1847); *Mins. Separation v. Hyde*, 242 U.S. 261 (1916)).

This case is different from *Amgen* in two meaningful ways. First, unlike Amgen's claim, the Asserted Claims do not claim an "entire genus" of release-controlling coatings regardless of physical characteristics or chemical properties. They claim sustained release formulations of topiramate comprising an XR component with cellulosic or acrylic polymers. (*See, e.g.*, '989 patent col. 21 ll. 1-8.) Recall, again, Dr. Rotella's testimony that "the term 'acrylic' means something" — it "confer[s] structure." (Tr. 483:1-5 (Rotella).) The XR component must also exhibit "a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single dose." (*See, e.g.*, '989 patent col. 21 ll. 33-35.) In short, the Asserted Claims require more than Amgen's claim.

Second, the Patents-in-Suit do not require "painstaking experimentation to see what works" as Amgen's patent required. *See Amgen*, 598 U.S. at 614 (citations and quotation marks omitted). Torrent argues that a POSA cannot "predict the rate of release for a given formulation without running [his or her] own experiments." (ECF No. 171 at 40.) Indeed, Dr. Khan testified that for in-vitro dissolution testing, "if I'm changing the polymer, I have to perform at least those three, four experiments to have that" curve. (Tr. 660:7-9.) But Dr. Khan added, "Once I have that curve, then I can predict anything within that. But I have to make my own curve." (Tr. 660:9-11.) Thus, once a POSA performs the first in-vitro dissolution test, gathers the data, and creates the slope formula — the parties' experts agree that these steps are routine[65] — the curve will tell the POSA

---

[65]     (*See* Tr. 638:4-6 (Khan) ("[T]he coating process is extremely well known, and I think Dr. Felton also admitted that it's very easy, any -- it's a routine formulator will do it."); Tr. 620:11-15 (Felton) (agreeing that "develop[ing] a dissolution test, coat[ing] beads with different weight gains, conduct[ing] the dissolution test, and analyz[ing] the data" "would be normal, everyday skills that a POSA could do").)

how much RC coating will achieve a certain $T_{80\%}$.  Using that information, the POSA can adjust

the RC coating precisely as needed to achieve a desired release rate.

Explaining the simplicity of this process, Dr. Khan testified as follows:

> MR. WEEKS (ATTORNEY FOR TORRENT).  And you would agree that you cannot predict what figures 1 and 2 would look like if you switched from using ethylcellulose to one of the Eudragit® acrylic polymers, for example, correct?
>
> DR. KHAN.  I am not worried at all.  I provide the coating, I do the dissolution, and I calculate the time for 80 percent dissolution.  If that dissolution, if it is releasing faster, I provide more coating so that my T[8]0 time increases.  And if I'm not satisfied with that, I provide even more coating.  So in one experiment, I keep on increasing the coating until I get the dissolution time, so I'm not at all worried about other polymers not giving the data.  Actually, I got the teaching from it, how to perform and how to coat.  I will use that and I get my own data.
>
> . . .
>
> Q.   The addition of a pore former significantly change the relationship between polymer weight gain and T80 dissolution time.  You could not have predicted that in advance without running experiments, right?
>
> A.  So when I run experiment, I will run without pore former.  If that dissolution is too slow, then I will add pore former.  And once I add pore former, I know now in my experiments I need pore former.  Then I start the process, right.  So I will increase the coating weight gain, perform dissolution.  And this time in my coating material, I have added a pore former excipient therein.  But I perform the same experiment.  Now I add a pore former.
>
> [(Tr. 659:5-660:23.)]

And, once more, after making beads that satisfy the "in-vitro dissolution" conditions in

Example 6, a POSA can rely on the "single initial dose in-vivo" data that correspond with the

beads' in-vitro release time.  (*See* '989 patent col. 18 ll. 46-55; *see also* Tr. 653:21-654:25 (Khan)

("What this patent did, even though there are so many variables there, they said, . . . focus on

118

coating thickness.  And that thickness will modulate their dissolution, and dissolution will get to your PK.").)

Even if Torrent had shown that a POSA could not rely on the in-vivo data in Example 6, the Court is not convinced that performing an in-vivo study would be undue experimentation.  Dr. Felton testified that in-vivo clinical studies are beyond a POSA's skillset, reasoning that even she has "never conducted a clinical trial" despite her qualifications exceeding the *POSA* construction. (Tr. 613:5-20.)  This is true even if a POSA hired a provider to perform the in-vivo study, because, as Dr. Felton understands "based on the legal description" that she received from counsel, all that matters is whether the POSA has the skillset.  (Tr. 613:21-614:12.)  Yet Dr. Khan countered that clinical studies are not as burdensome as Dr. Felton describes them.  He testified that contrary to Dr. Felton's testimony, "[y]ou don't need FDA permission" to conduct single dose in-vivo studies; you only need permission from your institutional review board, or "IRB."  (Tr. 632:18-633:15.) He also testified that his graduate students routinely conduct these studies.  (Tr. 633:17-634:10.) Dr. Taft likewise testified that "this type of clinical bioavailability test is a routine test that can be executed by a person of ordinary skill."  (Tr. 169:23-25.)  Faced with only these competing, equally credible opinions, the Court cannot rule that Torrent met the clear-and-convincing standard.

The Court finds that the Patents-in-Suit require some trial and error but not the type of "random trial-and-error discovery" that gave the Supreme Court pause.  *See Amgen*, 598 U.S. at 615; *see also Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1386 (Fed. Cir. 2013) ("Even 'a considerable amount of experimentation is permissible,' as long as it is 'merely routine' or the specification 'provides a reasonable amount of guidance' regarding the direction of experimentation." (quoting *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360-61 (Fed.

Cir. 1998))).[66]  Therefore, the fact that a POSA must perform in-vitro dissolution testing, which implicates the *quantity of experimentation*, *relative skill of a POSA*, and *predictability of the art* factors, does not favor a non-enablement finding.

Having found none of Torrent's challenges persuasive, the Court rules that Torrent has not shown by clear and convincing evidence that the Patents-in-Suit are not enabling.

### D.    Written Description

Under § 112(a), a patent's "description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (internal citation, quotation marks, and brackets omitted).  "To satisfy the written description requirement, a patent's specification must 'reasonably convey[ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (quoting *Ariad Pharms.*, 598 F.3d at 1351).  "[W]hether a patent complies with the written description requirement will necessarily vary depending on the context.  Specifically, the level of detail required . . . varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 380 (D.N.J. 2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020) (quoting *Ariad Pharms.*, 598 F.3d at 1351).  The party challenging a patent's written description must do so through clear and convincing evidence. *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

---

[66]    That Torrent took seven years to develop its ANDA Products (PFF ¶ 53, 569 (Def.)) is not alone dispositive.  *See Amgen*, 598 U.S. at 615 ("[E]nablement is not measured against the cumulative time and effort it takes to make every embodiment within a claim.").  Though Torrent presented evidence as to what could delay a POSA, Torrent never explained what actually took it so long to develop its ANDA Products.

Much of the Court's enablement discussion also applies to Torrent's written-description challenge. (*See* ECF No. 171 at 42 ("The same deficiencies in the asserted patent specifications described above regarding enablement, compel a similar result regarding inadequate written description.").) For Figures 1 and 2, for instance, Torrent asserts its failed *dissolution methodology* challenge. (*See* PFF ¶¶ 425-442 (Def.).) The Court will discuss only new arguments.

Torrent argues that the Patents-in-Suit do not show that the in-vitro mathematical relationship would hold for any formulation other than the RC coating materials used in Figures 1 and 2. (ECF No. 171 at 44.) Yet Torrent does not contest that the patents *claim* that the relationship would hold for each exemplary bead described in Table 1. *Compare Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1567-69 (Fed. Cir. 1997) (rejecting a description of "a process for obtaining human insulin-encoding cDNA" that lacked any "sequence information indicating which nucleotides constitute human cDNA" or "further information in the patent pertaining to that cDNA's relevant structural or physical characteristics"), *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011) (rejecting a description that included "no examples of macrocyclic lactone analogs of rapamycin" (the claimed genus) and generally "no guidance on how to properly determine whether a compound is a macrocyclic lactone analog of rapamycin"), *with Ajinomoto*, 932 F.3d at 1361 (accepting a description that expressly provided four examples of "more potent promoters" where a POSA could "make relatively predictable changes to the native promoter to arrive at a more potent promoter").

Torrent also argues that "there is no support in the specification showing that a single-component formulation could be used to achieve a target predetermined release profile." (ECF No. 171 at 45.) Not so. In Figure 2, which shows results of in-vitro dissolution testing with single-bead formulations, each of the four plotted data points meet the XR1, XR2 or XR3 conditions set

forth in Example 6: (i) about a 2% release coating had about a 2.8 hour $T_{80\%}$ time; (ii) about a 3%
release coating had about a 3.2 hour $T_{80\%}$ time; (iii) about a 5.5% release coating had about a 5.5
hour $T_{80\%}$ time; and (iv) about a 9.5% release coating had about a 9.5 hour $T_{80\%}$ time.[67] ('989
patent Fig. 2, Example 6.) Compare these release rates with Example 6's conditions "for in-vitro
dissolution": for XR1, $1.5\ h <= T_{80\%} <= 4\ h$; for XR2, $5\ h <= T_{80\%} <= 8\ h$; for XR3, $8\ h < T_{80\%} <= 10\ h$.
And in Figure 3, which shows results of in-vivo studies involving single-bead formulations, the
XR2 and XR3 beads each exhibit a $T_{max}$ of about 24 hours, satisfying the claimed $T_{max}$ of 16 or
more hours after a single initial dose. ('989 patent Fig. 3, Example 6; Tr. 85:1-5 (Bhatt).)

     Finally, contrary to Torrent's assertion, a patent's disclosing a handful of examples for far-
reaching claims is not in itself improper. (*See* ECF No. 171 at 45.) *See Ariad Pharms.*, 598 F.3d
at 1351 ("Nor do we set out any bright-line rules governing, for example, the number of species
that must be disclosed to describe a genus claim, as this number necessarily changes with each
invention, and it changes with progress in a field."). "A written description of an invention
involving a chemical genus, like a description of a chemical species, requires a precise definition,
such as by structure, formula, [or] chemical name of the claimed subject matter sufficient to
distinguish it from other materials." *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1164
(Fed. Cir. 2019) (quoting *Bos. Sci.*, 647 F.3d at 1363) (internal quotation marks omitted)
(alterations in *Bos. Sci.*). Here, the Patents-in-Suit satisfy this mandate. Recall, once more, Dr.
Rotella's testimony that "the term 'acrylic' means something" — it "confer[s] structure." (Tr.
483:1-5 (Rotella).)

---

[67]    The Court overrules Torrent's objection that Supernus's noting these datapoints violates
FRE 702's requirements. (*See* PFF ¶ 423 (Def.).) The data are in the specification, which is part
of the intrinsic record that the Court can review without the help of expert testimony.

As none of Torrent's written-description arguments is availing, the Court rules that Torrent has not shown by clear and convincing evidence that the Patents-in-Suit lack adequate written description.

## V. CONCLUSIONS OF LAW

For these reasons, the Court rules that Torrent's ANDA Products **INFRINGE** on the Asserted Claims of the Patents-in-Suit, and that the Patents-in-Suit are **VALID**.  An appropriate Order follows.


Date: January 30, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

Appx131

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SUPERNUS PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TORRENT PHARMACEUTICALS LTD., *et al.*, <br><br> Defendants. | Civil Action No. 21-06964 (GC) (DEA) <br> Civil Action No. 21-14268 (GC) (DEA) <br><br> **OPINION** <br> **FILED UNDER TEMPORARY SEAL** |

## APPEARANCES

Charles M. Lizza
William C. Baton
Sarah A. Sullivan
SAUL EWING LLP
One Riverfront Plaza
1037 Raymond Blvd., Ste. 1520
Newark, NJ 07102

Edgar H. Haug
Nicholas F. Giove
Richard F. Kurz
Andrew S. Wasson
Jason A. Kanter
Anna N. Lukacher
Jessica M. Stookey
Chinmay P. Bagwe
HAUG PARTNERS LLP
745 Fifth Ave.
New York, NY 10151

*Counsel for Plaintiff*
*Supernus Pharmaceuticals, Inc*

Rebekah R. Conroy
STONE CONROY LLC
25a Hanover Rd., Ste. 301
Florham Park, NJ 07932

Neal Seth (*pro hac vice*)
Wesley Weeks (*pro hac vice*)
Lawrence Sung (*pro hac vice*)
Corey Weinstein (*pro hac vice*)
WILEY REIN, LLP
2050 M St. NW
Washington, DC 20036

*Counsel for Defendants*
*Torrent Pharmaceuticals Ltd. and*
*Torrent Pharma Inc.*

**CASTNER, District Judge**

This matter comes before the Court upon a Hatch-Waxman patent-infringement action brought by Plaintiff Supernus Pharmaceuticals, Inc. (Supernus) against Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (Torrent), stemming from Torrent's Abbreviated New Drug Application seeking approval to market a generic version of Supernus's drug product. Supernus alleges that Torrent's ANDA Products infringe claims of three patents in suit: claim 14 of U.S. Patent No. 8,992,989 ('989 patent); claim 14 of U.S. Patent No. 9,549,940 ('940 patent); and claims 13 and 23 of U.S. Patent No. 9,622,983 ('983 patent).[1]

The Court held a bench trial on Supernus's infringement claims and Torrent's invalidity defenses. In this Opinion, the Court resolves disputes over infringement and validity of the Patents-in-Suit, including reserved decisions on motions *in limine* and trial objections and motions. The Court discusses the procedural history and trial record, and then makes findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure ("Rule") 52(a). The findings of fact are based on the Court's observations at trial, credibility judgments, and review of all admissible record evidence.

For the reasons set forth below, and other good cause shown, the Court finds that Torrent's ANDA Products **INFRINGE** on the Patents-in-Suit and that the asserted patents are **VALID**.[2]

---

[1] Collectively, the "Asserted Claims" of the "Patents-in-Suit." The '989 patent's trial exhibit is PTX058; the '940 patent's, PTX059; the '983 patent's, PTX061.

[2] When Supernus rested its case-in-chief, Torrent moved for judgment as a matter of law on infringement. (Tr. 420:10-19.) Rule 52(c) states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any

# I.     **FACTS ESTABLISHED**

The following facts are stipulated, not disputed, or established by undisputed record evidence in the Final Pretrial Order, the Joint Proposed Findings of Fact, or both[3]:

### A.     **The Parties**

1.      Plaintiff Supernus is a corporation organized and existing under the laws of Delaware, having its principal place of business at 9715 Key West Avenue, Rockville, Maryland 20850.  (PFF ¶ 1 (citing ECF No. 133 ¶ 29).)

2.      Defendant Torrent Pharmaceuticals Ltd. is a corporation operating and existing under the laws of India, with its principal place of business at Torrent House, Off. Ashram Road, Ahmedabad, Gujarat, 380009, India.  (PFF ¶ 2 (citing ECF No. 133 ¶ 30).)

3.      Defendant Torrent Pharma Inc. is a Delaware limited liability company having its principal place of business at 150 Allen Road, Suite 102, Basking Ridge, NJ 07920. (PFF ¶ 3 (citing ECF No. 133 ¶ 31).)

4.      Defendant Torrent Pharmaceuticals Inc. is a subsidiary of Torrent Pharmaceuticals Ltd.  (PFF ¶ 4 (citing ECF No. 133 ¶ 32).)

---

judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

The Court reserved on Torrent's motion.  For the reasons set forth in this Opinion, Torrent's motion is **DENIED**.

[3]      The Final Pretrial Order is at ECF No. 133, and the Joint Proposed Findings of Fact (PFF) is at ECF No. 169.  For several proposed facts, Torrent disputes their relevance but not their veracity.  (*See* PFF ¶¶ 22-24, 26-27 (Def.) (asserting that facts are "not relevant to the litigation and therefore . . . not relevant to the proposed findings of fact").)  The Court recites facts that it finds are both relevant under Federal Rule of Evidence 401 and established through undisputed, credible, and admissible evidence.

3

B.     **Background**

5.     This is a civil action for patent infringement that is brought by Supernus against Torrent arising under the patent laws of the United States, Title 35, United States Code.[4] (PFF ¶ 5 (citing ECF No. 133 ¶ 21).)

6.     Supernus asserts that Torrent infringes claims of three patents — United States Patent Nos. 8,992,989 ('989 patent); 9,549,940 ('940 patent); and 9,622,983 ('983 patent) (collectively, the "Patents-in-Suit").  (PFF ¶ 6 (citing ECF No. 133 ¶ 23).)

7.     This case involves the drug product Trokendi XR®, which is sold by Supernus and is indicated for treatment of epilepsy: initial monotherapy for the treatment of partial-onset or primary generalized tonic-clonic seizures in patients 6 years of age and older; adjunctive therapy for the treatment of partial-onset, primary generalized tonic-clonic seizures, or seizures associated with Lennox-Gastaut syndrome (LGS) in patients 6 years of age and older; and preventive treatment of migraine in patients 12 years of age and older.  (PFF ¶ 7 (citing ECF No. 133 ¶ 22).)

8.     Supernus owns the FDA approved New Drug Application (NDA) No. 201635 for Trokendi XR®, topiramate extended-release capsules, 25 mg, 50 mg, 100 mg, and 200 mg.  (PFF ¶ 8 (citing ECF No. 133 ¶¶ 28, 33).)

9.     Pursuant to 21 U.S.C. §§ 355(b)(1) and 355(c)(2), FDA's publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book") lists ten (10) patents as covering Supernus's Trokendi XR®. The Orange Book lists the Patents-in-Suit and also the following patents, which are no longer asserted against

---

[4]     This Court thus has subject-matter jurisdiction over all claims and counterclaims in this action under 28 U.S.C. §§ 1331 and 1338.  The parties do not dispute this Court's personal jurisdiction over them.  (ECF No. 133 ¶ 2.)

4

Torrent: United States Patent Nos. 8,298,576 ('576 patent), 8,298,580 ('580 patent), 8,663,683 ('683 patent), 8,877,248 ('248 patent), 8,889,191 ('191 patent), 9,555,004 ('004 patent), and 10,314,790 ('790 patent).  (PFF ¶ 9 (citing ECF No. 133 ¶ 34).)

10.    The inventors assigned ownership of all Orange Book Patents to Supernus. (PFF ¶ 10 (citing ECF No. 133 ¶ 36).)

11.    Torrent filed Abbreviated New Drug Application No. 215918 (Torrent's ANDA) with the FDA seeking approval to engage in commercial marketing of a generic version of Trokendi XR® (Torrent's ANDA Products).  (PFF ¶ 11 (citing 133 ¶ 55).)

12.    On or about June 15, 2021, Torrent sent a letter pursuant to 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95 regarding the Torrent ANDA Products and the '576, '580, '683, '248, '191, '989, '940, '004, '983, and '790 patents (the "June 15 Notice Letter") to Supernus.  (PFF ¶ 12 (citing ECF No. 133 ¶ 56).)

13.    Torrent's ANDA references Trokendi XR® (topiramate extended-release capsules) as the reference listed drug, or "RLD."  (PFF ¶ 13 (citing ECF No. 133 ¶ 57).)

14.    The Torrent ANDA Products are extended release formulations of topiramate.  (PFF ¶ 14 (citing ECF No. 133 ¶ 59).)

15.    The Torrent ANDA Products are topiramate extended-release capsules, 25 mg, 50 mg, 100 mg, and 200 mg.  (PFF ¶ 15 (citing ECF No. 133 ¶ 58).)

16.    Torrent has asserted affirmative defenses stating that the Patents-in-Suit are invalid and not infringed, directly or indirectly.  (PFF ¶ 17 (citing ECF No. 133 ¶ 24).)

17.    Torrent Pharmaceuticals Ltd. also brought counterclaims for a declaratory judgment of non-infringement with respect to the Patents-in-Suit.  (PFF ¶ 18 (citing ECF No. 133 ¶ 25).)

18.     Supernus asserted affirmative defenses stating that, among other things, the Patents-in-Suit are valid and enforceable, and infringed by Torrent's ANDA Products.  (PFF ¶ 19 (citing ECF No. 133 ¶ 26).)

### C.     The Accused Product

19.     The composition of Torrent's ANDA Products is disclosed in the Quality Overall Summary (QOS) that Torrent submitted to the FDA.  (PFF ¶ 20 (citing PTX106.3-5; Patel Tr. 65:12-66:2, 75:11-17, 75:20-22; Tr. 240:22-242:24, 232:2-237:24.).)[5]

20.     Torrent's ANDA Products comprise gelatin capsules that are filled with beads where each bead comprises (i) sugar sphere coated with a seal coating, (ii) a topiramate drug coating layer coated on top of each sugar sphere, and (iii) a release controlling polymer coating layer coated on top of the topiramate-coated beads.  (PFF ¶ 21 (citing Patel Tr. 21:18-24, 22:5-15; Tr. 240:22-242:24, 232:2-237:24; PTX106.3-5).)

21.     At the core of the Torrent ANDA Products beads is an inert sugar sphere.  (PFF ¶ 22 (Pl.) (citing PTX106.3; Patel Tr. 66:3-12; Tr. 240:22-241:8).)

22.     A seal coating suspension is coated on top of the sugar sphere.  (PFF ¶ 23 (Pl.) (citing PTX106.3; Patel Tr. 66:13-16; Tr. 240:22-241:18).)

23.     A drug coating suspension is coated on top of the seal coating suspension layer.  The drug coating suspension layer contains the active pharmaceutical ingredient (API), topiramate, along with various excipients.  The beads coated with the drug coating suspension are

---

[5]     Yogesh Patel, Assistant General Manager at Torrent, oversaw the formulation and development of Torrent's ANDA Products.  (PFF ¶ 133 (citing Patel Tr. 18:4-19, 19:4-20:4).)  In lieu of live testimony, excerpts of Mr. Patel's video deposition were played at trial.  (*See* ECF No. 166.)

6

also referred to as "drug coated pellets." (PFF ¶ 24 (Pl.) (citing PTX106.3; Patel Tr. 67:2-5, 67:19-22; Tr. 240:17-242:2).)

24.     Torrent's ANDA Products comprise polyvinyl acetate dispersion as a release controlling polymer. (PFF ¶ 25; PTX106.3-4.)

25.     The common polymer coated beads are filled into capsules, and each capsule may contain hundreds of beads. (PFF ¶ 26 (Pl.) (citing PTX106.4-5; Patel Tr. 21:18-24; Tr. 240:17-241:5; Tr. 61:19-62:2).)

26.     Torrent developed a formulation "to mimic the physiochemical characteristics of RLD [i.e., Supernus's Trokendi XR® product]. No other formulations were explored." (PFF ¶ 27 (Pl.) (citing Patel. Tr. 302:8-17; PTX106.29).)

27.     Torrent represented to the FDA that its ANDA Product is bioequivalent to Supernus's Trokendi XR®. (PFF ¶ 28 (citing Patel Tr. 55:3-7, 251:1-11).)

**D.     The Patents-in-Suit and the Asserted Claims**

28.     Supernus is asserting claim 14 of the '989 patent, claim 14 of the '940 patent, and claims 13 and 23 of the '983 patent (the "Asserted Claims") against Torrent in this action. (PFF ¶ 29 (citing ECF No. 133 ¶ 49).)

29.     The '989 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 30 (citing ECF No. 133 ¶ 37).)

30.     The '989 patent issued on March 31, 2015. (PFF ¶ 31 (citing ECF No. 133 ¶ 38).)

31.     The '989 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006. (PFF ¶ 32 (citing ECF No. 133 ¶ 39).)

32.     The '989 patent issued from U.S. Patent Application No. 14/499,462.  (PFF

¶ 33 (citing ECF No. 133 ¶ 40).)

33.     Claim 14 of the '989 patent reads:

14. A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 34 (citing ECF No. 133 ¶ 50).)]

8

34.     The '940 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 35 (citing ECF No. 133 ¶ 41).)

35.     The '940 patent issued on January 24, 2017. (PFF ¶ 36 (citing ECF No. 133 ¶ 42).)

36.     The '940 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006. (PFF ¶ 37 (citing ECF No. 133 ¶ 43).)

37.     The '940 patent issued from U.S. Patent Application No. 15/259,841. (PFF ¶ 38 (citing ECF No. 133 ¶ 44).)

38.     Claim 14 of the '940 patent reads:

14. A sustained release formulation of topiramate comprising between 0.5% to 85%, by weight of the formulation, topiramate, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate,

9

crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 39 (citing ECF No. 133 ¶ 51).)]

39.     The '983 patent is titled "Sustained-Release Formulations of Topiramate." (PFF ¶ 40 (citing ECF No. 133 ¶ 45).)

40.     The '983 patent issued on April 18, 2017.  (PFF ¶ 41 (citing ECF No. 133 ¶ 46).)

41.     The '983 patent claims priority to U.S. Provisional Patent Application No. 60/859,502, which has a priority date of November 17, 2006.  (PFF ¶ 42 (citing ECF No. 133 ¶ 47).)

42.     The '983 patent issued from U.S. Patent Application No. 15/259,856.  (PFF ¶ 43 (citing ECF No. 133 ¶ 48).)

43.     Claim 13 of the '983 patent reads:

13. A sustained release formulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, which topiramate is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

[(PFF ¶ 44 (citing ECF No. 133 ¶ 52).)]

44.     Claim 23 of the '983 patent, which depends from claim 13, reads:

23. The formulation according to claim 13 reads: wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly(a-w)alkylenediols, alkali metal salts, alkaline earth metal salts, and combinations thereof.

[(PFF ¶ 45 (citing ECF No. 133 ¶ 53).)]

11

### E.    Claim Construction

45.    For purposes of this litigation, the Parties have agreed upon, and the Court has adopted, the following definition of a person of ordinary skill in the art (POSA):

> [S]omeone in the 2006 time frame with at least a Bachelor of Science degree in Pharmaceutical Sciences or a related field, approximately three to five years of experience in a drug delivery technology or related field, and working knowledge regarding pharmacokinetics (or a person of commensurate education and experience).
>
> [(PFF ¶ 57 (citing ECF No. 88 at 9; ECF No. 133 ¶ 60).)]

46.    As per the Court's December 2, 2022 *Markman* Order, the following constructions apply to the Asserted Claims:

| Patent Claim Term | Court's Construction |
|---|---|
| "immediately and continuously"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claim 13) | Requires no construction—plain and ordinary meaning<br><br>"Without delay and without interruption" |
| "extended release (XR) component" or "extended release component"<br><br>"extended release (XR) topiramate-containing component(s)" or "extended release topiramate-containing component(s)"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claims 13 and 23) | "A component that releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time" |
| "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers"<br><br>('989 patent claim 14;<br>'940 patent claim 14;<br>'983 patent claim 13) | Requires no construction—plain and ordinary meaning |

[(PFF ¶ 58 (citing ECF No. 89 at 3-4; ECF No. 88 at 33; ECF No. 133 ¶ 61).)]

### F. Witnesses Presented at Trial

47. Supernus's expert witness Mansoor A. Khan, R.Ph., Ph.D., was admitted as an expert in the field of pharmaceutical formulations and drug delivery — specifically, the development, evaluation, and characterization of sustained release formulations and the ingredients in such formulations. (PFF ¶ 59 (citing Tr. 221:20-24, 231:22-24; PTX119).)

48. Supernus's expert witness David R. Taft, Ph.D., was admitted as an expert in pharmacokinetics and pharmacodynamics. (PFF ¶ 71 (citing Tr. 162:8-17).)

49. Supernus's fact witness, Padmanabh Bhatt, Ph.D., is one of the inventors of the Patents-in-Suit. (PFF ¶ 124 (citing Tr. 56:8-17; PTX058.2; PTX059.2; PTX061.2).).) Dr. Bhatt is a founding executive of Supernus. (PFF ¶ 126 (citing Tr. 52:22-24).) When Supernus was founded in December 2005, Dr. Bhatt was the head of pharmaceutical sciences and was involved in the development of Trokendi XR®. (PFF ¶ 127 (citing Tr. 52:22-24, 55:4-19).) At present, Dr. Bhatt is the Chief Scientific Officer and a senior vice president of intellectual property at Supernus. (PFF ¶ 128 (citing Tr. 53:13-15).) As a senior vice president of intellectual property at Supernus, Dr. Bhatt is responsible for managing outside counsel for intellectual property related matters both in the U.S. and worldwide. (PFF ¶ 130 (citing Tr. 54:13-25).) Dr. Bhatt is not an attorney. (PFF ¶ 131 (citing Tr. 54:11-12).) Dr. Bhatt earned an undergraduate degree and a master's degree in pharmacy from the University of Bombay. He also earned a Master of Science degree and a Ph.D. in pharmaceutical chemistry from the University of Kansas. (PFF ¶ 132 (citing Tr. 52:6-16).)

50. Torrent's expert witness Linda Felton, Ph.D., was admitted as an expert in drug formulation and modified drug delivery systems. (PFF ¶ 82 (citing Tr. 553:16-17).)

51. Torrent's expert witness David P. Rotella, Ph.D., was admitted as an expert in structural chemistry and organic chemistry. (PFF ¶ 96 (citing Tr. 449:22-23).).

<center>13</center>

52.     Torrent's fact witness, Yogesh Patel, is Assistant General Manager at Torrent, and oversaw the formulation and development of the Torrent ANDA Products. (PFF ¶ 133 (citing Patel Tr. 18:4-19, 19:4-20:4).) Mr. Patel has a master's degree in pharmaceutics. (PFF ¶ 134 (citing Patel Tr. 11:18-23).) Mr. Patel is Torrent's designated Rule 30(b)(6) witness. (PFF ¶ 135 (citing Patel Tr. 23:4-16, 24:13-19, 26:7-27:16, 28:16-29:15, 31:10-32:10; PTX067).)

## II.     **BACKGROUND**

### A.     **Procedural History**

Supernus filed separate infringement actions against Torrent and Ajanta Pharma Limited and Ajanta Pharma USA Inc. (ECF No. 1; ECF No. 43.)[6] The two actions were later consolidated. (ECF No. 43.) Torrent counterclaimed for declaratory judgments of noninfringement and asserted an affirmative defense that Supernus's patents were invalid.[7] Torrent's basis, according to its noninfringement contentions,[8] was that "Torrent's ANDA Products do not comprise any claimed controlling coating material including cellulosic and Acrylic polymer in composition" in the Asserted Claims of the Patents-in-Suit. (ECF No. 127-1 at 7-13.[9])

---

[6]     Civil Action No. 21-14268 (Torrent); Civil Action No. 21-6964 (Ajanta).

[7]     (Defs.' Answer to Complaint, Affirmative Defenses, & Counterclaim, *Supernus Pharmaceuticals, Inc. v. Torrent Pharmaceuticals Ltd., et al.*, Civil No. 21-14268 (D.N.J. Sept. 29, 2021), ECF No. 11.)

[8]     This District's local patent rules required Torrent to serve "Non-Infringement Contentions" describing its basis for opposing Supernus's infringement assertion. L. Pat. R. 3.6(e). The contentions needed to "include a chart identifying each claim at issue in the case and each limitation of each claim at issue" and "specifically identify[ing] for each claim which claim limitation(s) is/(are) literally absent from" Torrent's ANDA. *Id.* Torrent's noninfringement contentions also covered other patents that Supernus no longer asserts.

[9]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

At the *Markman* stage, the Court held a hearing and construed certain of the patents' claim terms — namely, the definition of a person of ordinary skill in the art, or "POSA"; "immediately and continuously"; "extended release (XR) component"; and "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (ECF Nos. 88, 89.)[10]

Supernus and the Ajanta defendants eventually dismissed their claims against each other. (ECF No. 104.)  Shortly after, Supernus and Torrent stipulated to reducing their claims and defenses: Supernus agreed to pursue only the Asserted Claims; Torrent agreed to withdraw reports of two experts; and both parties agreed to withdraw their requests to strike certain portions of each other's expert reports.  (ECF No. 106.)

In early July 2023, the Court entered the Final Pretrial Order.  (ECF No. 133.)  The Final Pretrial Order detailed, among other things, the legal issues, stipulated facts, contested facts, and potential fact and expert witnesses.  (*Id.*)

Leading up to trial, the Court addressed three motions *in limine* — one from Supernus and two from Torrent.  (ECF Nos. 126, 127, 128, 129.)  The Court partially granted Supernus's motion, precluding Torrent "from eliciting from its expert testimony about the absence of evidence or Supernus's alleged failure to prove that Torrent's ANDA products contain an extended release (XR) topiramate-containing component."  (ECF No. 151 at 7.)  The Court permitted Torrent, however, to cross-examine Supernus's expert "about the absence of such evidence or Supernus's satisfaction of its burden of proof," reserving on deciding whether that cross-examination testimony would ultimately be admissible.  (*Id.* at 8.)

As to Torrent's motions, the Court reserved on deciding (1) whether to preclude certain testimony of Supernus's expert Mansoor A. Khan, and (2) whether to preclude Supernus from

---

[10]      A transcript of the *Markman* hearing is at ECF No. 87.

asserting infringement under the doctrine of equivalents at trial.  (*Id.*)  The latter issue, the Court ruled, was "tantamount to a request for summary judgment of noninfringement" and should thus be resolved after trial.  (*Id.* at 7.)

The Court then held a four-day bench trial on Supernus's infringement claims and Torrent's invalidity defenses.  Following trial, the parties submitted Joint Proposed Findings of Fact along with their respective post-trial briefs.  (ECF Nos. 169, 170, 171.)  After reviewing the papers, the Court heard the parties' closing arguments.

### B.    Summary of the Arguments

Supernus argues that Torrent's ANDA Products infringe every limitation of the Asserted Claims, literally and under the doctrine of equivalents.  (PFF ¶¶ 136-139; ECF No. 170.)  Although, to prevail, Supernus must prove infringement of every claim limitation, the chief infringement dispute is whether Torrent's ANDA Products meet the claim limitation requiring "an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers."

Torrent's literal-infringement defense is twofold.  First, for its ANDA Products' coating material, Torrent uses polyvinyl acetate, which Torrent contends is not an acrylic polymer.[11] Second, Torrent asserts that Supernus has not shown that Torrent's ANDA Products contain an *extended-release component* within the Court's construction of that term.  As to the doctrine of equivalents, Torrent argues that the prosecution history estops Supernus from recapturing what it disclaimed in a narrowing amendment.  But even if Supernus is not so estopped, Torrent still contests that its ANDA Products are equivalent.  In addition, Torrent asserts that the Asserted Claims are invalid because they are not enabled and they lack written description.

---

[11]      Supernus does not assert that polyvinyl acetate is, or is equivalent to, a cellulosic polymer.

## III.   <u>ISSUES TO BE DECIDED</u>

The Court must resolve three main issues: *first*, whether Supernus has proven by a preponderance of the evidence that Torrent's ANDA Products infringe the Asserted Claims of the Patents-in-Suit, either literally or under the doctrine of equivalents; *second*, whether Torrent has proven by clear and convincing evidence that the Asserted Claims of the Patents-in-Suit are not enabled; and *third*, whether Torrent has proven by clear and convincing evidence that the Asserted Claims of the Patents-in-Suit lack adequate written-description support. (ECF No. 133 ¶¶ 15, 441-484.)

If there is no literal infringement, the Court must decide whether the doctrine of prosecution history estoppel bars Supernus from asserting that Torrent's use of polyvinyl acetate infringes the *acrylic polymers* claim term under the doctrine of equivalents. (*Id.* ¶ 442.) To get there, the Court must first decide whether Supernus's claim amendment during the prosecution of an earlier patent was narrowing such that a presumption of estoppel applies. And if one does apply, Supernus must have rebutted the presumption by a preponderance of the evidence.[12]

## IV.   <u>DISCUSSION</u>

The Court will discuss the relevant legal standards and how they apply to key parts of the trial record.

---

[12]     The Final Pretrial Order included two more issues: (1) whether Supernus is entitled to recover its costs and expenses in this action; and (2) whether Torrent has demonstrated that under the disclosure-dedication doctrine, the mention of *polyvinyl alcohol* in the specification would prevent a finding that polyvinyl acetate infringes the *acrylic polymers* claim term under the doctrine of equivalents. (ECF No. 133 ¶¶ 443, 451-452.) But Supernus's trial briefs did not mention costs-expenses recovery, and Torrent's trial briefs did not mention the disclosure-dedication doctrine. (ECF Nos. 139 & 170 (Supernus), 140 & 171 (Torrent).) As a result, the Court need not address either issue in this Opinion.

17

## A.     Literal Infringement

Patent infringement occurs when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). "To prove infringement, a patentee" — here, Supernus — "must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting *Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999)). "If any claim limitation is absent from the accused [product], there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Supernus must demonstrate infringement by a preponderance of the evidence. *Eli Lilly*, 933 F.3d at 1328 (citation omitted). A preponderance of the evidence means "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *Hale v. Dep't of Transp., F.A.A.*, 772 F.2d 882, 885 (Fed. Cir. 1985); *see In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (defining a preponderance of evidence as "the existence of a fact is more probable than its nonexistence"). "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement," and "circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal citations omitted).

### 1.     Asserted Claim Limitations Not in Dispute

Though Torrent challenges only two elements of the Asserted Claims, Supernus still must show that Torrent's ANDA Products contain every limitation of the Asserted Claims. Therefore,

the Court will first consider Supernus's proof of each limitation not in dispute.[13]  The undisputed

claim limitations are as follows:

- The *sustained release formulation of topiramate* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation "a sustained release formulation of topiramate."  (PFF ¶ 140.)

- The *topiramate as an active ingredient* limitation: claim 14 of the '989 patent recites the limitation "comprising topiramate as an active ingredient."  (PFF ¶ 147.)

- The *released immediately and continuously* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation "[topiramate is] released immediately and continuously upon administration from the formulation."  (PFF ¶ 149.)

- The optional *immediate release topiramate-containing component* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation: "optionally, an immediate release (IR) topiramate-containing component . . . ."  (PFF ¶ 255.)

- The *maximum plasma concentration ('$T_{max}$) of topiramate in vivo at 16 or more hours* limitation: claim 14 of the '989 patent, claim 14 of the '940 patent, and claim 13 of the '983 patent each recite the limitation: "wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose."  (PFF ¶ 257.)[14]

- The *0.5% to 85% by weight of the formulation, topiramate* limitation: claim 14 of the '940 patent recites the limitation: "comprising between 0.5% to 85%, by weight of the formulation, topiramate."  (PFF ¶ 297.)

---

[13]    The Court's discussion of undisputed elements will be expeditious.  *See LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, 759 F. App'x 917, 925 (Fed. Cir. 2019) ("The [Patent Trial and Appeal Board] is 'not required to address undisputed matters' or arguments about limitations with which it was never presented." (quoting *In re NuVasive, Inc.*, 841 F.3d 966, 974 (Fed. Cir. 2016))); *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1380 n.8 (Fed. Cir. 2006) (deeming arguments waived where a party "conceded that the dispute with respect to the doctrine of equivalents was limited to the 'way' prong of the analysis").

[14]    $T_{max}$ is the time at which the maximum level of the drug within a dosage form has been released from the dosage form.  (*See* Tr. 84:2-8 (Bhatt) (defining $T_{max}$ as "the time it takes for the plasma concentration to reach its highest point," recorded "in units of hours or minutes"); Tr. 169:17-22 (Taft) (defining $T_{max}$ as the "time point during the experiment [that] you see the peak plasma level," or $C_{max}$).)

19

- The *topiramate in the form of micronized particles* limitation: claim 13 of the '983 patent recites the limitation: "topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size." (PFF ¶ 299.)

- The *pore former* limitation: claim 23 of the '983 patent, which depends from claim 13, recites the limitation: "The formulation according to claim 13, wherein the XR component further comprises a pore former selected from the group consisting of . . . polyvinylpyrrolidone . . . ." (PFF ¶¶ 303-304.)

To prove infringement of these claim limitations, Supernus offered testimony of two expert witnesses, who explained how Torrent's ANDA submissions to the FDA supported their opinions; highlighted testimony of Torrent's Rule 30(b)(6) witness admitting that Torrent's ANDA Products contain these claim limitations; and cited, for some limitations, the parties' stipulated facts. (*See generally* PFF ¶¶ 136-155, 255-308; ECF No. 170 at 13-15.) The experts' testimony is well-reasoned and credible, and the Torrent witness's admissions are straightforward. In addition, Supernus's proposed findings of fact for these claim limitations — although not necessarily stipulated — are not disputed. (*See* PFF ¶¶ 136-155, 255-308 (Def.) (stating throughout that "Torrent is not disputing this element of the claims").) And Torrent did not offer evidence to the contrary at trial. All told, the Court finds that Supernus has established by a preponderance of the evidence that Torrent's ANDA Products contain the claim limitations not in dispute.

2.   Asserted Claim Limitations in Dispute

Now to the disputed limitations: "an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (ECF No. 171 at 7; ECF No. 88 at 29.)

<blockquote>
a.  *The* extended release (XR) topiramate-containing component *limitation*
</blockquote>

The Court starts with the *XR component* element: "an extended release (XR) topiramate-containing component." ('989 patent col. 21 ll. 5-6; '940 patent col. 21 ll. 64-65; '983 patent col. 21 ll. 37-38.)[15]

**Supernus's motion** in limine.  Before trial, the Court ruled that Torrent could not offer rebuttal evidence of Supernus's failure to prove that Torrent's ANDA Products contain an XR component.  (ECF No. 151 at 7.)  At trial, Supernus restated its objection to Torrent's cross-examining Supernus's experts about the *XR component* limitation.  (Tr. 409:10-22.)  The Court will now resolve the reserved issue: whether the testimony that Torrent elicited on cross-examination about the XR component is admissible.  The Court rules that it is.

Supernus argues that a party cannot challenge claim limitations that the party did not identify in its noninfringement contentions.  The problem with Supernus's proposition is that it would shift the ultimate burden of proving infringement of every claim limitation from the patentee to the accused infringer.  *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004) ("Comparison of the claims to the accused device requires a factual determination that every claim limitation or its equivalent is found in the accused device.").  The United States Supreme Court has rejected such a burden shift.  *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 203 (2014) (reversing a "change in the ordinary rule imposing the burden of proving infringement upon the patentee" in declaratory judgment actions).[16]  The burden of proof stays with the patentee even for limitations that the accused infringer did not identify in noninfringement

---

[15]     The claims and specification of the Patents-in-Suit use *extended release* and *XR* interchangeably.  The Court does the same here.

[16]     For a collection of authorities "establish[ing] that the burden of proving infringement generally rests upon the patentee," see *Medtronic*, 571 U.S. at 198-99.

contentions. *See Medtronic Inc. v. Bos. Sci. Corp.*, 558 F. App'x 998, 1000 (Fed. Cir. 2014) ("This court agrees with the district court that Medtronic's noninfringement contentions based on certain elements alleged to be missing from its devices do not relieve [the patentee's infringement expert] of the requirement to opine on the presence of structure meeting every claim limitation . . . .").[17] The Court will not relieve Supernus of its burden here.

To be sure, proper stipulations help expedite litigation, *see SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1131 (Fed. Cir. 1985) ("[T]rial judges . . . discourage unnecessary pleadings and encourage stipulation of undisputed matters."), and a party's decision to dispute overwhelmingly established facts, just because it can, would be in poor judgment. But here, there was little prejudice or surprise to Supernus that its expert's opinions must sustain scrutiny. Besides, Torrent's examination on this limitation was relatively brief. (*See* Tr. 388:2-393:9.) The Court therefore rules that in these circumstances, the testimony that Torrent elicited on cross-examination about the XR component is admissible for Torrent's argument that Supernus has not met its burden of proof for this element. That part of Supernus's motion is denied.

**Torrent's motion** **in limine.** The Court denies Torrent's motion *in limine* to preclude Dr. Khan's opinion about this limitation's *predetermined period of time*. (ECF No. 128.)

Torrent's motion highlights a discrepancy between the Court's claim construction and the Asserted Claims. At the *Markman* stage, the Court construed *extended release component* to

---

[17]    In analogous contexts, courts have refused to apply local rules in ways that would modify pleading standards under national rules. *See Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 904 (E.D. Pa. 2011) ("A local rule must be consistent with—but not duplicate—[the national] federal statutes and rules . . . ." (quoting Fed. R. Civ. P. 83(a)(1)) (alteration in *Tyco*)); *TSMC Tech., Inc. v. Zond, LLC*, 2014 WL 7498398, at *7 n.12 (D. Del. Jan. 8, 2014) ("Regardless of what internal procedures a court deploys for patent cases, such procedures could not modify the pleading requirements set forth in the Federal Rules of Civil Procedure, nor allow for disposing with such requirements.").

mean, "as stated expressly in the specification, a component that 'releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the *predetermined period of time*.'" (ECF No. 88 at 25; '989 patent col. 6 ll. 30-33 (emphasis added).)[18] The *predetermined period of time*, the Court continued, "refers to the period of time necessary to achieve the 'predetermined release profile' for the particular 'sustained release' formulation." (ECF No. 88 at 25.) The Court reasoned that "[t]his construction is consistent with the sentence following the definition for 'XR component,' which states, '[b]y way of example, and by no means limiting the scope of the invention, the period of time may be not more than 24 hours, not more than 16 hours, not more than 12 hours, not more than 8 hours, or not more than 4 hours, depending on desired attributes of the final product." (*Id.*; '989 patent col. 6 ll. 33-38.)

The discrepancy is that unlike other, no-longer-asserted claims, the Asserted Claims do not expressly recite predetermined periods of time. For example, claim 14 of the unasserted '248 patent recites the following as its final clause: "wherein the XR component releases topiramate in a continuous manner and such that greater than or equal to about 80% of the topiramate is released in vitro in less than or equal to about 12 hours." ('248 patent col. 22 ll. 12-15, ECF No. 1-4 at 21 (emphasis added).) That claim language recites a predetermined period of "about 12 hours." Compare that with the final clause of the Asserted Claims, which concerns not the $T_{80\%}$[19] but the

---

[18]      At the *Markman* stage, the Court referred to the specification of the '580 patent. (ECF No. 88 at 3 n.2.) That patent is no longer in suit. So now, references to the *specification* mean the '989 patent's specification, which the parties agree is identical to the '580 patent's specification. (Tr. 49:3-50:9.)

[19]      $T_{80\%}$ is "[t]he time at which [80%] of the drug within a dosage form has been released from the dosage form . . ., where [80%] is the percent of drug that has been released." (*See* '989 patent col. 3 ll. 61-64 ("The time at which a specified percentage of the drug within a dosage form has

23

$T_{max}$: "wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose." ('989 patent col. 21 ll. 33-35; '940 patent col. 22 ll. 25-27; '983 patent col. 21 ll. 65-67.)

Based on this, Supernus contends that the period of time for each "particular" sustained release formulation depends on the context of each individual claim. (ECF No. 170 at 16.) Since the Asserted Claims do not recite a predetermined period of time in which 80% of the active ingredient is released, Dr. Khan sought guidance in the specification's definitions of *immediate release formulation* and *sustained release*. (Tr. 250:10-251:3 (Khan).) *Immediate release formulation* is defined as "a formulation that releases greater than or equal to about 80% of the pharmaceutical agent in *less than or equal to about 1 hour*." ('989 patent col. 3 ll. 33-35 (emphasis added).) *Sustained release* is defined as "release of a pharmaceutical agent in a continuous manner over a *prolonged period of time*." ('989 patent col. 3 ll. 44-46 (emphasis added).) And *prolonged period of time* is defined as "a continuous period of time of greater than about 1 hour, preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours." ('989 patent col. 3 ll. 47-52.) So Dr. Khan selected "about 1 hour" as "a default in the definition" of *prolonged period of time*. (Tr. 251:2-3 (Khan).)

Dr. Khan then reviewed the in-vitro dissolution studies in Torrent's ANDA. (PTX109.39.) A dissolution profile shows that Torrent's ANDA Products release 80% of the drug between about eight to 10 hours. (PTX109.39; Tr. 252:9-253:7 (Khan).) Other data in Torrent's ANDA show that its ANDA Products release on average 11% of the drug in one hour and 80% in eight hours.

---

been released from the dosage form is referred to as the 'T.sub.x' value, where 'x' is the percent of drug that has been released.").)

(PTX109.38-39.) Given this data, Dr. Khan opined that Torrent's ANDA Products infringe the *XR component* limitation. (Tr. 249:24-25 (Khan).) Supernus adds that the parties stipulated that Torrent's ANDA Products are "extended release formulations of topiramate." (ECF No. 170 at 18 (citing ECF No. 133 ¶ 59, which states, "The Torrent ANDA Products are extended release formulations of topiramate").) In Supernus's Request for Admission No. 4, however, Torrent denied that its "ANDA Products include an extended-release component." (ECF No. 170-1 at 6.)

Torrent does not deny that its ANDA Products are extended release formulations. (PFF ¶¶ 171-172.) Rather, Torrent argues that Supernus did not meet the burden of proving that the ANDA Products contain an *XR component* "as construed by the Court." (PFF ¶¶ 171-172 (Def.) (citing ECF No. 88 at 33); Tr. 750:25-751:1).) Torrent attacks Dr. Khan's selection of about one hour as the so-called default *prolonged period of time*, for three reasons. (ECF No. 171 at 20.)

First, Dr. Khan selected a *predetermined period of time* based on the different term *prolonged period of time*. (ECF No. 171 at 21.) Torrent says the *prolonged period of time* concerns *exceeding* a period of time for releasing topiramate, whereas the *predetermined period of time* concerns releasing topiramate in vitro *within* a period of time. (ECF No. 171 at 21.)[20] Torrent asserts that Dr. Khan simply applied the same definition and analysis for both the *XR component* and *sustained release* claim elements. (ECF No. 171 at 21.)

[20] (*Compare* '989 patent col. 3 ll. 47-52 (defining *prolonged period of time* as "a continuous period of time of *greater than* about 1 hour, preferably, *greater than* about 4 hours, more preferably, *greater than* about 8 hours, more preferably, *greater than* about 12 hours, more preferably still, *greater than* about 16 hours up to *more than* about 24 hours"), *with* '989 patent col. 6 ll. 30-39 (describing *predetermined period of time*, "[b]y way of example, and by no means limiting the scope of the invention," as "*not more than* 24 hours, *not more than* 16 hours, *not more than* 12 hours, *not more than* 8 hours, or *not more than* 4 hours, depending on desired attributes of the final product") (emphasis added).)

25

Second, the Court construed the *predetermined period of time* as referring to "the period of time necessary to achieve the 'predetermined release profile' *for the particular 'sustained release' formulation*" (ECF No. 171 at 21 (quoting ECF No. 88 at 25) (emphasis added by Torrent)), yet Dr. Khan did not consider "the specifics of Torrent's ANDA formulation in determining the appropriate 'predetermined period of time' to use in his analysis" (ECF No. 171 at 21-22). Dr. Khan merely selected the lowest period of time described in the *prolonged period of time* definition regardless of the other, more preferable time periods listed there — "preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours." (ECF No. 171 at 22 (quoting '989 patent col. 3 ll. 47-52).)

Third, Dr. Khan's analysis is contrary to the Court's *Markman* Opinion, which rejected a proposed construction "seeking to construe 'extended release component' as the inverse of 'immediate release component.'" (ECF No. 171 at 22 (quoting ECF No. 88 at 26).)

The Court finds that several facts dictate that more likely than not, Torrent's ANDA Products meet the *XR component* limitation. Although not dispositive, Torrent's ANDA submission describes its ANDA Products as "extended-release" products. (PTX106.2; PTX161.4.) Indeed, the invention's novelty is the sustained release formulation that requires a continuous release of topiramate over a prolonged period of time beyond about one hour. Torrent omitted this element from its noninfringement contentions, and Torrent did not seek to amend its noninfringement contentions even after the Court issued its *Markman* Opinion. In consequence, Dr. Khan's opinion on this element is unrebutted.

The Court does not rely solely on Dr. Khan's opinion. For one thing, the in-vitro dissolution data in Torrent's ANDA show that its ANDA Products release 80% of topiramate

within eight to 10 hours, which far exceeds Dr. Khan's "about 1 hour" selection. For another, the ANDA Products' in-vitro release rate appears to be consistent with the specification's conditions for a bead population whose $T_{max}$ in vivo is at least 16 hours. Torrent's ANDA Products' in-vitro dissolution $T_{80\%}$ of eight hours, for instance, meets the in-vitro dissolution "conditions" for the XR2 bead population in Example 6 of the Patents-in-Suit. (*See* '989 patent Example 6.) According to Example 6, a bead population that exhibits an in-vitro dissolution $T_{80\%}$ at five to eight hours also exhibits a $T_{max}$ "for a single initial dose in-vivo" at ">=16 h" — that is, "a maximum plasma concentration . . . in vivo at 16 or more hours after a single initial does." (*Id.*)

The Court therefore concludes that Supernus has proven infringement of this limitation by a preponderance of the evidence.

        *b.*     The *acrylic polymers limitation*

Next, the *acrylic polymers* limitation: "comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (PFF ¶ 174.) At the *Markman* stage, the Court ruled that this limitation needed no further construction — "the plain meaning of this phrase governs the meaning of the disputed term." (PFF ¶ 178; ECF No. 88 at 30.) But that ruling concerned the entire limitation; the parties did not seek construction of the term *acrylic polymers*. Since then, the parties have disagreed over the plain meaning of *acrylic polymers*. The issue is thus whether the polyvinyl acetate dispersion that Torrent uses as the coating material in its ANDA Products falls within the plain and ordinary meaning of *acrylic polymers*.[21] Supernus says that it does; Torrent says that it does not.

---

[21]     The parties agree that Torrent's ANDA Products' coating material comprises polyvinyl acetate. (PFF ¶ 25; *see also* ECF No. 171 at 11 ("For infringement, the only question before the Court is '*whether polyvinyl acetate is or is not an acrylic polymer*.'").) They also agree that "a POSA viewing the 'acrylic polymers' claim term would agree that 'no construction [is] necessary because a POSA knows what the polymer is' because a 'POSA uses [them] all the time.'" (ECF No. 171 at 11 (quoting PFF ¶ 248 (Pl.)).)

27

When courts say that a term requires no construction, they mean that further elaboration is unnecessary because the term is common parlance and its meaning is clear. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *see Schumer v. Lab'y Computer Sys., Inc.*, 308 F.3d 1304, 1312 (Fed. Cir. 2002) ("These are not technical terms or art, and do not require elaborate interpretation." (quoting *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001))). But here, the term *acrylic polymers* is more technical, and the parties clash over its plain and ordinary meaning. Indeed, both parties called experts to present their competing knowledge of the term's "special meaning and usage in the field" of the invention. *See Mult,form Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). It follows that the Court must also measure the experts' testimony against the written record. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (noting that "the ordinary meaning of the term" is viewed not "in a vacuum" but "in the context of the written description and the prosecution history" (quoting *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir. 2001))); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.'" (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998))); *see also Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1362 (Fed. Cir. 2022) (noting critically that a party arguing the plain and ordinary meaning of a claim term "offers no intrinsic evidence for this position, only extrinsic dictionary definitions and attorney argument").

This is all to say, the Court cannot resolve the issue without engaging in further claim construction. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (noting that consulting extrinsic evidence to understand "the background science or the meaning of a term in

the relevant art during the relevant time period" may necessitate *Markman*-type factfinding "where those subsidiary facts are in dispute"); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996))). For clarity, the Court will discuss the type and priority of evidence that it will consider.[22]

"[T]he ordinary and customary meaning[23] of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. To ascertain that meaning, the Court first considers the intrinsic evidence: the claims, specification, and prosecution

---

[22]  Other courts have found it necessary to provide additional claim construction as part of infringement rulings following bench trials. *See, e.g.*, *NobelBiz, Inc. v. Glob. Connect, L.L.C.*, 701 F. App'x 994, 997 (Fed. Cir. 2017) ("The district court had the responsibility to determine the scope of the asserted claims, and '[a] determination that a claim term "needs no construction" or has the "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute.'" (quoting *O2 Micro Int'l*, 521 F.3d at 1361)); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 n.7 (Fed. Cir. 1993) (noting with approval the trial court's interpretation of a term "after a full bench trial"); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1369 (Fed. Cir. 2003) (reviewing an infringement ruling after a bench trial where the district court first construed disputed limitations and then found no infringement); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248, 1253 (Fed. Cir. 1998) (affirming district court's construction following a bench trial); *Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, — F. Supp. 3d —, 2023 WL 3254117 (D. Del. May 4, 2023) (engaging in claim construction following a bench trial).

[23]  The Federal Circuit Court of Appeals has used the phrases *plain and ordinary meaning* and *ordinary and customary meaning* interchangeably. *See, e.g.*, *Laitram, LLC v. Ashworth Bros.*, 2023 WL 3449148, at *3 (Fed. Cir. May 15, 2023); *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1002-03 (Fed. Cir. 2016); *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

29

history. *Markman*, 52 F.3d at 979 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991))).[24]

      If the intrinsic record is not telling enough, the Court must consider extrinsic evidence: "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 980; *see Teva Pharms.*, 574 U.S. at 331 ("In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.").[25] An expert may testify as to "how those skilled in the art would interpret the claims." *Markman*, 52 F.3d at 979 (citation omitted).[26]

      To be sure, a dispute among experts testifying about a claim term's meaning is factual for the Court to resolve. *Teva Pharms.*, 574 U.S. at 332. Indeed, "'[e]xperts may be examined to explain terms of art, and the state of the art, at any given time,' but they cannot be used to prove

---

[24]     *See also Phillips*, 415 F.3d at 1313 ("[POSA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); *Blazer v. Best Bee Bros. LLC*, 2022 WL 16954848, at *4 (Fed. Cir. Nov. 16, 2022) ("The specification is especially significant when a claim term possesses 'a range of possible ordinary meanings in context' or otherwise features 'genuine uncertainties.'" (quoting *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015))).

[25]     *See also Actelion Pharms. LTD v. Mylan Pharms. Inc.*, 85 F.4th 1167, 1173-74 (Fed. Cir. 2023) (noting that district courts must consult extrinsic evidence when the intrinsic evidence is not telling enough for claim construction); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims." (quoting *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995))).

[26]     Though "expert testimony can be useful to . . . establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," of no use are "conclusory, unsupported assertions by experts as to the definition of a claim term" or "any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Phillips*, 415 F.3d at 1318 (internal citations and quotation marks omitted).

'the proper or legal construction of any instrument of writing.'" *Id.* (quoting *Winans v. New York & E.R. Co.*, 62 U.S. 88, 100-01 (1858)). After resolving the factual dispute, the Court turns to the legal issue: it must "interpret the patent claim in light of the facts as [the Court] has found them." *Id.*

*The intrinsic evidence.* The Court begins with the intrinsic record, starting with the claims. The Asserted Claims require a "sustained release formulation." (*See, e.g.*, '989 patent col. 21 l. 1.) This requirement indicates that the claimed acrylic polymers must be suitable for sustained release formulations. Other than that, the Asserted Claims shed little light on the meaning of *acrylic polymers*, so the Court turns to the specification for guidance. *Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1563-64 (Fed. Cir. 1994).

The specification tells us more. It says "[t]he coating material is preferably selected from a group comprising cellulosic polymers, such as ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, and cellulose acetate phthalate; polyvinyl alcohol; acrylic polymers such as polyacrylates, polymethacrylates and copolymers thereof, and other water-based or solvent-based coating materials." ('989 patent col. 7 ll. 4-13.) From this the Court gathers a few things. The use of *such as* indicates that the claimed acrylic polymers are not limited to the examples listed. Indeed, the specification later describes an exemplary copolymer not expressly included in that list: the XR8 formulation in Table 1, "Acrylic polymers (Eudragit® RL30D/RS30D)," which Dr. Felton described as an "ammonio methacrylate copolymer." ('989 patent Table 1; Tr. 556:14-17 (Felton).) The specification likewise uses *such as* to list non-exhaustive examples of claimed cellulosic polymers. It does not do the same for *polyvinyl alcohol*, which is in the singular form unlike *cellulosic polymers* and *acrylic polymers*.

31

In addition, the specification uses semicolons to offset *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers*. (ECF No. 171 at 9.) This punctuation indicates that for this specification, these polymers are "separate and distinct" from one another. *See In re Affinity Labs of Texas, LLC*, 856 F.3d 902, 907 (Fed. Cir. 2017) (finding that semicolons offsetting each of five steps of a method claim "strongly indicates that each step is separate and distinct"); *In re Pelz*, 379 F. App'x 975, 978 (Fed. Cir. 2010) (noting that using "semicolons to separate the particulars for that list . . . indicates that the three positions are exemplary subsets").

But the Patents-in-Suit neither define these scientific terms nor disclaim a certain meaning. As a result, a POSA's understanding of the terms' plain and ordinary meaning is still unclear. The Court thus turns to the prosecution history.

"The prosecution history, in particular, may be critical in interpreting disputed claim terms, and even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Univ. of Massachusetts v. L'Oreal S.A.*, 36 F.4th 1374, 1379 (Fed. Cir. 2022) (quoting *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020)) (internal quotation marks omitted); *see Canopy Growth Corp. v. GW Pharma Ltd.*, 2023 WL 3048243, at *5 (Fed. Cir. Apr. 24, 2023) (opting not to decide whether amendments amounted to disavowal or disclaimer where the prosecution history showed that the patent "discloses three non-overlapping embodiments while claiming only one of them" (citing *L'Oreal S.A.*, 36 F.4th at 1379)).

Relevant here is the applicants' August 2012 amendment during the prosecution of U.S. Patent Application No. 12/926,931 ('931 application). (ECF No. 170 at 33; PTX233.1.) An earlier version of subsection (a) of claim 104 in the '931 application read: "(a) at least two different extended release topiramate-containing components, wherein each component comprises a release

controlling coating specific for its component . . . ." (PTX233.210.) The examiner rejected this claim for inadequately describing the claimed release controlling coating. (ECF No. 170 at 33; PTX233.230.) The applicants responded that they disagreed but would amend "solely in the interest of compact prosecution." (PTX233.249.) Their amendment added that the release controlling coating must "comprise[] a coating material selected from the group consisting of cellulosic polymers and acrylic polymers." (PTX233.242; ECF No. 170 at 34.) The applicants remarked that the amended claims "now recite species of the noted genera." (PTX233.249.) The specification also discloses *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers*, though this amendment added only *cellulosic polymers* and *acrylic polymers*. (*Compare* '989 patent col. 7 ll. 4-13 (specification), *with* PTX233.242 (amendment).)

Still, nothing in the prosecution history disclaims a plain meaning of *acrylic polymers* or prescribes it a special definition.

All intrinsic evidence considered, including a reading of the entire Patents-in-Suit, the Court would benefit from considering extrinsic evidence. The Court, in its discretion, turns to the experts who testified at trial about how a POSA would understand the plain and ordinary meaning of *acrylic polymers* and whether that meaning covers polyvinyl acetate. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012) (noting the district court's "sound discretion" to use extrinsic evidence to learn about "the field of the invention" and what a POSA "would understand claim terms to mean" (quoting *Phillips*, 415 F.3d at 1319)).

***The infringement experts.*** Supernus's infringement expert Mansoor A. Khan, R.Ph., Ph.D., was admitted as an expert in the field of pharmaceutical formulations and drug delivery — specifically, the development, evaluation, and characterization of sustained release formulations and the ingredients in such formulations. (PFF ¶¶ 59, 69; Tr. 231:22-24.)

Torrent called two experts for its infringement rebuttal — David P. Rotella, Ph.D., an expert in structural chemistry and organic chemistry; and Linda Felton, Ph.D., an expert in drug formulation and modified drug delivery systems. (PFF ¶¶ 82-95, 96.) Both were admitted as experts. But in post-trial submissions, Supernus challenged Dr. Rotella's qualification as a POSA. The Court will now address that challenge.

During claim construction, the Court adopted an undisputed definition of *POSA*:

> [S]omeone in the 2006 time frame with at least a Bachelor of Science degree in Pharmaceutical Sciences *or a related field*, approximately three to five years of experience in a drug delivery technology *or related field*, and working knowledge regarding pharmacokinetics (or a person of commensurate education and experience).

> [(PFF ¶ 57; ECF No. 88 at 9 (emphasis added).)]

This definition requires "at least a Bachelor of Science degree in Pharmaceutical Sciences or a related field"; Dr. Rotella received a bachelor's degree in pharmacy in 1981 and an advanced degree in medicinal chemistry in 1985. (Tr. 447:23-448:2; DTX025.) The definition also requires "experience in a drug delivery technology or related field"; Dr. Rotella has experience in medicinal chemistry and drug discovery, which he testified are fields related to "a drug delivery technology" field. (Tr. 447:25-448:2; *see* Tr. 446:8-11 (Rotella) (testifying that organic chemistry is "essentially the same thing" as drug-delivery technology).) And Dr. Rotella testified that he has a working knowledge of pharmacokinetics. (Tr. 446:12-22, 447:24-25.)

On these credentials, Dr. Rotella was admitted as an expert in the fields of structural chemistry and organic chemistry. (Tr. 448:6-449:23.) In qualifying Dr. Rotella, Torrent made clear that he would offer his opinions from a POSA's perspective. (Tr. 447:17-448:5.) Specifically, Torrent asked Dr. Rotella if he was familiar with the Court's construction of the term

34

*POSA*, if he considered himself to be a POSA, and if he applied a POSA standard in forming his

opinions — to all of which Dr. Rotella responded affirmatively. (Tr. 447:17-448:5.)

At that time, Supernus objected, but not to Dr. Rotella's opining as a POSA:

> MR. SETH (ATTORNEY FOR TORRENT). Okay. Your Honor, at this time we offer Dr. Rotella as an expert witness qualified to testify as an expert in the fields of structural chemistry, organic chemistry, and to testify about non-infringement.
>
> THE COURT. Any objection by Supernus?
>
> MR. KURZ (ATTORNEY FOR SUPERNUS). Your Honor, Supernus doesn't object to the extent that they're offering Dr. Rotella as an expert in medicinal chemistry or organic chemistry or perhaps structural chemistry. I'm not quite sure what counsel is getting at with the rest of what he asked for.
>
> THE COURT. At this point in the trial there should be no objections to the parties offering an expert opinion as what their witness is going to provide expert testimony on, so I'm not sure of the disconnect here.
>
> MR. KURZ. Anyway, Your Honor, Supernus has no objection to them offering Dr. Rotella as an expert in medicinal chemistry or organic chemistry.
>
> THE COURT. Is there -- I'm not sure I'm following. Is there a disconnect here, Mr. Seth?
>
> MR. SETH. If I'm understanding correctly, there's no objection; is that right?
>
> MR. KURZ. For medicinal chemistry and organic chemistry. I'm not quite sure. He said something else, I thought.
>
> THE COURT. Yeah, let's go back. What are you offering Dr. Rotella as an expert in?
>
> MR. SETH. I think I said structural chemistry, organic chemistry, and to testify about non-infringement.
>
> THE COURT. So offering as an expert in structural chemistry, organic chemistry, and offering an opinion with respect to infringement.

Appx166

MR. SETH.  Non-infringement.

THE COURT.  Non-infringement, correct, right.  Any objection with respect to Dr. Rotella as an expert in that area?

MR. KURZ.  With respect to offering testimony in organic chemistry and structural chemistry, there's no problem.  I'm not quite sure what it is to be an expert in non-infringement, Your Honor.  But as far as offering that to prove or to testify about non-infringement, we have no objection to that.

THE COURT.  Okay.  So the Court accepts Dr. Rotella as an expert in structural chemistry and organic chemistry.

MR. SETH.  Okay.

MR. KURZ.  Thank you, Your Honor.

[(Tr. 448:6-449:25.)]

Nor did Supernus previously move *in limine* to preclude Dr. Rotella's opinions as a POSA. Yet in its post-trial brief, Supernus argued that "Dr. Rotella's testimony from the perspective of a POSA is legally improper and substantively incorrect," because Dr. Rotella is a medicinal chemist without the requisite experience in drug-delivery technology.  (ECF No. 170 at 22-23 (emphasis omitted).)

The Court sees two reasons not to disqualify Dr. Rotella as a POSA.  First, Supernus had plenty of notice of Dr. Rotella's background and qualifications, and the Final Pretrial Order described how he would rebut Dr. Khan's opinion.  (ECF No. 133 at 83.)  That Supernus waited until post-trial briefing to object to Dr. Rotella's status as a POSA is enough for the Court to find that Supernus waived its objection.  *See Kreepy Krauly U.S.A., Inc. v. Sta-Rite Indus., Inc.*, 152 F.3d 949 (Fed. Cir. 1998) (ruling that by failing to object when the court qualified a witness as an expert, the party "waived any objection to the court's decision to qualify the expert").

36

Second, since Supernus waived its challenge to Dr. Rotella's experience as being "a related field," the Court views Supernus's arguments against Dr. Rotella's POSA status as truly credibility attacks on his qualifications. For instance, Supernus argues that medicinal chemistry (Dr. Rotella's field) is not a field related to drug delivery. (ECF No. 170 at 23-24.) Supernus reasons that unlike the pharmaceutical science of drug delivery, medicinal chemistry studies biologically *active* substances (here, topiramate), not *inactive* ingredients or excipients (here, polymer coatings). (PFF ¶ 110; ECF No. 170 at 23; *see* Tr. 496:24-25 (Rotella) ("Medicinal chemistry is the study of the chemistry of biologically active substances.").) Supernus also cites Dr. Felton's testimony that the *POSA* definition "doesn't include a medicinal chemist," who "is somebody who would synthesize a chemical entity, and that's not what these patents are about." (Tr. 584:7-18.)[27]

Supernus also asserts that Dr. Rotella admittedly has never designed a sustained-release formulation, is not involved in conducting formulation research, and has never developed a drug with FDA approval. (ECF No. 170 at 24 (citing Tr. 497:8-18, 499:10-13, 498:5-7 (Rotella)).) And Supernus contests that Dr. Rotella's experience working with formulators "for an unspecified period of time" qualifies him as a POSA. (ECF No. 170 at 24.) These attacks may raise credibility issues, but at this stage, the Court finds that Dr. Rotella's testimony as a POSA should not be stricken from the trial record.[28]

---

[27]     Dr. Felton's opinion that the *POSA* definition "doesn't include a medicinal chemist" might carry more weight if Dr. Rotella were only a medicinal chemist. But as mentioned, Dr. Rotella's bachelor's degree in pharmacy and professional experience, which Supernus delinquently challenged, meet the broad *POSA* definition requiring a "Bachelor of Science degree in Pharmaceutical Sciences" and experience in a field related to drug delivery technology. (*See also* Tr. 750:7-10 (Torrent arguing that Dr. Felton was correct that being a medicinal chemist is not by itself enough to be a POSA but that Dr. Rotella has the requisite experience).)

[28]     The Court also agrees with Torrent that Supernus opened the door to testimony about chemistry when Dr. Khan included an empirical formula as part of his definition of *acrylic polymers* and consulted a chemistry webbook in forming his definition. (Tr. 747:13-19.) The Court discusses Dr. Khan's definition next.

37

The Court turns to the parties' dispute over a POSA's understanding of *acrylic polymers*.

**Dr. Khan's definition of acrylic polymers.** Supernus's expert Dr. Khan first testified that a POSA would agree that the claim term *acrylic polymers* needs no construction, "because a POSA knows what the polymer is," a "POSA knows what function it plays," a "POSA uses [them] all the time." (Tr. 257:6-15.) But because the parties dispute the term's meaning, Dr. Khan sought "to come up with something so that everybody understands." (Tr. 257:16-24; *see* Tr. 255:10-11 (Khan) ("I was trying to get at the intent of the developer here, the formulator here.").) The challenge for Dr. Khan, he said, was that *acrylic polymers* represent a broad group, so broad that he knew of no single definition encompassing all of them. (*See* Tr. 257:19-21 (Khan) ("There's no single definition that I'm aware of that covers all [the] acrylic polymers."); Tr. 262:3-4 (Khan) ("[B]ut I haven't seen a single definition that covers all the acrylic polymers.").)[29]

So, trying to conceptualize what a POSA would understand *acrylic polymers* to mean here, Dr. Khan fashioned his own "operative definition": "A polymer containing a monomer from the series of olefin acids with the general formula $[C_nH_{2n-2}O_2]$ or their derivatives." (Tr. 258:1-4 (cleaned up); PFF ¶ 181.) At closing arguments, Supernus explained that "to be helpful, to have some words that Your Honor could utilize to do your infringement analysis, Dr. Khan put some meat on the ruling that is plain and ordinary meaning[,] and this is what he arrived at." (Tr. 723:1-4.) To get this definition, Dr. Khan drew from a POSA's "general understanding" based on

---

[29]     (*See also* Tr. 256:2-8 (Khan) ("So I was trying to look at what the acrylic polymer means. It may mean different things to different people. It's a pretty broad term. Some people may use a very narrow definition of that. Some people may use a broad definition of that. In the excipient world we use broad, so many different types of acrylic polymers in the pharmaceutical development.").)

everyday usage of *acrylic polymers*.  He also consulted Torrent's ANDA submission, the specification, and several extrinsic sources.

Starting with the intrinsic record, Dr. Khan testified that a POSA reading the patents would understand that the plain and ordinary meaning of *acrylic polymers* must encompass at least the polymers exemplified in the specification: here,[30] "polymers *such as* polyacrylates, polymethacrylates and copolymers thereof" and the "Acrylic polymers (Eudragit® RL30D/RS30D)."[31]  (ECF No. 170 at 11; PFF ¶ 55 (Pl.) (citing Tr. 254:6-255:11, 258:8-259:4, 263:2-264:5 (Khan)); PFF ¶¶ 187-189, 251 (Pl.).)  Eudragit® RL 30 D and Eudragit® RS 30 D are the tradenames of two polymethyl methacrylates listed in the *Handbook of Pharmaceutical Excipients* as pharmaceutically acceptable acrylic polymers.  (PFF ¶ 184 (Pl.) (citing Tr. 272:6-14, 312:6-21 (Khan); PTX113.3; PTX115.5); Tr. 556:12-17, 628:18-21 (Felton).)  They are used for extended-release applications.  (PFF ¶ 185 (citing Tr. 627:18-21 (Felton)).)

But other grades of Eudragit® polymers, Dr. Khan explained, would not be suitable acrylic polymers for the Patents-in-Suit.  (PFF ¶ 186 (Pl.) (citing Tr. 375:2-376:23 (Khan)).)  For example, Eudragit L®, an enteric polymer, is delayed release and thus does not release "immediately and continuously" as the claims require.  For another, Eudragit E®, an organic polymer, is not a

---

[30]     Mindful of the rule that "[e]xperts may be examined to explain terms of art, and the state of the art, at any given time, but they cannot be used to prove the proper or legal construction of any instrument of writing," *Teva Pharms.*, 574 U.S. at 332 (internal quotations omitted), the Court considers expert testimony only to find how a POSA would understand the plain and ordinary meaning of *acrylic polymers* in a similar context.

[31]     The Federal Circuit "has cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the intrinsic record."  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007)); *see Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1211 (Fed. Cir. 2007) (rejecting a definition of the term *pharmaceutically acceptable polymer* because the "definition would not cover some of the very polymers listed" in the specification).

dispersion and is used in organic solutions. (PFF ¶ 186 (Pl.).) The difference in available acrylic polymers indicates that *acrylic polymers*, as used here, must include not all acrylic polymers — only ones suitable for extended-release applications.

In fashioning his definition, Dr. Khan also reviewed Torrent's ANDA submission and supporting data. Specifically, Dr. Khan analyzed what ingredient Torrent used, whether it fit into his definition, and whether it had the same properties and "chemistry related to the functioning of this polymer." (Tr. 256:20-23 (Khan).) Dr. Khan clarified that he focused not on the "pharmacological action" but on "the use as an excipient." (Tr. 256:23-257:1.) "Based on all that," Dr. Khan testified, "I knew that it's the same polymer, acrylic polymer." (Tr. 257:2-3.)

Dr. Khan also reviewed "some of the scientific literature" — "for example, the National Institute of Standards and Technology," or "NIST," "chemistry workbook."[32] (Tr. 256:15-17.) The problem, according to Dr. Khan, was that "a lot of chemistry handbooks do not define things," and instead "have structures." (Tr. 260:3-8.) This touches a critical theory of Supernus's case: when classifying a polymer, a pharmaceutical scientist focuses on the polymer's function, not its structure. (PFF ¶ 55 (Pl.) (citing Tr. 345:17-346:1, 355:56-20 (Khan)).) It is where pharmaceutical scientist and chemists diverge, according to Dr. Khan:

> That's where the difference between chemist and pharmaceutical scientist come. A chemist would look at it as an ester because . . . yeah, as a structure you would see it as an ester. But a pharmaceutical scientist will not see that as a difference because the function doesn't change.
>
> [(Tr. 345:17-21.)]

---

[32]     The parties describe the NIST as "a Federal Government organization that sets standards." (PFF ¶ 229.)

Dr. Khan ultimately landed on the *Webster's New World Dictionary of the American Language, Second College Edition*,[33] which offers two definitions of the word *acrylic*. The first definition is "designating or of a colorless, pungent acid, $CH_2:CHCOOH$, obtained by the oxidation of acrolein." (PTX116.3.) Dr. Khan testified that this first definition is too narrow, as it does not even cover polymethacrylates, one of the acrylic polymers listed in the specification. (PFF ¶¶ 203-204 (Pl.) (citing Tr. 260:25-263:13 (Khan); PTX116.3; '989 patent col. 7 ll. 6-13)).)

Dr. Khan then turned to the second definition: "designating or of a series of olefin acids with the general formula $C_nH_{2n-2}O_2$." (PTX116.3.) He felt that this definition was better but still not broad enough to cover all acrylic polymers in the specification — namely, "Acrylic polymers (Eudragit® RL30D/RS30D)" in Table 1, which are derivatives of "a polymer containing a monomer from the series of olefin acids with the general formula $C_nH_{2n-2}O_2$." (PFF ¶ 55 (Pl.) (citing Tr. 257:4-259:4, 261:25-264:5, 325:7-19 (Khan); PTX116.3; '989 patent Table 1).) And so, Dr. Khan added to the second definition the words *or their derivatives*.[34]

Dr. Khan's definition also includes the phrase "a polymer containing a monomer." A polymer is made of many monomers bonded together through a chemical reaction called polymerization. (PFF ¶¶ 193-194 (citing Tr. 265:3-266:25 (Khan), 467:6-9 (Rotella)).) But not all monomers can form polymers. (*See* Tr. 539:22-540:11 (Rotella) ("[S]ome of these molecules may not be able to form polymers.").) So to meet Dr. Khan's definition, a compound must be a

---

[33]     Dr. Khan added that because this dictionary was copyrighted in 1986, it would have "a definition . . . that I thought was closest to what's there in the patent," whose priority date is in 2006. (Tr. 259:14-19.) *Webster's* was copyrighted in 1986 and was therefore a reference that was available to a POSA before the 2006 priority date. (PFF ¶ 200 (Pl.).)

[34]     Dr. Khan also testified that he "had to include the word[s] 'or their derivatives' to encompass the acrylic polymers listed in the specification, . . . because those polymers are not acids." (Tr. 347:16-20.)

41

polymer, which means that it must have monomers that can form a polymer. (PFF ¶¶ 194, 196-197 (Pl.).)

Thus, for a polymer to meet Dr. Khan's definition of *acrylic polymers*, the monomer must meet "the general formula $C_nH_{2n-2}O_2$" or be a derivative of such a compound. (PFF ¶ 214 (Pl.) (citing 257:4-258:6 (Khan)).) The general formula $C_nH_{2n-2}O_2$ indicates the ratio of carbon atoms (C) to hydrogen atoms (H) to oxygen atoms (O). (PFF ¶ 215 (Pl.) (citing Tr. 267:23-268:16 (Khan)).) The monomer must also be "a monomer from the series of olefin acids." (PFF ¶ 216 (Pl.) (citing 267:4-15, 268:16-17 (Khan)).) For a monomer to be an *olefin acid*, it must have "an olefin component and an acid component." (PFF ¶ 217 (Pl.) (citing Tr. 267:4-15, 268:16-17 (Khan)).) An *olefin* is a double-bonded structure. (PFF ¶ 218 (Pl.) (citing Tr. 267:11-15 (Khan)).)

According to Dr. Khan, polyvinyl acetate fits within his *acrylic polymers* definition. The monomer that is used to make polyvinyl acetate is vinyl acetate. (PFF ¶ 195.) Vinyl acetate satisfies the general formula in Dr. Khan's definition: $C_nH_{2n-2}O_2$. (PFF ¶ 226 (Pl.) (citing Tr. 267:4-268:25 (Khan)).) Vinyl acetate's chemical formula is $C_4H_6O_2$ — that is, four carbon (n = 4), six hydrogen ($2_{n-2}$ = 6), and two oxygen atoms. (ECF No. 170 at 27 (citing PTX117.1; PTX113.3 at Heading 4; Tr. 268:2-16 (Khan)).) Vinyl acetate is also "a monomer from the series of olefin acids." (*Id.*) Dr. Khan testified that an olefin acid has "an olefin component and an acid component." (Tr. 267:4-15, 268:16-14.) The following table illustrates vinyl acetate's structure in two ways — on the left as a line drawing, and on the right showing all of the atoms, with arrows included to identify each component:



[(ECF No. 170 at 27.)]

Dr. Khan testified that the term *olefin* refers to the double-bonded structure, which is also known as a *vinyl group*. (Tr. 267:11-15; *see* Tr. 270:6 (Khan) ("The vinyl is olefin.").)[35] Dr. Khan identified the olefin group in vinyl acetate as the "CH, double-bond CH2," or "CH=CH2," group. (PTX117; ECF No. 170 at 28 (citing Tr. 267:19-20, 270:18-20, 271:12-13 (Khan)).) For the acid component, Dr. Khan identified the "CH3CO" portion of the structure. (PTX117; ECF No. 170 at 28 (citing Tr. 267:20-21, 270:17-18, 271:10-11 (Khan)).) In fact, according to the *NIST WebBook*, vinyl acetate is also known as "acetic acid vinyl ester,"[36] whose structure includes olefin (the vinyl group) and acid (acetic acid) components. (ECF No. 170 at 28 (citing PTX117; Tr. 269:11-270:4 (Khan)); PFF ¶¶ 230-231 (Pl.)).)

---

[35] (*See* PFF ¶ 227 (Def.) ("The terms 'olefin' and 'vinyl' both refer to a carbon-carbon double bond (C=C), also known as a functional group, found in molecules." (citing Tr. 460:22-24, 469:16-19 (Rotella)).)

[36] Dr. Khan testified that "an ester is a derivative of an acid," given that "acid and alcohol react to make an ester." (Tr. 346:13-16.) Dr. Khan also testified that vinyl acetate is an ester that forms from acetic acid, thus making vinyl acetate a derivative of acetic acid. (Tr. 346:21-347:3.) But Dr. Khan testified that "acetic acid is different from acrylic acid," because acrylic acid has acid and olefin components, whereas "acetic acid doesn't have the olefin." (Tr. 347:4-9.) "That's why vinyl acetate is" acrylic "but acetic acid is not." (Tr. 347:9-10.)

43

Thus, if the Court accepts Dr. Khan's definition as the plain and ordinary meaning of *acrylic polymers*, Torrent's use of polyvinyl acetate in its ANDA Products literally infringes the Patents-in-Suit.

**Torrent's response.** Torrent rejects what it calls Dr. Khan's "Frankenstein" definition, claiming that he invented a self-serving definition by modifying a definition in a general-purpose dictionary that Supernus gave him. Torrent argues that Dr. Khan's definition is erroneous for several reasons. For starters, *Webster's* is not the type of technical resource that a POSA would ever consult. In fact, a POSA reading the specification would not feel the need to find a so-called special definition of *acrylic polymers*. This is because, as Dr. Khan conceded, a POSA would consult a dictionary only for unfamiliar terms. (Tr. 335:24-336:4 (Khan).) Yet, as Dr. Khan opined, a POSA would be familiar with the term *acrylic polymers*. (Tr. 336:5-8 (Khan).) So instead of being based on a general-purpose dictionary definition, a POSA's understanding of the plain and ordinary meaning of *acrylic polymers* is reflected in the myriad of technical literature in the field. And none of the technical literature in evidence refers to or classifies polyvinyl acetate as an acrylic polymer. Indeed, Dr. Khan has never seen vinyl acetate described *by name* as an acrylic polymer. (ECF No. 171 at 11 (citing Tr. 312:22-25, 314:22-24 (Khan)).)

Torrent attacks Dr. Khan's motive in crafting his definition. Torrent first asserts that Dr. Khan approached his POSA task with the wrong lens: he testified that he "was trying to get at the intent of the developer here, the formulator here," and "the intent of this author of that patent." (ECF No. 171 at 14 (citing Tr. 255:10-11, 322:17-19 (Khan)).)[37] Indeed, "the focus in construing

---

[37]    (*See also* Tr. 313:11-19 (Khan) ("I would say that vinyl acetate has vinyl background. Vinyl acetate has vinyl background. Methacrylates and acrylates also have vinyl background, as a polymer, when I look at the background, both have vinyl structures, so for me it is an acrylic polymer, but in terms of somebody specifically using the word, I don't know.").)

44

disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term"; it "is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman*, 52 F.3d at 986. The exception to this rule is the parties' subjective intent "as documented in the prosecution history." *Id.* at 985.

Torrent also asserts that Dr. Khan added the words *or their derivatives* to the *Webster's* definition "after a long discussion and conversation" with Supernus's counsel to give him flexibility to apply that definition to other polymers outside the scope of the *Webster's* definition. (ECF No. 171 at 14 (quoting Tr. 262:2-10, 347:16-20 (Khan)).)[38]

---

[38]     Torrent also asserts that Dr. Khan's trial testimony conflicts with his deposition testimony, where Torrent says Dr. Khan agreed that "absent the addition of the words 'or their derivatives,' the *Webster's* definition does not cover vinyl acetate." (ECF No. 171 at 14 (quoting Tr. 343:12-344:4 (Khan)); Tr. 339:11-340:3 (Khan).) At his deposition, when asked if he agreed that the monomer "vinyl acetate does not fit within either definition of acrylic provided in *Webster's*," Dr. Khan responded as follows: "Yeah, I thought I indicated that just the definition acrylic has nothing to do with acrylic polymers, just the definition of acrylic. If you're asking for vinyl, vinyl acetate, not polyvinyl, vinyl acetate, vinyl acetate is not an acid." (Tr. 343:12-21.) Dr. Khan's response makes sense, as Supernus submits, because "[v]inyl acetate is a monomer, and thus would not be described as a polymer." (ECF No. 170 at 28.)

At trial, Torrent confronted Dr. Khan with this deposition testimony. (Tr. 336:21-344:17.) Dr. Khan then clarified that he responded "Yeah" not to Torrent's question but to counsel's "asked and answered" objection, insisting that he "repeatedly said it does fall into it, and that's an acrylic polymer." (Tr. 344:6-17.) On redirect, Supernus read into the trial record excerpts of Dr. Khan's deposition testimony that "polyvinyl acetate does fall into" *Webster's* second definition of *acrylic*. (Tr. 394:2-396:9.) Torrent objected to Supernus's reading, and the Court reserved on its ruling. (Tr. 396:11-14.)

The Court now overrules Torrent's objection. Under Federal Rule of Evidence 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Torrent's use of a small part of Dr. Khan's deposition transcript created confusion about whether Dr. Khan believes that polyvinyl acetate, as opposed to the monomer vinyl acetate, fit *Webster's* second definition of *acrylic* before Dr. Khan added the phrase *or their derivatives*. In fairness, Supernus was entitled to repair the record by

45

***The technical literature.*** For coating materials, according to Torrent's expert Dr. Felton, formulators "categorize the polymers in three different categories: Cellulosic polymers, acrylic polymers, and vinyl polymers." (ECF No. 171 at 8 (citing Tr. 554:7-10 (Felton)).) For its part, Torrent relies on excerpts from a variety of technical literature that "uniformly refer to polyvinyl acetate as a vinyl polymer, not an acrylic polymer." (*Id.* at 11.)

First is a table from *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*, which Dr. Felton co-edited. (*Id.* at 8 (citing Tr. 554:9-10 (Felton); DTX019 at TORTOP_00127212).) Table 1.2, titled *Polymers Used for Aqueous-Based Coating as Solution or Dispersion*, lists three "[t]ype[s]" of polymers: "Cellulose derivatives"; "Acrylic resin, poly(meth) acrylates"; and "Polyvinyl derivatives." (DTX019 at TORTOP_00127212.) Polyvinyl acetate is in the *polyvinyl derivates* category and not the *acrylic* category. (ECF No. 171 at 8.) Dr. Felton testified that this table is consistent with how a POSA would classify polymers. (Tr. 557:17-24.) But Dr. Felton also testified that she does not consider the three categories to be "definitional." (Tr. 578:22-579:4.) Dr. Khan, for his part, testified that the table includes "[o]nly a small subset of acrylic polymer" and "exclude[s] a lot of acrylic polymers." (Tr. 302:4-12.)

Second is chemical manufacturer BASF's technical information bulletin for Kollicoat SR 30 D, the exact brand of polyvinyl acetate that Torrent uses in its ANDA Products. (DTX020; *see* Tr. 493:19-555:25 (Rotella).) The bulletin refers to Kollicoat SR 30 D as a vinyl polymer. (ECF No. 171 at 9 (citing Tr. 294:12-296:7 (Khan); DTX020).) Dr. Rotella noted that the bulletin "connotes directly the structure of the polymer" and includes "no mention . . . of anything being related to an acrylic polymer" or acrylate derivatives. (Tr. 494:6-25; *see* DTX020 at

---

reading other excerpts of Dr. Khan's deposition transcript giving context to the allegedly conflicting testimony.

TORTOP_001126491 (depicting the structural formula).)  Dr. Khan agreed that BASF did not describe polyvinyl acetate as an acrylic polymer, but he insisted that it "do[es]n't necessarily have to" describe it that way.  (Tr. 295:19-24.)

Third is the *Handbook of Pharmaceutical Excipients*, a source that provides descriptions and properties of pharmaceutical excipients.  (PTX113.3; PFF ¶ 232.)[39]  The parties agree that the *Handbook* is a "reliable source that is widely used by formulators."  (PFF ¶ 232 (citing Tr. 271:15-272:3 (Khan)); Tr. 298:25-299:3 (Khan).)  The *Handbook* describes polyvinyl acetate dispersion as a vinyl polymer.  (ECF No. 171 at 9 (citing Tr. 296:9-21, 297:6-10 (Khan); PTX113.3).)  Confronted with this description, Dr. Khan testified that, like BASF's bulletin, the *Handbook* need not describe the polymer as within the "broad group" that is acrylic polymers, adding that the *Handbook* does not say that polyvinyl acetate is *not* an acrylic polymer.  (Tr. 296:22-297:2.)  And, as Dr. Khan noted, the *Handbook* cites as a specific reference BASF's technical information bulletin for Kollicoat SR 30 D.  (Tr. 297:15-298:9; PTX113.4.)  So, it makes sense that the *Handbook* and BASF's bulletin describe polyvinyl acetate similarly.

Fourth is *Remington: The Science and Practice of Pharmacy*.  (DTX207 at 932.) *Remington* notes that "[a]lternatives to the cellulose ethers are acrylic copolymers (eg, methacrylate and methyl methacrylate copolymers) and vinyl polymers (eg, polyvinyl alcohol)." (ECF No. 171 at 10 (citing DTX207 at 932).)  Dr. Khan testified that this excerpt of *Remington*, like Table 1.2 in *Aqueous Polymeric Coatings*, is "just one description by one author," is "not all inclusive," and "doesn't encompass a lot of broad acrylic polymers that I used."  (Tr. 307:15-22.)

---

[39]     Dr. Khan relied on the *Handbook* during his direct examination.  (*See* Tr. 271:19-25 (Khan) ("This is a handbook that we routinely use, I think every formulator uses.").)

Fifth is the *NIST Chemistry WebBook* entry for *Acetic acid ethenyl ester*, which Dr. Khan referenced during direct examination. (PTX117; Tr. 308:6-15 (Khan).) The entry lists "[o]ther names" for the compound acetic acid ethenyl ester, including "acetic acid vinyl ester" and "vinyl acetate." (PTX117.) Dr. Khan testified that although the *NIST WebBook* does not identify the compound as "acrylic," it describes the compound in a way such that a pharmaceutical scientist would consider the compound acrylic. (Tr. 309:13-23.)[40] Dr. Khan explained that he would not expect a chemistry book like the *NIST Chemistry WebBook* to use the specific name *acrylate* when describing vinyl compounds, because chemists view compounds more narrowly than do pharmaceutical scientists. (Tr. 310:6-16.) Still, Dr. Khan conceded that he did not know any source that uses the word *acrylic* as part of the chemical name for vinyl acetate; only "[t]he use effect." (Tr. 310:17-20, 312:22-313:3.) This includes his own publications. (Tr. 312:22-313:3 (Khan).)

Sixth is *Polymer Science: A Textbook for Engineers and Technologists* — specifically, section 2.5 of Chapter 2 titled *Classification of Polymers*. (DTX027 at TORTOP_00126557.) In the subsection titled *Acrylic Polymers*, it notes that "[i]n this class, the polymers are derived from acrylic acid $CH_2=CH–CO–OH$ and methacrylic acid $CH_2=C(CH_3)–CO–OH$." (DTX027 at TORTOP_00126561; *see* Tr. 489:1-8 (Rotella).) In a separate subsection titled *Polyvinyl Esters*, it notes that "[p]olyvinyl acetate (PVA) belongs to this class, widely used in the form of aqueous emulsions for the manufacture of paints." (DTX027 at TORTOP_00126562; *see* Tr. 489:9-12 (Rotella).) Torrent's expert Dr. Rotella noted that *Polymer Science*'s method of classifying polymers matches the way in which *Remington* and *Aqueous Polymeric Coatings* classify

---

[40]     Torrent attacks Dr. Khan's testimony, "For me it's an acrylic polymer," as conveying his personal opinion rather than a POSA's understanding. (ECF No. 171 at 10 (quoting Tr. 308:6-20).) The Court disagrees. Dr. Khan made clear that he opined from a POSA's perspective.

polymers: by the polymers' structure. (Tr. 489:13-17.) He added that he was "unaware of any textbook that illustrates that polyvinyl acetate is an example of an acrylic polymer." (Tr. 489:18-19.)

Last is *Hawley's Condensed Chemical Dictionary*. (DTX033.) In *Hawley's*, the definition of *acrylic polymers* refers readers to *acrylic resins*, which "is another word for acrylic polymers," according to Dr. Rotella. (Tr. 491:21-25; DTX033.) The definition also notes that acrylic resins include "acrylonitrile." (Tr. 491:21-492:6.) Dr. Rotella testified that acrylonitrile "does not fit the empirical formula" of Dr. Khan's definition of *acrylic polymer*. (Tr. 492:3-6.) In addition, *Hawley's* defines *acrylic acid* using a structure. (Tr. 490:24-491:20; DTX033.) Dr. Rotella acknowledged, however, that *Hawley's* also refers to acrylonitrile as "vinyl cyanide," though he added that "nobody calls it that" (PFF ¶ 238 (Pl.); Tr. 508:15-509:23).

**Dr. Rotella's rebuttal opinion.** Torrent's expert Dr. Rotella disagrees with Dr. Khan's use of "the general formula $C_nH_{2n-2}O_2$" and the functional groups "olefin acids" to define *acrylic polymers*. Dr. Rotella opined that chemical compounds are defined by their structure, and that a POSA would not define a compound's structure based on its empirical formula or "functional groups that might be present in [the] structure." (Tr. 464:16-24 (Rotella).) An empirical formula describes "the number and type of atoms that exist in a molecule" — for example, in Dr. Khan's definition, "how many carbon atoms there are, how many hydrogen atoms there are, how many oxygen atoms there are." (Tr. 453:19-22, 456:2-18 (Rotella).) But according to Dr. Rotella, an empirical formula is "imprecise" and "confers no information about structure." (Tr. 453:19-22, 456:2-18.) In fact, an empirical formula does not determine or describe chemical structure; "[t]he bonding of atoms to other atoms is what describes it." (Tr. 537:24-538:8 (Rotella).) "The point here," Dr. Rotella said, "is that structure is unique and empirical formula is not. . . . And, therefore,

using empirical formula to help define structure is inappropriate, incomplete, and insufficient." (Tr. 538:7-11; *see* Tr. 465:2 (Rotella) ("Structure is unique; empirical formula is not."); Tr. 540:13-19 (Rotella) ("Empirical formula, in my opinion, as a person of skill in the art, is irrelevant. It simply is being employed here to define something. And that definition is, as I said, inappropriate, incomplete, and imprecise.").)

Dr. Rotella opined that "vinyl acetate is not an acrylic derivative[,] because the structures are different." (Tr. 471:22-23.) Indeed, Dr. Rotella testified, "vinyl polymers such as polyvinyl acetate polymers are characterized and classified differently" from acrylic polymers, "because they have different chemical structures." (Tr. 484:15-18.) He testified that the two terms and their descriptions in *Hawley's* are "mutually exclusive." (Tr. 493:7-10.) Acrylic polymers and vinyl polymers are "chemically and structurally distinct." (Tr. 506:19-23.)

Dr. Rotella testified that molecules could have the same empirical formula but have different chemical structures.[41] (Tr. 458; *see* Tr. 460:7-8 (Rotella) ("These two molecules have the same empirical formula but a different chemical structure.").) To illustrate, Dr. Rotella testified that acrylic acid, for example, has an olefin, which is "also sometimes called a vinyl group." (Tr. 460:21-24.) He then compared acrylic acid with another, unidentified molecule that has the same empirical formula, including the olefin, but has a different chemical structure. (Tr. 461:4-10.) Dr.

---

[41]    Dr. Rotella taught some chemistry fundamentals. "[M]olecules are made up of atoms. . . . And those atoms are connected to each other by bonds." (Tr. 458:24-459:3.) "A polymer . . . is a large molecule with a collection of monomeric units. And those monomeric units can be the same or they can be different." (Tr. 467:3-5.) "Polymerization is simply a general term for the chemical reaction by which monomers are connected to each other to make a polymer, and that's a chemical reaction that is, in many cases, very well established. It can be carried out by machines and it can be carried out by technicians according to recipes." (Tr. 467:7-12.) A "carbonyl functional group" is written as "C=O." (Tr. 468:10-15.) "[Y]ou need the elements of that . . . olefinic bond to make new bonds with other units in the structure," and so when polymerization occurs, the olefin "disappears." (Tr. 469:18-25 (cleaned up).)

Rotella's point was this: "[E]mpirical formula is not a determinant of structure. Structure determines structure, and how atoms are bonded to each other determines structure. Empirical formulas are not unique; structure is, and structure can be different." (Tr. 460:9-14.)

Dr. Rotella then compared the polymerization of an acrylic derivative with that of a vinyl acetate. (Tr. 467.) He explained that in the demonstratives, *R* "represents a variable group in the structure" — "[i]t can be changed to other atoms." (Tr. 470:8-11.) When *R* is hydrogen (H), the molecule is acrylic acid; when *R* is a "CH3 group," the molecule is a "methyl group." (Tr. 470:11-15.) Though the molecules are different, both "are acrylic derivatives because they are derived from acrylic acid or . . . structurally associated with acrylic acid." (Tr. 470:16-20.) But "regardless of what this R is," Dr. Rotella testified, a POSA would never "confuse an acrylic derivative . . . with vinyl acetate, because the structures are different" and "[t]hose differences in structure in the monomers are relayed faithfully into the polymers." (Tr. 471:24-472:3.)

Dr. Rotella then discussed examples of acrylic monomers that derive from acrylic acid. The examples were acrylic esters, which are "a family of molecules"; methyl methacrylate; acrylamides, which are also "a family of molecules"; and acrylonitrile. (Tr. 475:9-476:25.) He testified that although acrylamides and acrylonitrile "contain a vinyl group" — that is, an olefin — and "are used in polymers," these two molecules' formulas do not fit the empirical formula in Dr. Khan's *acrylic polymers* definition, because the molecules have a nitrogen atom and no oxygen atom. (Tr. 477:1-18, 478:1-4.) This illustrates, according to Dr. Rotella, "the imprecise, imperfect, and incomplete nature of using an empirical formula as a means for defining the term 'acrylic polymers.'" (Tr. 477:15-18.)

51

Dr. Rotella also testified that not all acrylic polymers have the same structure. (Tr. 477:21-23.) And "depending on the specifics of structure," Dr. Rotella continued, "these molecules can have distinct empirical formulas." (Tr. 477:24-478:1.)

Having discussed the "acrylic polymer family," Dr. Rotella shifted to describing vinyl acetate monomer and polymer units. (Tr. 478:5-9.) He explained that the vinyl acetate monomer's structure includes an olefin, which is where the "monomer undergoes polymerization . . . to create the polyvinyl acetate polymer." (Tr. 478:21-24.) He testified that "this monomer and this polymer are structurally distinct from the acrylic monomers and acrylic polymers." (Tr. 479:11-13.)

Dr. Rotella also described the structural differences between an acrylic derivative monomer and a vinyl acetate monomer. Starting with acrylic derivatives, Dr. Rotella testified that "by definition of acrylic derivative," its structure must have an olefin unit (*i.e.*, two carbon atoms double-bonded together, or "C=C"), with one of the double-bonded carbon atoms bonded to another carbon atom ("C–C"), with that other carbon atom bonded to either an oxygen or a nitrogen atom. (Tr. 480:13-481:13.) He testified that the "one tiny exception to this" is "acrylonitrile," whose second of the single-bonded carbon atoms is triple-bonded to a nitrogen atom. (Tr. 481:14-18.)

Turning to vinyl acetate, Dr. Rotella testified that vinyl acetate's structure has the same olefinic unit, and that "a vinyl polymer is defined, first off, by this olefinic unit," and "then there is another atom," which can be an oxygen or a carbon atom. (Tr. 482:7-24.) "The acrylic derivative," by contrast, "is defined by that olefin functional group, a carbon and then either an oxygen or a carbon." (Tr. 482:24-483:1.) Dr. Rotella also testified, referencing a demonstrative exhibit, that "where these molecules are similar is in the olefin functional group . . . . [I]t's identical in both." (Tr. 480:6-7.)

Asked to respond to "Dr. Khan's position that these two molecules" — the acrylic derivative and vinyl acetate — "are nearly identical or don't have widely differing structures," Dr. Rotella testified as follows:

> Well, you know, depending on your definition of widely different or not widely different, you might say, well, okay, that's a possibility, but they are different. It doesn't matter if there's one atom or several atoms that are different. The fact that the basic units in the two structures are different makes these molecules different. And it prevents a person of skill in the art from confusing them. They are mutually exclusive.

> [(Tr. 483:7-18.)]

Dr. Rotella then compared the chemical structures of polymethyl acrylate and polyvinyl acetate polymers that Dr. Khan had discussed:



[(PTX195 (polymethyl acrylate) (left); PTX196 (polyvinyl acetate) (right).)]

Dr. Rotella contended that the depiction of the polymethyl acrylate structure "could have been cherrypicked because it happens to have the same empirical formula as polyvinyl acetate." (Tr. 484:1-5.) By "cherrypicked," Dr. Rotella meant that both structures depicted the empirical formula of Dr. Khan's definition, though "a different acrylic polymer could have been picked" as the comparison. (Tr. 484:21-485:24.) But still, Dr. Rotella testified, "these two structures are different," and despite their similarities, "a [POSA] would not confuse them[,] because they are structurally distinct." (Tr. 484:8-12, 485:17-21.)

53

Dr. Rotella was then asked why these differences are important.  He responded that "the differences in structure lead to differences in clarification and description of polymers," adding that "polymers are often described in terms of structural classes, as was done in the patent, for example." (Tr. 486:10-20.)  Dr. Rotella testified that "the patent uses the terminology 'cellulosic polymers' and 'acrylic polymers.'  And both of those terms refer to a wide family of structural units that are structurally distinct from each other." (Tr. 486:21-24.)  Dr. Rotella further testified that the term *vinyl polymers* "is a distinct structural class of molecules that have distinct chemical structures from either of the two claimed in the patents-in-suit here.  And those structures are different.  And those vinyl polymers are not -- are specifically not mentioned and not claimed in the claims in the patents-in-suit." (Tr. 486:25-487:5.)

On cross-examination, some concerns were raised about the reliability of Dr. Rotella's opinions.  As to his experience, Dr. Rotella has collaborated with people "who have designed [sustained-release] formulations," but he has never designed one himself or developed a drug that received FDA approval.  (Tr. 497:8-498:7.)  In his work from 2006 and earlier, he had not used the *Handbook of Pharmaceutical Excipients*, because he was not involved with carrying out formulation research.  (Tr. 498:24-499:13.)  He has no personal experience developing a product using polyvinyl acetate or polymethacrylate.  (Tr. 499:14-21.)  And he has no "direct experience with" or "personal knowledge about whether poly methacrylate" or polyvinyl acetate "can be used as a coating material for release-controlling coatings and in an extended-release formulation of a drug," which Dr. Rotella testified is "outside the scope of my expertise." (Tr. 501:2-17.)

Another concern stems from two errors that Dr. Rotella made in his expert report.  First, Dr. Rotella acknowledged that just two weeks before trial, he submitted an errata sheet to his expert report, revising the name "hydroxypropyl methyl cellulose" to "methyl cellulose," an error that he

chalked up to a typo. (Tr. 502:13-18.) But when confronted with the error, Dr. Rotella testified that his errata sheet was incorrect — "I made a mistake in correcting a mistake." (Tr. 505: 2-506:17.) Second, in the report's sentence "A direct comparison of the structure of polyvinyl acetate and polyvinyl acrylate polymers are shown below," Dr. Rotella erroneously wrote "polyvinyl acrylate polymers" instead of "acrylate polymers." (Tr. 520:17-521:8.)

Perhaps most important, Dr. Rotella conceded that there are circumstances where "acrylic compounds" and "vinyl compounds" are not mutually exclusive. (Tr. 517:12-15.) The concession came from a series of questions about the book *Polymer Chemistry*, on which Dr. Rotella relied in his expert report. (PTX192; Tr. 512:20-22.) Figure 1.4 of *Polymer Chemistry* shows the "[p]olymerization of an olefinically unsaturated compound."



[(PTX192.17.)]

Dr. Rotella first acknowledged that both the structure of the unit depicted in Figure 1.4 and the structures of the polyacrylonitrile, polyvinyl acetate, polymethyl acrylate units depicted, respectively, in PTX198 share a "similar functional group": the olefin, which "is necessary for the polymerization reaction." (Tr. 515:23-516:13.)

55

[(PTX198 (from left to right: polyacrylonitrile, polyvinyl acetate, polymethyl acrylate); *see also* Tr. 510:4-511:14 (Rotella) (identifying the structures).)]

Supernus then confronted Dr. Rotella with this excerpt from *Polymer Chemistry*: "Vinyl compounds can often be polymerized by a chain-growth mechanism. Here, the double bond is converted into two single bonds (see Fig. 1.4)." (PTX192.16; Tr. 516:20-24.) Dr. Rotella testified that the book uses the term *vinyl* to refer to the olefinic unit that is common among the structures of the polymers depicted in PTX198. (Tr. 516:25-517:6.) Still, Dr. Rotella testified, a POSA "recognizes that there is variability in that R and that the polymers derived therefrom can be characterized and should be characterized differently because they are structurally distinct, depending on what you're comparing." (Tr. 517:7-11.) But ultimately, Dr. Rotella testified that "acrylic compounds contain a vinyl unit. They contain an olefinic unit." (Tr. 517:12-15.) Dr. Rotella nevertheless contested that the existence of a vinyl unit dictates how a POSA characterizes polymers. (Tr. 517:17-19.)[42]

In the same light, Supernus confronted Dr. Rotella with a 2004 article by D. Jones titled *Pharmaceutical Applications of Polymers for Drug Delivery* — excerpts of which were read into the record.[43] (Tr. 521:17-19, 522:23-24.) In section 1.2 titled *Examples of Pharmaceutical*

---

[42] Torrent offered a cleaned-up version of this testimony in its proposed findings of fact: "References may use bond nomenclature [to] describe a molecule, but again, this nomenclature does not mean that anything with a vinyl bond, for instance, is automatically a vinyl polymer." (PFF ¶ 243 (Def.) (citing Tr. 517:2-6 (Rotella)).) At closing arguments, Supernus argued that "every acrylic polymer has a vinyl backbone. . . . So the acrylic polymers are vinyl polymers" (Tr. 737:16-18); Torrent countered that "just because a molecule has a vinyl bond doesn't make it a vinyl polymer" (Tr. 748:19-20).

[43] Under Federal Rule of Evidence 803(18)(B), a "statement contained in a treatise, periodical, or pamphlet" is not hearsay if "(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." The rule permits admissible statements to "be read into

56

*Polymers*, it states, "As described previously, there are a wide range of polymers that are used as components of pharmaceutical formulations." (Tr. 521:23-522:22.) Underneath section 1.2 is subheading 1.2.1 titled *vinyl polymers*. (Tr. 523:2-5.) And underneath that section is subheading 1.2.1.1 titled *poly methacrylates*. (Tr. 523:6-8.) Based on this limited review of the article, Dr. Rotella surmised that the author "characterize[d] polymers based on the existence of a vinyl group, as we've seen in others." (Tr. 523:16-18.) He reasoned that "the characterization here goes from the so-called vinyl polymers, that is, polymers that contain an olefin, to cellulose polymers, and it breaks those down structurally as well." (Tr. 523:18-21.) "And so," Dr. Rotella concluded, "I think what he's referring to here is -- if I look at this in context -- is the functional unit in a molecule that undergoes the polymerization reaction, not in terms of structural characterization which he does differently." (Tr. 523:22-25.)

Also underneath the *vinyl polymers* subsection is subheading 1.2.1.2 titled *polyvinyl alcohol*. (Tr. 524:13-21.) Dr. Rotella testified that polyvinyl alcohol is "structurally distinct from polyvinyl acetate because . . . the polymer contains a different structure." (Tr. 524:22-525:1.)

The next line of questions fielded a well-made objection. While cross-examining Dr. Rotella, Supernus tried to run a Google search of "popular types of acrylic polymers." Supernus anticipated that the search would return a link to a chemical manufacturer's website showing that "at least some people who are in the chemical arts would understand that polyvinyl acetate is an acrylic polymer." (Tr. 526:17-527:2.) Supernus's idea was to contradict Dr. Rotella's opinion that a POSA "would not confuse and not mistake polyvinyl acetate for an acrylate polymer because they are structurally distinct." (Tr. 526:9-15.) Torrent argued that this was not a proper basis for

---

evidence but not received as an exhibit." Fed. R. Evid. 803(18). Supernus used the D. Jones article on cross-examination. Although Dr. Rotella had never seen the article before, Torrent did not object to Supernus's reading it into the record.

impeachment and challenged the search results' authenticity and evidentiary value. (Tr. 527:7-11.) Supernus responded that the search would rebut Dr. Rotella's opinion that "no one or no POSA would consider polyvinyl acetate as being a kind of acrylic polymer." (Tr. 528:17-25.)

Impeachment by contradiction is a permissible theory of impeachment. *Primus v. Target Corp.*, 532 F. App'x 314, 315 (3d Cir. 2013) (citing *United States v. Gilmore*, 553 F.3d 266, 271 (3d Cir. 2009); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 n.8 (9th Cir. 2009)). But here, the Internet marketing materials, which Supernus offers for their substantive truth, are hearsay. For the Court to admit them, they must meet a hearsay exception. *See Pernix Ireland Pain Dac v. Alvogen Malta Cperations Ltd.*, 316 F. Supp. 3d 816, 826 (D. Del. 2018) ("An effort to impeach a witness with an out-of-court statement made by another person necessarily relies on the truth of the out-of-court statement and, consequently, requires a hearsay exception for admission." (quoting 30B Charles Alan Wright, et al., Fed. Prac. & Proc. Evid. § 6728 (2018 ed.))).[44] Supernus cited no hearsay exception. More important, as Torrent correctly asserted, "people on the internet [are] not a [POSA]." (Tr. 529:4-5.) As a result, the Internet materials do not in fact contradict Dr. Rotella's testimony about a POSA's understanding. *See Primus*, 532 F. App'x at 315 ("Absent an actual contradiction, the evidence could not impeach by contradiction."). The Court therefore finds that the Internet materials are unreliable and inadmissible, and it will not consider the related testimony in its decision.

---

[44] *C.f. Huzinec v. Six Flags Great Adventure, LLC*, 2023 WL 1433633, at *3 (3d Cir. Feb. 1, 2023) (ruling that YouTube videos offered to prove that Six Flags was on notice of a danger, not the truth of the matter asserted, were not hearsay); *Express Homebuyers USA, LLC v. WBH Mktg. Inc.*, 323 F. Supp. 3d 784, 789 n.3 (E.D. Va. 2018) (finding that results of the Internet search "we buy houses" were not hearsay where they were offered to show not that "companies advertising home-buying services in fact buy houses" but that "many third parties currently use and have used the 'we buy houses' phrase").

Finally, when confronted with the claim limitations at issue, Dr. Rotella agreed that "for any structure to fit within the claim language, it would need to be able to form a polymer." (Tr. 539:17-20 (referencing DTX170 ¶ 45).) He acknowledged that some of the molecules that he used to demonstrate the notion that molecules can have the same empirical formula but different structures "may not be able to form polymers." (Tr. 539:22-540:11; *see* Tr. 466:3-25.)[45]

***The Court's conclusions.*** The Court finds that Supernus has not shown by a preponderance of the evidence that a POSA would understand the plain and ordinary meaning of *acrylic polymers* to include polyvinyl acetate.

Supernus contends that the term *acrylic polymers* needs no construction, as Dr. Khan testified, "because a POSA knows what the polymer is," "knows what function it plays," and "uses [them] all the time." According to Supernus, pharmaceutical scientists focus on a polymer's function, not on its structure. (PFF ¶ 55 (Pl).)[46] As Dr. Khan sees it, if a pharmaceutical scientist knows that a polymer functions like an acrylic polymer, the scientist need not consult a definition to know that it is an acrylic polymer. By Dr. Khan's analogy, people who have seen an elephant know what an elephant is; his definition was purposed to "describe an elephant to people who haven't seen" one before. (Tr. 322:2-12.)

The problem for Supernus is that a purely function-based description — such as "a release controlling coating" (PTX233.210) — is something the PTO examiner rejected during the patent prosecution:

---

[45] At trial, Supernus objected to Torrent's use of DDX107, which depicted chemical structures that were not disclosed in Dr. Rotella's report. (*See* Tr. 421-435.) Because neither DDX107 nor Dr. Rotella's related direct-examination testimony meaningfully influenced the Court's decision, the Court need not resolve the objection.

[46] (*See* Tr. 314:10-12 (Khan) ("So within acrylic, there is vinyl set of polymers that are separated out from acrylic, but they work the same way. They work as acrylic polymer.").)

59

> Defining . . . release coatings in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the . . . release coatings which would have the stated function.
>
> Applicants are describing what . . . release coatings do rather than what they are. Describing a compound by its functions [(release coatings)] will not substitute for written description of the structure of the compound. Describing the function of a compound fails to distinguish the compound from other molecules or agents that can perform the same functions.

[(PTX233.230.)]

Hoping to solve that problem, Dr. Khan crafted a definition that he believed both covered the acrylic polymers in the Patents-in-Suit and included a structure feature: the olefin acid. (Tr. 267:8-268:22 (Khan).) Indeed, Dr. Rotella also referred to an olefin as a "functional group" and to an acid as "a different functional group." (Tr. 455:16-19, 480:5-7, 482:22-25, 516:6-13 (Rotella).)

But the Court is not satisfied that a POSA would more likely than not read the specification and arrive at Dr. Khan's exact definition. The Court expects that if a pharmaceutical scientist viewed the olefin acid as the structure feature that, coupled with the empirical formula, defined a polymer as acrylic, vinyl, or both, that view might oft appear in technical literature. Yet Dr. Khan's definition is not in any of the technical literature in evidence. Even in *Webster's*, the source from which Dr. Khan drew his definition, the *acrylic* definition needed Dr. Khan's modification to cover the claimed acrylic polymers.[47] And, as Torrent established through cross-examination, Dr. Khan

---

[47]     The Court rejects Torrent's argument that general-use dictionaries cannot be used to define scientific terms. The Federal Circuit has cited similar dictionaries for definitions of chemical compounds. *See, e.g., Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) (noting the definition of *anhydrite* from *Webster's Third New International Dictionary of the English Language Unabridged* (1986)). General-use dictionaries are unhelpful when a claim term has a different meaning in the art than it has in common, lay usage. *See Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004) ("[A] general-

60

is "not aware of any references that discuss or describe vinyl acetate as an acrylic polymer." (Tr. 314:22-24.)

On the other hand, the record supports that no all-encompassing definition of *acrylic polymers* may exist. That explains the, as Torrent put it, "Frankenstein" nature of Dr. Khan's definition. But record evidence also shows that acrylic polymers and vinyl polymers are not always mutually exclusive. For instance, *Hawley's* refers to *acrylonitrile*, an acrylic polymer, as "vinyl cyanide," showing that acrylic polymers can be described as vinyl polymers. For another, Dr. Rotella acknowledged that the 2004 D. Jones article characterizes polymers with vinyl groups as vinyl polymers. The article supports Dr. Khan's opinion that a pharmaceutical scientist prioritizes a polymer's function and thus focuses on its functional group — that is, the olefin, also called the vinyl group.

In addition, Dr. Rotella offered nothing but his testimony to support his "definitions" of vinyl polymers and acrylic polymers, which were vague and overly sensitive to structure:

> DR. ROTELLA. And a vinyl polymer is defined, first off, by this olefinic unit. And then there is another atom here in this example. It happens to be oxygen. But in other examples it can be a carbon atom, but that carbon atom then is bonded in different ways to other carbon atoms present in this structure. But in this specific example, so vinyl acetate is defined by the oxygen atom and the olefin functional group here. The acrylic derivative is defined by that olefin functional group, a carbon and then either an oxygen or a carbon. And those are different. And that's why the term "acrylic" means something. That's why the term "vinyl" means something. Those terms confer structure. And the word "acrylic" confers the structure as I have just outlined it for you and illustrated it for you.

> [(Tr. 482:17-483:5.)]

---

usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term."). Torrent has not argued that *acrylic polymers* means something different in the drug-delivery context than in lay usage.

The Court does not find that a POSA would view structural differences as narrowly as Dr. Rotella views them. Dr. Rotella's testimony highlights his sensitivity to even slight differences between structures. He testified that polyvinyl alcohol and polyvinyl acetate are "structurally distinct" because they contain different structures. He also testified that "[i]t doesn't matter if there's one atom or several atoms that are different. The fact that the basic units in the two structures are different makes these molecules different. And it prevents a person of skill in the art from confusing them. They are mutually exclusive." (Tr. 483:7-18.)

In addition, as knowledgeable as Dr. Rotella is about organic chemistry and drug discovery, he lacks experience in drug formulation and delivery. Yet Dr. Felton, an expert in the field of drug formulation and modified drug delivery systems (Tr. 553:10-17 (Felton)), did not provide testimony corroborating Dr. Rotella's narrow view of classifying polymers. On the topic, Torrent established only her opinion that *Aqueous Polymeric Coatings*'s depicting cellulosic, acrylic, and vinyl polymers separately is consistent with how formulators classify polymers. (Tr. 557:17-21.) Even so, Dr. Felton testified that the depiction was not definitional. Beyond that, her infringement testimony concerned only the doctrine of equivalents.

In sum, the Court finds that there may be more than one way to classify a polymer, and that there are times when acrylic polymers and vinyl polymers may overlap. That said, Supernus has not proven by a preponderance of the evidence that a POSA would apply Dr. Khan's definition to conclude that polyvinyl acetate falls within the plain and ordinary meaning of *acrylic polymers*. The Court therefore rules that Torrent's ANDA Products do not literally infringe the Asserted Claims.

### B.    Doctrine of Equivalents

Next, the Court decides whether Supernus proved by a preponderance of the evidence that Torrent's ANDA Products infringe the *acrylic polymers* limitation under the doctrine of equivalents.  "Under [the doctrine of equivalents], a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1375 (Fed. Cir. 2022) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)).

But first, Supernus must prove by a preponderance of the evidence that its prosecution history does not estop it from asserting infringement by equivalence.

### 1.    Prosecution History Estoppel

"Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution."  *Pharma Tech Sols., Inc. v. LifeScan, Inc.*, 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013)).  "Prosecution history estoppel can occur in two ways: 'either (1) by making a narrowing amendment to the claim ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent examiner ("argument-based estoppel").'"  *Id.* (quoting *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006)).

An amendment is narrowing if it is necessary to satisfy a requirement of the Patent Act and secure the patent.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736-37 (2002).  Indeed, "[a] patentee who narrows a claim as a condition for obtaining a patent disavows

[its] claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Id.* at 737. In contrast, "[i]f a § 112 amendment is truly cosmetic, then it would not narrow the patent's scope or raise an estoppel." *Id.* at 736-37. A "patentee's decision to narrow [its] claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting *Festo*, 535 U.S. at 725). This is often called the "*Festo* presumption."

Torrent invokes amendment-based estoppel. It argues that during the prosecution of the '580 patent,[48] the applicants made a narrowing amendment surrendering polyvinyl acetate as a release controlling polymer. (ECF No. 171 at 24-27; *see* PTX233.1 ('931 application).) The Court must therefore analyze the prosecution history.

An earlier version of subsection (a) of claim 104 in the '931 application read "(a) at least two different extended release topiramate-containing components, wherein each component comprises a release controlling coating specific for its component. . . ." (PTX233.210.)

In an August 8, 2012 Office Action, the examiner rejected claim 104 of the '931 application for "failing to comply with the written description requirement" under § 112. (PTX233.229.) The examiner reasoned as follows:

> The disclosure of a species may provide an adequate written
> description of a genus when the species disclosed is representative
> of the genus. The present claims encompass any and all enhancing
> agents, complexing agents and release coatings that can exist. There
> is substantial variability among the species of enhancing agents,
> complexing agents and release coatings encompassed within the
> scope of the claims because the enhancing agents, complexing
> agents and release coatings have widely differing structures and

---

[48]     The '580 patent was prosecuted under U.S. Patent Application No. 12/926,931 ("the '931 application"). (PTX233.1.) In the *Markman* Opinion, the Court found that "[t]he parties also agree that, because the patents in suit are part of the same patent 'family,' the 'prosecution history of related patents is relevant to all patents in that family.'" (ECF No. 88 at 8 (citations omitted).) Thus, the '580 patent prosecution history is relevant to the Patents-in-Suit.

corresponding biological activities. Defining the enhancing agents, complexing agents and release coatings in terms of functional features or elements does not suffice in the absence of a disclosure of structure features or elements of the enhancing agents complexing agents and release coatings which would have the stated function.

Applicants are describing what the enhancing agents, complexing agents and release coatings do rather than what they are. Describing a compound by its functions (enhancing agents, complexing agents and release coatings) will not substitute for written description of the structure of the compound. Describing the function of a compound fails to distinguish the compound from other molecules or agents that can perform the same functions.

A description of a genus may be achieved by means of a recitation of a representative number of species falling within the scope of the genus or of a recitation of structural features common to the members of the genus, which features constitute a substantial portion of the genus. Regents of the University of California v Eli Lilly Co., 119 F3d 1559, 1569, 43 USPQ2d 1398, 1406 (Fed Cir 1997). Consequently, the Examiner notes that the claimed invention which is drawn to a genus of enhancing agents, complexing agents and release coatings may be adequately described if there is a (1) sufficient description of a representative number of species, or (2) by disclosure of relevant, identifying characteristics sufficient to describe the claimed invention in such full, clear, concise and exact terms that a skilled artisan would recognize applicant was in possession of the claimed invention. Here, the specification discloses only a few common structural features shared by the members of the claimed genus. Since the claimed genus encompasses compounds yet to be discovered, the disclosed structural feature does not constitute a substantial portion of the claimed genus.

Therefore, the disclosure of several examples of enhancing agents, complexing agents and release coatings and others listed in the specification, does not provide an adequate description of the claimed genus of enhancing agents, complexing agents and release coatings because the claims are broader than the disclosure.

[(PTX233.230-231.)]

In response, the applicants amended subsection (a) of claim 104, adding this underlined clause: "(a) at least two different extended release topiramate-containing components, wherein

65

each component comprises a release controlling coating specific for its component <u>and comprising</u> <u>a coating material selected from the group consisting of cellulosic polymers and acrylic polymers.</u> . . ." (PTX233.242.)  In their remarks, the applicants first acknowledged that claim 104 "stand[s] rejected for failing to comply with the written description requirement" — "[i]n particular, . . . that the specification fails to adequately describe . . . 'release controlling coating'."  The applicant then stated that "[a]lthough Applicants respectfully disagree, solely in the interest of compact prosecution, Applicants have amended the claims to now recite species of the noted genera." (PTX233.249.)

Supernus does not deny that the amendment was narrowing for patentability reasons. Indeed, the examiner rejected the original claim for written-description shortcomings.   The responsive amendment was purposed to address the examiner's concerns about compliance with § 112.  And given the examiner's note that the original claim encompassed "any and all . . . release coatings that can exist," including "compounds yet to be discovered" (PTX233.230-231), the original claim covered polyvinyl acetate.  *C.f. Intendis GMBH v. Glenmark Pharms. Inc., USA,* 822 F.3d 1355, 1365-66 (Fed. Cir. 2016) (holding that where the claims as originally written could not have included the accused equivalent, the amendment was made for clarification, not patentability).  For these reasons, the Court finds that there is a presumption of prosecution history estoppel.[49]

### 2.    Tangential Relation

The issue, then, is whether Supernus has rebutted the presumption.  There are three ways to overcome the presumption: "(1) the rationale underlying the amendment bears no more than a

---

[49]    In support of estoppel, Torrent asserts that "Supernus chose to use the closed transition phrase 'consisting of' in its amendment."  (ECF No. 171 at 26.)  Because the Court finds that the *Festo* presumption applies regardless of this argument, the Court need not analyze it.

tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time

of the application; or (3) there was some other reason suggesting that the patentee could not

reasonably be expected to have described the equivalent." *Bio-Rad Lab'ys, Inc. v. 10X Genomics*

*Inc.*, 967 F.3d 1353, 1364 (Fed. Cir. 2020) (citing *Festo*, 535 U.S. at 740-41). The standard to

rebut the presumption is a preponderance of the evidence. *Integrated Tech. Corp. v. Rudolph*

*Techs., Inc.*, 734 F.3d 1352, 1359 (Fed. Cir. 2013).

Supernus invokes only the "tangential relation" exception: that "the rationale underlying

the amendment . . . bore no more than a tangential relationship to the alleged equivalent (i.e.,

polyvinyl acetate)." (ECF No. 170 at 33.) "The tangential relation inquiry 'focuses on the

patentee's objectively apparent reason for the narrowing amendment,' which 'should be

discernible from the prosecution history record.'" *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting

*Integrated Tech.*, 734 F.3d at 1358). Courts considering the tangential relation exception ask

"whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the

alleged equivalent." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1354 (Fed. Cir. 2019)

(quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir.

2003)).[50]

Supernus argues that "the objectively apparent reason for the amendment was to alleviate

the Patent Office's explicitly stated concern that the claims, as then written, encompassed coatings

that 'have widely differing structures and corresponding biological activities.'" (ECF No. 170 at

34.) Polyvinyl acetate, Supernus says, "has the *same biological activity* and a *structure that is*

---

[50]     Tangential means "touching lightly or in the most tenuous way." *Eli Lilly*, 933 F.3d at
1331 (quoting *Webster's* Third New International Dictionary (2002)).

*nearly identical* to the structure of the exemplary acrylic polymers listed in the patent specification." (*Id.*)

Torrent counters that "the clear purpose of Supernus's amendment was to overcome a § 112 rejection by claiming specific polymers (cellulosic and acrylic polymers) and surrendering other polymers (vinyl polymers)." (ECF No. 171 at 28.) Torrent asserts that Supernus puts all of its weight behind one sentence from the prosecution history: that "[t]here is substantial variability among the species of enhancing agents, complexing agents and release coatings encompassed within the scope of the claims because the enhancing agents, complexing agents and release coatings have widely differing structures and corresponding biological activities." (*Id.*)

The Court must resolve whether the objectively apparent reason for Supernus's amendment narrowing the release coatings to cellulosic polymers and acrylic polymers was more than tangentially related to polyvinyl acetate.

"[W]hether the patentee has established a merely tangential reason for a narrowing amendment is [a question of law] for the court to determine from the prosecution history record without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record." *Festo*, 344 F.3d at 1370. "[T]he reason for an amendment, where the tangential exception is invoked, cannot be determined without reference to the context in which it was made." *Eli Lilly*, 933 F.3d at 1332. The Federal Circuit has described this analysis as "case-specific," cautioning that "analogies to other cases [are] less helpful than a direct consideration of the specific record . . . and what it shows about the reason for amendment and the relation of that reason to the asserted equivalent." *Id.* at 1332 n.5. Indeed, prosecution history estoppel has not applied "in similar circumstances, where the prosecution

record differed." *Id.* at 1333; *see Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010) ("[T]here is no hard-and-fast test for what is and what is not a tangential relation.").

That said, it is helpful to understand how the Federal Circuit has addressed the tangential exception in comparable circumstances.

In *Eli Lilly & Co. v. Hospira, Inc.*, the patent owner narrowed claims during prosecution to recite "pemetrexed disodium" instead of "an antifolate." 933 F.3d at 1325-26, 1330-31. The accused equivalent was pemetrexed ditromethamine, which is functionally identical to pemetrexed disodium. *Id.* at 1327. The Federal Circuit concluded that "[t]he reason for Lilly's amendment . . . was to narrow original claim 2 to avoid Arsenyan, which only discloses treatments using methotrexate, a different antifolate," and "not to cede other, functionally identical pemetrexed, salts." *Id.* at 1331. Thus, claiming the functionally equivalent pemetrexed salts was only tangential to overcoming prior art disclosing an antifolate other than pemetrexed.

There is more to take from the *Eli Lilly* decision. First, the Federal Circuit does not "demand perfection from patent prosecutors." *Id.* at 1332. Even "inartful" amendments may be saved depending on the context. *See id.* ("The prosecution record implies that Lilly's amendment, inartful though it might have been, was prudential in nature and did not need or intend to cede other pemetrexed salts.").

Second, a patentee invoking the tangential exception need not "prove that it could not have drafted a claim that literally encompassed" the accused equivalent. *Id.* at 1332. The patentee must show that the accused equivalent was "'peripheral, or not directly relevant,' to its amendment." *Id.* (quoting *Festo*, 344 F.3d at 1369). And "the reason for an amendment . . . cannot be determined without reference to the context in which it was made." *Id.*

Finally, the Federal Circuit rejected the "bright-line rule" that "where the reason for the amendment and the equivalent in question both relate to the same claim element, the tangential exception does not apply." *Id.* at 1333. The unanimous panel made clear that "an amendment that narrows an existing claim element" often "evinces an intention to relinquish that claim scope" — but that "this consideration is not dispositive." *Id.* (citing *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315-16 (Fed. Cir. 2008), as an example of where the intention to relinquish was so evinced)); *see Honeywell*, 523 F.3d at 1322 (Newman, J., dissenting) ("It does not suffice to say that by narrowing a claim by adding an element, *ipso facto* the relation to the accused equivalent element is not tangential. This criterion relates to why an amendment was made; it does not become irrebuttable simply when the accused equivalent concerns the same element that was added by amendment."). Even though the narrowing amendment and the accused equivalent both related to the particular type of salt in the invention, the Federal Circuit held that "the particular type of salt to which pemetrexed is complexed relates only tenuously to the reason for the narrowing amendment, which was to avoid" the prior art. *Eli Lilly*, 933 F.3d at 1331.

By contrast, in *Amgen Inc. v. Amneal Pharmaceuticals LLC*, the Federal Circuit rejected use of the tangential exception. 945 F.3d 1368 (Fed. Cir. 2020). There, the accused product used "pregelatinized starch" as a binder, yet the asserted claim did not list pregelatinized starch in its Markush group reciting binders. *Id.* at 1380. In the prosecution history, the patent owner had revised the claim's binder limitations to be in Markush group format to overcome prior art references that taught the use of pregelatinized starch as a binder. *Id.* at 1382. Thus, the Federal Circuit concluded that the amendment — made to avoid prior art that contains the accused equivalent — was more than tangential to the accused equivalent. *Id.* Because the prior art

70

references taught the use of the alleged equivalent for the claimed function, the tangential exception to prosecution history estoppel could not apply. *Id.*

In *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, the inventors amending claims specified that their invention uses "non-fluorinated microchannels" that are chemically distinct from "fluorinated surfactant" carrier fluid so that "the carrier fluid and the microchannels in the claimed invention would not react with each other." 967 F.3d at 1365. "In amending the claims," the Federal Circuit noted, "the patentees sought to distinguish the claimed invention from [the prior art], which disclosed fluorinated microchannel wall coatings that would react with the carrier fluid." *Id.* The accused equivalent was microchannels containing a nominal amount of fluorine that is "not chemically distinct from the carrier fluid" but still "cannot react with the carrier fluid." *Id.* The Federal Circuit concluded that "the inventors surrendered microchannels coated with fluorine '*for a purpose*—not those containing *de minimis* amounts of fluorine that have no effect on how the microchannel functions in the system.'" *Id.* Thus, the narrowing amendment had only a tangential relation to the equivalent — "negligibly fluorinated microchannels, or, put differently, microchannels with non-fluorinated properties." *Id.* at 1366.

In reaching that decision, the Federal Circuit in *Bio-Rad* measured its facts against those in *Amgen* and *Eli Lilly*. In *Amgen*, the amendment was more than tangential, because it was "made to avoid prior art that contains the equivalent in question"; in *Bio-Rad*, by contrast, the prior art "did not teach the use of the alleged equivalent—negligibly fluorinated microchannels or those with no fluorinated properties." *Bio-Rad*, 967 F.3d at 1366 (citing *Amgen*, 945 F.3d at 1382). And in *Eli Lilly*, the amendment was tangential, in part because it was made to avoid prior art, which did not disclose the accused equivalent; likewise, in *Bio-Rad*, the prior art disclosed fluorinated

microchannels and not the accused equivalent "microchannels with no fluorinated properties." *Bio-Rad*, 967 F.3d at 1366 (citing *Eli Lilly*, 933 F.3d at 1325-27, 1331).

In this case, no one disputes that the applicants' remarks show that the amendment was made to address the examiner's concerns. (*See* ECF No. 170 at 35 ("[T]he applicants amended claim 104 of the '931 Application to address the Examiner's concerns."); ECF No. 171 at 29 ("Supernus specifically told the USPTO that the amendment was made 'in the interest of compact prosecution' to address the Examiner's concerns." (quoting PTX233.249)) (cleaned up); Tr. 563:12-16 (Felton) ("It says that the applicants have amended the claims in a manner that ought to address the examiner's concerns.").) Torrent argues that the Court, in discerning the rationale for the amendment, should focus not on the examiner's reasons for its rejection, but on the applicants' remarks. (ECF No. 171 at 28-29.) Based on those remarks, Torrent asserts, the objectively apparent reason for the amendment could not have been to respond to the examiner's *widely differing structures and corresponding biological activities* comment, because the applicants did not specifically identify that comment in their response. In essence, Torrent proposes that the Court focus on what the applicants did not say rather than what they responded to.

The Court cannot do so. Again, the Court's inquiry "focuses on the patentee's objectively apparent reason for the narrowing amendment" based on "the prosecution history record." *Pharma Tech Sols.*, 942 F.3d at 1380 (quoting *Integrated Tech.*, 734 F.3d at 1358). This focus does not make the tangential exception unavailable just because the applicants did not neatly recite a particular sentence from the examiner's opinion, despite what Torrent would prefer. Indeed, divorcing the examiner's reasons from the applicants' response would disregard "the context in which [the amendment] was made." *Eli Lilly*, 933 F.3d at 1332; *accord Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 2023 WL 7171484, at *8 (Fed. Cir. Nov. 1, 2023) (considering

72

how "a reasonable reader" could interpret the prosecution history (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009))).

In context, the prosecution history shows that the applicants amended the claim to address the examiner's concerns that "the scope of the claims" encompassed "any and all . . . release coatings that can exist" or have "yet to be discovered," including coatings with "widely differing structures and corresponding biological activities." (PTX233.230-231.)  The examiner explained that by "describing the function of a compound" — here, release control — the original claims "fail[ed] to distinguish the compound from other molecules or agents that can perform the same functions." (PTX233.230.)  The examiner advised that the applicants had to disclose "structure features or elements of the . . . release coatings which would have the stated function." (PTX233.230.)  The examiner noted that the specification disclosed "several examples of . . . release coatings," but that disclosure did "not provide an adequate description of the claimed genus of . . . release coatings because the claims" — which then lacked the species of genus disclosed in the specification — "are broader than the disclosure." (PTX233.231.)  In response, the applicants amended the claim to include the "species of the noted genera" that were disclosed in the specification. (PTX233.249.)

Dr. Felton testified that the objectively apparent reason was to address the examiner's concerns that the language "was just too broad." (Tr. 563:15-22.)  But Dr. Felton's opinion ignores the context of the examiner's rejection.  The spirit of the rejection is captured by the examiner's position that the claim as originally written included "widely differing structures and corresponding biological activities."  Hence why Dr. Khan testified that a POSA would interpret the objectively apparent reason for the amendment as "to obtain a . . . claims scope that includes

73

polymers that are *not* widely differing, in structures that are *not* widely different in their biological properties." (Tr. 286:7-18 (emphasis added).)

The Court here, like the Federal Circuit in *Eli Lilly*, finds it unlikely that a competitor would have been justified in assuming that if it used a release coating polymer "with the same biological activity" and "a structure that is nearly identical" to the structure of the specific acrylic polymers exemplified in the patent specification, it would not infringe the Patents-in-Suit. *See Eli Lilly*, 933 F.3d at 1332 ("[I]t is unlikely that a competitor would have been 'justified in assuming that if he [made an equivalent pemetrexed salt], he would not infringe [the '209 patent].'" (quoting *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed. Cir. 1984)) (alterations in *Eli Lilly*)). The Court therefore concludes that Supernus's proposed objectively apparent reason for the amendment — "to obtain a . . . claims scope that includes polymers that are not widely differing, in structures that are not widely different in their biological properties" — is more likely than not the true reason.

Torrent's arguments to the contrary are unpersuasive. Torrent argues that "[i]f Supernus's amendment to recite the specific cellulosic and acrylic polymer categories was based on some unrecited structure, it would have 'fail[ed] to distinguish the compound from other molecules or agents that can perform the same functions' and thus failed to resolve the examiner's concerns." (ECF No. 171 at 30 (quoting PTX233.230).) In other words, including *acrylic polymers* does not adequately convey a distinct structure. But as the Court found earlier, a POSA reading the specification would understand that the plain and ordinary meaning of *acrylic polymers* included the exemplary acrylic polymers described in the specification. In fact, opposing literal infringement, Torrent argued that the term *acrylic* confers structure. (*See* Tr. 483:1-5 (Rotella) ("And that's why the term 'acrylic' means something. That's why the term 'vinyl' means

something.  Those terms confer structure.  And the word 'acrylic' confers the structure as I have just outlined it for you and illustrated it for you.").)  *See Eli Lilly*, 933 F.3d at 1332 ("It does not follow . . . that [an] amended claim becomes so perfect in its description that no one could devise an equivalent." (quoting *Festo*, 535 U.S. at 738) (alterations in *Eli Lilly*)).

Torrent also argues that "Supernus clearly had the language to describe vinyl polymers, including polyvinyl acetate, and the 'the original application once embraced' those polymers, yet Supernus ultimately chose not to claim them."  (ECF No. 171 at 30 (citing PTX233.242; quoting *Festo*, 535 U.S. at 734); *see* Tr. 559:10-12 (Felton) (testifying that the term "release-controlling coating" captures "all three categories of polymers").)  Torrent is correct that the original claim covered, in the examiner's words, "any and all . . . release coatings that can exist," which would include polyvinyl acetate.  (PTX233.230.)  But that fact is not dispositive.  In similar cases where an original claim theoretically encompassed the accused equivalent, the Federal Circuit opted not to apply "[s]uch a draconian preclusion . . . beyond a fair interpretation of what was surrendered." *Intervet*, 617 F.3d at 1292; *see, e.g.*, *Eli Lilly*, 933 F.3d at 1330-31 (holding that a narrowing amendment was only tangential to the accused equivalent even though the equivalent was within "the territory between the original claim and the amended claim").[51]  The objectively apparent reason for the amendment here was not to disclaim polyvinyl acetate or some attribute of polyvinyl acetate; it was to disclaim release coatings that have widely differing structures and corresponding biological activities.  In fact, the amendment was "peripheral, or not directly relevant," to polyvinyl acetate. *Eli Lilly*, 933 F.3d at 1332 (quoting *Festo*, 344 F.3d at 1369).

---

[51]     "After all, the tangential exception only exists because applicants over-narrow their claims during prosecution." *Eli Lilly*, 933 F.3d at 1332.

Torrent cites three cases that are compelling but ultimately inapposite. (ECF No. 171 at 30-31.) First, in *Duramed Pharmaceuticals, Inc. v. Paddock Laboratories, Inc.*, at the examiner's suggestion, Duramed amended its independent claim from tablets "coated with a moisture barrier coating" to tablets with a "moisture barrier coating compris[ing] ethylcellulose." 715 F. Supp. 2d 552, 556 (S.D.N.Y. 2010), *aff'd*, 644 F.3d 1376 (Fed. Cir. 2011). The district court ruled that "[b]ecause Duramed's amendment concerned the type of [moisture barrier coating] to be used, and the alleged equivalent [polyvinyl alcohol] is another type of moisture barrier coating, Duramed's narrowing amendment was not tangential to the alleged equivalent." *Id.* at 565. In other words, the tangential exception did not apply, because the amendment and the accused equivalent both related to the moisture barrier coating.

The Federal Circuit held that Duramed did not meet the unforeseeability exception because the prior art application's disclosure of the accused equivalent moisture barrier coating established that the accused equivalent was known in the field of pharmaceutical compositions as of the time of Duramed's narrowing amendment. *Duramed Pharms., Inc. v. Paddock Lab'ys, Inc.*, 644 F.3d 1376, 1381 (Fed. Cir. 2011). But the tangential exception was not discussed on appeal. Had it been, the Federal Circuit may have rejected the above-mentioned "bright-line rule" that it later rejected in *Eli Lilly*: "where the reason for the amendment and the equivalent in question both relate to the same claim element" — in *Duramed*, the moisture barrier coating — "the tangential exception does not apply." *Eli Lilly*, 933 F.3d at 1333. Indeed, "such a bright-line rule is both contrary to the equitable nature of prosecution history estoppel . . . and inconsistent with the equitable spirit that animates the doctrine of equivalents." *Id.* (internal citations omitted).[52]

---

[52]   Torrent notes that in *Duramed*, Supernus's counsel's firm opposed applying the tangential exception. (ECF No. 171 at 31.) That counsel has been on both sides of this issue matters less given that each case depends on its unique prosecution history. *See Eli Lilly*, 933 F.3d at 1333

This Court has the benefit of *Eli Lilly*'s guidance. Here, the applicants amended the claim to better describe the release controlling coating. That may be — indeed it is — enough to create a presumption of estoppel. *See Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1341 (Fed. Cir. 2007) ("[I]f a § 112 amendment is necessary and narrows the patent's scope—even if only for the purpose of better description—estoppel may apply." (quoting *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1142 (Fed. Cir. 2004))).[53] But following *Eli Lilly*, that alone does not bar Supernus from invoking the tangential exception to accuse an equivalent release controlling coating (here, polyvinyl acetate) of infringement. *See Eli Lilly*, 933 F.3d at 1333-34 (concluding that the consideration "that an amendment that narrows an existing claim element evinces an intention to relinquish that claim scope" "is not dispositive because the rest of the prosecution history, and the '209 patent itself, show that it is implausible that the reason for Lilly's amendment was to surrender other pemetrexed salts").[54]

Second, in *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, the applicant told the examiner that to overcome § 112 rejections, it added a "thread depth limitation" to capture the way that the "stabilizer aspect of the invention operated": with "threads extend[ing] toward the channel to a depth below the top of the stabilizer." 480 F.3d at 1343. The accused equivalent, however, did "*not* include threads extending 'to a depth below the top of the stabilizer'" and thus

---

(collecting cases showing that "prosecution history estoppel d[id] not apply in similar circumstances" "where the prosecution record differed").

[53]    Again, "these circumstances create a presumption of estoppel" that "the patentee may still rebut." *Cross Med. Prod.*, 480 F.3d at 1341 (citation omitted).

[54]    *Compare Pharma Tech Sols.*, 942 F.3d at 1381, 1383-84 (rejecting the tangential exception where the inventors' remarks "distinguish[ing] the prior art based on the newly added sequential 'converting' and 'comparing' limitations" surrendered the accused equivalent's systems, which did not have a "comparing" limitation, because the "comparing" limitation "was integral to the inventors' . . . amendment" and "necessary to overcome the prior art").

did "*not* capture this aspect of the invention." *Id.* Because the accused equivalent "relate[d] to the amendment as shown even by the applicant's own statements," the tangential exception did not apply. *Id.*

Critical to the *Cross Medical Products* decision was that an invention either had the threads or did not, and the applicant made clear that the inclusion of threads is what distinguished the invention from prior art. Here, the amendment was not so polarizing. Patentability did not depend on, nor was it influenced by, *polyvinyl acetate*'s absence from the claim. And nothing in the prosecution history indicates that the applicants amended the claim to distinguish their formulation from release controlling coatings in prior art. Rather, the amendment addressed the need for "a disclosure of structure features or elements of the . . . release coatings which would have the stated function." (PTX233.230.)

Third, and finally, Torrent cites *International Rectifier Corp. v. IXYS Corp.*[55] for the proposition that "because the amendment added specific structure to overcome a Section 112 rejection and the asserted equivalent related to the specific structure added by amendment, the reason could not be deemed tangential." (ECF No. 171 at 29-30.) The Court disagrees with Torrent's framing of that case's holding. In *International Rectifier*, the amendment adding the limiting term *adjoining* more than tangentially related to the specific structure because it "recited precisely the structure it disclosed," which did not include the opposite non-adjoining structure. 515 F.3d at 1359; *see Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335, 1346 (Fed. Cir. 2023) ("While we have recognized that literal failure to meet a claim limitation does not necessarily constitute a 'specific exclusion,' we have found 'specific exclusion' where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation."

---

[55]     515 F.3d 1353, 1359 (Fed. Cir. 2008).

(quoting *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014)) (internal citations omitted)); *see, e.g.*, *Cross Med. Prod.*, 480 F.3d at 1343 (finding that an invention whose distinguishing feature was its threads could not be equivalent to an invention that had no threads); *Integrated Tech.*, 734 F.3d at 1355, 1359 (holding that because the patentee relied on physical contact to overcome prior art, it could not "prove by a preponderance of the evidence that . . . the 'objectively apparent reason for the narrowing amendment' was only tangentially related to the [no-touch] equivalent" (quoting *Festo*, 344 F.3d at 1369)).

In contrast, here the Court has already found that vinyl polymers and acrylic polymers are not mutually exclusive and can overlap. (*See* § IV.A.2.b above.) Recall, as Dr. Rotella testified, both vinyl polymers and acrylic polymers are at least somewhat defined by their "identical" vinyl groups. (*See* Tr. 480:6-7 (Rotella) ("[W]here these molecules are similar is in the olefin functional group here. You see it's identical in both."); Tr. 482:17-483:5 (Rotella) (defining vinyl polymer, "first off, by this olefinic unit," and acrylic polymer "by that olefin functional group").) Thus, unlike the *adjoining-not adjoining* components in *International Rectifier*, the *threads-no threads* components in *Cross Medical Products*, or the *touch-no touch* components in *Integrated Technology*, here vinyl polymers and acrylic polymers are not necessarily "the opposite of, or inconsistent with," each other.

The Court's finding that vinyl polymers and acrylic polymers are not mutually exclusive undermines Torrent's argument that where there are only three categories of polymers (cellulosic, acrylic, and vinyl), the omission of one of them is disclaiming. Even so, the Court finds that the Patents-in-Suit do not disclaim all vinyl polymers. As mentioned, the specification's use of semicolons to offset *cellulosic polymers*, *polyvinyl alcohol*, and *acrylic polymers* indicates that these polymers are separate from one another. Dr. Khan agreed with this reading. (Tr. 318:22-

319:3.)  He also agreed that polyvinyl alcohol is a vinyl polymer.  (Tr. 317:5-13, 319:4-5.)  Using that testimony, Torrent contends that the Patents-in-Suit distinguish between three categories of polymers — cellulosic polymers; vinyl polymers, with polyvinyl alcohol as the representative example; and acrylic polymers.  If Torrent is correct, the omission of *polyvinyl alcohol* in the Asserted Claims may prevent Supernus from claiming any vinyl polymer.

But that is neither what Dr. Khan said nor what the specification says.  Dr. Khan was careful not to concede that the list represents "distinct categories" of polymers.  (*See* Tr. 319:6-14.)  Dr. Khan's carefulness makes sense.  The specification's word choice makes clear that when it intends to identify a polymer category, it states a polymer category.  Cellulosic polymers and acrylic polymers are categories of polymers.  Polyvinyl alcohol is not; it is a specific vinyl polymer.  In fact, Dr. Rotella testified that polyvinyl alcohol and polyvinyl acetate are different polymers.  (Tr. 524:22-525:1.)  So construing "polyvinyl alcohol" as representing all vinyl polymers would not only alter the plain text and ignore that the specification treats categories of polymers and specific polymers as different, but also ignore the differences between polyvinyl alcohol and other vinyl polymers.  (*See* Tr. 524:22-525:1 (Rotella) (testifying that polyvinyl alcohol and polyvinyl acetate are "structurally distinct").)  For this specification, polyvinyl alcohol is not a cellulosic polymer or an acrylic polymer.  That's all.

The Court therefore finds that Supernus qualifies for the tangential exception and has rebutted the *Festo* presumption.  As a result, the Court need not address Supernus's argument that "[b]ecause the Asserted Claims do not recite the claim term that was amended in the '931 Application, there is no prosecution history estoppel."  (ECF No. 170 at 36 n.14.)  Nor must the Court address Supernus's preemptive strike against the disclosure-dedication doctrine (*id.* at 36-37), as Torrent did not assert that doctrine in defense.

3.     Equivalence Tests

Having found that Supernus rebutted the presumption of prosecution history estoppel, the Court turns to the issue whether Torrent's ANDA Products infringe under the doctrine of equivalents.

There are two tests for evaluating equivalence.  The first is the "function-way-result," or "FWR," test: "whether the accused product performs 'substantially the same function in substantially the same way to obtain the same result.'"  *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608 (1950)).  The second is the "insubstantial difference" test: "whether the accused product or process is substantially different from what is patented."  *Id.* (citing *Graver Tank*, 339 U.S. at 608).

The Federal Circuit has said that for "non-mechanical" cases involving the "chemical arts," the "[in]substantial differences test may be more suitable than FWR for determining equivalence." *Id.* at 869.  For example, "[h]ow a particular component of a composition, or substituent of a compound, functions in a human or animal body, or in what way, may not be known or even knowable (although, as technology evolves, that may change)."  *Id.* at 867.  In that scenario, the patentee could not prove that each limitation satisfies the FWR test.  Thus, courts must decide which test is "better suited to the particular facts of th[e] case."  *Id.* at 867-70.

a.     *Function-Way-Result Test*

The Court starts with FWR.

**Function.**  Supernus alleges that both polyvinyl acetate and the acrylic polymers listed in the specification "function as release controlling polymers as part of a release controlling coating." (ECF No. 170 at 29 (citing Tr. 276:1-24 (Khan)).)  In support, Supernus first notes how the '989

patent describes the coating: "In one embodiment, the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating)." (PTX058.13 col. 6 ll. 39-42.) This description tells us, as Dr. Khan said, that the function of the coating material is "the release controlling coating polymer." (Tr. 276:17-24.) Supernus then compares the '989 patent specification to Torrent's ANDA, which says the "Pharmaceutical Function" of "Polyvinyl acetate dispersion" is "Release controlling polymer." (PTX106.4.) Dr. Khan testified that the function described in the '989 patent specification and the function disclosed in Torrent's ANDA are "[i]dentical, virtually identical." (Tr. 277:1-13.)

Supernus also asserts that Torrent's own witnesses confirm Dr. Khan's opinion. Dr. Felton "admitted that the function of polyvinyl acetate and 'acrylic polymers' that are expressly listed in the patent specification (e.g., polymethacrylates) 'is to control the release of drug.'" (PFF ¶ 326 (Pl.).) The admission came when Supernus read this excerpt from Dr. Felton's edition of *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*: "The water-insoluble polymers (e.g., ethylcellulose, polyvinyl acetate, neutral or quaternary poly(meth)acrylates) can be applied for controlled drug delivery, especially for prolonged and sustained release." (Tr. 579:6-17 (quoting DTX019 at TORTOP_00127213).) Dr. Felton agreed that these polymers are used "to control the release of drug." (Tr. 579:18-21.) And Yogesh Patel, who oversaw the formulation and development of Torrent's ANDA Products (PFF ¶ 133), testified that Torrent uses polyvinyl acetate as a release-controlling polymer in its ANDA product (Patel Tr. 72:2-12, 75:24-76:5, 77:6-78:14, 169:25-170:8; PTX106.29).

Torrent makes two counterarguments. Torrent first counters that it is not enough that the release controlling coating controls the release of the active ingredient; the coating must do so in

such a way that achieves an 80% drug release at a predetermined period of time. (PFF ¶¶ 231-327 (Def.) (citing Tr. 575:14-22 (Felton)).)[56]  In support, Torrent cites three specification excerpts. First, "[t]he release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population." (ECF No. 171 at 32-33 (quoting '989 patent col. 6 ll. 42-45).)  Second, "wherein the active ingredient is released from the formulation at a sustained rate along a pre-determined release profile." ('989 patent col. 2 ll. 23-25.)  Third, "there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time.  Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve." ('989 patent col. 7 ll. 28-33.)

Based on these excerpts, Torrent asserts that "[a]s the only required element of the extended release components, the recited cellulosic and acrylic polymers['] function is to allow the active ingredient to be 'released from the formulation at a sustained rate along a *pre-determined* release profile.'"  (ECF No. 171 at 32-33 (quoting '989 patent col. 2 ll. 23-25) (emphasis added by Torrent).)  In other words, "the function of the claimed acrylic polymers is to control the release of the active ingredient such that 80 percent of the drug [has been] release[d] at the predetermined period of time."  (PFF ¶¶ 231-327 (Def.) (citing Tr. 573:14-22 (Felton)).)

Torrent argues that Dr. Khan ignored this *pre-determined release profile* aspect of the function.  (ECF No. 171 at 33.)  Instead, Dr. Khan "relied on his personal experience with polymer coatings."  (*Id.*)  In doing so, Torrent asserts, Dr. Khan disregarded that the FWR test "focuses on

---

[56]     Dr. Felton testified that based on "the Court's construction and the context of the patent," she understood the function of the claimed acrylic polymers to be "controlling the release of the active ingredient, the topiramate, . . . in such a way as to achieve a T80, 80 percent drug release at a predetermined period of time."  (Tr. 575:10-19.)

an examination of the claim and the explanation of it found in the written description of the patent." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007) (internal citation and quotation marks omitted).

Torrent next counters that Dr. Khan admitted that many acrylic polymers do not function as he described. (ECF No. 171 at 33 (citing Tr. 373:18-21, 376:10-377:6 (Khan)).) This is problematic, according to Torrent, because although the Asserted Claims recite only *acrylic polymers*, Dr. Khan admittedly excluded "hundreds, or maybe thousands, of acrylic polymers." (*Id.* (citing Tr. 376:10-377:6 (Khan)).)

Supernus contests that "the claimed acrylic polymers must alone function to achieve '80 percent drug release at a predetermined period of time.'" (ECF No. 170 at 30 (quoting Tr. 575:14-19 (Felton)).) Supernus argues that Dr. Felton conflated the function of the *acrylic polymers* with the Court's construction of the *extended release (XR) topiramate-containing component*. (*Id.*) Recall, once more, the Court construed *extended release (XR) topiramate-containing component* to mean "[a] component that releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time." (*Id.* (quoting ECF No. 88 at 33).) Supernus asserts that "[n]either the Court's Markman Order nor the patent specification requires that the 'acrylic polymers'—by themselves—function to achieve 80% drug release in a predetermined period of time." (*Id.*) In fact, Supernus adds, "the specification discloses that the release rate of topiramate is controlled by a combination of factors, including, for example, the 'type and concentration of a pore former' and the 'process parameters.'" (*Id.* (quoting '989 patent col. 7 ll. 13-24).)

The Court agrees with Supernus. At trial, Torrent argued that "there's a relationship between the polymer thickness and the T80 time, the time when the 80 percent releases," and that

84

a POSA "can use that mathematical relationship and determine how to coat their beads and achieve" a "release time . . . of 80 percent of the T80 within the predetermined period of time." (Tr. 369:13-370:3 (rearranged for clarity).) In so arguing, Torrent referenced this part of the specification: "For example, with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve." ('989 patent col. 7 ll. 28-33.)

But as Supernus submits, the acrylic polymers are only part of the relationship. The patent specification discloses that several factors affect the rate of release of topiramate:

> The release-controlling coating is population-specific in the sense that the rate of release of topiramate from every bead population is controlled by at least one parameter of the release controlling coating, such as the nature of the coating, coating level, type and concentration of a pore former, process parameters and combinations thereof. Thus, changing a parameter, such as a pore former concentration, or the conditions of the curing, . . . allows to change the release of topiramate from any given bead population and to selectively adjust the formulation to the pre-determined release profile.
>
> [('989 patent col. 7 ll. 13-24.)]

In addition, although Dr. Khan admittedly excluded many acrylic polymers that function differently, he testified that he excluded ones that "are not used for sustained release." (Tr. 376:20-21.) Indeed, the Asserted Claims require a "sustained release formulation." (*See, e.g.*, '989 patent col. 21 l. 1.)

Thus, the Court finds that the specification coupled with the experts' and Mr. Patel's testimony establish that both polyvinyl acetate and the acrylic polymers listed in the Patents-in-Suit function as release-controlling polymers.

85

***Way.*** Supernus next alleges that "[p]olyvinyl acetate functions in the same way as the polymers listed in the specification—by creating a barrier that controls the entry of aqueous fluid into the coated pellets." (ECF No. 170 at 30 (citing Tr. 277:14-280:2, 280:20-281:11, 279:7-280:2 (Khan); PTX113.3).) According to the *Handbook of Pharmaceutical Excipients*, Eudragit® RL and RS, tradenames of two polymethacrylates, which are exemplary acrylic polymers recited in the Patents-in-Suit, "are used to form water-insoluble film coats for sustained-release products." (PTX115.5.) Consistent with that text, Dr. Khan testified that the acrylic polymers listed in the patent work by forming "a water insoluble film coating on the bead" such that "the drug diffuses out" of the water-insoluble film coating. (PFF ¶ 329 (Pl.) (citing Tr. 278:6-279:6 (Khan); PTX115.5).)

Here, too, Supernus asserts that Torrent's witnesses confirm Dr. Khan's opinion. Supernus says "Dr. Felton admitted that the way both polymethacrylates and polyvinyl acetate function in sustained release formulations is by acting as a 'diffusional barrier[].'" (ECF No. 170 at 31; Tr. 580:2-12 (Felton).) After asking Dr. Felton about the polymers' function, Supernus confronted her with more text from *Aqueous Polymeric Coatings*: "The water-insoluble polymers (e.g., ethylcellulose, *polyvinyl acetate*, neutral or quaternary *poly(meth)acrylates*) . . . are insoluble in the entire gastrointestinal tract and act as a diffusion barrier as long as the coating remains intact. The API is released by a diffusion-controlled mechanism through the polymer film itself (often after swelling) or through pores." (DTX019 at TORTOP_00127213 (emphasis added).) Dr. Felton agreed that this text explained the way in which those polymers work, adding that "[t]hey are diffusional barriers, and that's why they're used as coating materials to control the release of drug." (Tr. 580:2-12.)

Torrent advances a different *way* theory. As it did for the polymers' *function*, Torrent argues that Supernus must show the way in which a POSA achieves the *pre-determined release profiles*. (ECF No. 171 at 33-34.) Torrent asserts that "[t]he patent provides no support to show that the acrylic polymers listed in the patent achieve the results claimed in the patents." (PFF ¶¶ 330-332.) Though not dispositive, Torrent cites no expert testimony in support. Torrent only attacks Dr. Khan's position that "it's not very important" "whether Torrent's ANDA Products obtained . . . any pre-determined target release profile based on modifying the coating thickness in the way described in the patent." (Tr. 367:11-20.)

It is true, as mentioned, that the FWR test focuses on "an examination of the claim and the explanation of it found in the written description of the patent," as well as, "[i]n some cases, the patent's prosecution history." *AquaTex Indus.*, 479 F.3d at 1326, 1328 (quoting *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998)). "But this, of course, does not mean that discussion of the equivalence of the function, way, or result between a claimed invention and an accused product is irrelevant when the claims and specification of a patent are silent on the subject." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007). "When the claims and specification of a patent are silent as to the result of a claim limitation, . . . we should turn to the ordinarily skilled artisan." *Id.*; *see Intendis*, 822 F.3d at 1362 ("We have never held that a patent must spell out a claim element's function, way, and result in order for the doctrine of equivalents to apply as to that element."). In *Intendis*, the Federal Circuit rejected that "a determination of the claimed element's function is limited to a review of the intrinsic record." 822 F.3d at 1362. "The relevant inquiry," the Federal Circuit added, "is what the claim element's function in the claimed composition is to one of skill in the art, and a fact finder may rely on

extrinsic evidence in making this factual determination." *Id.* (citing *Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 (Fed. Cir. 1994)).

In its literal-infringement rebuttal, Torrent argued that the textbook *Aqueous Polymeric Coatings* — on which Supernus relies for the *way* prong — was "reflective of, and consistent with, how a POSA would view the categories of polymers available for use as a release control coating in sustained release formulations." (ECF No. 171 at 8 (citing Tr. 557:17-24 (Felton)).) The literature *Aqueous Polymeric Coatings* is reliable here too. Thus, the Court may use it to determine how a POSA understands the way in which the release-controlling polymers function.

Considering Dr. Khan's and Dr. Felton's testimony and the scientific literature, along with the lack of support for Torrent's argument, the Court finds that both the polyvinyl acetate in Torrent's ANDA Products and the acrylic polymers listed in the specification function in the same way: by creating a barrier that controls the entry of aqueous fluid into the coated pellets.

**Result.** Supernus last alleges that the polyvinyl acetate in Torrent's ANDA Products achieves the same result as the polymers listed in the specification — controlled release of topiramate. (ECF No. 170 at 31; *see* Tr. 280:3-11 (Khan) (testifying that the result is "you control the release of the drug" topiramate).) Once again, Supernus points to Dr. Felton's testimony. After covering the *function* and *way* prongs, Supernus confronted Dr. Felton with one more excerpt from *Aqueous Polymeric Coatings*: "The release rate of the drug can mainly be influenced by the type of polymer, the thickness of the film, and the addition of excipients, such as pore formers." (Tr. 580:17-19 (Felton) (quoting DTX019 at TORTOP_00127213).) Asked if she agreed that "this is the result of how those three polymers" — that is, "ethylcellulose, polyvinyl acetates, neutral or quaternary poly(meth)acrylates" — "are used, being that you can adjust the release rate of the drug," Dr. Felton testified as follows:

88

> I think that's something that a person of ordinary skill would understand, that the release rate of the drug can be influenced by the type of polymer that's used, the thickness, which is how much coating is added to the substrate, and the addition of other excipients, including pore formers.
>
> [(Tr. 580:22-581:4.)]

Satisfied with the *result* prong, the Court concludes that Supernus has provided "particularized testimony and linking argument as to the" function, way, and result of the claimed acrylic polymers and the polyvinyl acetate in Torrent's ANDA products. *AquaTex Indus.*, 479 F.3d at 1328 (quoting *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)).

### b.      Insubstantial Differences Test

The insubstantial-differences test asks "whether the substitute element plays a role substantially different from the claimed element." *Warner-Jenkinson*, 520 U.S. at 40; *see, e.g.*, *Mylan Institutional*, 857 F.3d at 869 ("But the court failed to consider whether the key reagent in the process, manganese dioxide, was *substantially different from* the claimed reagent, silver oxide, and hence whether the substitution for, and omission of, silver oxide left the accused infringer outside of the bounds of the claims."). Here, the issue is whether polyvinyl acetate in Torrent's ANDA Products is substantially different from the claimed acrylic polymers.

Supernus says it is not. Dr. Khan testified that from a pharmaceutical scientist's perspective, the polymers in the Patents-in-Suit and the polyvinyl acetate dispersion in Torrent's ANDA Products are insubstantially different. (Tr. 281:14-24.) To illustrate, Dr. Khan compared polymethacrylate, one of the polymers listed in the patent, to Torrent's polyvinyl acetate:

polyacrylate (i.e., polymethyl acrylate)          polyvinyl acetate

[(PTX195 (left);[57] PTX196 (right).)]

Dr. Khan testified that the two polymers have "very, very close" structures — "[t]hey do not have widely differing structures" — specifically, the same vinyl structure. (Tr. 281:19-21, 286:19-288:1.) He also testified that they have the same biological properties, that they both release drug in the entire gastrointestinal tract, and that they are both used for the same purpose. (Tr. 286:19-288:1.)

Perhaps most telling, Dr. Rotella thrice refused to testify that the two polymers have "widely differing" structures. Asked on direct examination to respond to "Dr. Khan's position that these two molecules" — comparing an acrylic derivative monomer with vinyl acetate — "are nearly identical or don't have widely differing structures," Dr. Rotella testified as follows: "Well, you know, depending on your definition of widely different or not widely different, you might say, well, okay, that's a possibility, but they are different." (Tr. 483:7-13.)

---

[57]    The parties have referred to *polymethacrylate*, *poly acrylate*, and *polymethyl acrylate* interchangeably. (*See* ECF No. 170 at 32 (describing PTX195 as *polymethacrylate* and *polymethyl acrylate*); Tr. 402:12-17 (Khan) (accepting counsel's statement "poly acrylate, i.e., poly methacrylate").)

On cross-examination, Dr. Rotella avoided two more opportunities to testify unequivocally that the structures of polyacrylonitrile, polyvinyl acetate, and polymethyl acrylate are widely differing:

> MR. KURZ (ATTORNEY FOR SUPERNUS).  And just so I'm clear on your testimony, because I remember your counsel brought up whether these are widely differing structures or at least two of the structures on the screen are widely differing.  And is it your testimony that these three have widely differing structures?
>
> DR. ROTELLA.  I would say that these three structures are different.  And I would also repeat what I said previously that the one on the left and the one on the far right are representatives of acrylic polymers.  The structures are clearly different from each other.  And as I have stated previously, the polymer derived from acrylonitrile and the polymer derived from methyl acrylate are representative examples of acrylic polymers.  The polymer in the middle derived from vinyl acetate is not, because of those structural differences.
>
> Q.  Okay.  And just so the record is clear, is it your opinion that these are widely differing structures?
>
> A.  I said that they are different structures.
>
> [(Tr. 511:24-512:15 (referencing PTX198).)]

During his examination, Dr. Rotella implored the Court to "[b]elieve your eyes, because they're right."  (Tr. 460:6-7, 471:12-13, 480:6-7.)  The Court finds that these structures are not widely differing, and Dr. Rotella's reluctance to testify otherwise further supports that the structures' differences are insubstantial.  Because the structural differences between polyvinyl acetate and the claimed acrylic polymers are insubstantial, and because the polymers pass the FWR test, the Court concludes that Torrent's use of polyvinyl acetate in its ANDA Products infringes the Asserted Claims under the doctrine of equivalents.

91

C.      **Invalidity**

A patent is presumed valid.  35 U.S.C. § 282(a).  The party asserting invalidity of a patent or claim bears the burden of establishing its invalidity.  *Id.*  Rebutting the validity presumption requires clear and convincing evidence of invalidity.  *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) (citing 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)).  "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'"  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).  This is a "high burden of proof created by the necessary deference to the PTO."  *Sciele*, 684 F.3d at 1260.  To be sure, the burden does not require "extremely clear and convincing evidence" or "crystal clear and convincing evidence."  *Id.*

1.      <u>Enablement</u>

A patent is invalid if it cannot enable a POSA to "make and use" the claimed invention. 35 U.S.C. § 112(a).  To win on a lack of enablement theory, "a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'"  *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (citing *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)); *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) ("To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." (citations omitted)).

"[A]n enablement determination is made retrospectively, *i.e.*, by looking back to the filing date of the patent application and determining whether undue experimentation would have been required to make and use the claimed invention at that time."  *Enzo Biochem, Inc. v. Calgene, Inc.*,

188 F.3d 1362, 1371-72 (Fed. Cir. 1999). To determine if experimentation is "undue," courts consider the so-called *Wands* factors:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.
>
> [*Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (quoting *Wands*, 858 F.2d at 737)[58]]

A reasonable amount of routine experimentation is permissive. *ALZA*, 603 F.3d at 940.

Torrent submits that for the Patents-in-Suit "to be enabled for the full scope of the claims, a POSA must be able to make and use formulations of topiramate that achieve the appropriate 'predetermined release rate' for" the "incredibly broad variety of conditions" that the claims-covered formulations intend to treat. (ECF No. 171 at 36-37.) Yet for claims so broad and an invention so complex, Torrent argues, the Patents-in-Suit teach too little. Torrent first argues that the patents claim a "near infinite number of formulations" yet give examples of only seven formulations. (*Id.* at 37; PFF ¶ 467 (Def.).) Next, the patents do not disclose the exact dissolution methodology that Supernus used. (ECF No. 171 at 38.) Finally, the patents lack "any connection between the formulations of the two critical example[s], Examples 1 and 6." (*Id.* (citing Tr. 598:13-17 (Felton)).)

The Court will discuss each of Torrent's challenges and the *Wands* factors it implicates.

---

[58]     "[I]t is not necessary that a court review all the *Wands* factors to find a disclosure enabling. They are illustrative, not mandatory." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (quoting *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991)).

### a.    Seven examples for infinite formulations

Torrent's first challenge implicates the *breadth of the claims* and *amount of direction presented* factors.  Torrent argues that the Patents-in-Suit do not provide enough information to teach what they claim.  For its part, Torrent first relies on remarks from the prosecution of the '475 application that led to a patent not in suit.  The applicants remarked that "the number of possible populations of beads available to the pharmacologist is near infinite."   (DTX015 at 29.) Confronted with these remarks at trial, Supernus's witness Padmanabh Bhatt, Ph.D., a founding executive of Supernus and one inventor of the Patents-in-Suit, testified that the remarks meant that "we can make literally hundreds and thousands of formulations," and "[i]t can take years and years to do that."  (PFF ¶¶ 124, 126-128; Tr. 134:3-9.)  Dr. Bhatt testified that they "could have done hundreds, if not thousands, of examples for table 1," though they disclosed only seven.  (Tr. 126:15-21, 135:6-14.)[59]  Thus, Torrent argues that there is a "disconnect between what the asserted patents claim (near infinite number of formulations) and what the asserted patents actually teach (7 formulations)."  (ECF No. 171 at 37.)

In further support, Torrent cites testimony of Dr. Felton, who felt that "the breadth of the claims is quite large," also highlighting the "near infinite" remark.  (Tr. 608:11-14; DTX015 at 29.)  Dr. Felton testified that there are "numerous different types of polymers that are acrylic polymers, and there's also a number of cellulosic polymers," and that there are "a lot of different polymers that could be used to coat the beads in order to get the desired release profiles of those beads."  (Tr. 609:16-22.)  "And within each of the polymers," she added, "there's different weight

---

[59]    In its invalidity discussion, the Court cites Dr. Bhatt's factual, nonexpert testimony only as to his personal knowledge of "the claimed invention and its development."  *Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1340 (Fed. Cir. 2010) (citing *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999)).

gains, there's different plasticizers and other excipients that might be added to the coatings to get them to adhere to the dosage form and function like they're supposed to." (Tr. 609:23-610:1.)

Supernus calls Torrent's "near infinite" argument misleading and taken out of context. (ECF No. 170 at 46.) The Court agrees. The remark concerned claims in an application for a familial patent that is indisputably not asserted or even "directly related in this case." (ECF No. 170 at 46 (citing PFF ¶¶ 396, 467); Tr. 620:23-621:2 (Felton).) That application is not useful here, as its claims differ from those at issue in a meaningful way. The '475 application remark relates to claims that recite specific combination-ratios of multi-bead formulations (ECF No. 170 at 37 (citing PFF ¶¶ 396, 467; Tr. 621:13-16, 621:25-622:7, 622:21-23, 623:16-24 (Felton); DTX015 at 13, 23-24, 29)), as opposed to single-bead formulations, which the Patents-in-Suit describe (PFF ¶¶ 396, 410-411, 445, 448-449, 457-458, 462, 493-494, 501-502, 506, 512 (Pl.)). In fact, the claims' only single-bead formulation, designated as Formulation 7, had been crossed out. (DTX015 at 13, 23-24; Tr. 621:17-62324.)

By contrast, Formulation 7 in Example 6 of the '989 patent discloses a sustained-release formulation that contains only one population of extended-release beads. ('989 patent Table 5.) Example 6 also reports the in-vivo pharmacokinetic testing of three single-bead populations, designated as XR1, XR2, and XR3, with the data for each bead's population reported in Figure 3. (ECF No. 170 at 41; '989 patent Fig. 3, Example 6.) The Patents-in-Suit's description of single-bead formulations makes the unrelated application and its remarks less meaningful here.

In addition, the remark was part of a disagreement over the claims' obviousness, not its enablement or written description. In making the remark, the applicants stated that they were responding to the examiner's allegation that "the release-profile is considered a result-effective variable which is obvious to optimize . . . with a combination of independent pellet populations

which release topiramate at different layers." (DTX015 at 29, SUPTXR0002277.)  The applicants then remarked in relevant part as follows:

> [T]he Examiner has not explained what would have guided the ordinary artisan to specifically select the bead populations as identified in items 1-3 of claims 34 and 92.  Indeed, . . . there is no teaching in the art that would have led the ordinary artisan to the *populations* of beads *per se* identified by the present inventors.
>
> [(DTX015 at 29.)]

In this context, the "near infinite" remark addressed allegations of obviousness — it did not relate to the claims' scope.

For these reasons, the Court does not give weight to the "near infinite" remark.  This challenge does not support a non-enablement finding.

### b.  *Dissolution test methodology*

Torrent's next challenge implicates the *amount of direction presented*, *relative skill of a POSA*, and *predictability of the art* factors.  There is no dispute that the Patents-in-Suit do not disclose the inventors' exact dissolution methodology.  The issue is whether they needed to disclose it for enablement.

As a rule, "a patent need not teach, and preferably omits, what is well known in the art." *Streck*, 665 F.3d at 1288 (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986)).  That rule, however, is "merely a rule of supplementation, not a substitute for a basic enabling disclosure."  *ALZA*, 603 F.3d at 940-41 (quoting *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1283 (Fed. Cir. 2007)).  Indeed, "the specification, not the knowledge of those skilled in the art, 'must supply the novel aspects of an invention' to satisfy the enablement requirement."  *Streck*, 665 F.3d at 1289 (quoting *Auto. Techs.*, 501 F.3d at 1283).

96

Torrent argues that the patents needed to disclose the exact dissolution methodology. Dr. Felton testified that if a POSA does not use the "exact same methodology" as the one used in the patent, the POSA's $T_{80\%}$ results will be "meaningless in reference to this patent," because "it would be like comparing apples and oranges." (Tr. 602:20-603:5.) Without that information, Dr. Felton continued, a POSA "would have to conduct the equivalent of a clinical trial," which "is a huge undertaking, and certainly more than routine experimentation." (Tr. 610:18-21.)

Dr. Felton testified that she found only "one small[,] generalized statement about the dissolution methodology" in the specification:

> The release rates referred to herein are determined by placing a dosage form to be tested in a medium[60] in an appropriate dissolution bath. Aliquots of the medium, collected at pre-set intervals, are then injected into a chromatographic system fitted with an appropriate detector to quantify the amounts of drug released during the testing intervals."

[(Tr. 601:12-602:7; '989 patent col. 3 ll. 65-67, col. 4 ll. 1-3.)]

Dr. Felton testified that this statement does not say "what dissolution methodology was used" or "what type of equipment to use." (Tr. 602:8-11.) Although "[t]here's a number of different standardized pieces of equipment that are used for dissolution testing," Dr. Felton added, "that's not disclosed here, so I don't know which is used." (Tr. 602:11-13.) "So while the person of ordinary skill is familiar with the dissolution test and could recreate his or her own test," Dr. Felton concluded, "if they're not using the exact same methodology, they're not going to get an equivalent T80 to be able to compare." (Tr. 602:20-24.)

Dr. Bhatt agreed that the Patents-in-Suit disclose "no specific information about the parameters or the equipment that's used in order to generate data." (Tr. 118:8-11.) But Dr. Bhatt

---

60      The *medium* is "the liquid that we're going to put the product in." (Tr. 602:2-3 (Felton).)

insisted that they did not need to include specific information; it is enough to say that the methodology "was a dissolution study." (Tr. 110:23-24.)  This is because the standard dissolution methodologies are publicly available.  The United States Pharmacopeia (USP) publishes guidance on the dissolution apparatuses and media to use for a given purpose.  Dr. Bhatt described USP as "a standard reference book for conducting testing of pharmaceutical products." (Tr. 110:16-18.) "For solid dosage forms," Dr. Bhatt testified, the guidance "detail[s] USP dissolution bath number two apparatus as a standard dissolution testing in vitro testing method." (Tr. 109:11-16.)  The FDA also publishes guidance on how to test extended-release products.  (Tr. 110:19-20.)  So pharmaceutical scientists doing formulation development, including testing formulations in vitro, know to visit USP and FDA guidance.  (Tr. 109:5-110:24.)

Echoing Dr. Bhatt, Dr. Khan testified that for dissolution methodology, "[e]verybody knows [to] go to USP." (Tr. 634:20-21.)  In fact, there are only seven approved USP methods, and "most of them use USP apparatus one or apparatus two, because others are used for other purposes, not for tablets and capsules." (Tr. 634:11-635:5.)  Even his "simple laboratory" has "full dissolution equipment." (Tr. 634:16-18.)  Dr. Khan also testified that the "FDA routinely publishes . . . product-specific guidance," including a "topiramate dissolution method." (Tr. 635:10-14.)  And if a method is not available, "sponsors submit a controlled correspondence to FDA," requesting "a method for dissolution." (Tr. 635:14-22.)

For reasons discussed after further factfinding below, the Court finds that Torrent did not meet its burden to prove that the Patents-in-Suit needed to describe the inventors' exact dissolution methodology.

c.      *Connection between Examples 1 and 6*

Torrent's final challenge implicates the *quantity of experimentation*, *amount of direction presented*, *working examples*, *relative skill of a POSA*, and *predictability of the art* factors.  Torrent argues that there is no connection between Example 1's and Example 6's bead formulations.  (ECF No. 171 at 38 (citing Tr. 598:13-17 (Felton)).)  Example 1, Table 1, lists three XR1 beads (XR1a, XR1b, XR1c), four XR2 beads (XR2a, XR2b, XR2c, XR2d), and one bead each for XR3 to XR8.  ('989 patent Table 1; Tr. 597:22-598:1 (Felton).)   Dr. Felton testified that she "could not understand how the compositions in table 1 related to" Example 6, which lists only three beads, designated as XR1, XR2, and XR3, and does not state their compositions.  (Tr. 598:8-12, 606:22-607:3, 610:15-18; '989 patent col. 18 l. 26.)  So Dr. Felton concluded that "the examples in table 1 do not correspond at all to examples in example 6."  (Tr. 598:13-14.)  She opined that without that connecting information, a POSA "would have to test the product in vivo.  They would have to create beads, test them in vivo.  It would be like an entire drug development project, a huge undertaking."  (Tr. 603:23-604:4.)

No one disputes that none of the 13 exemplary beads in Table 1 directly corresponds to any of the three beads designated as XR1, XR2, and XR3 in Example 6.  Rather, Supernus argues that "[b]ased on the teachings in Example 1 and Figures 1 and 2, a POSA would have understood how to make XR formulations that match the parameters listed in Example 6 to achieve Tmax . . . in vivo at 16 or more hours after a single initial dose."  (PFF ¶ 444 (Pl.).)

The Court analyzes the specification to determine whether a POSA would draw a connection between Examples 1 and 6.

Along with describing several embodiments, the specification describes a multi-step method of preparing bead formulations:

The current invention additionally encompasses a method of preparing formulations of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile.   The method comprises the following steps:

    1.  determining the desired release profile;

    2.  determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

    3.  incorporating the specified amounts of the components into the formulation.

[('989 patent col. 11 ll. 25-36.)]

Example 1, titled *Extended Release Beads Preparation*, teaches how to prepare the beads contained in the product capsule.  ('989 patent col. 14 l. 15; Tr. 61:21-62:23 (Bhatt).)  Relevant here, the disclosure teaches the "Coating of the Core with a Release Controlling Coating."  ('989 patent col. 14 l. 33.)  To that end, Table 1, titled *Composition and process parameters for the extended Release*, exemplifies 13 different beads that Supernus developed and designated as follows: XR1a, XR1b, XR1c, XR2a, XR2b, XR2c, XR2d, XR3, XR4, XR5, XR6, XR7, and XR8. (*See* '989 patent Table 1, col. 14 ll. 40-43 ("The release controlling coating dispersion is sprayed onto the bed to evenly coat the core to a desired coating level as exemplified in Table 1."); Tr. 63:7-11, 64:19-23 (Bhatt).)

100

TABLE 1

Composition and process Parameters for the extended Release

| | XR1a | XR1b | XR1c | XR2a | XR2b | XR2c | XR2d |
|---|---|---|---|---|---|---|---|
| RC* coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) |
| Pore-former RC coating material to pore-former ratio | — | — | Opadry ® Clear 80:20 | — | — | Opadry ® Clear 60:20 | Opadry ® Clear 80:20 |
| RC coating level | 2% | 4% | 3% | 3% | 3% | 6.5% | 6.5% |
| Product temperature during coating | 20° C.-50° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-50° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-seal material | — | Opadry ® AMB White | Opadry ® AMB White | — | Opadry ® AMB White | — | Opadry ® AMB White |
| Over-seal coating level | — | 1.5% | 1.5% | — | 1.5% | — | 1.5% |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven |

TABLE 1-continued

Composition and process Parameters for the extended Release

| | | Topiramate Beads | | | | |
|---|---|---|---|---|---|---|
| | XR3 | XR4 | XR5 | XR6 | XR7 | XR8 |
| RC coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Acrylic polymers (Eudragit ® RL30D/RS30D) |
| Pore-former | — | Cellulosic polymers (Opadry ® Clear) 80:20 | Cellulosic polymers (Opadry ® Clear) 80:20 | Cellulosic polymers (Opadry ® Clear) 80:20 | Cellulosic polymers (Opadry ® Clear) 85:15 | — |
| RC coating material to pore-former ratio | | | | | | |
| RC coating level | 3.7% | 3.1% | 3.2% | 9.5% | 15% | 15% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | — | — | — | — | — |
| Over-coat coating level | — | — | — | — | — | — |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, fluid bed/ 5% alcohol-water, or oven | Fluid bed/ water, fluid bed/ 5% alcohol-water, or oven |

*RC—Release Controlling

[('989 patent Table 1.)]

In each bead's column, the top row discloses the name of the release-controlling polymer, or "RC coating material," sprayed onto that bead. All but one bead uses ethylcellulose. ('989 patent Table 1; Tr. 598:3-7 (Felton).) The one bead, XR8, uses an acrylic-polymer combination of Eudragit® RL 30 D and RS 30 D. ('989 patent Table 1; Tr. 598:3-5 (Felton).) Some beads also use a "pore former," which helps speed up the drug's release.[61] (Tr. 66:15-67:15 (Bhatt).) If the bead uses a pore former, the second and third rows disclose the pore former's name and the ratio of the RC coating material to the pore former. ('989 patent Table 1; Tr. 63:23-64:3 (Bhatt).)

---

[61]     For examples of suitable pore formers, see '989 patent col. 7 ll. 48-67.

101

The fourth row shows the bead's *RC coating level*, which discloses how much RC coating material to use relative to the bead's total weight.  (Tr. 74:4-9 (Bhatt).)  The fifth row, *Product temperature during coating*, discloses the temperature of air flowing through the equipment as the beads are coated.  (Tr. 74:14-24 (Bhatt); *see* '989 patent col. 14 ll. 31-33 ("Inlet airflow rate and product temperature are adjusted to keep the batch from spray-drying the coating material or over-wetting the spheres.").)  The sixth and seventh rows, *Over-coat material* and *Over-coat coating level*, respectively, disclose the "nonfunctional coating" that rounds and smoothens the bead's surface "so that the beads can then be easily filled into a capsule."  (Tr. 74:25-75:12 (Bhatt).)[62]

The bottom row, *Curing method*, discloses the equipment used for curing.  (Tr. 75:17-78:3 (Bhatt).)  More details on the curing process are provided in Example 5.  ('989 patent col. 17 ll. 45-67, col. 18 ll. 1-10; Tr. 78:5-19 (Bhatt).)  Example 5 discloses, for instance, "assisting solvents" that "dramatically reduce[] the curing time necessary to produce a desired release profile and a level of stability" from "up to two weeks" to "several hours."  ('989 patent col. 11 ll. 58-67; *see* '989 patent col. 13 ll. 1-6 ("In most instances, less than 4 hours of solvent-assisted curing resulted in more complete curing of the extended release dosage forms than 2 weeks of heat-only oven curing of the same dosage forms.").)

Dr. Bhatt testified that Table 1 does not describe every detail, as some details are known in the art.  (Tr. 65:4-8.)  Dr. Felton did not take issue with Example 1 and Table 1; she understood them just fine.  (*See* Tr. 607:5-8 (Felton) ("So, in example 1, we saw that the inventors disclosed how to make compositions.  But the person of ordinary skill knew how to make and coat beads.  So that's not what's novel.").)  Her issue remained that the 13 beads in Table 1 "don't relate at all to what's shown in example 6."  (Tr. 607:12-14 (Felton).)

---

[62]     For more information on overcoats, see '989 patent col. 8 ll. 4-13.

102

Example 6, titled *Sustained Release Formulations of Topiramate*, "gives a plan of study for the human subjects" to see how formulations "perform in the body in vivo." ('989 patent Example 6; Tr. 79:10-11, 80:8-9 (Bhatt).) Example 6 describes the inventors' "6-way crossover study," where volunteers underwent six stages of testing, receiving a different bead each stage so that every volunteer receives every bead over the course of the study. ('989 patent col. 18 l. 23; Tr. 79:10-80:2 (Bhatt); PFF ¶ 443 (Pl.).) The study included administration of "three extended release compositions, designated here" — in Example 6 — as XR1, XR2 and XR3," each representing a single-bead formulation. ('989 patent col. 18 ll. 24-30; Tr. 80:22-25 (Bhatt).) The study also included administration of "two immediate release compositions ((Topamax®, Ortho-McNeil Neurologics, Inc.) (25 mg BID), and an immediate release bead formulation) and an enhanced immediate release (IR) bead composition." ('989 patent col. 18 ll. 26-30.) Data from the Example 6 in-vivo study are shown in Figures 3 and 4. (*See* '989 patent col. 18 ll. 30-33 (referencing Figures 3 and 4).)

Figure 3 shows the "single dose topiramate plasma concentration profiles for XR1, XR2 and XR3." ('989 patent Fig. 3, col. 4 ll. 53-54, col. 18 ll. 30-31; Tr. 82:19-22 (Bhatt).) Each bead has its own data-curve. The X axis is time in hours over 72 hours starting from the participant's swallowing the capsule, and the Y axis is the plasma concentration of topiramate at different times over 72 hours. (Tr. 83:3-20 (Bhatt); Tr. 167:24-168:1 (Taft).) The apex of each bead's curve reflects that bead's $T_{max}$. (Tr. 84:2-3 (Bhatt).) For XR2 and XR3 each, the $T_{max}$ is about 25 hours, which is "obviously greater than 16 hours," as the Asserted Claims require. (Tr. 85:1-5 (Bhatt); '989 patent col. 21 ll. 33-35.)

103



[('989 patent Fig. 3.)]

Figure 4 also shows topiramate plasma concentration profiles, this time for the IR formulations — two of Supernus's IR beads and, as the control formulation, Topamax. ('989 patent Fig. 4, col. 4 ll. 55-56, col. 18 ll. 31-33; Tr. 85:6-25 (Bhatt).)



[('989 patent Fig. 4.)]

Circling back, Example 6 further states,

The extended release populations XR1, XR2 and XR3, and an immediate release (IR) population are selected in such a way as to be defined by at least one of the three following sets of conditions:

1. for the steady state,
for XR1, $1.70C_{maxIR} >= C_{maxXR1} >= 1.30C_{maxIR}$
for XR2, $0.40C_{maxIR} >= C_{maxXR2} >= 0.20C_{maxIR}$
for XR3, $0.25C_{maxIR} >= C_{maxXR3} >= 0.05C_{maxIR}$

2. for in-vitro dissolution,
for XR1, $1.5\ h <= T_{80\%} <= 4\ h$
for XR2, $5\ h <= T_{80\%} <= 8\ h$
for XR3, $8\ h < T_{80\%} <= 10\ h$

3. for a single initial dose in-vivo,
for XR1, $4\ h <= T_{max} <= 8.5\ h$
for XR2, $T_{max} >= 16\ h$
for XR3, $T_{max} >= 16\ h$.

105

[('989 patent col. 18 ll. 36-55.)]

Dr. Felton understood these conditions. She confirmed that "for in-vitro dissolution," "the desire is that the XR1 needs to have a T80 of between 1.5 and four" hours; the XR2 bead, "a T80 of between five and eight hours"; and the XR3 bead, "greater than eight hours or equal to or less than ten hours." (Tr. 617:11-618:8; PFF ¶ 454 (Pl.).) Though emphasizing that the inventors' exact dissolution methodology is critical, Dr. Felton agreed that regardless of the methodology, the conditions dictate that "the XR2 dissolution for T80 is slower than the XR1 dissolution" and faster than the XR3 dissolution. (Tr. 619:7-620:2.) But still, Dr. Felton's issue was that she could find "no data in here that . . . say what the XR1 is or that that XR1 had that dissolution data that met this criteria." (Tr. 617:21-23.)

Both sides agree that a POSA would conduct in-vitro dissolution testing before in-vivo testing. (See Tr. 600:11-16 (Felton) ("I don't want to go to a clinical test until I've tested something in the lab."); Tr. 79:4-9 (Bhatt) (testifying that the process requires testing formulations in vitro to identify formulations for human clinical study).) They also agree that in-vitro dissolution testing is relatively simple. (See Tr. 600:1-5 (Felton) (testifying that the "in-vitro dissolution" test "just means testing the drug and measuring the release of the drug in a beaker," which involves "a lot of parameters" but is "the simplest test"); Tr. 620:11-15 (Felton) (agreeing that "develop[ing] a dissolution test, coat[ing] beads with different weight gains, conduct[ing] the dissolution test, and analyz[ing] the data" "would be normal, everyday skills that a POSA could do"); Tr. 634:11-636:8 (Khan) (testifying that in-vitro dissolution testing is "very standard" and "very routine").) Therefore, the Court finds that the specification provides enough direction for a POSA to understand that to carry out Example 6, the POSA must first identify beads that meet the $T_{80\%}$ conditions "for in-vitro dissolution."

106

Figures 1 and 2 of the Patents-in-Suit show the results of in-vitro dissolution testing. ('989 patent Fig. 1, Fig. 2; *see* '989 patent col. 4 ll. 47-52 (describing Figures 1 and 2 as showing "the time of release of 80% of the drug vs. % wt. gain of release controlling coating for" specific "coated extended release beads"); '989 patent col. 7 ll. 28-45 (describing Figures 1 and 2 as "in-vitro dissolution test[s]").)

Figure 1 graphs the results of in-vitro experiments calculating how long it took for 80% of topiramate to release from three different sets of beads, each coated with Surelease® ethylcellulose in varying thickness, into the dissolution media. ('989 patent Fig. 1; Tr. 68:22-12 (Bhatt).) In simpler terms, the test measured how fast topiramate released from the beads and dissolved in surrounding liquid, depending on how much Surelease® RC coating was on the beads. When plotted in log scale, which is used to scale down data that increase exponentially, the datapoints formed a nearly straight line sloping upward. (Tr. 69:16-19, 71:19-72:2 (Bhatt).)



Fig.1

80% release time vs. %Wt. gain of Release-Controlling Coating

For Surelease® coated Extended Release Beads

[('989 patent Fig. 1.)]

Figure 2 shows the results of other in-vitro experiments like Figure 1's but with a few differences. ('989 patent Fig. 2.) First, the beads were coated with ethylcellulose along with a pore former. (Tr. 72:6-9 (Bhatt); *see* Tr. 661:3-5 (Khan) ("That's the difference between figure 1 and Figure 2. One of them has pore former and the other one doesn't have a pore former.").) Second, the Y axis reflects time in hours, but it is not converted into a log scale. (Tr. 72:11-15 (Bhatt); *see* Tr. 661:5-6 (Khan) ("So one is log relationship. The other one is non-log relationship.").) Finally, Figure 1 plots three datapoints, whereas Figure 2 plots four datapoints. (Tr. 72:22-23 (Bhatt).) But as in Figure 1, Figure 2's datapoints form a nearly straight line sloping upward. (Tr. 72:16-21 (Bhatt).) Dr. Felton understood that Figure 2 "is a summary of the dissolution data" for "four different release-controlling coating weight gains," estimating that "the

108

individual dissolution data was probably plotted, and the T80, the time for 80 percent release, was then calculated."  (Tr. 615:20-616:8.)



Fig. 2

80% release time vs. % Wt. gain of Release-Controlling Coating

For Sureloase®/ Opadry® coated Extended Release Beads

[('989 patent Fig. 2.)]

Both figures have equations representing the slope formula of the datapoints.  The closer $R^2$ is to 1.0, the straighter the line.  (Tr. 70:9-16 (Bhatt).)  The nearly straight lines in both figures reflect the linear co-relationship between RC coating thickness and release time: the thicker the RC coating, the longer it takes to release 80% of the drug.  (Tr. 69:19-21, 70:9-16 (Bhatt); see Tr. 616:9-14 (Felton) ("The higher the amount of polymer that was applied, the longer it took to get to the T80.").)  Indeed, the specification refers to Figures 1 and 2 as exemplifying that, "with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time."  ('989 patent col. 7 ll. 28-47.)

109

Appx240

Critical in these experiments, the only parameter varying between the beads was the amount of RC coating. (Tr. 70:22-71:15 (Bhatt); Tr. 653:21-654:5 (Khan).) Thus, Supernus says, a POSA can use the linear equation to find the $T_{80\%}$ of any amount of coating along the line. (Tr. 73:3-14 (Bhatt).)

The parties disagree about the usefulness of the figures' exemplifying the linear co-relationship. The disagreement manifested during a late-trial objection, which the Court will now resolve.

On the invalidity issue, the parties agreed to present evidence in the following order: Torrent calls Dr. Felton in its case-in-chief, Supernus calls Dr. Khan in rebuttal, and Torrent recalls Dr. Felton in reply. (ECF No. 133 ¶ 506.) During Torrent's case-in-chief, when Dr. Felton opined on the disconnect between Examples 1 and 6, she specifically mentioned the "mathematical models" in Figures 1 and 2 as follows:

> MR. SUNG (ATTORNEY FOR TORRENT). And in addition to the lack of that information, was there anything else that you found in your analysis?
>
> DR. FELTON. Well, there's other -- there's some other things related to the mathematical models that are used in figures 1 and 2. And the patent makes clear that those mathematical models which would allow a person of ordinary skill to predict how much coating I would need to apply to achieve a specific T80, those mathematical relationships don't hold for all of the compositions. So a person of ordinary skill would have to recreate, again, recreate these types of mathematical models. But again, without the dissolution methodology that was used, finding a T80 using these mathematical models is meaningless.
>
> [(Tr. 603:06-18.)]

At that time, Dr. Felton did not elaborate on her opinion that "those mathematical relationships don't hold for all of the compositions." In Supernus's rebuttal, Dr. Khan explained step by step how a POSA would use the patent to arrive at the formulations described in the

110

Asserted Claims, once mentioning that "all the information is there very easily." (*See generally* Tr. 637:7-646:3.) In reply, Torrent presented — for the first time — a demonstrative exhibit showing Dr. Felton's failed attempt at using the mathematical equation in Figure 1 to predict the $T_{80\%}$ of five exemplary beads from Table 1. (Tr. 679:4-681:5.) The demonstrative was in Dr. Felton's binder of direct-examination exhibits, though it was not referenced in Torrent's case-in-chief.

Supernus objected, arguing that Dr. Felton's calculations went to the heart of Torrent's case-in-chief. (Tr. 681:6-682:13.) Torrent countered that it "opted not to do this on direct," but that Dr. Felton's calculations rebutted Dr. Khan's opinion "that someone could easily follow from example 1 to example 6, and that it was simple for a POSA to be able to go through the entire patent." (Tr. 681:13-16, 682:14-22, 683:12-17, 688:3-21.) Torrent told the Court that Dr. Khan's rebuttal testimony was "the first time that he ha[d] provided information from his perspective," and that "prior to that point during the trial proceedings, there was no information that Dr. Khan was going to say that a person of ordinary skill in the art could easily walk from example 1 to example 6." (Tr. 683:21-684:1.) Supernus responded that Torrent's representation was verifiably inaccurate based on Dr. Khan's expert report and deposition, Torrent's preparation and disclosure of the demonstrative in advance, and Supernus's pretrial disclosure of "the exhibits and everything we would be using on direct with Dr. Khan." (Tr. 684:8-16.)

For expediency, the Court let Torrent finish questioning Dr. Felton about her calculations and let Supernus recall Dr. Khan in another rebuttal, reserving on both Supernus's objection to Torrent's reply-examination and Torrent's subsequent objection to the Court's modifying the order of evidence presentation. (Tr. 700:9-701:21.)

The spirit of the federal rules on rebuttal testimony applies to Torrent's reply-examination. The "purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party." *Vay v. Huston*, 725 F. App'x 112, 116 (3d Cir. 2018) (quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). "At trial, rebuttal evidence is limited 'to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief.'" *Crowley v. Chait*, 322 F. Supp. 2d 530, 550 (D.N.J. 2004) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 752 F. Supp. 181, 193 (E.D. Pa. 1990), *aff'd in part, rev'd in part on other grounds*, 939 F.2d 91 (3d Cir. 1991)). It is not "an opportunity for the correction of any oversights in the [party-proponent]'s case in chief." *Smithkline Beecham Corp. v. Ranbaxy Lab'ys, LTD.*, Civ. No. 03-2158, 2006 WL 8459047, at *4 (D.N.J. Feb. 23, 2006) (quoting *Crowley*, 322 F. Supp. 2d at 551). "[E]vidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected, so as to avoid prejudice to the [party-opponent] and to ensure the orderly presentation of proof." *Vay*, 725 F. App'x at 117 (quoting *Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d 19, 22 (3d Cir. 1984)).

The Court finds that Dr. Felton's calculations exceeded the purpose of Torrent's reply. The notion that Torrent could not anticipate, or that "there was no information" suggesting, what Dr. Khan would testify as to the connection between Examples 1 and 6 is undermined by the record. Dr. Khan's opinion was no surprise. Before trial, Torrent was on notice that Dr. Khan would testify that the specification (1) "teaches a POSA how to make and use the claimed inventions," citing Example 1, and (2) "provides clear guidance on how to create sustained release formulations containing one or more XR components that deliver topiramate with the claimed pharmacokinetic parameters," citing Example 6. (ECF No. 139 at 25-26.) That Dr. Khan used the word *easily* changes nothing.

112

What's more, Dr. Felton's calculations are not purposed merely to rebut Dr. Khan's testimony.  They are the entire basis for her opinion that "those mathematical relationships don't hold for all of the compositions" — which Torrent elicited in its case-in-chief.  The "punchline," Torrent argued, was that "based on the calculations from Dr. Felton, only one example of the 13 [beads] that are in table 1 . . . even fits example 6.  And as a result of that, even the examples that [Supernus] points to as supporting their written description or enablement begins to collapse." (Tr. 688:6-14.)  In other words, Dr. Felton's calculations are the proof that undermines the usefulness of the Patents-in-Suit's examples and thus their enablement and written description.  It was the "sum and substance of the evidence" that Torrent presented in its case-in-chief on invalidity. *Step-Saver*, 752 F. Supp. at 193.

Contrary to Dr. Felton's suggestion in her reply testimony, the equations in Figures 1 and 2 are not meant to apply universally to all 13 beads in Table 1.  Indeed, changing an in-vitro dissolution parameter — namely, the RC coating material or pore former — would make "a similar graph, but the equation, the slope of the line will be different."  (Tr. 71:10-15 (Bhatt); *see* Tr. 659:18-660:3 (Khan) (testifying that changing the polymer will change the slope and intercept value but not the relationship).)  In Supernus's surrebuttal, Dr. Khan testified that Dr. Felton had "taken a bead population that probably is belonging to that log population" in Figure 1 and "try[ed] to fit [it] into a non-log.  So obviously those numbers will look very, very high."  (Tr. 706:15-19.)  Dr. Felton's "fundamental problem," as Dr. Khan put it, was that she tried to apply "the equation and the data" for one bead population to all 13 exemplary beads.  (Tr. 706:20-25.)  But in fact, each of the 13 exemplary beads requires its own set of in-vitro dissolution experiments.  (*See* Tr. 704:25-705:4 (Khan) ("Each one of the columns [in Table 1] that we have, . . . we have to perform

an experiment, that different coating thicknesses.  Each one of them [is] different.  So you can perform experiment for column one, get that, column two.").

Thus, the takeaway from Figures 1 and 2 is not their particular datapoints or slope formula.  Nor is it that a POSA could plug data from other experiments into the figures' equations to calculate other formulations' release times.  It is that they exemplify (1) how to analyze in-vitro dissolution data to find beads' $T_{80\%}$, and (2) that the RC coating thickness or the presence of pore formers correlates with release time.  So although many variables affect release time, the Patents-in-Suit teach that to modulate release time, a POSA need only modulate the amount of RC coating or use of a pore former, leaving all other parameters equal.

Based on the Patents-in-Suit's direction and evidence of a POSA's skillset, the Court draws the connection between Examples 1 and 6 as follows.  Example 1 teaches how to prepare the beads.  Figures 1 and 2 show that a POSA can modulate thickness of an RC coating material or a pore former to achieve a $T_{80\%}$ that meets the conditions "for in-vitro dissolution" in Example 6.  Upon completing in-vitro dissolution experiments and preparing single-bead XR formulations that satisfy those in-vitro conditions in Example 6, the POSA designates each formulation as the XR composition whose $T_{80\%}$ range matches the formulation's $T_{80\%}$: XR1 (1.5 h$<=T_{80\%}<=$4 h), XR2 (5 h$<=T_{80\%}<=$8 h), or XR3 (8 h$<T_{80\%}<=$10 h) in Example 6.  After that, Dr. Khan testified, the POSA can simply rely on the bead-designations' $T_{max}$ data "for a single initial dose in-vivo" provided in Example 6.  (*See* Tr. 642:23-643:10 (Khan) ("[I]f I coat the beads, get the dissolution between five to ten hours, I know I get the Tmax value because the patent already shows me that thing.").)

With these findings, the Court revisits Torrent's claim that the specification must describe the inventors' exact dissolution methodology for in-vitro testing.  Torrent argues that "without specific information about the dissolution parameters and method that Supernus used to generate

114

the in-vitro data in Figures 1 and 2, a POSA could not rely on that information to determine which formulations described in Example 1 might be acceptable under Example 6." (ECF No. 171 at 37 (citing Tr. 602:25-603:5 (Felton)).) Torrent attacks Supernus's contention that "a POSA could look up the appropriate dissolution method," flagging that neither Dr. Bhatt nor Dr. Khan "testified as to the actual method that should be used." (*Id.* at 37-38 (citing PFF ¶ 54 (Pl.)).) Torrent argues that without the inventors' exact methodology, "the data in Figures 1 and 2 would be meaningless," and a POSA could not follow or replicate the examples. (*Id.* at 38 (citing Tr. 602:25-603:5 (Felton)).)

It was incumbent upon Torrent, who bears the burden to prove invalidity, to make clear why the data would be "meaningless." The Court is not satisfied that Torrent has done so. Torrent repeatedly cites Dr. Felton's refrain that using another dissolution methodology would produce "meaningless" data and "be like comparing apples and oranges." For this assertion, Torrent offers only Dr. Felton's calculations showing that the equations in Figures 1 and 2 do not apply universally to all polymers — an undisputed fact that misses the point of the figures. Torrent presented nothing to show, for instance, in what ways the differences among dissolution methodologies make the results meaningless or untranslatable from Example 1 to Example 6, or that a POSA does not have access to the apparatuses that USP or FDA recommends for this type of in-vitro dissolution testing. And again, that different dissolution methods "have different parameters" (Tr. 602:14-19 (Felton)) matters less given the specification's showing that, with those parameters being equal, a POSA can modulate release time by modulating only the thickness of the RC coating or a pore former (*see* Tr. 655:16-22 (Khan) (asking "why would I want to know all the variables?" if modulating coating thickness alone enables a POSA to achieve the desired $T_{80\%}$)).

Therefore, Torrent's *dissolution methodology* and *connection between Examples 1 and 6* challenges, which implicate the *amount of direction presented*, *relative skill of a POSA*, and *predictability of the art* factors, do not support a non-enablement finding.

Torrent likens this case to *Amgen Inc. v. Sanofi*.[63]  In *Amgen*, the United States Supreme Court rejected Amgen's "functional" claim to "an entire class of things" — there, antibodies — "defined by their function" rather than their "physical characteristics or chemical properties."  598 U.S. at 602, 610, 613.[64]  Specifically, Amgen did not claim "any particular antibody described by amino acid sequence," which is how a particular antibody is commonly identified; it claimed "'the entire genus' of antibodies" that performed two particular functions.  *Id.* at 600, 602 (citation and some internal quotation marks omitted).  The challenge for Amgen, the Supreme Court said, was that its described methods for making other antibodies forced a scientist "to engage in 'painstaking experimentation' to see what works."  *Id.* at 614 (citation omitted).

But the Supreme Court qualified its holding in two ways.  First, a specification need not always "describe with particularity how to make and use every single embodiment within a claimed class."  *Id.* at 610-11.  "For instance," the Supreme Court said, "it may suffice to give an example (or a few examples) if the specification also discloses 'some general quality . . . running through' the class that gives it 'a peculiar fitness for the particular purpose.'"  *Id.* (quoting *Consol. Elec. Light Co v. McKeesport Light Co*., 159 U.S. 465, 475 (1895)).  Second, "a specification may call for a reasonable amount of experimentation to make and use a patented invention," such as when "some small difference in the proportions" of the claimed ingredient are required.  *Id.* at 611-

[63]    598 U.S. 594 (2023).

[64]    Supernus distinguishes the functional claim in *Amgen* from the Asserted Claims here.  (ECF No. 170 at 43.)  Because the Court ultimately rejects *Amgen*'s applicability for other reasons, it need not address the asserted distinction.

116

12 (citing, *e.g.*, *Wood v. Underhill*, 46 U.S. 1 (1847); *Mins. Separation v. Hyde*, 242 U.S. 261 (1916)).

This case is different from *Amgen* in two meaningful ways. First, unlike Amgen's claim, the Asserted Claims do not claim an "entire genus" of release-controlling coatings regardless of physical characteristics or chemical properties. They claim sustained release formulations of topiramate comprising an XR component with cellulosic or acrylic polymers. (*See, e.g.*, '989 patent col. 21 ll. 1-8.) Recall, again, Dr. Rotella's testimony that "the term 'acrylic' means something" — it "confer[s] structure." (Tr. 483:1-5 (Rotella).) The XR component must also exhibit "a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single dose." (*See, e.g.*, '989 patent col. 21 ll. 33-35.) In short, the Asserted Claims require more than Amgen's claim.

Second, the Patents-in-Suit do not require "painstaking experimentation to see what works" as Amgen's patent required. *See Amgen*, 598 U.S. at 614 (citations and quotation marks omitted). Torrent argues that a POSA cannot "predict the rate of release for a given formulation without running [his or her] own experiments." (ECF No. 171 at 40.) Indeed, Dr. Khan testified that for in-vitro dissolution testing, "if I'm changing the polymer, I have to perform at least those three, four experiments to have that" curve. (Tr. 660:7-9.) But Dr. Khan added, "Once I have that curve, then I can predict anything within that. But I have to make my own curve." (Tr. 660:9-11.) Thus, once a POSA performs the first in-vitro dissolution test, gathers the data, and creates the slope formula — the parties' experts agree that these steps are routine[65] — the curve will tell the POSA

---

[65]     (*See* Tr. 638:4-6 (Khan) ("[T]he coating process is extremely well known, and I think Dr. Felton also admitted that it's very easy, any -- it's a routine formulator will do it."); Tr. 620:11-15 (Felton) (agreeing that "develop[ing] a dissolution test, coat[ing] beads with different weight gains, conduct[ing] the dissolution test, and analyz[ing] the data" "would be normal, everyday skills that a POSA could do").)

117

how much RC coating will achieve a certain $T_{80\%}$. Using that information, the POSA can adjust

the RC coating precisely as needed to achieve a desired release rate.

Explaining the simplicity of this process, Dr. Khan testified as follows:

> MR. WEEKS (ATTORNEY FOR TORRENT). And you would agree that you cannot predict what figures 1 and 2 would look like if you switched from using ethylcellulose to one of the Eudragit® acrylic polymers, for example, correct?

> DR. KHAN. I am not worried at all. I provide the coating, I do the dissolution, and I calculate the time for 80 percent dissolution. If that dissolution, if it is releasing faster, I provide more coating so that my T[8]0 time increases. And if I'm not satisfied with that, I provide even more coating. So in one experiment, I keep on increasing the coating until I get the dissolution time, so I'm not at all worried about other polymers not giving the data. Actually, I got the teaching from it, how to perform and how to coat. I will use that and I get my own data.

> . . .

> Q. The addition of a pore former significantly change the relationship between polymer weight gain and T80 dissolution time. You could not have predicted that in advance without running experiments, right?

> A. So when I run experiment, I will run without pore former. If that dissolution is too slow, then I will add pore former. And once I add pore former, I know now in my experiments I need pore former. Then I start the process, right. So I will increase the coating weight gain, perform dissolution. And this time in my coating material, I have added a pore former excipient therein. But I perform the same experiment. Now I add a pore former.

> [(Tr. 659:5-660:23.)]

And, once more, after making beads that satisfy the "in-vitro dissolution" conditions in

Example 6, a POSA can rely on the "single initial dose in-vivo" data that correspond with the

beads' in-vitro release time. (*See* '989 patent col. 18 ll. 46-55; *see also* Tr. 653:21-654:25 (Khan)

("What this patent did, even though there are so many variables there, they said, . . . focus on

118

coating thickness. And that thickness will modulate their dissolution, and dissolution will get to your PK.").)

Even if Torrent had shown that a POSA could not rely on the in-vivo data in Example 6, the Court is not convinced that performing an in-vivo study would be undue experimentation. Dr. Felton testified that in-vivo clinical studies are beyond a POSA's skillset, reasoning that even she has "never conducted a clinical trial" despite her qualifications exceeding the *POSA* construction. (Tr. 613:5-20.) This is true even if a POSA hired a provider to perform the in-vivo study, because, as Dr. Felton understands "based on the legal description" that she received from counsel, all that matters is whether the POSA has the skillset. (Tr. 613:21-614:12.) Yet Dr. Khan countered that clinical studies are not as burdensome as Dr. Felton describes them. He testified that contrary to Dr. Felton's testimony, "[y]ou don't need FDA permission" to conduct single dose in-vivo studies; you only need permission from your institutional review board, or "IRB." (Tr. 632:18-633:15.) He also testified that his graduate students routinely conduct these studies. (Tr. 633:17-634:10.) Dr. Taft likewise testified that "this type of clinical bioavailability test is a routine test that can be executed by a person of ordinary skill." (Tr. 169:23-25.) Faced with only these competing, equally credible opinions, the Court cannot rule that Torrent met the clear-and-convincing standard.

The Court finds that the Patents-in-Suit require some trial and error but not the type of "random trial-and-error discovery" that gave the Supreme Court pause. *See Amgen*, 598 U.S. at 615; *see also Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1386 (Fed. Cir. 2013) ("Even 'a considerable amount of experimentation is permissible,' as long as it is 'merely routine' or the specification 'provides a reasonable amount of guidance' regarding the direction of experimentation." (quoting *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360-61 (Fed.

Cir. 1998))).[66]  Therefore, the fact that a POSA must perform in-vitro dissolution testing, which implicates the *quantity of experimentation*, *relative skill of a POSA*, and *predictability of the art* factors, does not favor a non-enablement finding.

Having found none of Torrent's challenges persuasive, the Court rules that Torrent has not shown by clear and convincing evidence that the Patents-in-Suit are not enabling.

### D.    Written Description

Under § 112(a), a patent's "description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (internal citation, quotation marks, and brackets omitted).  "To satisfy the written description requirement, a patent's specification must 'reasonably convey[ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (quoting *Ariad Pharms.*, 598 F.3d at 1351).  "[W]hether a patent complies with the written description requirement will necessarily vary depending on the context.  Specifically, the level of detail required . . . varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 380 (D.N.J. 2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020) (quoting *Ariad Pharms.*, 598 F.3d at 1351).  The party challenging a patent's written description must do so through clear and convincing evidence.  *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

---

[66]    That Torrent took seven years to develop its ANDA Products (PFF ¶ 53, 569 (Def.)) is not alone dispositive.  *See Amgen*, 598 U.S. at 615 ("[E]nablement is not measured against the cumulative time and effort it takes to make every embodiment within a claim.").  Though Torrent presented evidence as to what could delay a POSA, Torrent never explained what actually took it so long to develop its ANDA Products.

120

Much of the Court's enablement discussion also applies to Torrent's written-description challenge.  (*See* ECF No. 171 at 42 ("The same deficiencies in the asserted patent specifications described above regarding enablement, compel a similar result regarding inadequate written description.").)  For Figures 1 and 2, for instance, Torrent asserts its failed *dissolution methodology* challenge.  (*See* PFF ¶¶ 425-442 (Def.).)  The Court will discuss only new arguments.

Torrent argues that the Patents-in-Suit do not show that the in-vitro mathematical relationship would hold for any formulation other than the RC coating materials used in Figures 1 and 2. (ECF No. 171 at 44.)  Yet Torrent does not contest that the patents *claim* that the relationship would hold for each exemplary bead described in Table 1.  *Compare Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1567-69 (Fed. Cir. 1997) (rejecting a description of "a process for obtaining human insulin-encoding cDNA" that lacked any "sequence information indicating which nucleotides constitute human cDNA" or "further information in the patent pertaining to that cDNA's relevant structural or physical characteristics"), *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011) (rejecting a description that included "no examples of macrocyclic lactone analogs of rapamycin" (the claimed genus) and generally "no guidance on how to properly determine whether a compound is a macrocyclic lactone analog of rapamycin"), *with Ajinomoto*, 932 F.3d at 1361 (accepting a description that expressly provided four examples of "more potent promoters" where a POSA could "make relatively predictable changes to the native promoter to arrive at a more potent promoter").

Torrent also argues that "there is no support in the specification showing that a single-component formulation could be used to achieve a target predetermined release profile."  (ECF No. 171 at 45.)  Not so.  In Figure 2, which shows results of in-vitro dissolution testing with single-bead formulations, each of the four plotted data points meet the XR1, XR2 or XR3 conditions set

forth in Example 6: (i) about a 2% release coating had about a 2.8 hour $T_{80\%}$ time; (ii) about a 3% release coating had about a 3.2 hour $T_{80\%}$ time; (iii) about a 5.5% release coating had about a 5.5 hour $T_{80\%}$ time; and (iv) about a 9.5% release coating had about a 9.5 hour $T_{80\%}$ time.[67] ('989 patent Fig. 2, Example 6.) Compare these release rates with Example 6's conditions "for in-vitro dissolution": for XR1, 1.5 h$<=T_{80\%}<=$4 h; for XR2, 5 h$<=T_{80\%}<=$8 h; for XR3, 8 h$<T_{80\%}<=$10 h. And in Figure 3, which shows results of in-vivo studies involving single-bead formulations, the XR2 and XR3 beads each exhibit a $T_{max}$ of about 24 hours, satisfying the claimed $T_{max}$ of 16 or more hours after a single initial dose. ('989 patent Fig. 3, Example 6; Tr. 85:1-5 (Bhatt).)

Finally, contrary to Torrent's assertion, a patent's disclosing a handful of examples for far-reaching claims is not in itself improper. (*See* ECF No. 171 at 45.) *See Ariad Pharms.*, 598 F.3d at 1351 ("Nor do we set out any bright-line rules governing, for example, the number of species that must be disclosed to describe a genus claim, as this number necessarily changes with each invention, and it changes with progress in a field."). "A written description of an invention involving a chemical genus, like a description of a chemical species, requires a precise definition, such as by structure, formula, [or] chemical name of the claimed subject matter sufficient to distinguish it from other materials." *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019) (quoting *Bos. Sci.*, 647 F.3d at 1363) (internal quotation marks omitted) (alterations in *Bos. Sci.*). Here, the Patents-in-Suit satisfy this mandate. Recall, once more, Dr. Rotella's testimony that "the term 'acrylic' means something" — it "confer[s] structure." (Tr. 483:1-5 (Rotella).)

---

[67]     The Court overrules Torrent's objection that Supernus's noting these datapoints violates FRE 702's requirements. (*See* PFF ¶ 423 (Def.).) The data are in the specification, which is part of the intrinsic record that the Court can review without the help of expert testimony.

As none of Torrent's written-description arguments is availing, the Court rules that Torrent has not shown by clear and convincing evidence that the Patents-in-Suit lack adequate written description.

## V.   **CONCLUSIONS OF LAW**

For these reasons, the Court rules that Torrent's ANDA Products **INFRINGE** on the Asserted Claims of the Patents-in-Suit, and that the Patents-in-Suit are **VALID**.  An appropriate Order follows.

Date: January 30, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

123

Appx254

US008992989B2

(12) **United States Patent**
Liang et al.

(10) **Patent No.:**     **US 8,992,989 B2**
(45) **Date of Patent:**     \*Mar. 31, 2015

(54) **SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE**

(71) Applicant: **Supernus Pharmaceuticals, Inc.,** Rockville, MD (US)

(72) Inventors: **Likan Liang**, Boyds, MD (US); **Hua Wang**, Clarksville, MD (US); **Padmanabh P. Bhatt**, Rockville, MD (US); **Michael L. Vieira**, Gaithersburg, MD (US)

(73) Assignee: **Supernus Pharmaceuticals, Inc.,** Rockville, MD (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/499,462**

(22) Filed: **Sep. 29, 2014**

(65) **Prior Publication Data**

US 2015/0017249 A1     Jan. 15, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/330,423, filed on Jul. 14, 2014, now Pat. No. 8,877,248, which is a continuation of application No. 12/926,936, filed on Dec. 17, 2010, now Pat. No. 8,889,191, which is a continuation of application No. 11/941,475, filed on Nov. 16, 2007, now Pat. No. 8,298,576.

(60) Provisional application No. 60/859,502, filed on Nov. 17, 2006.

(51) **Int. Cl.**
*A61K 9/14*     (2006.01)
*A61K 9/50*     (2006.01)
*A61K 31/357*     (2006.01)
*A61K 47/48*     (2006.01)

(52) **U.S. Cl.**
CPC ............. *A61K 9/5047* (2013.01); *A61K 31/357* (2013.01); *A61K 47/48969* (2013.01)
USPC .......................................... **424/495**; 514/454

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,528,378 | A | 10/1950 | Mannheimer et al. |
| 2,675,619 | A | 4/1954 | Cone |
| 2,677,700 | A | 5/1954 | Jackson et al. |
| 2,781,354 | A | 2/1957 | Mannheimer et al. |
| 2,979,578 | A | 4/1961 | Curtis |
| 2,996,431 | A | 8/1961 | Barry |
| 3,036,118 | A | 5/1962 | Jackson et al. |
| 3,139,383 | A | 6/1964 | Neville et al. |
| 3,535,307 | A | 10/1970 | Moss et al. |
| 3,811,444 | A | 5/1974 | Heller et al. |
| 3,829,506 | A | 8/1974 | Schmolka et al. |
| 3,962,414 | A | 6/1976 | Michaels |
| 3,992,518 | A | 11/1976 | Chien et al. |
| 4,066,747 | A | 1/1978 | Capozza |
| 4,070,347 | A | 1/1978 | Schmitt |
| 4,079,038 | A | 3/1978 | Choi et al. |
| 4,083,949 | A | 4/1978 | Benedikt |
| 4,093,709 | A | 6/1978 | Choi et al. |
| 4,290,426 | A | 9/1981 | Luschen et al. |
| 4,434,153 | A | 2/1984 | Urquhart et al. |
| 4,513,006 | A | 4/1985 | Maryanoff et al. |
| 4,721,613 | A | 1/1988 | Urquhart et al. |
| 4,727,064 | A | 2/1988 | Pitha |
| 4,752,470 | A | 6/1988 | Mehta |
| 4,757,128 | A | 7/1988 | Domb et al. |
| 4,853,229 | A | 8/1989 | Theeuwes |
| 4,938,763 | A | 7/1990 | Dunn et al. |
| 4,997,904 | A | 3/1991 | Domb |
| 5,030,447 | A | 7/1991 | Joshi et al. |
| 5,175,235 | A | 12/1992 | Domb et al. |
| 5,180,589 | A | 1/1993 | Joshi et al. |
| 5,225,202 | A | 7/1993 | Hodges et al. |
| 5,256,440 | A | 10/1993 | Appel et al. |
| 5,378,475 | A | 1/1995 | Smith et al. |
| 5,478,577 | A | 12/1995 | Sackler et al. |
| 5,500,227 | A | 3/1996 | Oshlack et al. |
| 5,576,311 | A | 11/1996 | Guy |
| 5,753,693 | A | 5/1998 | Shank |
| 5,760,007 | A | 6/1998 | Shank et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1130352 A | 9/1996 |
| WO | WO 93/21906 A1 | 11/1993 |

(Continued)

OTHER PUBLICATIONS

Adin et al., "Topiramate Serum Concentration-to-Dose Ratio," Therapeutic Drug Monitoring, Jun. 2004; 26(3):251-257.
Bahk et al., "Topiramate and divalproex in combination with risperidone for acute mania: a randomized open-label study," Progress in Neuropsychopharmacology & Biological Psychiatry, 2005, 29(1):115-121.
Beaumanoir, Anne, "The Landau-Kleffner syndrome", In: Roger et al., Eds. *Epileptic Syndromes in Infancy, Childhood, and Adolescence*, 2nd Ed., London, England: John Libby, pp. 231-244, 1992.
Berge et al., "Pharmaceutical Salts", J. Pharm. Sci., Jan. 1977, 66(1): 1-19.

(Continued)

*Primary Examiner* — Suzanne Ziska
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP; Sunit Talapatra

(57)     **ABSTRACT**

Pharmaceutical compositions of topiramate for once-a-day oral administration are provided. The formulations comprise a sustained-release component and an optional immediate-release component, the compositions of which can be selectively adjusted, respectively, to release the active ingredient along a pre-determined release profile. Method of treating or preventing pathological disorders in mammalian subjects comprising the administration of the novel formulations disclosed herein is also provided.

**20 Claims, 6 Drawing Sheets**

**US 8,992,989 B2**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,773,019 | A | 6/1998 | Ashton et al. |
| 5,935,933 | A | 8/1999 | Shank et al. |
| 5,955,096 | A | 9/1999 | Santos et al. |
| 5,985,312 | A | 11/1999 | Jacob et al. |
| 5,998,380 | A | 12/1999 | Ehrenberg et al. |
| 6,123,965 | A | 9/2000 | Jacob et al. |
| 6,156,348 | A | 12/2000 | Santos et al. |
| 6,159,501 | A | 12/2000 | Skinhoj |
| 6,191,117 | B1 | 2/2001 | Kozachuk |
| 6,197,346 | B1 | 3/2001 | Mathiowitz et al. |
| 6,201,010 | B1 | 3/2001 | Cottrell |
| 6,217,908 | B1 | 4/2001 | Mathiowitz et al. |
| 6,235,311 | B1 | 5/2001 | Ullah et al. |
| 6,248,363 | B1 | 6/2001 | Patel et al. |
| 6,294,192 | B1 | 9/2001 | Patel et al. |
| 6,319,903 | B1 | 11/2001 | Carrazana et al. |
| 6,344,215 | B1 | 2/2002 | Bettman et al. |
| 6,365,187 | B2 | 4/2002 | Mathiowitz et al. |
| 6,368,586 | B1 | 4/2002 | Jacob et al. |
| 6,479,467 | B1 | 11/2002 | Buchanan et al. |
| 6,503,884 | B1 | 1/2003 | Ehrenberg et al. |
| 6,514,531 | B1 | 2/2003 | Alaux et al. |
| 6,524,620 | B2 | 2/2003 | Cheng et al. |
| 6,559,293 | B1 | 5/2003 | Almarsson et al. |
| 6,562,865 | B1 | 5/2003 | Codd et al. |
| 6,569,463 | B2 | 5/2003 | Patel et al. |
| 6,696,091 | B2 | 2/2004 | Thakur et al. |
| 6,699,840 | B2 | 3/2004 | Almarsson et al. |
| 6,797,283 | B1 | 9/2004 | Edgren et al. |
| 6,923,988 | B2 | 8/2005 | Patel et al. |
| 7,018,609 | B2 | 3/2006 | Hwang Pun et al. |
| 7,195,778 | B2 | 3/2007 | Fleshner-Barak et al. |
| 7,611,722 | B2 | 11/2009 | Lerner et al. |
| 7,737,133 | B2 | 6/2010 | Devane et al. |
| 7,763,635 | B2 | 7/2010 | Kidane et al. |
| 2002/0044962 | A1 | 4/2002 | Cherukuri et al. |
| 2002/0054907 | A1 | 5/2002 | Devane et al. |
| 2002/0064563 | A1 | 5/2002 | Thakur et al. |
| 2002/0150616 | A1 | 10/2002 | Vandecruys |
| 2003/0017972 | A1 | 1/2003 | Pun et al. |
| 2003/0064097 | A1 | 4/2003 | Patel et al. |
| 2003/0072802 | A1 | 4/2003 | Cutler |
| 2003/0091630 | A1 | 5/2003 | Louie-Helm et al. |
| 2003/0133985 | A1 | 7/2003 | Louie-Helm et al. |
| 2003/0147952 | A1 | 8/2003 | Lim et al. |
| 2003/0157173 | A1 | 8/2003 | Percel et al. |
| 2003/0166581 | A1 | 9/2003 | Almarsson et al. |
| 2003/0215496 | A1 | 11/2003 | Patel et al. |
| 2003/0225002 | A1 | 12/2003 | Livingstone |
| 2004/0002462 | A1 | 1/2004 | Najarian |
| 2004/0022844 | A1 | 2/2004 | Hasenzahl et al. |
| 2004/0028729 | A1 | 2/2004 | Shojaei et al. |
| 2004/0028735 | A1 | 2/2004 | Kositprapa |
| 2004/0052843 | A1 | 3/2004 | Lerner et al. |
| 2004/0053853 | A1 | 3/2004 | Almarsson et al. |
| 2004/0082519 | A1 | 4/2004 | Hedner et al. |
| 2004/0091533 | A1 | 5/2004 | Edgren et al. |
| 2004/0096501 | A1 | 5/2004 | Vaya et al. |
| 2004/0109894 | A1 | 6/2004 | Shefer et al. |
| 2004/0115262 | A1 | 6/2004 | Jao et al. |
| 2004/0122104 | A1 | 6/2004 | Hirsh et al. |
| 2004/0132826 | A1 | 7/2004 | Hirsh et al. |
| 2004/0156901 | A1 | 8/2004 | Thakur et al. |
| 2004/0157785 | A1 | 8/2004 | Connor |
| 2004/0185097 | A1 | 9/2004 | Kannan et al. |
| 2004/0204601 | A1 | 11/2004 | Legrand et al. |
| 2004/0258758 | A1 | 12/2004 | Gustow et al. |
| 2005/0053653 | A1 | 3/2005 | Kidane et al. |
| 2005/0058707 | A1 | 3/2005 | Reyes et al. |
| 2005/0069587 | A1 | 3/2005 | Modi et al. |
| 2005/0106242 | A1 | 5/2005 | Yan et al. |
| 2005/0106247 | A1 | 5/2005 | Venkatesh et al. |
| 2005/0129765 | A1 | 6/2005 | Li et al. |
| 2005/0136108 | A1 | 6/2005 | Yam et al. |
| 2005/0169982 | A1 | 8/2005 | Almarssoo et al. |

| | | | |
|---|---|---|---|
| 2005/0169992 | A1 | 8/2005 | Jao et al. |
| 2005/0175697 | A1 | 8/2005 | Edgren et al. |
| 2005/0191343 | A1 | 9/2005 | Liang |
| 2005/0220596 | A1 | 10/2005 | Gaedy et al. |
| 2006/0018933 | A1 | 1/2006 | Vaya et al. |
| 2006/0018934 | A1 | 1/2006 | Vaya et al. |
| 2006/0024365 | A1 | 2/2006 | Vaya et al. |
| 2006/0034927 | A1 | 2/2006 | Casadevall et al. |
| 2006/0078609 | A1 | 4/2006 | Vandecruys et al. |
| 2006/0105045 | A1 | 5/2006 | Buchanan et al. |
| 2006/0121112 | A1 | 6/2006 | Jenkins et al. |
| 2006/0147527 | A1 | 7/2006 | Bachmann et al. |
| 2006/0223762 | A1 | 10/2006 | Ehrenberg et al. |
| 2006/0233892 | A1 | 10/2006 | Hendrix |
| 2007/0212411 | A1 | 9/2007 | Fawzy et al. |
| 2008/0085306 | A1 | 4/2008 | Nangia et al. |
| 2008/0131501 | A1 | 6/2008 | Liang et al. |
| 2011/0287099 | A1 | 11/2011 | Liang et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 01/37808 A1 | 5/2001 |
| WO | WO 02/03984 A2 | 1/2002 |
| WO | WO 02/43731 A3 | 6/2002 |
| WO | WO 2004/022037 A1 | 3/2004 |
| WO | WO 2004/078162 A1 | 9/2004 |
| WO | WO 2004/078163 A2 | 9/2004 |
| WO | WO 2005/030166 A1 | 4/2005 |
| WO | WO 2005/079748 A2 | 9/2005 |
| WO | WO 2006/009403 A1 | 1/2006 |
| WO | WO 2006/119153 A2 | 11/2006 |
| WO | WO 2007/002318 | 1/2007 |

OTHER PUBLICATIONS

Berlant, Jeffery L., M.D., Ph.D., "Topiramate in Posttraumatic Stress Disorder: Preliminary Clinical Observations," J. Clin. Psychiatry, 2001, 62(Suppl 17):60-63.

Brandes et al., "Topiramate for Migraine Prevention," JAMA, Feb. 25, 2004, 291(8):965-973.

Carpenter et al., "Do obese depressed patients respond to topiramate? A retrospective chart review," J. Affect. Disord., 2002, 69(1-3):251-255.

Chen et al., "Combination Treatment of Clozapine and Topiramate in Resistant Rapid-Cycling Bipolar Disorder," Clin. Neuropharmacol., May-Jun. 2005, 28(3):136-138.

Coleman et al., "Polymer reviewed: A practical guide to polymer miscibility," Jul. 1990, 31:1187-1230.

Conlin et al., "Topiramate Therapeutic Monitoring in Patients with Epilepsy: Effect of Concomitant Antiepileptic Drugs," Ther. Drug Monit., 2002, 24(3):332-337.

D'Amico et al., "Topiramate in migraine prophylaxis," Neurological Sciences, 2005, 26(Suppl 2):S130-S133.

Deckers et al., "Selection of Antiepileptic Drug Polytherapy Based on Mechanisms of Action: The Evidence Reviewed," Epilepsia, 2000, 41(11):1364-1374.

Diener et al., "Topiramate in migrain prophylaxis: Results from a placebo-controlled trail with propranolol as an active control," J. Neurol., 2004, 251(8):943-950.

Dorado et al., "Topiramato en enfermedades comorbidas: epilepsia y migrana," Rev. Neurol., 2006, 43(4):193-196.

Duchene et al., "Pharmaceutical and Medical Aspects of Bioadhesive Systems for Drug Administration," Drug Dev. Ind. Pharm., 1988, 14(2&3):283-318.

Erfurth et al., "Bupropion as Add-On Strategy in Difficult-to-Treat Bipolar Depressive Patients," Neuropsychobiology, 2002, 45(Suppl 1):33-36.

Felmeister, Alvin Ph.D., "Powders," Remington's Pharm. Sci., 14th Ed., 1970, Chapter 86, 1626-1628.

Ferrari et al., "Influence of Dosage, Age, and Co-Medication on Plasma Topiramate Concentrations in Children and Adults with Severe Epilepsy and Preliminary Observations on Correlations with Clinical Response," Therapeutic Drug Monitoring 2003, 25(6):700-708.

Ferrari et al. "Rizatriptan: a new milestone in migraine treatment," Cephalalgia, 2000, 20(Suppl 1):1.

## US 8,992,989 B2

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Fincher, Julian H., "Particle Size of Drugs and Its Relationship to Absorption and Activity," J. Pharm. Sci., Nov. 1968, 57(11):1825-1835.

Fisher et al., "Synergism between Topiramate and Budipine in Refractory Status Epilepticus in the Rat," Epilepsia, 2004, 45(11):1300-1307.

François et al., "The combination of topiramate and diazepam is partially neuroprotective in the hippocampus but not antiepileptogenic in the lithium-pilocarpine model of temporal lobe epilepsy," Epilepsy Research, 2006, 72:147-163.

Gurny et al., "Bioadhesive intraoral release systems: design, testing and analysis," Biomaterials, Nov. 1984, 5:336-340.

Hershey et al., "Effectiveness of Topiramate in the Prevention of Childhood Headaches," Headache, Sep. 2002;42(8):810-818.

Hoes et al., "The Application of Drug-Polymer Conjugates in Chemotherapy," Drug Carrier Systems, 1989, 9:57-109.

Hollander et al., "Topiramate plus paroxetine in treatment-resistant obsessive-compulsive disorder," Int. Clin. Psychopharmacol., 2006, 21(3): 189-191.

International Search Report and Written Opinion mailed Sep. 2, 2008, in PCT/US2007/19208, 10 pages.

Ioannides-Demos et al., "Pharmacotherapy for Obesity," Drugs, 2005, 65(10):1391-1418.

Johnson et al., "Oral topiramate for treatmeut of alcohol dependence: a randomised controlled trial," The Lancet, May 17, 2003, 361(9370):1677-1685.

Kellett et al "Topiramate in clinical practice: first year's postlicensing experience in a specialist epilepsy clinic," J. Neurol. Neurosurg. and Psych., 1999;66:759-763.

Lainez et al., "Topiramate in the Prophylactic Treatment of Cluster Headache," Headache, Jul./Aug. 2003, 43(7):784-789.

Lalonde et al., "Additive effects of leptin and topiramate in reducing fat deposition in lean and obese *ob/ob* mice," Physiology & Behavior, 2004, 80(4):415-420.

Lee et al., "The Effects of Adjunctive Topiramate on Cognitive Function in Patients with Epilepsy," Epilepsia, 2003; 44(3):339-347.

Lehr et al., "Intestinal Transit of Bioadhesive Microspheres in an in situ Loop in the Rat—A Comparative Study with Copolymers and Blends Based on Poly(acrylic acid)," Journal of Controlled Release, 1990, 13:51-62.

Leong et al., "Polymeric controlled drug delivery," Adv. Drug Delivery Rev., 1987, 1:199-233.

Linhardt, Robert J. "Biodegradable Polymers for Controlled Release of Drugs," Controlled Release of Drugs, 1989, Chapter 2, 53-95.

Liu et al., "Preparation, characterization and in vivo evaluation of formulation of baicalein with hydroxypropyl-beta-cyclodextrin," International Journal of Pharmaceutics, 2006, 312:137-147.

Longer, Mark A., Ph.D., "Sustained-Release Drug Delivery Systems," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 91, 1676-1693.

Lu et al., "Dimensionless presentation for drug release from a coated pure drug bead: 1. Analysis," Inter. J. of Pharm., 1994, 112:105-116.

Lu et al., "Dimensionless presentation for drug release from a coated pure drug bead: 2. Experiment," Inter. J. of Pharm., 1994, 112:117-124.

Luszczki et al., "Interactions of Lamotrigine with Topiramate and First-Generation Antiepileptic Drugs in the Maximal Electroshock Test in Mice: An Isobolographic Analysis," Epilepsia, 2003, 44(8):1003-1013.

Mathew et al., "Prophylaxis of Migraine, Transformed Migraine, and Cluster Headache with Topiramate," Headache, Sep. 2002, 42(8):796-803.

McElroy et al., "Topiramate in the Treatment of Binge Eating Disorder Associated with Obesity: A Randomized, Placebo-Controlled Trial," Am. J. Psychiatry, Feb. 2003, 160(2):255-261.

Meador et al., "Cognitive and behavioral effects of lamotrigine and topiramate in healthy volunteers," Neurology, Jun. 2005, 64:2108-2114.

Mikos et al., "Interaction of Polymer Microspheres with Mucin Gels as a Means of Characterizing Polymer Retention on Mucus," Journal of Colloid and Interface Science, May 1991, 143(2): 366-373.

Morton et al., "Diagnosis and treatment of epilepsy in children and adolescents", Drugs, Mar. 1996, 51(3):399-414.

Mosek et. al., "Topiramate in the treatment of refractory chronic daily headache. An open trial," Journal of Headache and Pain, 2005, 6:77-80.

O'Connor et al., "Powders," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 88, 1615-1632.

Park et al., "Alternative Approaches to Oral Controlled Drug Delivery: Bioadhesives and In-Situ Systems," Recent Advances in Drug Delivery, Plenum Press, New York, 1984, 163-183.

Pascual et al., "Testing the combination beta-blocker plus topiramate in refractory migraine," Acta Neurol. Scand., 2007, 115(2):81-83.

Physician's Desk Reference, 69th Edition, 2006, pp. 2438-2447, entry for TOPAMAX®.

Physicians' Desk Reference 59th edition, 2541-2548 (2005).

Physician's Desk Reference, 56th ed., 2590-2595 (2002).

Pies, Ronald M.D. "Combining Lithium and Anticonvulsants in Bipolar Disorder: A Review," Annals of Clinical Psychiatry, Dec. 2002, 14(4):223-232.

Porter, Stuart C., Ph.D., "Coating of Pharmaceutical Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 90, 1666-1675.

Potter et al., "A Double-Blind, Randomized, Placebo-Controlled, Parallel Study to Determine the Efficacy of Topiramate in the Prophylactic Treatment of Migraine," Neurology, Apr. 2000, 54(Suppl 3):A15.

Rudnic et al., "Oral Solid Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 89, 1633-1665.

Silberstein et al., "Topiramate in Migraine Prevention," Arch, Neurol., Apr. 2004, 61(4):490-495.

Siniscalchi et al., "Combined topiramate and declorazepam therapy in a patient affected by essential tremor," Parkinsonism Relat. Disord., 2007, 13(2):129-130.

Smart et al., "An in-vitro investigation of mucosa-adhesive materials for use in controlled drug delivery," J. Pharm, Pharmacol., 1984, 36:295-299.

Sofuoglu et al., "Effects of topiramate in combination with intravenous nicotine in overnight abstinent smokers," Psychopharmacology, 2006, 184(3-4): 645-651.

Storey et al., "Topiramate in Migraine Prevention: A Double-Blind Placebo-Controlled Study," Headache, Nov./Dec. 2001, 41(10):968-975.

Thompson et al., "Effects of topiramate on cognitive function," J. Neurol. Neurosurg and Psych., 2000; 69:634-641.

Toplak et al., "Efficacy and safety of topiramate in combination with metformin in the teratment of obese subjects with type 2 diabetes: a randomized, double-blind placebo-controlled study," Int. J. Obes., 2007, 31(1):138-146.

Von Seggern et al., "Efficacy of Topiramate in Migraine Prophylaxis: A Retrospective Chart Analysis," Neurology, Apr. 2000, 54(Suppl 3):A267-A268.

Weber, Marcus Vinicius Keche, M.D., "Topiramate for Obstructive Sleep Apnea and Snoring," Am. J. Psychiatry, May 2002, 159(5):872-873.

Winkelman, John W., "Treatement of nocturnal eating syndrome and sleep-related eating disorder with topiramate," Sleep Medicine, 2003, 4(3):243-246.

US 6,103,281, 08/2000, DelDuca et al. (withdrawn)

**Fig.1**

*80% release time vs. %Wt. gain of Release-Controlling Coating*

*For Surelease® coated Extended Release Beads*



**Fig. 2**

*80% release time vs. % Wt. gain of Release-Controlling Coating*

*For Surelease®/ Opadry® coated Extended Release Beads*



**Fig. 3**

**Mean (n= 16) PK Profiles from Bead Populations XR1, XR2 and XR3**



**Fig. 4**

**Mean (n= 16) PK Profiles from the Immediate Release Formulations**



**Fig.5**

**Dissolution Profiles of Immediate Release Formulations**



**U.S. Patent**     **Mar. 31, 2015**     **Sheet 6 of 6**     **US 8,992,989 B2**

Fig.6.  Mean PK Profiles for Sustained Release Formulations A, B, and C



US 8,992,989 B2

**1**

# SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 14/330,423, filed Jul. 14, 2014, which is a Continuation of U.S. application Ser. No. 12/926,936, filed Dec. 17, 2010, which is a Continuation of U.S. application Ser. No. 11/941,475, filed Nov. 16, 2007, which claims benefit of U.S. Provisional Application No. 60/859,502, filed Nov. 17, 2006, the entire contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Topiramate is a sulfamate substituted monosaccharide which under the trade name TOPAMAX® (Ortho-McNeil Pharmaceutical, Inc., Raritan, N.J., U.S.A.) has been approved for use as an antiepileptic agent, as an adjunct therapy for patients with partial onset seizures or primary generalized tonic-clonic seizures, and for the prevention of migraine. See generally, Physician's Desk Reference, 60th ed., 2538-2447 (2006); see also, U.S. Pat. No. 4,513,006.

For the treatment of epilepsy, the recommended dose of Topamax® is 400 mg/day in one or multiple doses (Physician's Desk Reference, 60th ed., 2538-2447 (2006)). For adults with epilepsy, treatment is initiated with a dose of 25-50 mg/day, with the dose being titrated in increments of 25-50 mg at weekly intervals to the recommended or effective dose.

Topamax® is an immediate release formulation. Adverse effects associated with the administration of Topamax® include, but are not limited to, somnolence, dizziness, ataxia, speech disorders and related speech problems, psychomotor slowing, abnormal vision, difficulty with memory, paresthesia, diplopia, renal calculi (kidney stones), hepatic failure, pancreatitis, renal tubular acidosis, acute myopia and secondary angle closure glaucoma (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Hence, though topiramate has a relatively long half-life of 21 hours in vivo, it has not been prescribed (or formulated) as a single, daily-dose, in part due to severe side-effects that often result with peak plasma levels of the drug when taken in high doses. Instead, Topamax® is typically taken in multiple, "divided" doses, usually twice-daily ("BID"). However, administration of the medicament in this manner is cumbersome and patients can forget to take their medication in a timely manner. What is more, each administration of a dose is associated with a peak in plasma concentrations of the drug, and the fluctuations associated with the peaks and valleys of blood plasma levels of the drug are undesirable. Therefore, there is a need for a formulation of topiramate, which reduces or eliminates the side effects associated with peaking and fluctuating plasma levels of the drug and preferably may be administered in a once-daily regimen.

New, highly soluble and bioavailable forms of topiramate are also needed in order to increase the safety and effectiveness of the drug.

The instant invention addresses these and other needs by providing a modified formulation of topiramate characterized by a sustained, non-pulsatile release of an active ingredient. This invention additionally provides an effective, once-daily dosage form of topiramate or salts thereof, which not only enables an effective single daily dose regimen to improve patient compliance but may also reduce some of the side effects of topiramate compared to the current or higher daily doses of immediate release topiramate formulations.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a sustained release formulation of topiramate for the treatment or prevention of a pathological condition in a mammalian subject, characterized by a sustained rate of topiramate release along a pre-determined release profile.

It is yet another object of the present invention to provide topiramate formulation wherein topiramate is released at a rate which results in a reduction in the frequency or severity of at least one side effect associated with the topiramate treatment.

It is a further object of the present invention to provide a sustained release formulation of topiramate that can be administered orally once a day.

It is an object of the present invention to provide a sustained release formulation of topiramate for oral administration to a mammalian subject comprising topiramate as an active ingredient, wherein the active ingredient is released from the formulation at a sustained rate along a pre-determined release profile, and wherein the sustained release formulation comprises an extended release (XR) component and an optional immediate release (IR) component.

In one embodiment of the invention, the extended release component is contained in at least one population of beads coated with a release controlling coating. The above-mentioned coating is specific for every bead population and determines its rate of release. Thus, every given bead population included into the formulation is characterized by its own specific rate of release.

In another embodiment of the invention, the sustained release topiramate formulation comprises an immediate release component in addition to an extended release component.

In a preferred embodiment of the invention, the immediate release component is an enhanced immediate release (EIR) composition.

The formulation of the present invention may be incorporated in any oral dosage form such as represented by, but not limited to, a tablet, a pill, a capsule, a troche, a sachet, and sprinkles.

It is yet another object of the present invention to provide a method of preparation of a sustained release formulation of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile, the method comprising the steps of:

1. determining the desired release profile;

2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method of preparation additionally includes a process for providing an XR component contained in at least one population of beads, wherein every population of beads is characterized by its own rate of release. This process comprises the steps of

1. forming at least one population of topiramate-containing beads;

2. coating each population of beads with its own coating solution;

US 8,992,989 B2

**3**

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The method may optionally include a process for preparation of an IR component, which optionally is an enhanced immediate release (EIR) composition. The enhanced immediate release composition includes at least one agent selected from a group comprising complexing agents and enhancing agents. Without any limitations, the enhancing agents useful in the present invention may be selected from solubilizing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, stabilizing agents, enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors or combinations thereof.

It is yet another object of the present invention to provide a method of treatment or prevention of a pathological condition in a mammalian subject by orally administering to the subject a therapeutically effective amount of a sustained release topiramate formulation of the instant invention. The pathological conditions that may be treated by the method of the present invention include neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by topiramate administration.

DEFINITIONS

For the purposes of this invention, the term "topiramate" includes topiramate or any pharmaceutically acceptable salts thereof.

An "immediate release formulation" refers to a formulation that releases greater than or equal to about 80% of the pharmaceutical agent in less than or equal to about 1 hour.

For the purposes of this application, an enhancing agent ("enhancer") is defined as any non-pharmaceutically active ingredient that improves the therapeutic potential of a formulation.

The term "enhanced immediate release composition" as used herein describes an immediate release composition improved in terms of a therapeutic potential or treatment modality.

"Sustained release" is defined herein as release of a pharmaceutical agent in a continuous manner over a prolonged period of time.

By "prolonged period of time" it is meant a continuous period of time of greater than about 1 hour, preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours.

As used herein, unless otherwise noted, "rate of release" or "release rate" of a drug refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr) or a percentage of a total drug dose released per hour. Drug release rates for dosage forms are typically measured as an in vitro rate of drug release, i.e., a quantity of drug released from the dosage form per unit time measured under appropriate conditions and in a suitable fluid. The time at which a specified percentage of the drug within a dosage form has been released from the dosage form is referred to as the "T.sub.x" value, where "x" is the percent of drug that has been released.

The release rates referred to herein are determined by placing a dosage form to be tested in a medium in an appropriate dissolution bath. Aliquots of the medium, collected at pre-set

**4**

intervals, are then injected into a chromatographic system fitted with an appropriate detector to quantify the amounts of drug released during the testing intervals.

"C" denotes the concentration of drug in blood plasma, or serum, of a subject, and is generally expressed as mass per unit volume, for example nanograms per milliliter. For convenience, this concentration may be referred to herein as "drug plasma concentration", "plasma drug concentration" or "plasma concentration" which is intended to be inclusive of a drug concentration measured in any appropriate body fluid or tissue. The plasma drug concentration at any time following drug administration is referenced as Ctime, as in C9 hr or C4 hr, etc.

The maximum plasma drug concentration during the dosing period is referenced as Cmax, while Cmin refers to the minimum blood plasma drug concentration at the end of a dosing interval; and Cave refers to an average concentration during the dosing interval.

The "degree of fluctuation" is defined as a quotient (Cmax−Cmin)/Cave.

Persons of skill in the art will appreciate that blood plasma drug concentrations obtained in individual subjects will vary due to interpatient variability in the many parameters affecting drug absorption, distribution, metabolism and excretion. For this reason, unless otherwise indicated, when a drug plasma concentration is listed, the value listed is the calculated mean value based on values obtained from a groups of subjects tested.

The term "bioavailability" refers to an extent to which—and sometimes rate at which—the active moiety (drug or metabolite) enters systemic circulation, thereby gaining access to the site of action.

"AUC" is the area under the plasma concentration-time curve and is considered to be the most reliable measure of bioavailability. It is directly proportional to the total amount of unchanged drug that reaches the systemic circulation.

Side effect is defined herein as a secondary and usually adverse effect of a drug.

The term "beads", as used herein, includes, without any limitations on the nature and size thereof, any particles, spheres, beads, granules, pellets, particulates or any structural units that may be incorporated into an oral dosage form.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease® coated extended release beads.

FIG. **2** shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease®/Opadry® coated extended release beads.

FIG. **3** shows mean (n=16) pharmacokinetic profiles for bead populations XR1, XR2 and XR3.

FIG. **4** shows mean (n=16) pharmacokinetic profiles for the immediate release formulations.

FIG. **5** shows the dissolution profiles of Topamax®, topiramate IR beads, and topiramate enhanced immediate release beads.

FIG. **6** shows mean PK Profiles for Sustained Release Formulations A, B, and C.

DETAILED DESCRIPTION OF THE INVENTION

Topiramate is a sulfamate-substituted monosaccharide having the chemical name 2,3:4,5-Di-O-isopropylidene-beta-D-fructopyranose sulfamate. The molecular formula of

5

topiramate is C12H21NO8S, and its chemical structure is represented by formula below:

CH2OSO2NH2 / H3C / CH3 / H3C / O / CH3

Topiramate is a white crystalline powder that is soluble in alkaline solutions containing sodium hydroxide or sodium phosphate, soluble in acetone, dimethylsulfoxide and ethanol. However, the solubility of topiramate in water at room temperature is only about 9.8 mg/ml. Topiramate is not extensively metabolized and is excreted largely through the urine (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Topiramate pharmacokinetics are linear, producing a dose proportional increase in blood plasma concentration levels with increased dosing, and is not significantly affected by food. Patients taking topiramate over prolonged period of time did not develop resistance to the drug. Following oral administration of an immediate release dosage form, topiramate is rapidly absorbed with plasma drug concentrations peaking in approximately 2 hours. The mean elimination half-life is reported to be about 21 hours.

Currently, topiramate is administered in multiple daily doses in part due to the severe side effects exhibited by the immediate release product, especially when taken in a high single dose.

A sustained release topiramate formulation that will be suitable for once-a-day administration and will result in the diminished level or severity of side effects is needed.

The present invention provides sustained release formulation of topiramate wherein the total daily dose of topiramate is provided in an effective once-daily dose while minimizing fluctuations in the blood plasma drug concentration.

The current invention also provides for formulations of topiramate wherein the maximum plasma concentration of topiramate is attenuated as compared to the same amount of topiramate administered as an immediate release formulation BID; therefore some of the side effects of topiramate, such as CNS side effects including but not limited to dizziness, paresthesia, nervousness, psychomotor slowing, confusion, and difficulty with concentration/attention, observed when taking the immediate release product, may be reduced or eliminated.

Formulations of the instant invention are characterized by a maximum steady state plasma concentration (Cmax) of topiramate which is higher than the minimal therapeutically effective concentration, and is in the range of 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. In one embodiment, the novel formulations provide for a relative Cmax in the range of 80% to 125%, as compared to the same amount of topiramate administered as an immediate release formulation BID. In the other embodiment, the invention provides for the Cmax which is lower than the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. The Cmin of the topiramate formulation of the present invention is about equal or higher than a Cmin of an equivalent amount of immediate release topiramate formulation given BID.

Compared to the immediate release topiramate formulation, the sustained release topiramate formulations attenuate the Cmax of topiramate while extending the coverage of

6

plasma concentration above the minimum plasma concentration required therapeutic efficacy. The formulation of the current invention provides for a relative steady state AUC in the range of 80% to 125%, while minimizing the degree of fluctuation, which is preferably in the range of 25% to 90%, as compared to an equivalent amount of immediate release topiramate formulation given in two divided doses (Table 5 and 6).

The present invention additionally provides a sustained release topiramate formulation for the treatment or prevention of a pathological condition in a mammalian subject wherein topiramate is released from the formulation at a sustained rate along a pre-determined release profile. Such release is achieved by incorporation into the formulation of an extended release component (XR) and an optional immediate release component (IR).

The relative amount of each component in the topiramate formulation of the present invention is determined according to the purpose of administration and a pre-determined release profile, and the total amount of topiramate in the formulation varies from 0.5 mg to about 3000 mg. In other words, topiramate or its salt is present in the composition in an amount of from about 0.5% to about 85% by weight, and preferably of from about 2% to about 70% by weight. The term "about" has been recited here and throughout the specification to account for variations, which can arise from inaccuracies in measurement inherent and understood by those of ordinary skill in the chemical and pharmaceutical arts.

The XR component of the formulation of the present invention releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time. By way of example, and by no means limiting the scope of the invention, the period of time may be not more than 24 hours, not more than 16 hours, not more than 12 hours, not more than 8 hours, or not more than 4 hours, depending on desired attributes of the final product.

In one embodiment, the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating). The release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population.

The beads useful in the formulation of the present invention comprise an inert carrier, topiramate, a binder, an aforementioned release controlling coating and optionally, an overcoat that provides additional protection from moisture, static charge reduction, taste masking and coloring attributes to the particulates.

The inert carriers useful in the present invention may be selected from, but are not limited to, a group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres. The inert carrier is present in an amount of from about 15% to about 99% by weight, and preferably in an amount of from about 40% to about 97% by weight.

Topiramate is introduced to the inert carrier by techniques known to one skilled in the art, such as drug layering, powder coating, extrusion/spheronization, roller compaction or granulation. Preferably, the introduction method is drug layering by spraying a suspension of topiramate and a binder onto the inert carrier.

The binder may be present in the bead formulation in an amount of from about 0.1% to about 15% by weight, and preferably of from about 0.2% to about 10% by weight. Binders include, but are not limited to starches, microcrystal-

US 8,992,989 B2

7

line cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, or polyvinylpyrrolidone.

The release controlling coating specific for every bead population comprises a coating material and, optionally, a pore former and other excipients. The coating material is preferably selected from a group comprising cellulosic polymers, such as ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, and cellulose acetate phthalate; polyvinyl alcohol; acrylic polymers such as polyacrylates, polymethacrylates and copolymers thereof, and other water-based or solvent-based coating materials. The release-controlling coating is population-specific in the sense that the rate of release of topiramate from every bead population is controlled by at least one parameter of the release controlling coating, such as the nature of the coating, coating level, type and concentration of a pore former, process parameters and combinations thereof. Thus, changing a parameter, such as a pore former concentration, or the conditions of the curing, as will be discussed in more details below, (see Example 5) allows to change the release of topiramate from any given bead population and to selectively adjust the formulation to the pre-determined release profile. The release profile, in its turn, may be chosen or modified in such a way as to achieve the best treatment modality depending on the specific needs of the patient population and the nature of the condition.

For example, with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve. For example, when the release controlling coating comprises only ethylcellulose (Surelease®) as a coating material, a logarithmic relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 1):

$$Log(T_{80\% \, release}) = a(\% \, coating) + b.$$

When ethylcellulose/HPMC (Surelease®/Opadry®) mixture is used, for example, 85:15 mixture or 80:20 mixture, a linear relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 2):

$$T_{80\% \, release} = a(\% \, coating) + b.$$

Pore formers suitable for use in the release controlling coating herein can be organic or inorganic agents, and include materials that can be dissolved, extracted or leached from the coating in the environment of use. Examples of pore formers include but are not limited to organic compounds such as mono-, oligo-, and polysaccharides including sucrose, glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran; polymers soluble in the environment of use such as water-soluble hydrophilic polymers, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, Carbowaxes, Carbopol, and the like, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols, or block polymers thereof, polyglycols, poly($\alpha$-$\omega$)alkylenediols; inorganic compounds such as alkali metal salts, lithium carbonate, sodium chloride, sodium bromide, potassium chloride, potassium sulfate, potassium phosphate, sodium acetate, sodium citrate, suitable calcium salts, and the like.

8

The release controlling coating in the current invention can further comprise other additives known in the art such as plasticizers, anti-adherents, glidants, and antifoams.

In some embodiments, it may be further desirable to optionally coat the XR beads with an "overcoat," to provide, e.g., moisture protection, static charge reduction, taste-masking, flavoring, coloring, and/or polish or other cosmetic appeal to the beads. Suitable coating materials for such an overcoat are known in the art, and include, but are not limited to, cellulosic polymers such as hydroxypropylmethylcellulose, hydroxypropylcellulose and microcrystalline cellulose, or combinations thereof (for example various Opadry® coating materials).

Topiramate-containing beads of the present invention may additionally contain enhancers that may be exemplified by, but not limited to, solubility enhancers, dissolution enhancers, absorption enhancers, permeability enhancers, stabilizers, complexing agents, enzyme inhibitors, p-glycoprotein inhibitors, and multidrug resistance protein inhibitors. Alternatively, the formulation can also contain enhancers that are separated from the topiramate beads, for example in a separate population of beads or as a powder. In yet another embodiment, the enhancer(s) may be contained in a separate layer on a topiramate-containing bead either under or above the release controlling coating.

The beads may further comprise other pharmaceutically active agents suitable for use in combination with topiramate for treatment or prevention of a pathological condition. The additional pharmaceutically active agents, without limitation, may be represented by analgesic and anti-inflammatory compounds such as COX-2 inhibitors, nonsteroidal anti-inflammatory drugs (NSAIDs), narcotic drugs such as opiates and morphinomimetics, synthetic drugs with narcotic properties such as tramadol; anticonvulsants such as valproic acid or its derivatives, carbamazepine, oxcarbazepine, gabapentin, and lamotrigine; anorectics or anti-obesity agents such as sibutramine or other, orlistat or other pancreatic lipase inhibitors, diethylpropion, fluoxetine, bupropion, amphetamine, methamphetamine, sertraline, zonisamide, and metformin, as well as medications associated with weight-gain, such as sulfonylurea derivatives, insulin, and thiazolidinediones whose weight-gain effect is tempered by topiramate; anti-hypertensive agents such as diuretics, anti-adrenergics, calcium channel blockers, ACE inhibitors, angiotensin II receptor antagonists, aldosterone antagonists, vasodilators, centrally acting adrenergic drugs, and adrenergic neuron blockers; mood stabilizers such as various forms/salts of lithium, Omega-3 fatty acids and others known in the art, drugs for treatment or prevention of migraines, such as ergot derivatives or triptans, or any other pharmaceutical or nutraceutical ingredient that can be safely and beneficially combined with topiramate.

A relative amount of every bead population in the complete formulation is determined on the basis of the pharmacokinetic data of the separate bead populations and the pre-determined release profile and will be discussed in more detail in Example 6.

In another embodiment, the formulation of the present invention comprises an extended release component as described above, and an immediate release component. The IR component may be an enhanced immediate release composition. The enhanced immediate release composition may be characterized by a faster in vitro topiramate release as compared to the IR formulation. Preferably, at least 80% of an active compound from the enhanced immediate release composition is released in a time period of not more than 30 minutes. More preferably, at least 50% of an active compound from the enhanced immediate release composition is released

US 8,992,989 B2

9
10

in a time period of not more than 10 minutes, and at least 25% is dissolved in a time period of not more than 5 minutes after the oral administration. In the most preferred embodiment of the present invention, at least 75% of the active compound is released from the EIR composition in a time period of not more than 10 minutes. The embodiment in which the IR component is an enhanced immediate release composition will be discussed in more details below.

In addition to topiramate and inactive excipients, the EIR composition of the present invention comprises at least one agent selected from a group consisting of complexing agents and enhancing agents.

Without any limitation, the enhancing agents suitable for the present invention may be selected from the solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives, buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. The representative, but non-limiting examples of these compounds are Vitamin E TPGS, amino acid such as glutamic acid and glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins such as maltodextrin, Cremophor RH40 (glycerol-polyethylene glycol oxystearate), Gelucire 50/13 (PEG-32 glyceryl palmitostearate), sodium lauryl sulfate, Tween 80 (polyoxyethylene sorbitan monooleate), benzyl alcohol, Span 20 (sorbitan monolaurate), Poloxamer 407, PEG3350, PVP K25, oleic acid, Capmul GMO (glyceryl monooleate), sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, crosscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, HPMC, substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, and menthol, among others. Enhancers can be combined to achieve multiple enhancement effects, for example, solubility enhancement combined with permeability enhancement and p-glycoprotein inhibition, or to provide a synergistic enhancement effect to achieve greater and more efficient enhancement. For example, polyglycolized glycerides (different grades of Gelucire) can be combined with sodium lauryl sulfate to achieve higher solubility enhancement as well as faster dissolution of topiramate.

In one embodiment, the EIR composition comprises a highly soluble complex of topiramate with a complexing agent that is represented by, but not limited to, cyclodextrins, including cyclodextrin derivatives, such as hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, and alpha-cyclodextrin. The ratio of cyclodextrin to topiramate in the EIR formulation is preferably less than 20:1 and more preferably less than 5:1. In the most preferred embodiment, the complexing agent is hydroxypropyl beta cyclodextrin.

The highly soluble complex of topiramate and cyclodextrin is prepared by mixing topiramate and cyclodextrin together in the presence of water. The concentration of cyclodextrin is preferably high to facilitate the formation of topiramate-enhancer complex. In the case when the complexing agent is hydroxypropyl-beta-cyclodextrin, the concentration of the hydroxypropyl-beta-cyclodextrin solution used for mixing with topiramate is greater than 2%, preferably greater than 20%, and more preferably at least about 40%. The amount of topiramate is determined by a desired ratio of hydroxypropyl-beta-cyclodextrin to topiramate, which is preferably less than 20:1, and more preferably less than 5:1. The mixing time of

the complex solution is from about one hour to about 48 hours, and preferably from about 5 hours to about 24 hours. The addition of hydroxypropyl-beta-cyclodextrin and topiramate can be incremental to reduce the viscosity of the complex solution and to achieve better complexation.

In a further embodiment, the EIR component of the present invention is contained in at least one bead population. Topiramate EIR beads can be prepared using processes suitable for bead manufacturing, such as coating of a topiramate suspension, dispersion or solution onto an inert carrier, or by roller compaction, granulation, extrusion/spheronization, or powder coating, and are not limited by the examples cited therein. The enhancing agents of the present invention can be incorporated into the topiramate containing beads, or may be contained in other beads separated from the topiramate containing beads. By way of a non-limiting example, topiramate-containing EIR beads were prepared by coating topiramate dispersion onto an inert carrier such as sugar spheres. The topiramate dispersion, in addition to topiramate in the micronized form or in non-micronized form, can contain one or more enhancers, water and optionally a binder such as hydroxypropylcellullose, hydroxypropylmethylcellulose, polyvinylpyrrolidone and polyvinyl alcohol.

When the formulation is enhanced with complexing agents, the agents may be first mixed with topiramate and a suitable solvent such as water to form the complex. The topiramate-containing complex is then mixed with a binder solution prepared separately to give the coating dispersion. The coating dispersion is then sprayed onto the inert carrier such as sugar spheres using a fluid bed processor.

In an alternative embodiment of the invention, the formulation comprises at least one XR bead population, and at least one additional combination bead population consisting of the extended release beads that have an additional immediate release component layer coated on top of the release controlling coating. This layer may be formed by a suitable loading method such as solution/suspension/dispersion coating, powder coating or wet granulation.

In yet another embodiment, at least part (i.e., more than 0.01%, preferably at least 1%) of the active ingredient may be present in the formulation in a form of micronized particles with the size of from 1 $\mu$m to 1000 $\mu$m, preferably from 2 $\mu$m to about 200 $\mu$m, more preferably from 2 $\mu$m to about 100 $\mu$m. Further, one or more enhancers may be present in the formulations covered by this embodiment. The enhancers are selected from solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives, buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. Preferably, the enhancer is a solubility enhancer or a dissolution enhancer.

The topiramate formulation of the present invention may be formulated in a dosage form selected from a tablet, a pill, a capsule, a caplet, a troche, a sachet, a cachet, a pouch, sprinkles, or any other form suitable for oral administration.

In one embodiment of the invention, the dosage form is a gelatin capsule containing the XR component in a form of at least one population of beads, and an optional IR component. The IR component, when present, may be in a form of a powder, or may also be contained in at least one population of beads to achieve faster dissolution of topiramate (FIG. 5).

In an alternative embodiment, part of the total amount of the active ingredient may be incorporated into the aforementioned bead populations that will be contained inside an

US 8,992,989 B2

**11**

enclosure such as a capsule, and the rest of the active ingredient can be loaded on the outside of the enclosure by a suitable loading method such as solution/suspension/dispersion coating or powder coating or wet granulation. For example, a part of the immediate release topiramate formulation can be loaded by coating on the outside of a capsule that contains within it other populations of topiramate such as extended release topiramate. This dosage form can provide almost instantaneous dissolution of the initial portion of topiramate dose from the outside of the capsule, followed by a sustained release of the rest of topiramate from inside the capsule.

In a further embodiment of the invention, the dosage form is a tablet. Without imposing any limitations, this embodiment may be exemplified by a multilayered tablet that comprises at least one layer containing the extended release component, and at least one layer comprising the immediate release component, wherein the IR component may or may be not an EIR composition.

The last two embodiments are especially beneficial when fast onset of action followed by sustained release is preferred, as is for example in the cases of a breakthrough migraine episode.

The current invention additionally encompasses a method of preparing formulations of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile. The method comprises the following steps:

1. determining the desired release profile;

2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method comprises a step for providing an immediate release component, which may be an enhanced immediate release composition.

In another embodiment, the method includes a process for providing an extended release component contained in at least one population of beads characterized by its own rate of release, wherein the process includes the steps of:

1. forming at least one population of topiramate-containing beads;

2. coating each population of beads with its own coating solution;

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The exact amount of beads of every population incorporated into the formulation and into the final dosage form is determined using the linear superposition principle (Win-NonLin) on the basis of the pharmacokinetic data of the separate bead populations and the pre-determined release profile (Example 6).

Release profiles of XR topiramate beads can be selectively adjusted, modified or stabilized by curing the beads at an elevated temperature. This process is well known in the art. However, it was unexpectedly discovered that curing the beads in the curing apparatus in the presence of at least one suitable solvent dramatically reduces the curing time necessary to produce a desired release profile and a level of stability. The curing process that previously required up to two weeks can be carried out by the method of current invention in several hours.

**12**

The assisting solvents can be selected from those solvents that can dissolve or partially dissolve the coating material, or those that can induce or assist the coalescence or molecular relaxation of the coating material, or those that can reduce electrostatic charge on the dosage forms during curing and those that can facilitate curing at a higher temperature. Examples of these solvents include but are not limited to organic solvents, such as alcohols, ketones, ethers, esters, amides, amines, hydrocarbons including substituted hydrocarbons such as chlorinated hydrocarbons and aromatic hydrocarbons, furans, sulfoxides, organic acids, phenols, super-critical fluids; ammonia; and water, buffered water, or water solutions of other inorganic or organic compounds, and their combinations. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

The curing of the dosage form normally is done in an apparatus that can operate at elevated temperatures and that can deliver the assisting solvents by means such as spray, injection, or vaporization. In the embodiment of the invention when the assisting solvent is sprayed or injected into the curing apparatus, the stream of solvent is introduced directly onto the coated beads. The amount of the solvent necessary to produce the desired effect, such as the desired release parameters and stabilization of the coating, depends on the nature of the solvent and the method of solvent delivery.

Typically, when the vaporization method is used, the organic solvents and aqueous solutions may be used in the wide range of vapor concentrations varying from 2% to more than 100%, providing an unsaturated, saturated or an oversaturated atmosphere. The pure water, however, has to be used in such an amount as to provide at least a saturated or, preferably, an oversaturated atmosphere in the curing apparatus. At least during the delivery of assisting solvents, the coated beads are mixed or agitated either continuously or in a pulsed manner.

In an alternative embodiment of the invention, hot water steam is introduced into the curing apparatus for a pre-selected period of time. The steam serves simultaneously as a solvent and as a source of heat for the beads. Introduction of steam is followed by a drying period.

This method of curing the release controlling coating results in many benefits including the dramatically shortened curing time, increased stability and modification of the release profile, and is not limited to topiramate containing beads, but includes the curing of any microparticles regardless of the drug.

Specifically, active ingredient containing beads, with or without the optional over-coat, are charged to a fluid bed processor or a pan coater and heated to a desired curing temperature range, for example 40° C. to 80° C. for sustained release dosage forms containing ethylcellulose (Surelease®), and 40° C. to 70° C. for sustained release dosage forms containing acrylic polymers (Eudragit® RS and Eudragit® RL). The assisting solvent or solvents, such as water or alcohol-water mixture, are sprayed onto the beads while mixing by, for example, fluidizing or rotating. Alternatively, the process is carried out in an oven where hot steam is introduced as previously discussed. Solvent-assisted curing is carried out to a desired curing time length, either in one curing period or in multiple, separate curing periods. The dosage forms can be further dried for a short period of time to remove residual solvents.

The solvent-assisted curing process significantly accelerates the curing of release controlling coating on active ingredient containing beads as compared to the heat-only curing of

US 8,992,989 B2

13
14

the same. In most instances, less than 4 hours of solvent-assisted curing resulted in more complete curing of the extended release dosage forms than 2 weeks of heat-only oven curing of the same dosage forms.

The present invention also presents a method of treatment or prevention of a pathological condition in a mammalian subject, comprising orally administering to the subject a therapeutically effective amount of a novel topiramate formulation of the instant invention, wherein topiramate is released from the formulation at a sustained rate along the pre-determined release profile. The method of the current invention possesses the flexibility to selectively adjust the pharmacokinetics of the administered formulations depending on the nature of the condition and needs of the patients due to the novel design of the topiramate formulation that comprises an extended release component and an optional immediate release component, and the release profiles of both components can be selectively modified during the preparation process as described above to comply with the predetermined release profile.

The pathological condition that may be treated by a method of the present invention is a neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by the topiramate administration.

The neurological disorders that may be treated or prevented by a formulation of the present invention include, but are not limited to, epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, perinatal hypoxia ischemia and related damage, chronic neurodegenerative disorders, acute neurodegeneration, and ALS.

Psychiatric disorders that may be treated or prevented by a formulation of the present invention include, but are not limited to bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, ADHD, impulse control disorders, border line personality disorder, addiction, and autism.

Formulations of the present invention may be also used for the treatment and prevention of diabetes and related disorders, such as type II diabetes mellitus, diabetic retinopathy, impaired oral glucose tolerance, diabetic skin lesions, diabetic neuropathy, Syndrome X and elevated blood glucose levels; ocular disorders, including but not limited to glaucoma and macular degeneration; cardiovascular disorders represented but not limited to elevated blood pressure and elevated lipids; obesity; asthma; autoimmune disorders; sleep apnea and sleep disorders. The formulations may be also used for inducing weight loss or promoting wound healing, or for any other condition, not specified above, wherein the use of topiramate is indicated.

The invention will be further illustrated by the following Examples, however, without restricting its scope to these embodiments.

EXAMPLES

Example 1

Extended Release Beads Preparation

Topiramate Drug Layering on Sugar Spheres—The "Core"

An aqueous suspension of 10-20% (w/w) topiramate (particle size 90% vol. NMT 30 micrometer, 50% vol. NMT 15 micrometer and 10% vol. NMT 5 micrometer) and 0.5-4% (w/w) HPMC or other aqueous binder can be used as the drug layering coating solution. A fluid bed suited for Wurster-spray is assembled and charged with inert carriers such as sugar spheres. The coating suspension is sprayed onto the bed to evenly coat the inert carriers to a desired topiramate loading level. Higher binder concentration in the coating solution may be used for smaller size inert carrier and higher topiramate loading. Inlet airflow rate and product temperature are adjusted to keep the batch from spray-drying the coating material or over-wetting the spheres.

Coating of the Core with a Release Controlling Coating

A dispersion of a cellulosic polymer such as ethylcellulose and methylcellulose can be used to coat the core in the current invention. Ethylcellulose dispersion (Surelease®) can be diluted to a final concentration of about 10% to about 20% and with or without the use of other ingredients such as pore formers. A fluid bed suited for Wurster-spray is assembled and charged with the cores prepared in Example 1. The release controlling coating dispersion is sprayed onto the bed to evenly coat the core to a desired coating level as exemplified in Table 1.

TABLE 1

| Composition and process Parameters for the extended Release | | | | | | | |
|---|---|---|---|---|---|---|---|
| | XR1a | XR1b | XR1c | XR2a | XR2b | XR2c | XR2d |
| RC* coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) |
| Pore-former | — | — | Opadry ® Clear | — | — | Opadry ® Clear | Opadry ® Clear |
| RC coating material to pore-former ratio | — | — | 80:20 | — | — | 80:20 | 80:20 |
| RC coating level | 2% | 4% | 3% | 3% | 3% | 6.5% | 6.5% |
| Product temperature during coating | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C. | 20° C.-60° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | Opadry ® AMB White | Opadry ® AMB White | — | Opadry ® AMB White | — | Opadry ® AMB White |
| Over-coat coating level | — | 1.5% | 1.5% | — | 1.5% | — | 1.5% |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven |

US 8,992,989 B2

**15**          **16**

TABLE 1-continued

Composition and process Parameters for the extended Release

Topiramate Beads

| | XR3 | XR4 | XR5 | XR6 | XR7 | XR8 |
|---|---|---|---|---|---|---|
| RC coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Acrylic polymers (Eudragit ® RL30D/RS30D) |
| Pore-former | — | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | — |
| RC coating material to pore-former ratio | — | 80:20 | 80:20 | 80:20 | 85:15 | — |
| RC coating level | 3.7% | 3.1% | 5.2% | 9.5% | 15% | 15% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.- 60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | — | — | — | — | — |
| Over-coat coating level | — | — | — | — | — | — |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, fluid bed/ 5% alcohol- water, or oven | Fluid bed/ water, fluid bed/ 5% alcohol- water, or oven |

*RC—Release Controlling

## Example 2

### Method of Topiramate-Hydroxypropyl-beta-cyclodextrin Complex Bead Preparation

Approximately half of the intended amount of topiramate was added to the water with constant mixing followed by sprinkling of hydroxypropyl-beta-cyclodextrin into the dispersion. Once the dispersion became significantly less viscous, more drug substance was added followed by sprinkling of more hydroxypropyl-beta-cyclodextrin. The drug and hydroxypropyl-beta-cyclodextrin addition steps were repeated, and the dispersion was mixed for 12-18 hours. Separately, hydroxypropylmethylcellulose was dissolved in water. The above topiramate—hydroxypropyl-beta-cyclodextrin dispersion and hydroxypropylmethylcellulose solution were mixed together for 15 to 30 minutes and the mixture was screened through an 80-mesh sieve. The resultant dispersion was sprayed onto sugar spheres using a fluid bed processor to yield the enhanced immediate release beads (Table 2).

TABLE 2

Hydroxypropyl-beta-cyclodextrin - Topiramate EIR Bead Compositions

| | Percentage (w/w) in Beads | | | |
|---|---|---|---|---|
| Component | EIR-1 (HPBCD: Drug = 3:2)* | EIR-2 (HPBCD: Drug = 3:2)* | EIR-3 (HPBCD: Drug = 1:1)* | EIR-4 (HPBCD: Drug = 1:2)* |
| Topiramate | 25.0 | 3.3 | 28.9 | 33.3 |
| Hydroxypropyl- beta-cyclodextrin | 37.5 | 4.95 | 28.9 | 16.7 |
| Hydroxypropyl- methylcellulose | 3.1 | 0.41 | 2.4 | 4.2 |
| Sugar spheres | 34.4 | 91.34 | 39.8 | 45.8 |

*HPBCD:Drug—Hydroxypropyl-beta-cyclodextrin to drug substance ratio

## Example 3

### Topiramate EIR Beads Containing Non-Complexing Enhancers

Topiramate is dispersed in a binder solution, such as hydroxypropylmethylcellulose solution, that contains an appropriate amount of enhancer or enhancers such as d-alpha-tocopheryl polyethylene glycol 1000 succinate (vitamin E TPGS) and sodium lauryl sulfate combination, polyoxyl hydrogenated castor oil (different grades of Cremophor RH), polyglycolized glycerides (different grades of Gelucire), polyglycolized glycerides (different grades of Gelucire) combined with sodium lauryl sulfate, or combinations thereof. The resultant dispersion is sprayed onto an inert carrier such as sugar spheres using a fluid bed processor to achieve a desired drug load (Table 3).

TABLE 3

Enhanced Immediate Release Topiramate Bead Compositions

| | Percentage (w/w) in Beads | | |
|---|---|---|---|
| Component | EIR-5 | EIR-6 | EIR-7 |
| Topiramate | 36.8 | 37.9 | 36.4 |
| Sodium lauryl sulfate | 0.7 | 0.5 | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | 7.3 | — | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | 9.1 |
| Polyglycolized glycerides (Gelucire 50/13) | — | 4.7 | — |
| Hydroxypropylmethylcellulose | 4.6 | 4.8 | 4.5 |
| Sugar spheres | 50.6 | 52.1 | 50.0 |

US 8,992,989 B2

**17**

Example 4

Topiramate EIR Beads Containing Micronized Particles

Micronized or non-micronized topiramate is dispersed in a solution with or without heating, optionally containing dissolution enhancing agents such as mannose, maltose, mannitol, lactose, maltodextrin and sodium starch glucolate, and optionally containing one or more additional enhancers such as PEG3350, sodium lauryl sulfate, sodium docusate, polyoxyethylene sorbitan monooleate and Poloxamers, under such process parameters that topiramate particles that remain undissolved have a particle size of about 2 micron to about 30 micron. A particle size reduction device such as a homogenizer can also be used to reduce the particle size of undissolved topiramate. The resultant topiramate dispersion is then sprayed onto inert carriers such as sugar spheres in a coating processor such as a fluid bed processor. The formulations obtained are represented in the Table 4:

TABLE 4

Topiramate EIR Beads containing micronized particles

| | Percentage (w/w) in Beads | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | EIR-8 | EIR-9 | EIR-10 | EIR-11 | EIR-12 | EIR-13 |
| Topiramate | 3.2 | 26.0 | 25.0 | 3.2 | 26.0 | 26.0 |
| Mannose | 0.4 | 5.0 | 3.3 | 2.0 | 10.0 | 10.0 |
| Maltrin 250 | — | — | 1.0 | 1.0 | — | — |
| PEG3350 | 1.0 | 15.0 | — | — | — | 10.0 |
| Sodium lauryl sulfate | — | — | — | — | 0.5 | — |
| Hydroxypropyl-beta-cyclodextrin | — | — | 37.5 | — | — | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | — | — | — | — | 2.0 | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | — | — | — | 2.0 |
| Sugar spheres | 95.4 | 54.0 | 33.2 | 93.8 | 61.5 | 52.0 |

Example 5

Method of Curing Beads

The topiramate beads coated with a release controlling coating, with or without an overcoat, can be cured using the above-mentioned solvent-assisted curing process, or using the heat-only curing process, to a desired curing level and preferably to complete curing.

Specifically, the core is coated to a desired coating level with a solution or dispersion of the release controlling coating material, with or without the above-mentioned additives such as pore-formers, using a fluid bed processor or any other suitable apparatus for coating of the core. Product temperature is controlled at a desirable range, for example 20° C. to 60° C. for the coating of ethylcellulose (Surelease®) and 20° C. to 60° C. for acrylic polymers (Eudragit® RL and Eudragit® RS grades). An optional overcoat with materials such as cellulosic polymers (various Opadry®) is applied thereafter. Curing of the sustained release topiramate beads is carried out either in an oven at 40° C. to 80° C. for Surelease® containing beads or at 40° C. to 70° C. for Eudragit® RL or

**18**

RS containing beads, or in a fluid bed processor with or without the use of assisting solvents at similar product temperatures.

For curing that uses assisting solvents, the assisting solvent can be delivered through top spray, bottom spray, side spray or injection, or introduced by vaporization. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

Example 6

Sustained Release Formulations of Topiramate

a. Plasma concentration versus time curves for the topiramate formulations containing extended release and immediate release bead populations are simulated using WinNonlin Version 5.0.1 based on the pharmacokinetic data on the separate bead populations that were generated in a comparative randomized single-dose 6-way crossover study in healthy adult volunteers. The study included administration of a 50 mg oral dose of three extended release compositions, designated here as XR1, XR2 and XR3, two immediate release compositions ((Topamax®, Ortho-McNeil Neurologics, Inc.) (25 mg BID), and an immediate release bead formulation) and an enhanced immediate release (IR) bead composition. The single dose topiramate plasma concentration profiles for XR1, XR2 and XR3 are shown in FIG. 3. The single dose topiramate plasma concentration profiles for IR are shown in FIG. 4. The data are projected to a steady-state (SS) with a 24 h dosing interval for the sustained release compositions and a 12 h dosing interval for Topamax, using the linear superposition principle (WinNonlin). The extended release populations XR1, XR2 and XR3, and an immediate release (IR) population are selected in such a way as to be defined by at least one of the three following sets of conditions:

1. for the steady state,

for XR1, $1.70C_{maxIR} \geq C_{maxXR1} \geq 1.30C_{maxIR}$

for XR2, $0.40C_{maxIR} \geq C_{maxXR2} \geq 0.20C_{maxIR}$

for XR3, $0.25C_{maxIR} \geq C_{maxXR3} \geq 0.05C_{maxIR}$

2. for in-vitro dissolution,

for XR1, $1.5 h \leq T_{80\%} \leq 4 h$

for XR2, $5 h \leq T_{80\%} \leq 8 h$

for XR3, $8 h \leq T_{80\%} \leq 10 h$

3. for a single initial dose in-vivo,

for XR1, $4 h \leq T_{max} \leq 8.5 h$

for XR2, $T_{max} \geq 16 h$

for XR3, $T_{max} \geq 16 h$.

Optionally, the immediate release bead population is composed of enhanced immediate release (EIR) beads such that at least one condition is true: a. for the steady state, $2.40CmaxIR \geq CmaxEIR \geq 1.20CmaxIR$; b. for in-vitro dissolution, $T80\% \leq 30 min$; c. for a single initial dose in-vivo, $Tmax \leq 2 h$.

The results of the pharmacokinetic simulation for the seven exemplary formulations are summarized in Table 5 below. These formulations are selected as examples only, and in no way limit the range, compositions or properties of the formulations covered by the present invention.

US 8,992,989 B2

19      20

TABLE 5

Composition and Pharmacokinetic data of Multi-bead Formulations

|  | #1 | #2 | #3 | #4 | #5 | #6 | #7 |
|---|---|---|---|---|---|---|---|
| % XR1 | 20 | 50 | 0 | 10 | 10 | 15 | 0 |
| % XR2 | 80 | 0 | 85 | 80 | 80 | 70 | 100 |
| % XR3 | 0 | 50 | 0 | 0 | 0 | 15 | 0 |
| % IR | 0 | 0 | 15 | 5 | 10 | 0 | 0 |
| Rel. BA (%), SS | 98.5 | 100.5 | 96.6 | 97.4 | 97.6 | 97.3 | 96.0 |
| Degree of fluctuation, SS | 0.15 | 0.22 | 0.14 | 0.14 | 0.15 | 0.13 | 0.09 |

b. based on the results of WinNonlin simulation discussed in part (a), formulations #1 (A), #3 (B), and #4 (C) were tested in the comparative randomized multi-dose 4-way study following a once a day 50 mg oral dose of three controlled release formulations and a 25 mg twice a day oral doses of Topamax® in healthy adult volunteers.

The results of the study are summarized in Table 6 and FIG. 6:

TABLE 6

Pharmacokinetic study data for Multi-bead Formulations

|  | #1 A | #3 B | #4 C | Control (Topamax ®) |
|---|---|---|---|---|
| % XR1 | 20 | 0 | 10 | — |
| % XR2 | 80 | 86 | 84 | — |
| % XR3 | 0 | 0 | 0 | — |
| % IR | 0 | 14 | 6 | — |
| Rel. BA (%), SS | 92 | 93 | 95 | 100 |
| Relative Degree of fluctuation, SS | 73% | 72% | 66% | 100% |

What is claimed is:

1. A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, micro-

crystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

2. The formulation of claim 1, wherein the XR component is contained in at least one population of beads.

3. The formulation of claim 1, comprising an IR component such that 80% of the topiramate is released in not more than 1 hour.

4. The formulation according to claim 1, wherein the XR component further comprises a binder selected from the group consisting of starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and polyvinylpyrrolidone.

5. The formulation according to claim 1, wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, crosslinked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly(α-ω)alkylenediols; alkali metal salts and alkaline earth metal salts, and combinations thereof.

6. The formulation of claim 1, wherein at least a part of the active ingredient is in a form of micronized particles.

7. The formulation of claim 1, wherein the formulation is in a dosage form of a capsule or sprinkles.

8. The formulation of claim 1, wherein the total amount of topiramate in the formulation is from 0.5 to 3000 mg.

9. The formulation of claim 1, wherein the XR component comprises an inert carrier selected from the group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres.

10. The formulation of claim 1, wherein the release controlling coating comprises ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, cellulose acetate phthalate, polyvinyl alcohol, polyacrylates, polymethacrylates or copolymers thereof.

11. The formulation of claim 1, wherein the formulation provides for a maximum steady state plasma concentration (Cmax) of topiramate which is in the range from 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID.

12. The formulation of claim 1, wherein the formulation provides for a relative steady state AUC in the range of 80% to 125% of the AUC of the same amount of topiramate administered as an immediate release formulation BID.

13. The formulation of claim 1, further comprising an additional pharmaceutically active ingredient in combination with topiramate.

US 8,992,989 B2

21
22

**14**. A sustained release formulation of topiramate comprising topiramate as an active ingredient, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

**15**. A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotropic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release formulation of topiramate comprising topiramate as an active ingredient, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol,

sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

**16**. The method of claim **15**, wherein the condition is epilepsy.

**17**. The method of claim **15**, wherein the condition is migraine.

**18**. A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotropic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release formulation of topiramate comprising topiramate as an active ingredient, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR

US 8,992,989 B2

**23**

**24**

component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

**19**. The method of claim **18**, wherein the condition is epilepsy.

**20**. The method of claim **18**, wherein the condition is migraine.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,992,989 B2                                   Page 1 of 1
APPLICATION NO.   : 14/499462
DATED             : March 31, 2015
INVENTOR(S)       : Likan Liang et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Claim 1, column 20, line 13: "...microcrystalline cellulose sodium bicarbonate,..." should read
-- ...microcrystalline cellulose, sodium bicarbonate,... --

Claim 10, column 20, line 50: "...wherein the release controlling coating comprises..." should read
-- ...wherein the coating material comprises... --

Claim 14, column 21, line 30: "...microcrystalline cellulose sodium bicarbonate,..." should read
-- ...microcrystalline cellulose, sodium bicarbonate,... --

Claim 15, column 21, line 46: "...amyotropic..." should read -- ......amyotrophic... --

Claim 15, column 22, line 10: "...microcrystalline cellulose sodium bicarbonate,..." should read
-- ...microcrystalline cellulose, sodium bicarbonate,... --

Claim 18, column 22, line 33: "...amyotropic..." should read -- ......amyotrophic... --

Claim 18, column 22, line 63: "...microcrystalline cellulose sodium bicarbonate,..." should read
-- ...microcrystalline cellulose, sodium bicarbonate,... --

Signed and Sealed this
Thirty-first Day of May, 2016

Michelle K. Lee

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

Case: 24-1696    Document: 14    Page: 355    Filed: 06/06/2024



US009549940B2

(12) **United States Patent**
Liang et al.

(10) Patent No.: **US 9,549,940 B2**
(45) Date of Patent: **\*Jan. 24, 2017**

(54) **SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE**

(71) Applicant: **Supernus Pharmaceuticals, Inc.,** Rockville, MD (US)

(72) Inventors: **Likan Liang**, Boyds, MD (US); **Hua Wang**, Clarksville, MD (US); **Padmanabh P. Bhatt**, Rockville, MD (US); **Michael L. Vieira**, Gaithersburg, MD (US)

(73) Assignee: **Supernus Pharmaceuticals, Inc.,** Rockville, MD (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/259,841**

(22) Filed: **Sep. 8, 2016**

(65) **Prior Publication Data**

US 2016/0375047 A1    Dec. 29, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/630,099, filed on Feb. 24, 2015, which is a continuation of application No. 14/499,462, filed on Sep. 29, 2014, now Pat. No. 8,992,989, which is a continuation of application No. 14/330,423, filed on Jul. 14, 2014, now Pat. No. 8,877,248, which is a continuation of application No. 12/926,936, filed on Dec. 17, 2010, now Pat. No. 8,889,191, which is a continuation of application No. 11/941,475, filed on Nov. 16, 2007, now Pat. No. 8,298,576.

(60) Provisional application No. 60/859,502, filed on Nov. 17, 2006.

(51) **Int. Cl.**
*A61K 9/16*       (2006.01)
*A61K 31/7048*   (2006.01)
*A61K 45/06*     (2006.01)

(52) **U.S. Cl.**
CPC ......... *A61K 31/7048* (2013.01); *A61K 9/1676* (2013.01); *A61K 45/06* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 9/1676; A61K 9/209; A61K 9/5078; A61K 9/5084; A61K 9/5047; A61K 47/48969; A61K 9/5042; A61K 31/7048; A61K 31/357; B82Y 5/00
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,528,378 A | 10/1950 | Mannheimer et al. |
| 2,675,619 A | 4/1954 | Cone |
| 2,677,700 A | 5/1954 | Jackson et al. |
| 2,738,303 A | 3/1956 | Blythe |
| 2,781,354 A | 2/1957 | Mannheimer et al. |
| 2,979,578 A | 4/1961 | Curtis |
| 2,996,431 A | 8/1961 | Barry |
| 3,036,118 A | 5/1962 | Jackson et al. |
| 3,139,383 A | 6/1964 | Neville et al. |
| 3,535,307 A | 10/1970 | Moss et al. |
| 3,811,444 A | 5/1974 | Heller et al. |
| 3,829,506 A | 8/1974 | Schmolka et al. |
| 3,962,414 A | 6/1976 | Michaels |
| 3,992,518 A | 11/1976 | Chien et al. |
| 4,066,747 A | 1/1978 | Capozza |
| 4,070,347 A | 1/1978 | Schmitt |
| 4,079,038 A | 3/1978 | Choi et al. |
| 4,083,949 A | 4/1978 | Benedikt |
| 4,093,709 A | 6/1978 | Choi et al. |
| 4,290,426 A | 9/1981 | Luschen et al. |
| 4,434,153 A | 2/1984 | Urquhart et al. |
| 4,513,006 A | 4/1985 | Maryanoff et al. |
| 4,721,613 A | 1/1988 | Urquhart et al. |
| 4,727,064 A | 2/1988 | Pitha |
| 4,752,470 A | 6/1988 | Mehta |
| 4,757,128 A | 7/1988 | Domb et al. |
| 4,853,229 A | 8/1989 | Theeuwes |
| 4,938,763 A | 7/1990 | Dunn et al. |
| 4,997,904 A | 3/1991 | Domb |
| 5,030,447 A | 7/1991 | Joshi et al. |
| 5,133,974 A | 7/1992 | Paradissis et al. |
| 5,175,235 A | 12/1992 | Domb et al. |
| 5,180,589 A | 1/1993 | Joshi et al. |
| 5,225,202 A | 7/1993 | Hodges et al. |
| 5,256,440 A | 10/1993 | Appel et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CN | 1130352 A | 9/1996 |
|---|---|---|
| WO | WO 93/21906 A1 | 11/1993 |

(Continued)

OTHER PUBLICATIONS

US 6,103,281, 08/2000, DelDuca et al. (withdrawn)
Adin et al., "Topiramate Serum Concentration-to-Dose Ratio," Therapeutic Drug Monitoring, Jun. 2004; 26(3):251-257.
Bahk et al., "Topiramate and divalproex in combination with risperidone for acute mania: a randomized open-label study," Progress in Neuropsychopharmacology & Biological Psychiatry, 2005, 29(1):115-121.
Beaumanoir, Anne, "The Landau-Kleffner syndrome", In: Roger et al., Eds. *Epileptic Syndromes in Infancy, Childhood, and Adolescence* 2nd Ed., London, England: John Libby, pp. 231-244, 1992.
Berge et al., "Pharmaceutical Salts", J. Pharm. Sci., Jan. 1977, 66(1): 1-19.

(Continued)

*Primary Examiner* — Suzanne Ziska

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP; Sunit Talapatra

(57) **ABSTRACT**

Pharmaceutical compositions of topiramate for once-a-day oral administration are provided. The formulations comprise a sustained-release component and an optional immediate-release component, the compositions of which can be selectively adjusted, respectively, to release the active ingredient along a pre-determined release profile. Method of treating or preventing pathological disorders in mammalian subjects comprising the administration of the novel formulations disclosed herein is also provided.

**20 Claims, 6 Drawing Sheets**

# US 9,549,940 B2

Page 2

(56) **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,378,475 A | 1/1995 | Smith et al. |
| 5,470,584 A | 11/1995 | Hendrickson et al. |
| 5,478,577 A | 12/1995 | Sackler et al. |
| 5,500,227 A | 3/1996 | Oschlack et al. |
| 5,576,311 A | 11/1996 | Guy |
| 5,639,476 A | 6/1997 | Oshlack et al. |
| 5,753,693 A | 5/1998 | Shank |
| 5,760,007 A | 6/1998 | Shank et al. |
| 5,773,019 A | 6/1998 | Ashton et al. |
| 5,912,013 A | 6/1999 | Rudnic et al. |
| 5,935,933 A | 8/1999 | Shank et al. |
| 5,955,096 A | 9/1999 | Santos et al. |
| 5,968,552 A | 10/1999 | Sherman |
| 5,985,312 A | 11/1999 | Jacob et al. |
| 5,998,380 A | 12/1999 | Ehrenberg et al. |
| 6,066,339 A | 5/2000 | Stark et al. |
| 6,123,965 A | 9/2000 | Jacob et al. |
| 6,156,348 A | 12/2000 | Santos et al. |
| 6,159,501 A | 12/2000 | Skinhoj |
| 6,191,117 B1 | 2/2001 | Kozachuk |
| 6,197,346 B1 | 3/2001 | Mathiowitz et al. |
| 6,201,010 B1 | 3/2001 | Cottrell |
| 6,217,908 B1 | 4/2001 | Mathiowitz et al. |
| 6,235,311 B1 | 5/2001 | Ullah et al. |
| 6,248,363 B1 | 6/2001 | Patel et al. |
| 6,294,192 B1 | 9/2001 | Patel et al. |
| 6,319,903 B1 | 11/2001 | Carrazana et al. |
| 6,344,215 B1 | 2/2002 | Bettman et al. |
| 6,365,187 B2 | 4/2002 | Mathiowitz et al. |
| 6,368,586 B1 | 4/2002 | Jacob et al. |
| 6,479,467 B1 | 11/2002 | Buchanan et al. |
| 6,500,454 B1 | 12/2002 | Percel et al. |
| 6,503,884 B1 | 1/2003 | Ehrenberg et al. |
| 6,514,531 B1 | 2/2003 | Alaux et al. |
| 6,524,620 B2 | 2/2003 | Cheng et al. |
| 6,528,090 B2 | 3/2003 | Qiu et al. |
| 6,559,293 B1 | 5/2003 | Almarsson et al. |
| 6,562,865 B1 | 5/2003 | Codd et al. |
| 6,569,463 B2 | 5/2003 | Patel et al. |
| 6,635,284 B2 | 10/2003 | Mehta et al. |
| 6,696,091 B2 | 2/2004 | Thakur et al. |
| 6,699,840 B2 | 3/2004 | Almarsson et al. |
| 6,797,283 B1 | 9/2004 | Edgren et al. |
| 6,923,988 B2 | 8/2005 | Patel et al. |
| 7,018,609 B2 | 3/2006 | Hwang Pun et al. |
| 7,195,778 B2 | 3/2007 | Fleshner-Barak et al. |
| 7,611,722 B2 | 11/2009 | Lerner et al. |
| 7,737,133 B2 | 6/2010 | Devane et al. |
| 7,763,635 B2 | 7/2010 | Kidane et al. |
| 2002/0044962 A1 | 4/2002 | Cherukuri et al. |
| 2002/0054907 A1 | 5/2002 | Devane et al. |
| 2002/0064563 A1 | 5/2002 | Thakur et al. |
| 2002/0150616 A1 | 10/2002 | Vandecruys |
| 2003/0017972 A1 | 1/2003 | Pun et al. |
| 2003/0064097 A1 | 4/2003 | Patel et al. |
| 2003/0072802 A1 | 4/2003 | Cutler |
| 2003/0091630 A1 | 5/2003 | Louie-Helm et al. |
| 2003/0133985 A1 | 7/2003 | Louie-Helm et al. |
| 2003/0147952 A1 | 8/2003 | Lim et al. |
| 2003/0157173 A1 | 8/2003 | Percel et al. |
| 2003/0166581 A1 | 9/2003 | Almarsson et al. |
| 2003/0215496 A1 | 11/2003 | Patel et al. |
| 2003/0225002 A1 | 12/2003 | Livingstone |
| 2004/0002462 A1 | 1/2004 | Najarian |
| 2004/0022844 A1 | 2/2004 | Hasenzahl et al. |
| 2004/0028729 A1 | 2/2004 | Shojaei et al. |
| 2004/0028735 A1 | 2/2004 | Kositprapa |
| 2004/0052843 A1 | 3/2004 | Lerner et al. |
| 2004/0053853 A1 | 3/2004 | Almarsson et al. |
| 2004/0083819 A1 | 4/2004 | Hedner et al. |
| 2004/0091529 A1 | 5/2004 | Edgren et al. |
| 2004/0096501 A1 | 5/2004 | Vaya et al. |
| 2004/0109894 A1 | 6/2004 | Shefer et al. |
| 2004/0115262 A1 | 6/2004 | Jao et al. |
| 2004/0122104 A1 | 6/2004 | Hirsh et al. |

| | | | |
|---|---|---|---|
| 2004/0132826 A1 | 7/2004 | Hirsh et al. |
| 2004/0156901 A1 | 8/2004 | Thakur et al. |
| 2004/0157785 A1 | 8/2004 | Connor |
| 2004/0185097 A1 | 9/2004 | Kannan et al. |
| 2004/0228912 A1 | 11/2004 | Chang et al. |
| 2004/0234601 A1 | 11/2004 | Legrand et al. |
| 2004/0258758 A1 | 12/2004 | Gustow et al. |
| 2005/0053653 A1 | 3/2005 | Kidane et al. |
| 2005/0058707 A1 | 3/2005 | Reyes et al. |
| 2005/0069587 A1 | 3/2005 | Modi et al. |
| 2005/0106242 A1 | 5/2005 | Yan et al. |
| 2005/0106247 A1 | 5/2005 | Venkatesh et al. |
| 2005/0106248 A1 | 5/2005 | Dixit et al. |
| 2005/0129765 A1 | 6/2005 | Li et al. |
| 2005/0136108 A1 | 6/2005 | Yam et al. |
| 2005/0169982 A1 | 8/2005 | Almarssoo et al. |
| 2005/0169992 A1 | 8/2005 | Jao et al. |
| 2005/0175697 A1 | 8/2005 | Edgren et al. |
| 2005/0191343 A1 | 9/2005 | Liang |
| 2005/0191351 A1 | 9/2005 | Kidane et al. |
| 2005/0220596 A1 | 10/2005 | Gaedy et al. |
| 2005/0245460 A1 | 11/2005 | Meyerson et al. |
| 2006/0018933 A1 | 1/2006 | Vaya et al. |
| 2006/0018934 A1 | 1/2006 | Vaya et al. |
| 2006/0024365 A1 | 2/2006 | Vaya et al. |
| 2006/0034927 A1 | 2/2006 | Casadevall et al. |
| 2006/0045912 A1 | 3/2006 | Truog |
| 2006/0078609 A1 | 4/2006 | Vandecruys et al. |
| 2006/0105045 A1 | 5/2006 | Buchanan et al. |
| 2006/0121112 A1 | 6/2006 | Jenkins et al. |
| 2006/0147527 A1 | 7/2006 | Bachmann et al. |
| 2006/0223762 A1 | 10/2006 | Ehrenberg et al. |
| 2006/0233892 A1 | 10/2006 | Hendrix |
| 2007/0212411 A1 | 9/2007 | Fawzy et al. |
| 2007/0264323 A1 | 11/2007 | Shojaei et al. |
| 2008/0085306 A1 | 4/2008 | Nangia et al. |
| 2008/0131501 A1 | 6/2008 | Liang et al. |
| 2011/0287099 A1 | 11/2011 | Liang et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 01/37808 A1 | 5/2001 |
| WO | WO 02/03984 A2 | 1/2002 |
| WO | WO 02/43731 A3 | 6/2002 |
| WO | WO-2004/002427 A1 | 1/2004 |
| WO | WO 2004/022037 A1 | 3/2004 |
| WO | WO 2004/078162 A1 | 9/2004 |
| WO | WO 2004/078163 A2 | 9/2004 |
| WO | WO-2004/108067 A3 | 12/2004 |
| WO | WO 2005/030166 A1 | 4/2005 |
| WO | WO-2005/046664 A1 | 5/2005 |
| WO | WO 2005/079748 A2 | 9/2005 |
| WO | WO 2006/009403 A1 | 1/2006 |
| WO | WO-2006/063078 A3 | 6/2006 |
| WO | WO-2006/075925 A2 | 7/2006 |
| WO | WO 2006/119153 A2 | 11/2006 |
| WO | WO 2007/002318 | 1/2007 |
| WO | WO 2008/060963 A2 | 5/2008 |

## OTHER PUBLICATIONS

Berlant, Jeffery L., M.D., Ph.D., "Topiramate in Posttraumatic Stress Disorder: Preliminary Clinical Observations," J. Clin. Psychiatry, 2001, 62(Suppl 17):60-63.

Brandes et al., "Topiramate for Migraine Prevention," JAMA, Feb. 25, 2004, 291(8):965-973.

Carpenter et al., "Do obese depressed patients respond to topiramate? A retrospective chart review," J. Affect. Disord., 2002, 69(1-3):251-255.

Chen et al., "Combination Treatment of Clozapine and Topiramate in Resistant Rapid-Cycling Bipolar Disorder," Clin. Neuropharmacol., May-Jun. 2005, 28(3):136-138.

Coleman et al., "Polymer reviewed: A practical guide to polymer miscibility," Jul. 1990, 31:1187-1230.

Contin et al., "Topiramate Therapeutic Monitoring in Patients with Epilepsy: Effect of Concomitant Antiepileptic Drugs," Ther. Drug Monit., 2002, 24(3):332-337.

(56)        **References Cited**

OTHER PUBLICATIONS

D'Amico et al., "Topiramate in migraine prophylaxis," Neurological Sciences, 2005, 26(Suppl 2):S130-S133.

Deckers et al., "Selection of Antiepileptic Drug Polytherapy Based on Mechanisms of Action: The Evidence Reviewed," Epilepsia, 2000, 41(11):1364-1374.

Diener et al., "Topiramate in migrain prophylaxis: Results from a placebo-controlled trail with propranolol as an active control," J. Neurol., 2004, 251(8):943-950.

Dorado et al., "Topiramato en enfermedades comorbidas: epilepsia y migrana," Rev. Neurol., 2006, 43(4):193-196.

Duchene et al., "Pharmaceutical and Medical Aspects of Bioadhesive Systems for Drug Administration," Drug Dev. Ind. Pharm., 1988, 14(2&3):283-318.

Erfurth et al., "Bupropion as Add-On Strategy in Difficult-to-Treat Bipolar Depressive Patients," Neuropsychobiology, 2002, 45(Suppl 1):33-36.

Felmeister, Alvin Ph.D., "Powders," Remington's Pharm. Sci., 14th Ed., 1970, Chapter 86, 1626-1628.

Ferrari et al., "Influence of Dosage, Age, and Co-Medication on Plasma Topiramate Concentrations in Children and Adults with Severe Epilepsy and Preliminary Observations on Correlations with Clinical Response," Therapeutic Drug Monitoring, 2003, 25(6):700-708.

Ferrari et al., "Rizatriptan: a new milestone in migraine treatment," Cephalalgia, 2000, 20(Suppl 1):1.

Fincher, Julian H., "Particle Size of Drugs and Its Relationship to Absorption and Activity," J. Pharm. Sci., Nov. 1968, 57(11):1825-1835.

Fisher et al., "Synergism between Topiramate and Budipine in Refractory Status Epilepticus in the Rat," Epilepsia, 2004, 45(11):1300-1307.

François et al., "The combination of topiramate and diazepam is partially neuroprotective in the hippocampus but not antiepileptogenic in the lithium-pilocarpine model of temporal lobe epilepsy," Epilepsy Research, 2006, 72:147-163.

Gurny et al., "Bioadhesive intraoral release systems: design, testing and analysis," Biomaterials, Nov. 1984, 5:336-340.

Hershey et al., "Effectiveness of Topiramate in the Prevention of Childhood Headaches," Headache, Sep. 2002;42(8):810-818.

Hoes et al., "The Application of Drug-Polymer Conjugates in Chemotherapy," Drug Carrier Systems, 1989, 9:57-109.

Hollander et al., "Topiramate plus paroxetine in treatment-resistant obsessive-compulsive disorder," Int. Clin. Psychopharmacol., 2006, 21(3): 189-191.

International Search Report and Written Opinion mailed Sep. 2, 2008, in PCT/US2007/19208, 10 pages.

Ioannides-Demos et al., "Pharmacotherapy for Obesity," Drugs, 2005, 65(10):1391-1418.

Johnson et al., "Oral topiramate for treatmetn of alcohol dependence: a randomised controlled trial," The Lancet, May 17, 2003, 361(9370):1677-1685.

Kellett et al., "Topiramate in clinical practice: first year's postlicensing experience in a specialist epilepsy clinic," J. Neurol. Neurosurg. and Psych., 1999;66:759-763.

Lainez et al., "Topiramate in the Prophylactic Treatment of Cluster Headache," Headache, Jul./Aug. 2003, 43(7):784-789.

Lalonde et al., "Additive effects of leptin and topiramate in reducing fat deposition in lean and obese ob/ob mice," Physiology & Behavior, 2004, 80(4):415-420.

Lee et al., "The Effects of Adjunctive Topiramate on Cognitive Function in Patients with Epilepsy," Epilepsia, 2003; 44(3):339-347.

Lehr et al., "Intestinal Transit of Bioadhesive Microspheres in an in situ Loop in the Rat—A Comparative Study with Copolymers and Blends Based on Poly(acrylic acid)," Journal of Controlled Release, 1990, 13:51-62.

Leong et al., "Polymeric controlled drug delivery," Adv. Drug Delivery Rev., 1987, 1:199-233.

Linhardt, Robert J. "Biodegradable Polymers for Controlled Release of Drugs," Controlled Release of Drugs, 1989, Chapter 2, 53-95.

Liu et al., "Preparation, characterization and in vivo evaluation of formulation of baicalein with hydroxypropyl-beta-cyclodextrin," International Journal of Pharmaceutics, 2006, 312:137-147.

Longer, Mark A., Ph.D., "Sustained-Release Drug Delivery Systems," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 91, 1676-1693.

Lu et al., "Dimensionless presentaion for drug release from a coated pure drug bead: 1. Analysis," Inter. J. of Pharm., 1994, 112:105-116.

Lu et al., "Dimensionless presentation for drug release from a coated pure drug bead: 2. Experiment," Inter. J. of Pharm., 1994, 112:117-124.

Luszczki et al., "Interactions of Lamotrigine with Topiramate and First-Generation Antiepileptic Drugs in the Maximal Electroshock Test in Mice: An Isobolographic Analysis," Epilepsia, 2003, 44(8):1003-1013.

Mathew et al., "Prophylaxis of Migraine, Transformed Migraine, and Cluster Headache with Topiramate," Headache, Sep. 2002, 42(8):796-803.

McElroy et al., "Topiramate in the Treatment of Binge Eating Disorder Associated with Obesity: A Randomized, Placebo-Controlled Trial," Am. J. Psychiatry, Feb. 2003, 160(2):255-261.

Meador et al., "Cognitive and behavioral effects of lamotrigine and topiramate in healthy volunteers," Neurology, Jun. 2005, 64:2108-2114.

Mikos et al., "Interaction of Polymer Microspheres with Mucin Gels as a Means of Characterizing Polymer Retention on Mucus," Journal of Colloid and Interface Science, May 1991, 143(2): 366-373.

Morton et al., "Diagnosis and treatment of epilepsy in children and adolescents", Drugs, Mar. 1996, 51(3):399-414.

Mosek et al., "Topiramate in the treatment of refractory chronic daily headache. An open trial," Journal of Headache and Pain, 2005, 6:77-80.

O'Connor et al., "Powders," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 88, 1615-1632.

Park et al., "Alternative Approaches to Oral Controlled Drug Delivery: Bioadhesives and In-Situ Systems," Recent Advances in Drug Delivery, Plenum Press, New York, 1984, 163-183.

Pascual et al., "Testing the combination beta-blocker plus topiramate in refractory migraine," Acta Neurol. Scand., 2007, 115(2):81-83.

Physician's Desk Reference, 60th Edition, 2006, pp. 2438-2447, entry for TOPAMAX®.

Physicians' Desk Reference 59th edition, 2541-2548 (2005).

Physician's Desk Reference, 56th ed., 2590-2595 (2002).

Pies, Ronald M.D., "Combining Lithium and Anticonvulsants in Bipolar Disorder: A Review," Annals of Clinical Psychiatry, Dec. 2002, 14(4):223-232.

Porter, Stuart C., Ph.D., "Coating of Pharmaceutical Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 90, 1666-1675.

Potter et al., "A Double-Blind, Randomized, Placebo-Controlled, Parallel Study to Determine the Efficacy of Topiramate in the Prophylactic Treatment of Migraine," Neurology, Apr. 2000, 54(Suppl 3):A15.

Rudnic et al., "Oral Solid Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 89, 1633-1665.

Silberstein et al., "Topiramate in Migraine Prevention," Arch. Neurol., Apr. 2004, 61(4):490-495.

Siniscalchi et al., "Combined topiramate and declorazepam therapy in a patient affected by essential tremor," Parkinsonism Relat. Disord., 2007, 13(2):129-130.

Smart et al., "An in-vitro investigation of mucosa-adhesive materials for use in controlled drug delivery," J. Pharm. Pharmacol., 1984, 36:295-299.

Sofuoglu et al., "Effects of topiramate in combination with intravenous nicotine in overnight abstinent smokers," Psychopharmacology, 2006, 184(3-4): 645-651.

Case: 24-1606   Document: 14   Page: 358   Filed: 06/06/2024

(56)            **References Cited**

OTHER PUBLICATIONS

Storey et al., "Topiramate in Migraine Prevention: A Double-Blind Placebo-Controlled Study," Headache, Nov./Dec. 2001, 41(10):968-975.

Thompson et al., "Effects of topiramate on cognitive function," J. Neurol. Neurosurg and Psych., 2000; 69:634-641.

Toplak et al., "Efficacy and safety of topiramate in combination with metformin in the treatment of obese subjects with type 2 diabetes: a randomized, double-blind placebo-controlled study," Int. J. Obes., 2007, 31(1):138-146.

Von Seggern et al., "Efficacy of Topiramate in Migraine Prophylaxis: A Retrospective Chart Analysis," Neurology, Apr. 2000, 54(Suppl 3):A267-A268.

Weber, Marcus Vinicius Keche, M.D., "Topiramate for Obstructive Sleep Apnea and Snoring," Am. J. Psychiatry, May 2002, 159(5):872-873.

Winkelman, John W., "Treatement of nocturnal eating syndrome and sleep-related eating disorder with topiramate," Sleep Medicine, 2003, 4(3):243-246.

Frohoff-Huelsmann et al., "Aqueous ethyl cellulose dispersions containing plasticizers of different water solubility and hydroxypropyl methylcellulose as coating material for diffusion pellets I. Drug release rates from coated pellets," International Journal on Pharmaceutics, 1999, 177:69-82.

Liu, Ying, "A Multi-Mechanistic Drug Release Approach in a Bead Dosage Form and in Vitro and in Vivo Evaluation, A Dissertation" (Liu Thesis), May 1, 2002, available online Oct. 2002, 158 pages.

Liu et al., "A Multimechanistic Drug Release Approach in a Bead Dosage Form and In Vivo Predictions," Pharmaceutical Development and Technology, 2003, 8(2):163-173.

Liu et al., "A Multi-mechanistic Drug Release Approach in a Bead Dosage Form and In Vitro/In Vivo Correlations," Pharmaceutical Development and Technology, 2003, 8(4)409-417.

Liu et al., "A Multi-mechanistic Drug Release Approach in a Bead Dosage Form and In Vivo Predictions," Pharmaceutical Development and Technology, 2003, 8(4):419-430.

Rege et al., "Predictability of Drug Release from Multiparticulate Systems Coated with an Aqueous Ethylcellulose Dispersion," Poster Reprint, Controlled Release Society Annual Meeting, Jun. 2005, 5 pages.

Allen et al., "Ansel's pharmaceutical dosage forms and drug delivery systems: Chapters 5 & 9", Lipponcott Williams & Wilkins, 2005, 63 pages.

Doose et al., "Single-dose pharmacokinetics and effect of food on the bioavailability of topiramate, a novel antiepileptic drug", Journal of Clinical Pharmacology, 1996, vol. 36, pp. 884-891.

FDA Approved Labeling for Adderall XR, 2001.

FDA Approved Labeling for Carbatrol, Jun. 2005.

FDA Approved Labeling for Oracea, May 26, 2006.

Ghebre-Sellassie, "Pharmaceutical pelletization technology", Marcel Dekker Inc., 1989, 17 pages.

Kibbe, "Handbook of pharmaceutical excipients", American Pharmaceutical Association, 3rd ed., 2000, 33 pages.

Kim, "Controlled release dosage form design: Chapter 1", CRC Press LLC, 2000, pp. 1-12.

Lachman et al., "The theory & practice of industrial pharmacy", Lea & Febiger, 1976, 29 pages.

Langtry et al., "Topiramate: a review of its pharmacodynamics and pharmacokinetic properties and clinical efficacy in the management of epilepsy", Drugs, Nov. 1997, vol. 54, No. 5, pp. 752-773.

Leeson et al., "The in vitro development of extended-release solid oral dosage forms", Journal of Pharmacokinetics and Biopharmaceutics, 1985, vol. 13, No. 5, pp. 493-514.

Pellock et al., "Extended-release formulations: simplifying strategies in the management of antiepileptic drug therapy," Epilepsy & Behavior, 2004, vol. 5, pp. 301-307.

Perucca et al., "The clinical pharmacokinetics of the newer antiepileptic drugs", Clinical Pharmacokinetics, Jul. 1996, vol. 1, pp. 29-46.

Rosenfeld et al. "Comparison of the steady-state pharmacokinetics of topiramate and valproate in patients with epilepsy during monotheraphy and concomitant therapy", Epilepsia, 1997, vol. 38, No. 3, pp. 324-333.

Sachdeo et al., "Steady-state pharmacokinetics of topiramate and carbamazepine in patients with epilepsy during monotherapy and concomitant therapy", Epilepsia, 1996, vol. 37, No. 8, pp. 774-780.

Shire Press Release on Carbatrol, "Shire launches Carbatrol(R) in U.S." Feb. 10, 2015.

Topamax Sprinkle Capsules Label, Jun. 29, 2005.

Topamax Sprinkle Capsules Label, Oct. 26, 1998.

Welling, "Oral controlled drug administration, pharmacokinetic considerations", Drug Development and Industrial Pharmacy, 1983, vol. 9, No. 7, pp. 1185-1225.

Case: 24-1606    Document: 14    Page: 359    Filed: 06/06/2024

**Fig.1**

*80% release time vs. %Wt. gain of Release-Controlling Coating*

*For Surelease® coated Extended Release Beads*



**Fig. 2**

*80% release time vs. % Wt. gain of Release-Controlling Coating*

*For Surelease®/ Opadry® coated Extended Release Beads*



**Fig. 3**

**Mean (n= 16) PK Profiles from Bead Populations XR1, XR2 and XR3**



**Fig. 4**

**Mean (n= 16) PK Profiles from the Immediate Release Formulations**



Fig.5

**Dissolution Profiles of Immediate Release Formulations**



Fig.6. **Mean PK Profiles for Sustained Release Formulations A, B, and C**



US 9,549,940 B2

<div style="text-align:center">1</div>

# SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 14/630,099, filed Feb. 24, 2015; which is a Continuation of U.S. application Ser. No. 14/499,462, filed Sep. 29, 2014, now U.S. Pat. No. 8,992,989; which is a Continuation of U.S. application Ser. No. 14/330,423, filed Jul. 14, 2014, now U.S. Pat. No. 8,877,248; which is a Continuation of U.S. application Ser. No. 12/926,936, filed Dec. 17, 2010, now U.S. Pat. No. 8,889,191; which claims benefit of U.S. application Ser. No. 11/941,475, filed Nov. 16, 2007, now U.S. Pat. No. 8,298,576; which claims benefit of U.S. Provisional Application No. 60/859,502, filed Nov. 17, 2006, the entire contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Topiramate is a sulfamate substituted monosaccharide which under the trade name TOPAMAX® (Ortho-McNeil Pharmaceutical, Inc., Raritan, N.J., U.S.A.) has been approved for use as an antiepileptic agent, as an adjuvant therapy for patients with partial onset seizures or primary generalized tonic-clonic seizures, and for the prevention of migraine. See generally, Physician's Desk Reference, 60th ed., 2538-2447 (2006); see also, U.S. Pat. No. 4,513,006.

For the treatment of epilepsy, the recommended dose of Topamax® is 400 mg/day in one or multiple doses (Physician's Desk Reference, 60th ed., 2538-2447 (2006)). For adults with epilepsy, treatment is initiated with a dose of 25-50 mg/day, with the dose being titrated in increments of 25-50 mg at weekly intervals to the recommended or effective dose.

Topamax® is an immediate release formulation. Adverse effects associated with the administration of Topamax® include, but are not limited to, somnolence, dizziness, ataxia, speech disorders and related speech problems, psychomotor slowing, abnormal vision, difficulty with memory, paresthesia, diplopia, renal calculi (kidney stones), hepatic failure, pancreatitis, renal tubular acidosis, acute myopia and secondary angle closure glaucoma (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Hence, though topiramate has a relatively long half-life of 21 hours in vivo, it has not been prescribed (or formulated) as a single, daily-dose, in part due to severe side-effects that often result with peak plasma levels of the drug when taken in high doses. Instead, Topamax® is typically taken in multiple, "divided" doses, usually twice-daily ("BID"). However, administration of the medicament in this manner is cumbersome and patients can forget to take their medication in a timely manner. What is more, each administration of a dose is associated with a peak in plasma concentrations of the drug, and the fluctuations associated with the peaks and valleys of blood plasma levels of the drug are undesirable. Therefore, there is a need for a formulation of topiramate, which reduces or eliminates the side effects associated with peaking and fluctuating plasma levels of the drug and preferably may be administered in a once-daily regimen.

New, highly soluble and bioavailable forms of topiramate are also needed in order to increase the safety and effectiveness of the drug.

The instant invention addresses these and other needs by providing a modified formulation of topiramate character-

<div style="text-align:center">2</div>

ized by a sustained, non-pulsatile release of an active ingredient. This invention additionally provides an effective, once-daily dosage form of topiramate or salts thereof, which not only enables an effective single daily dose regimen to improve patient compliance but may also reduce some of the side effects of topiramate compared to the current or higher daily doses of immediate release topiramate formulations.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a sustained release formulation of topiramate for the treatment or prevention of a pathological condition in a mammalian subject, characterized by a sustained rate of topiramate release along a pre-determined release profile.

It is yet another object of the present invention to provide topiramate formulation wherein topiramate is released at a rate which results in a reduction in the frequency or severity of at least one side effect associated with the topiramate treatment.

It is a further object of the present invention to provide a sustained release formulation of topiramate that can be administered orally once a day.

It is an object of the present invention to provide a sustained release formulation of topiramate for oral administration to a mammalian subject comprising topiramate as an active ingredient, wherein the active ingredient is released from the formulation at a sustained rate along a pre-determined release profile, and wherein the sustained release formulation comprises an extended release (XR) component and an optional immediate release (IR) component.

In one embodiment of the invention, the extended release component is contained in at least one population of beads coated with a release controlling coating. The above-mentioned coating is specific for every bead population and determines its rate of release. Thus, every given bead population included into the formulation is characterized by its own specific rate of release.

In another embodiment of the invention, the sustained release topiramate formulation comprises an immediate release component in addition to an extended release component.

In a preferred embodiment of the invention, the immediate release component is an enhanced immediate release (EIR) composition.

The formulation of the present invention may be incorporated in any oral dosage form such as represented by, but not limited to, a tablet, a pill, a capsule, a troche, a sachet, and sprinkles.

It is yet another object of the present invention to provide a method of preparation of a sustained release formulation of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile, the method comprising the steps of:

1. determining the desired release profile;
2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and
3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method of preparation additionally includes a process for providing an XR component contained in at least one population of beads, wherein every

population of beads is characterized by its own rate of release. This process comprises the steps of

1. forming at least one population of topiramate-containing beads;

2. coating each population of beads with its own coating solution;

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The method may optionally include a process for preparation of an IR component, which optionally is an enhanced immediate release (EIR) composition. The enhanced immediate release composition includes at least one agent selected from a group comprising complexing agents and enhancing agents. Without any limitations, the enhancing agents useful in the present invention may be selected from solubilizing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, stabilizing agents, enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors or combinations thereof.

It is yet another object of the present invention to provide a method of treatment or prevention of a pathological condition in a mammalian subject by orally administering to the subject a therapeutically effective amount of a sustained release topiramate formulation of the instant invention. The pathological conditions that may be treated by the method of the present invention include neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by topiramate administration.

DEFINITIONS

For the purposes of this invention, the term "topiramate" includes topiramate or any pharmaceutically acceptable salts thereof.

An "immediate release formulation" refers to a formulation that releases greater than or equal to about 80% of the pharmaceutical agent in less than or equal to about 1 hour.

For the purposes of this application, an enhancing agent ("enhancer") is defined as any non-pharmaceutically active ingredient that improves the therapeutic potential of a formulation.

The term "enhanced immediate release composition" as used herein describes an immediate release composition improved in terms of a therapeutic potential or treatment modality.

"Sustained release" is defined herein as release of a pharmaceutical agent in a continuous manner over a prolonged period of time.

By "prolonged period of time" it is meant a continuous period of time of greater than about 1 hour, preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours.

As used herein, unless otherwise noted, "rate of release" or "release rate" of a drug refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr) or a percentage of a total drug dose released per hour. Drug release rates for dosage forms are typically measured as an in vitro rate of drug release, i.e., a quantity of drug released from the dosage form per unit time measured under appropriate conditions

and in a suitable fluid. The time at which a specified percentage of the drug within a dosage form has been released from the dosage form is referred to as the "T.sub.x" value, where "x" is the percent of drug that has been released.

The release rates referred to herein are determined by placing a dosage form to be tested in a medium in an appropriate dissolution bath. Aliquots of the medium, collected at pre-set intervals, are then injected into a chromatographic system fitted with an appropriate detector to quantify the amounts of drug released during the testing intervals.

"C" denotes the concentration of drug in blood plasma or serum, of a subject, and is generally expressed as mass per unit volume, for example nanograms per milliliter. For convenience, this concentration may be referred to herein as "drug plasma concentration", "plasma drug concentration" or "plasma concentration" which is intended to be inclusive of a drug concentration measured in any appropriate body fluid or tissue. The plasma drug concentration at any time following drug administration is referenced as Ctime, as in C9 hr or C4 hr, etc.

The maximum plasma drug concentration during the dosing period is referenced as Cmax, while Cmin refers to the minimum blood plasma drug concentration at the end of a dosing interval; and Cave refers to an average concentration during the dosing interval.

The "degree of fluctuation" is defined as a quotient (Cmax−Cmin)/Cave.

Persons of skill in the art will appreciate that blood plasma drug concentrations obtained in individual subjects will vary due to interpatient variability in the many parameters affecting drug absorption, distribution, metabolism and excretion. For this reason, unless otherwise indicated, when a drug plasma concentration is listed, the value listed is the calculated mean value based on values obtained from a groups of subjects tested.

The term "bioavailability" refers to an extent to which—and sometimes rate at which—the active moiety (drug or metabolite) enters systemic circulation, thereby gaining access to the site of action.

"AUC" is the area under the plasma concentration-time curve and is considered to be the most reliable measure of bioavailability. It is directly proportional to the total amount of unchanged drug that reaches the systemic circulation.

Side effect is defined herein as a secondary and usually adverse effect of a drug.

The term "beads", as used herein, includes, without any limitations on the nature and size thereof, any particles, spheres, beads, granules, pellets, particulates or any structural units that may be incorporated into an oral dosage form.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease® coated extended release beads.

FIG. 2 shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease®/Opadry® coated extended release beads.

FIG. 3 shows mean (n=16) pharmacokinetic profiles for bead populations XR1, XR2 and XR3.

FIG. 4 shows mean (n=16) pharmacokinetic profiles for the immediate release formulations.

FIG. 5 shows the dissolution profiles of Topamax®, topiramate IR beads, and topiramate enhanced immediate release beads.

5

FIG. **6** shows mean PK Profiles for Sustained Release Formulations A, B, and C.

## DETAILED DESCRIPTION OF THE INVENTION

Topiramate is a sulfamate-substituted monosaccharide having the chemical name 2,3:4,5-Di-O-isopropylidene-beta-D-fructopyranose sulfamate. The molecular formula of topiramate is C12H21NO8S, and its chemical structure is represented by formula below:



Topiramate is a white crystalline powder that is soluble in alkaline solutions containing sodium hydroxide or sodium phosphate, soluble in acetone, dimethylsulfoxide and ethanol. However, the solubility of topiramate in water at room temperature is only about 9.8 mg/ml. Topiramate is not extensively metabolized and is excreted largely through the urine (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Topiramate pharmacokinetics are linear, producing a dose proportional increase in blood plasma concentration levels with increased dosing, and is not significantly affected by food. Patients taking topiramate over prolonged period of time did not develop resistance to the drug. Following oral administration of an immediate release dosage form, topiramate is rapidly absorbed with plasma drug concentrations peaking in approximately 2 hours. The mean elimination half-life is reported to be about 21 hours.

Currently, topiramate is administered in multiple daily doses in part due to the severe side effects exhibited by the immediate release product, especially when taken in a high single dose.

A sustained release topiramate formulation that will be suitable for once-a-day administration and will result in the diminished level or severity of side effects is needed.

The present invention provides sustained release formulation of topiramate wherein the total daily dose of topiramate is provided in an effective once-daily dose while minimizing fluctuations in the blood plasma drug concentration.

The current invention also provides for formulations of topiramate wherein the maximum plasma concentration of topiramate is attenuated as compared to the same amount of topiramate administered as an immediate release formulation BID; therefore some of the side effects of topiramate, such as CNS side effects including but not limited to dizziness, paresthesia, nervousness, psychomotor slowing, confusion, and difficulty with concentration/attention, observed when taking the immediate release product, may be reduced or eliminated.

Formulations of the instant invention are characterized by a maximum steady state plasma concentration (Cmax) of topiramate which is higher than the minimal therapeutically effective concentration, and is in the range of 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. In one embodiment, the novel formulations provide for a relative Cmax in the range of 80% to

6

125%, as compared to the same amount of topiramate administered as an immediate release formulation BID. In the other embodiment, the invention provides for the Cmax which is lower than the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. The Cmin of the topiramate formulation of the present invention is about equal or higher than a Cmin of an equivalent amount of immediate release topiramate formulation given BID.

Compared to the immediate release topiramate formulation, the sustained release topiramate formulations attenuate the Cmax of topiramate while extending the coverage of plasma concentration above the minimum plasma concentration required therapeutic efficacy. The formulation of the current invention provides for a relative steady state AUC in the range of 80% to 125%, while minimizing the degree of fluctuation, which is preferably in the range of 25% to 90%, as compared to an equivalent amount of immediate release topiramate formulation given in two divided doses (Table 5 and 6).

The present invention additionally provides a sustained release topiramate formulation for the treatment or prevention of a pathological condition in a mammalian subject wherein topiramate is released from the formulation at a sustained rate along a pre-determined release profile. Such release is achieved by incorporation into the formulation of an extended release component (XR) and an optional immediate release component (IR).

The relative amount of each component in the topiramate formulation of the present invention is determined according to the purpose of administration and a pre-determined release profile, and the total amount of topiramate in the formulation varies from 0.5 mg to about 3000 mg. In other words, topiramate or its salt is present in the composition in an amount of from about 0.5% to about 85% by weight, and preferably of from about 2% to about 70% by weight. The term "about" has been recited here and throughout the specification to account for variations, which can arise from inaccuracies in measurement inherent and understood by those of ordinary skill in the chemical and pharmaceutical arts.

The XR component of the formulation of the present invention releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time. By way of example, and by no means limiting the scope of the invention, the period of time may be not more than 24 hours, not more than 16 hours, not more than 12 hours, not more than 8 hours, or not more than 4 hours, depending on desired attributes of the final product.

In one embodiment, the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating). The release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population.

The beads useful in the formulation of the present invention comprise an inert carrier, topiramate, a binder, an afore-mentioned release controlling coating and optionally, an overcoat that provides additional protection from moisture, static charge reduction, taste masking and coloring attributes to the particulates.

The inert carriers useful in the present invention may be selected from, but are not limited to, a group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres. The inert carrier is present in an amount of from about 15%

7

to about 99% by weight, and preferably in an amount of from about 40% to about 97% by weight.

Topiramate is introduced to the inert carrier by techniques known to one skilled in the art, such as drug layering, powder coating, extrusion/spheronization, roller compaction or granulation. Preferably, the introduction method is drug layering by spraying a suspension of topiramate and a binder onto the inert carrier.

The binder may be present in the bead formulation in an amount of from about 0.1% to about 15% by weight, and preferably of from about 0.2% to about 10% by weight. Binders include, but are not limited to starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, or polyvinylpyrrolidone.

The release controlling coating specific for every bead population comprises a coating material, and, optionally, a pore former and other excipients. The coating material is preferably selected from a group comprising cellulosic polymers, such as ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, and cellulose acetate phthalate; polyvinyl alcohol; acrylic polymers such as polyacrylates, polymethacrylates and copolymers thereof, and other water-based or solvent-based coating materials. The release-controlling coating is population-specific in the sense that the rate of release of topiramate from every bead population is controlled by at least one parameter of the release controlling coating, such as the nature of the coating, coating level, type and concentration of a pore former, process parameters and combinations thereof. Thus, changing a parameter, such as a pore former concentration, or the conditions of the curing, as will be discussed in more details below, (see Example 5) allows to change the release of topiramate from any given bead population and to selectively adjust the formulation to the pre-determined release profile. The release profile, in its turn, may be chosen or modified in such a way as to achieve the best treatment modality depending on the specific needs of the patient population and the nature of the condition.

For example, with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve. For example, when the release controlling coating comprises only ethylcellulose (Surelease®) as a coating material, a logarithmic relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 1):

$$\text{Log}(T_{80\% \ release}) = a(\% \ release) + b.$$

When ethylcellulose/HPMC (Surelease®/Opadry®) mixture is used, for example, 85:15 mixture or 80:20 mixture, a linear relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 2):

$$T_{80\% \ release} = a(\% \ coating) + b.$$

Pore formers suitable for use in the release controlling coating herein can be organic or inorganic agents, and include materials that can be dissolved, extracted or leached from the coating in the environment of use. Examples of pore formers include but are not limited to organic compounds such as mono-, oligo-, and polysaccharides including sucrose, glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran; polymers soluble in the environment of use such as water-soluble hydrophilic poly-

8

mers, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, Carbowaxes, Carbopol, and the like, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols, or block polymers thereof, polyglycols, poly(α-ω)alkylenediols; inorganic compounds such as alkali metal salts, lithium carbonate, sodium chloride, sodium bromide, potassium chloride, potassium sulfate, potassium phosphate, sodium acetate, sodium citrate, suitable calcium salts, and the like.

The release controlling coating in the current invention can further comprise other additives known in the art such as plasticizers, anti-adherents, glidants, and antifoams.

In some embodiments, it may be further desirable to optionally coat the XR beads with an "overcoat," to provide, e.g., moisture protection, static charge reduction, taste-masking, flavoring, coloring, and/or polish or other cosmetic appeal to the beads. Suitable coating materials for such an overcoat are known in the art, and include, but are not limited to, cellulosic polymers such as hydroxypropylmethylcellulose, hydroxypropylcellulose and microcrystalline cellulose, or combinations thereof (for example various Opadry® coating materials).

Topiramate-containing beads of the present invention may additionally contain enhancers that may be exemplified by, but not limited to, solubility enhancers, dissolution enhancers, absorption enhancers, permeability enhancers, stabilizers, complexing agents, enzyme inhibitors, p-glycoprotein inhibitors, and multidrug resistance protein inhibitors. Alternatively, the formulation can also contain enhancers that are separated from the topiramate beads, for example in a separate population of beads or as a powder. In yet another embodiment, the enhancer(s) may be contained in a separate layer on a topiramate-containing bead either under or above the release controlling coating.

The beads may further comprise other pharmaceutically active agents suitable for use in combination with topiramate for treatment or prevention of a pathological condition. The additional pharmaceutically active agents, without limitation, may be represented by analgesic and anti-inflammatory compounds such as COX-2 inhibitors, nonsteroidal anti-inflammatory drugs (NSAIDs), narcotic drugs such as opiates and morphinomimetics, synthetic drugs with narcotic properties such as tramadol; anticonvulsants such as valproic acid or its derivatives, carbamazepine, oxcarbazepine, gabapentin, and lamotrigine; anorectics or anti-obesity agents such as sibutramine or other, orlistat or other pancreatic lipase inhibitors, diethylpropion, fluoxetine, bupropion, amphetamine, methamphetamine, sertraline, zonisamide, and metformin, as well as medications associated with weight-gain, such as sulfonylurea derivatives, insulin, and thiazolidinediones whose weight-gain effect is tempered by topiramate; anti-hypertensive agents such as diuretics, anti-adrenergics, calcium channel blockers, ACE inhibitors, angiotensin II receptor antagonists, aldosterone antagonists, vasodilators, centrally acting adrenergic drugs, and adrenergic neuron blockers; mood stabilizers such as various forms/salts of lithium, Omega-3 fatty acids and others known in the art, drugs for treatment or prevention of migraines, such as ergot derivatives or triptans, or any other pharmaceutical or nutraceutical ingredient that can be safely and beneficially combined with topiramate.

A relative amount of every bead population in the complete formulation is determined on the basis of the pharma-

9

cokinetic data of the separate bead populations and the pre-determined release profile and will be discussed in more detail in Example 6.

In another embodiment, the formulation of the present invention comprises an extended release component as described above, and an immediate release component. The IR component may be an enhanced immediate release composition. The enhanced immediate release composition may be characterized by a faster in vitro topiramate release as compared to the IR formulation. Preferably, at least 80% of an active compound from the enhanced immediate release composition is released in a time period of not more than 30 minutes. More preferably, at least 50% of an active compound from the enhanced immediate release composition is released in a time period of not more than 10 minutes, and at least 25% is dissolved in a time period of not more than 5 minutes after the oral administration. In the most preferred embodiment of the present invention, at least 75% of the active compound is released from the EIR composition in a time period of not more than 10 minutes. The embodiment in which the IR component is an enhanced immediate release composition will be discussed in more details below.

In addition to topiramate and inactive excipients, the EIR composition of the present invention comprises at least one agent selected from a group consisting of complexing agents and enhancing agents.

Without any limitation, the enhancing agents suitable for the present invention may be selected from the solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives, buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. The representative, but non-limiting examples of these compounds are Vitamin E TPGS, amino acid such as glutamic acid and glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins such as maltodextrin, Cremophor RH40 (glycerol-polyethylene glycol oxystearate), Gelucire 50/13 (PEG-32 glyceryl palmitostearate), sodium lauryl sulfate, Tween 80 (polyoxyethylene sorbitan monooleate), benzyl alcohol, Span 20 (sorbitan monolaurate), Poloxamer 407, PEG3350, PVP K25, oleic acid, Capmul GMO (glyceryl monooleate), sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, crosscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, HPMC, substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, and menthol, among others. Enhancers can be combined to achieve multiple enhancement effects, for example, solubility enhancement combined with permeability enhancement and p-glycoprotein inhibition, or to provide a synergistic enhancement effect to achieve greater and more efficient enhancement. For example, polyglycolized glycerides (different grades of Gelucire) can be combined with sodium lauryl sulfate to achieve higher solubility enhancement as well as faster dissolution of topiramate.

In one embodiment, the EIR composition comprises a highly soluble complex of topiramate with a complexing agent that is represented by, but not limited to, cyclodextrins, including cyclodextrin derivatives, such as hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, and alpha-cyclodextrin. The ratio of cyclodextrin to topiramate in the EIR formulation is preferably less than 20:1 and

10

more preferably less than 5:1. In the most preferred embodiment, the complexing agent is hydroxypropyl beta cyclodextrin.

The highly soluble complex of topiramate and cyclodextrin is prepared by mixing topiramate and cyclodextrin together in the presence of water. The concentration of cyclodextrin is preferably high to facilitate the formation of topiramate-enhancer complex. In the case when the complexing agent is hydroxypropyl-beta-cyclodextrin, the concentration of the hydroxypropyl-beta-cyclodextrin solution used for mixing with topiramate is greater than 2%, preferably greater than 20%, and more preferably at least about 40%. The amount of topiramate is determined by a desired ratio of hydroxypropyl-beta-cyclodextrin to topiramate, which is preferably less than 20:1, and more preferably less than 5:1. The mixing time of the complex solution is from about one hour to about 48 hours, and preferably from about 5 hours to about 24 hours. The addition of hydroxypropyl-beta-cyclodextrin and topiramate can be incremental to reduce the viscosity of the complex solution and to achieve better complexation.

In a further embodiment, the EIR component of the present invention is contained in at least one bead population. Topiramate EIR beads can be prepared using processes suitable for bead manufacturing, such as coating of a topiramate suspension, dispersion or solution onto an inert carrier, or by roller compaction, granulation, extrusion/spheronization, or powder coating, and are not limited by the examples cited therein. The enhancing agents of the present invention can be incorporated into the topiramate containing beads, or may be contained in other beads separated from the topiramate containing beads. By way of a non-limiting example, topiramate-containing EIR beads were prepared by coating topiramate dispersion onto an inert carrier such as sugar spheres. The topiramate dispersion, in addition to topiramate in the micronized form or in non-micronized form, can contain one or more enhancers, water and optionally a binder such as hydroxypropylcellulose, hydroxypropylmethylcellulose, polyvinylpyrrolidone and polyvinyl alcohol.

When the formulation is enhanced with complexing agents, the agents may be first mixed with topiramate and a suitable solvent such as water to form the complex. The topiramate-containing complex is then mixed with a binder solution prepared separately to give the coating dispersion. The coating dispersion is then sprayed onto the inert carrier such as sugar spheres using a fluid bed processor.

In an alternative embodiment of the invention, the formulation comprises at least one XR bead population, and at least one additional combination bead population consisting of the extended release beads that have an additional immediate release component layer coated on top of the release controlling coating. This layer may be formed by a suitable loading method such as solution/suspension/dispersion coating, powder coating or wet granulation.

In yet another embodiment, at least part (i.e., more than 0.01%, preferably at least 1%) of the active ingredient may be present in the formulation in a form of micronized particles with the size of from 1 μm to 1000 μm, preferably from 2 μm to about 200 μm, more preferably from 2 μm to about 100 μm. Further, one or more enhancers may be present in the formulations covered by this embodiment. The enhancers are selected from solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives,

US 9,549,940 B2

11                                    12

buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. Preferably, the enhancer is a solubility enhancer or a dissolution enhancer.

The topiramate formulation of the present invention may be formulated in a dosage form selected from a tablet, a pill, a capsule, a caplet, a troche, a sachet, a cachet, a pouch, sprinkles, or any other form suitable for oral administration.

In one embodiment of the invention, the dosage form is a gelatin capsule containing the XR component in a form of at least one population of beads, and an optional IR component. The IR component, when present, may be in a form of a powder, or may also be contained in at least one population of beads to achieve faster dissolution of topiramate (FIG. **5**).

In an alternative embodiment, part of the total amount of the active ingredient may be incorporated into the aforementioned bead populations that will be contained inside an enclosure such as a capsule, and the rest of the active ingredient can be loaded on the outside of the enclosure by a suitable loading method such as solution/suspension/dispersion coating or powder coating or wet granulation. For example, a part of the immediate release topiramate formulation can be loaded by coating on the outside of a capsule that contains within it other populations of topiramate such as extended release topiramate. This dosage form can provide almost instantaneous dissolution of the initial portion of topiramate dose from the outside of the capsule, followed by a sustained release of the rest of topiramate from inside the capsule.

In a further embodiment of the invention, the dosage form is a tablet. Without imposing any limitations, this embodiment may be exemplified by a multilayered tablet that comprises at least one layer containing the extended release component, and at least one layer comprising the immediate release component, wherein the IR component may or may not be an EIR composition.

The last two embodiments are especially beneficial when fast onset of action followed by sustained release is preferred, as is for example in the cases of a breakthrough migraine episode.

The current invention additionally encompasses a method of preparing formulations of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile. The method comprises the following steps:

1. determining the desired release profile;

2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method comprises a step for providing an immediate release component, which may be an enhanced immediate release composition.

In another embodiment, the method includes a process for providing an extended release component contained in at least one population of beads characterized by its own rate of release, wherein the process includes the steps of:

1. forming at least one population of topiramate-containing beads;

2. coating each population of beads with its own coating solution;

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The exact amount of beads of every population incorporated into the formulation and into the final dosage form is determined using the linear superposition principle (Win-NonLin) on the basis of the pharmacokinetic data of the separate bead populations and the pre-determined release profile (Example 6).

Release profiles of XR topiramate beads can be selectively adjusted, modified or stabilized by curing the beads at an elevated temperature. This process is well known in the art. However, it was unexpectedly discovered that curing the beads in the curing apparatus in the presence of at least one suitable solvent dramatically reduces the curing time necessary to produce a desired release profile and a level of stability. The curing process that previously required up to two weeks can be carried out by the method of current invention in several hours.

The assisting solvents can be selected from those solvents that can dissolve or partially dissolve the coating material, or those that can induce or assist the coalescence or molecular relaxation of the coating material, or those that can reduce electrostatic charge on the dosage forms during curing and those that can facilitate curing at a higher temperature. Examples of these solvents include but are not limited to organic solvents, such as alcohols, ketones, ethers, esters, amides, amines, hydrocarbons including substituted hydrocarbons such as chlorinated hydrocarbons and aromatic hydrocarbons, furans, sulfoxides, organic acids, phenols, super-critical fluids; ammonia; and water, buffered water, or water solutions of other inorganic or organic compounds, and their combinations. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

The curing of the dosage form normally is done in an apparatus that can operate at elevated temperatures and that can deliver the assisting solvents by means such as spray, injection, or vaporization. In the embodiment of the invention when the assisting solvent is sprayed or injected into the curing apparatus, the stream of solvent is introduced directly onto the coated beads. The amount of the solvent necessary to produce the desired effect, such as the desired release parameters and stabilization of the coating, depends on the nature of the solvent and the method of solvent delivery.

Typically, when the vaporization method is used, the organic solvents and aqueous solutions may be used in the wide range of vapor concentrations varying from 2% to more than 100%, providing an unsaturated, saturated or an oversaturated atmosphere. The pure water, however, has to be used in such an amount as to provide at least a saturated or, preferably, an oversaturated atmosphere in the curing apparatus. At least during the delivery of assisting solvents, the coated beads are mixed or agitated either continuously or in a pulsed manner.

In an alternative embodiment of the invention, hot water steam is introduced into the curing apparatus for a preselected period of time. The steam serves simultaneously as a solvent and as a source of heat for the beads. Introduction of steam is followed by a drying period.

This method of curing the release controlling coating results in many benefits including the dramatically shortened curing time, increased stability and modification of the release profile, and is not limited to topiramate containing beads, but includes the curing of any microparticles regardless of the drug.

Specifically, active ingredient containing beads, with or without the optional over-coat, are charged to a fluid bed

US 9,549,940 B2

13

processor or a pan coater and heated to a desired curing temperature range, for example 40° C. to 80° C. for sustained release dosage forms containing ethylcellulose (Surelease®), and 40° C. to 70° C. for sustained release dosage forms containing acrylic polymers (Eudragit® RS and Eudragit® RL). The assisting solvent or solvents, such as water or alcohol-water mixture, are sprayed onto the beads while mixing by, for example, fluidizing or rotating. Alternatively, the process is carried out in an oven where hot steam is introduced as previously discussed. Solvent-assisted curing is carried out to a desired curing time length, either in one curing period or in multiple, separate curing periods. The dosage forms can be further dried for a short period of time to remove residual solvents.

The solvent-assisted curing process significantly accelerates the curing of release controlling coating on active ingredient containing beads as compared to the heat-only curing of the same. In most instances, less than 4 hours of solvent-assisted curing resulted in more complete curing of the extended release dosage forms than 2 weeks of heat-only oven curing of the same dosage forms.

The present invention also presents a method of treatment or prevention of a pathological condition in a mammalian subject, comprising orally administering to the subject a therapeutically effective amount of a novel topiramate formulation of the instant invention, wherein topiramate is released from the formulation at a sustained rate along the pre-determined release profile. The method of the current invention possesses the flexibility to selectively adjust the pharmacokinetics of the administered formulations depending on the nature of the condition and needs of the patients due to the novel design of the topiramate formulation that comprises an extended release component and an optional immediate release component, and the release profiles of both components can be selectively modified during the preparation process as described above to comply with the predetermined release profile.

The pathological condition that may be treated by a method of the present invention is a neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by the topiramate administration.

The neurological disorders that may be treated or prevented by a formulation of the present invention include, but are not limited to: epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, perinatal hypoxia ischemia and related damage, chronic neurodegenerative disorders, acute neurodegeneration, and ALS.

Psychiatric disorders that may be treated or prevented by a formulation of the present invention include, but are not

14

limited to bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, ADHD, impulse control disorders, border line personality disorder, addiction, and autism.

Formulations of the present invention may be also used for the treatment and prevention of diabetes and related disorders, such as type II diabetes mellitus, diabetic retinopathy, impaired oral glucose tolerance, diabetic skin lesions, diabetic neuropathy, Syndrome X and elevated blood glucose levels; ocular disorders, including but not limited to glaucoma and macular degeneration; cardiovascular disorders represented but not limited to elevated blood pressure and elevated lipids; obesity; asthma; autoimmune disorders; sleep apnea and sleep disorders. The formulations may be also used for inducing weight loss or promoting wound healing, or for any other condition, not specified above, wherein the use of topiramate is indicated.

The invention will be further illustrated by the following Examples, however, without restricting its scope to these embodiments.

EXAMPLES

Example 1

Extended Release Beads Preparation

Topiramate Drug Layering on Sugar Spheres—the "Core"

An aqueous suspension of 10-20% (w/w) topiramate (particle size 90% vol. NMT 30 micrometer, 50% vol. NMT 15 micrometer and 10% vol. NMT 5 micrometer) and 0.5-4% (w/w) HPMC or other aqueous binder can be used as the drug layering coating solution. A fluid bed suited for Wurster-spray is assembled and charged with inert carriers such as sugar spheres. The coating suspension is sprayed onto the bed to evenly coat the inert carriers to a desired topiramate loading level. Higher binder concentration in the coating solution may be used for smaller size inert carrier and higher topiramate loading. Inlet airflow rate and product temperature are adjusted to keep the batch from spray-drying the coating material or over-wetting the spheres.

Coating of the Core with a Release Controlling Coating

A dispersion of a cellulosic polymer such as ethylcellulose and methylcellulose can be used to coat the core in the current invention. Ethylcellulose dispersion (Surelease®) can be diluted to a final concentration of about 10% to about 20% and with or without the use of other ingredients such as pore formers. A fluid bed suited for Wurster-spray is assembled and charged with the cores prepared in Example 1. The release controlling coating dispersion is sprayed onto the bed to evenly coat the core to a desired coating level as exemplified in Table 1.

TABLE 1

| Composition and process Parameters for the extended Release | | | | | | | |
|---|---|---|---|---|---|---|---|
| | XR1a | XR1b | XR1c | XR2a | XR2b | XR2c | XR2d |
| RC* coating material | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) | Ethyl-cellulose (Surelease) |
| Pore-former | — | — | Opadry ® Clear 80:20 | — | — | Opadry ® Clear 80:20 | Opadry ® Clear 80:20 |
| RC coating material to pore-former ratio | — | — | | — | | | |

   

TABLE 1-continued

| Composition and process Parameters for the extended Release | | | | | | |
|---|---|---|---|---|---|---|
| RC coating level | 2% | 4% | 3% | 3% | 3% | 6.5% | 6.5% |
| Product temperature during coating | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C, | 20° C.-60° C, |
| Over-coat material | — | Opadry ® AMB White | Opadry ® AMB White | — | Opadry ® AMB White | — | Opadry ® AMB White |
| Over-coat coating level | | 1.5% | 1.5% | | 1.5% | | 1.5% |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven |

| Topiramate Beads | | | | | |
|---|---|---|---|---|---|
| | XR3 | XR4 | XR5 | XR6 | XR7 | XR8 |
| RC coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Acrylic polymers (Eudragit ® RL30D/RS30D) |
| Pore-former | — | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | |
| RC coating material to pore-former ratio | — | 80:20 | 80:20 | 80:20 | 85:15 | — |
| RC coating level | 3.7% | 3.1% | 5.2% | 9.5% | 15% | 15% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | — | — | — | — | — |
| Over-coat coating level | — | — | — | — | — | — |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, fluid bed/5% alcohol- water, or oven | Fluid bed/ water, fluid bed/5% alcohol- water, or oven |

*RC- Release Controlling

Example 2

Method of
Topiramate-Hydroxypropyl-beta-cyclodextrin
Complex Bead Preparation

Approximately half of the intended amount of topiramate was added to the water with constant mixing followed by sprinkling of hydroxypropyl-beta-cyclodextrin into the dispersion. Once the dispersion became significantly less viscous, more drug substance was added followed by sprinkling of more hydroxypropyl-beta-cyclodextrin. The drug and hydroxypropyl-beta-cyclodextrin addition steps were repeated, and the dispersion was mixed for 12-18 hours. Separately, hydroxypropylmethylcellulose was dissolved in water. The above topiramate—hydroxypropyl-beta-cyclodextrin dispersion and hydroxypropylmethylcellulose solution were mixed together for 15 to 30 minutes and the mixture was screened through an 80-mesh sieve. The resultant dispersion was sprayed onto sugar spheres using a fluid bed processor to yield the enhanced immediate release beads (Table 2).

TABLE 2

| Hydroxypropyl-beta-cyclodextrin - Topiramate EIR Bead Compositions | | | | |
|---|---|---|---|---|
| | Percentage (w/w) in Beads | | | |
| Component | EIR-1 (HPBCD:Drug = 3:2)* | EIR-2 (HPBCD:Drug = 3:2)* | EIR-3 (HPBCD:Drug = 1:1)* | EIR-4 (HPBCD:Drug = 1:2)* |
| Topiramate | 25.0 | 3.3 | 28.9 | 33.3 |
| Hydroxypropyl-beta-cyclodextrin | 37.5 | 4.95 | 28.9 | 16.7 |

US 9,549,940 B2

17            18

TABLE 2-continued

Hydroxypropyl-beta-cyclodextrin - Topiramate EIR Bead Compositions

| | Percentage (w/w) in Beads | | | |
|---|---|---|---|---|
| Component | EIR-1 (HPBCD:Drug = 3:2)* | EIR-2 (HPBCD:Drug = 3:2)* | EIR-3 (HPBCD:Drug = 1:1)* | EIR-4 (HPBCD:Drug = 1:2)* |
| Hydroxypropylmethylcellulose | 3.1 | 0.41 | 2.4 | 4.2 |
| Sugar spheres | 34.4 | 91.34 | 39.8 | 45.8 |

*HPBCD:Drug - Hydroxypropyl-beta-cyclodextrin to drug substance ratio

Example 3

Topiramate EIR Beads Containing Non-Complexing Enhancers

Topiramate is dispersed in a binder solution, such as hydroxypropylmethylcellulose solution, that contains an appropriate amount of enhancer or enhancers such as d-alpha-tocopheryl polyethylene glycol 1000 succinate (vitamin E TPGS) and sodium lauryl sulfate combination, polyoxyl hydrogenated castor oil (different grades of Cremophor RH), polyglycolized glycerides (different grades of Gelucire), polyglycolized glycerides (different grades of Gelucire) combined with sodium lauryl sulfate, or combinations thereof. The resultant dispersion is sprayed onto an inert carrier such as sugar spheres using a fluid bed processor to achieve a desired drug load (Table 3).

TABLE 3

Enhanced Immediate Release Topiramate Bead Compositions

| | Percentage (w/w) in Beads | | |
|---|---|---|---|
| Component | EIR-5 | EIR-6 | EIR-7 |
| Topiramate | 36.8 | 37.9 | 36.4 |
| Sodium lauryl sulfate | 0.7 | 0.5 | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | 7.3 | — | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | 9.1 |
| Polyglycolized glycerides (Gelucire 50/13) | — | 4.7 | — |
| Hydroxypropylmethylcellulose | 4.6 | 4.8 | 4.5 |
| Sugar spheres | 50.6 | 52.1 | 50.0 |

Example 4

Topiramate EIR Beads Containing Micronized Particles

Miconized or non-micronized topiramate is dispersed in a solution with or without heating, optionally containing dissolution enhancing agents such as mannose, maltose, mannitol, lactose, maltodextrin and sodium starch glucolate, and optionally containing one or more additional enhancers such as PEG3350, sodium lauryl sulfate, sodium docusate, polyoxyethylene sorbitan monooleate and Poloxamers, under such process parameters that topiramate particles that remain undissolved have a particle size of about 2 micron to about 30 micron. A particle size reduction device such as a homogenizer can also be used to reduce the particle size of undissolved topiramate. The resultant topiramate dispersion is then sprayed onto inert carriers such as sugar spheres in a coating processor such as a fluid bed processor. The formulations obtained are represented in the Table 4:

TABLE 4

Topiramate EIR Beads containing micronized particles

| | Percentage (w/w) in Beads | | | | | |
|---|---|---|---|---|---|---|
| | EIR-8 | EIR-9 | EIR-10 | EIR-11 | EIR-12 | EIR-13 |
| Topiramate | 3.2 | 26.0 | 25.0 | 3.2 | 26.0 | 26.0 |
| Mannose | 0.4 | 5.0 | 3.3 | 2.0 | 10.0 | 10.0 |
| Maltrin 250 | — | — | 1.0 | 1.0 | — | — |
| PEG3350 | 1.0 | 15.0 | — | — | — | 10.0 |
| Sodium lauryl sulfate | — | — | — | — | 0.5 | — |
| Hydroxypropyl-beta-cyclodextrin | — | — | 37.5 | — | — | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | — | — | — | — | 2.0 | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | — | — | — | 2.0 |
| Sugar spheres | 95.4 | 54.0 | 33.2 | 93.8 | 61.5 | 52.0 |

Example 5

Method of Curing Beads

The topiramate beads coated with a release controlling coating, with or without an overcoat, can be cured using the above-mentioned solvent-assisted curing process, or using the heat-only curing process, to a desired curing level and preferably to complete curing.

Specifically, the core is coated to a desired coating level with a solution or dispersion of the release controlling coating material, with or without the above-mentioned additives such as pore-formers, using a fluid bed processor or any other suitable apparatus for coating of the core. Product temperature is controlled at a desirable range, for example 20° C. to 60° C. for the coating of ethylcellulose (Surelease®) and 20° C. to 60° C. for acrylic polymers (Eudragit® RL and Eudragit® RS grades). An optional overcoat with materials such as cellulosic polymers (various Opadry®) is applied thereafter. Curing of the sustained release topiramate beads is carried out either in an oven at 40° C. to 80° C. for Surelease® containing beads or at 40° C. to 70° C. for Eudragit® RL or RS containing beads, or in a fluid bed processor with or without the use of assisting solvents at similar product temperatures.

US 9,549,940 B2

19

20

For curing that uses assisting solvents, the assisting solvent can be delivered through top spray, bottom spray, side spray or injection, or introduced by vaporization. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

### Example 6

#### Sustained Release Formulations of Topiramate

a. Plasma concentration versus time curves for the topiramate formulations containing extended release and immediate release bead populations are simulated using WinNonlin Version 5.0.1 based on the pharmacokinetic data on the separate bead populations that were generated in a comparative randomized single-dose 6-way crossover study in healthy adult volunteers. The study included administration of a 50 mg oral dose of three extended release compositions, designated here as XR1, XR2 and XR3, two immediate release compositions ((Topamax®, Ortho-McNeil Neurologics, Inc.) (25 mg BID) and an immediate release bead formulation) and an enhanced immediate release (IR) bead composition. The single dose topiramate plasma concentration profiles for XR1, XR2 and XR3 are shown in FIG. 3. The single dose topiramate plasma concentration profiles for IR are shown in FIG. 4. The data are projected to a steady-state (SS) with a 24 h dosing interval for the sustained release compositions and a 12 h dosing interval for Topamax, using the linear superposition principle (WinNonlin). The extended release populations XR1, XR2 and XR3, and an immediate release (IR) population are selected in such a way as to be defined by at least one of the three following sets of conditions:

1. for the steady state,
    for XR1, $1.70 C_{maxIR} >= C_{maxXR1} >= 1.30 C_{maxIR}$
    for XR2, $0.40 C_{maxIR} >= C_{maxXR2} >= 0.20 C_{maxIR}$
    for XR3, $0.25 C_{maxIR} >= C_{maxXR3} >= 0.05 C_{maxIR}$
2. for in-vitro dissolution,
    for XR1, $1.5 \text{ h} <= T_{80\%} <= 4 \text{ h}$
    for XR2, $5 \text{ h} <= T_{80\%} <= 8 \text{ h}$
    for XR3, $8 \text{ h} < T_{80\%} <= 10 \text{ h}$
3. for a single initial dose in-vivo,
    for XR1, $4 \text{ h} <= T_{max} <= 8.5 \text{ h}$
    for XR2, $T_{max} >= 16 \text{ h}$
    for XR3, $T_{max} >= 16 \text{ h}$.

Optionally, the immediate release bead population is composed of enhanced immediate release (EIR) beads such that at least one condition is true: a. for the steady state, $2.40 C_{maxIR} >= C_{maxEIR} >= 1.20 C_{maxIR}$; b. for in-vitro dissolution, $T80\% <= 30 \text{ min}$; c. for a single initial dose in-vivo, $T_{max} <= 2 \text{ h}$.

The results of the pharmacokinetic simulation for the seven exemplary formulations are summarized in Table 5 below. These formulations are selected as examples only, and in no way limit the range, compositions or properties of the formulations covered by the present invention.

TABLE 5

| Composition and Pharmacokinetic data of Multi-bead Formulations | | | | | | | |
|---|---|---|---|---|---|---|---|
| | #1 | #2 | #3 | #4 | #5 | #6 | #7 |
| % XR1 | 20 | 50 | 0 | 10 | 10 | 15 | 0 |
| % XR2 | 80 | 0 | 85 | 85 | 80 | 70 | 100 |
| % XR3 | 0 | 50 | 0 | 0 | | 15 | 0 |

TABLE 5-continued

| Composition and Pharmacokinetic data of Multi-bead Formulations | | | | | | | |
|---|---|---|---|---|---|---|---|
| | #1 | #2 | #3 | #4 | #5 | #6 | #7 |
| % IR | 0 | 0 | 15 | 5 | 10 | 0 | 0 |
| Rel. BA (%), SS | 98.5 | 100.5 | 96.6 | 97.4 | 97.6 | 97.3 | 96.0 |
| Degree of fluctuation, SS | 0.15 | 0.22 | 0.14 | 0.14 | 0.15 | 0.13 | 0.09 |

b. based on the results of WinNonlin simulation discussed in part (a), formulations #1 (A), #3 (B), and #4 (C) were tested in the comparative randomized multi-dose 4-way study following a once a day 50 mg oral dose of three controlled release formulations and a 25 mg twice a day oral doses of Topamax® in healthy adult volunteers.

The results of the study are summarized in Table 6 and FIG. 6:

TABLE 6

| Pharmacokinetic study data for Multi-bead Formulations | | | | |
|---|---|---|---|---|
| | #1 A | #3 B | #4 C | Control (Topamax ®) |
| % XR1 | 20 | 0 | 10 | — |
| % XR2 | 80 | 86 | 84 | — |
| % XR3 | 0 | 0 | 0 | — |
| % IR | 0 | 14 | 6 | — |
| Rel. BA (%), SS | 92 | 93 | 95 | 100 |
| Relative Degree of fluctuation, SS | 73% | 72% | 66% | 100% |

What is claimed is:

1. A sustained release formulation of topiramate comprising between 0.5% to 85%, by weight of the formulation, topiramate, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

   (i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

   (ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerolpolyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylenepolypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose,

<table>
<tr><td>

21

starch, pregelatinized starch, hydroxypropylmethyl-cellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

**2.** The formulation of claim **1**, wherein the XR component is contained in at least one population of beads.

**3.** The formulation of claim **1**, comprising an IR component such that 80% of the topiramate is released in not more than 1 hour.

**4.** The formulation according to claim **1**, wherein the XR component further comprises a binder selected from the group consisting of starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and polyvinylpyrrolidone.

**5.** The formulation according to claim **1**, wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethyl-cellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly((α-ω)alkylenediolsH, alkali metal salts, alkaline earth metal salts, and combinations thereof.

**6.** The formulation of claim **1**, wherein at least a part of the topiramate is in a form of micronized particles.

**7.** The formulation of claim **1**, wherein the formulation is in a dosage form of a capsule or sprinkles.

**8.** The formulation of claim **1**, wherein the total amount of topiramate in the formulation is from 0.5 to 3000 mg.

**9.** The formulation of claim **1**, wherein the XR component further comprises an inert carrier selected from the group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres.

**10.** The formulation of claim **1**, wherein the coating material comprises ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, cellulose acetate phthalate, polyvinyl alcohol, polyacrylates, polymethacrylates or copolymers thereof.

**11.** The formulation of claim **1**, wherein the formulation provides for a maximum steady state plasma concentration (Cmax) of topiramate which is in the range from 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID.

**12.** The formulation of claim **1**, wherein the formulation provides for a relative steady state AUC in the range of 80% to 125% of the AUC of the same amount of topiramate administered as an immediate release formulation BID.

**13.** The formulation of claim **1**, further comprising an active ingredient in combination with topiramate.

**14.** A sustained release formulation of topiramate comprising between 0.5% to 85%, by weight of the formulation, topiramate, which is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

</td><td>

22

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethyl-cellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

**15.** A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotrophic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release formulation of topiramate comprising between 0.5% and 85%, by weight of the formulation, topiramate, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethyl-

</td></tr>
</table>

cellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

**16**. The method of claim **15**, wherein the condition is epilepsy.

**17**. The method of claim **15**, wherein the condition is migraine.

**18**. A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotrophic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release formulation of topiramate comprising between 0.5% to 85%, by weight of the formulation, topiramate, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

    (i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

    (ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32 glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

**19**. The method of claim **18**, wherein the condition is epilepsy.

**20**. The method of claim **18**, wherein the condition is migraine.

\* \* \* \* \*



US009622983B2

(12) **United States Patent**
Liang et al.

(10) Patent No.: **US 9,622,983 B2**
(45) Date of Patent: *****Apr. 18, 2017**

(54) **SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE**

(71) Applicant: **Supernus Pharmaceuticals, Inc.,** Rockville, MD (US)

(72) Inventors: **Likan Liang**, Boyds, MD (US); **Hua Wang**, Clarksville, MD (US); **Padmanabh P. Bhatt**, Rockville, MD (US); **Michael L. Vieira**, Gaithersburg, MD (US)

(73) Assignee: **Supernus Pharmaceutcals, Inc.,** Rockville, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/259,856**

(22) Filed: **Sep. 8, 2016**

(65) **Prior Publication Data**

US 2016/0375048 A1    Dec. 29, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/630,099, filed on Feb. 24, 2015, now Pat. No. 9,555,004, which is a continuation of application No. 14/499,462, filed on Sep. 29, 2014, now Pat. No. 8,992,989, which is a continuation of application No. 14/330,423, filed on Jul. 14, 2014, now Pat. No. 8,877,248, which is a continuation of application No. 12/926,936, filed on Dec. 17, 2010, now Pat. No. 8,889,191, which is a continuation of application No. 11/941,475, filed on Nov. 16, 2007, now Pat. No. 8,298,576.

(60) Provisional application No. 60/859,502, filed on Nov. 17, 2006.

(51) **Int. Cl.**
| *A61K 9/14* | (2006.01) |
| *A61K 9/50* | (2006.01) |
| *A61K 9/16* | (2006.01) |
| *A61K 9/24* | (2006.01) |
| *A61K 31/357* | (2006.01) |
| *A61K 47/48* | (2006.01) |
| *B82Y 5/00* | (2011.01) |
| *A61K 31/7048* | (2006.01) |
| *A61K 45/06* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *A61K 9/5042* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1676* (2013.01); *A61K 9/209* (2013.01); *A61K 9/5047* (2013.01); *A61K 9/5078* (2013.01); *A61K 9/5084* (2013.01); *A61K 31/357* (2013.01); *A61K 31/7048* (2013.01); *A61K 45/06* (2013.01); *A61K 47/48969* (2013.01); *B82Y 5/00* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 9/1676; A61K 9/209; A61K 9/5078; A61K 9/5084; A61K 31/357; A61K 45/06; A61K 9/5042; A61K 31/7048; A61K 9/5047; A61K 9/1652; A61K 47/4899; B82Y 5/00
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 2,528,378 A | 10/1950 | Mannheimer et al. |
| 2,675,619 A | 4/1954 | Cone |
| 2,677,700 A | 5/1954 | Jackson et al. |
| 2,738,303 A | 3/1956 | Blythe |
| 2,781,354 A | 2/1957 | Mannheimer et al. |
| 2,979,578 A | 4/1961 | Curtis |
| 2,996,431 A | 8/1961 | Barry |
| 3,036,118 A | 5/1962 | Jackson et al. |
| 3,139,383 A | 6/1964 | Neville et al. |
| 3,535,307 A | 10/1970 | Moss et al. |
| 3,811,444 A | 5/1974 | Heller et al. |
| 3,829,506 A | 8/1974 | Schmolka et al. |
| 3,962,414 A | 6/1976 | Michaels |
| 3,992,518 A | 11/1976 | Chien et al. |
| 4,066,747 A | 1/1978 | Capozza |
| 4,070,347 A | 1/1978 | Schmitt |
| 4,079,038 A | 3/1978 | Choi et al. |
| 4,083,949 A | 4/1978 | Benedikt |
| 4,093,709 A | 6/1978 | Choi et al. |
| 4,290,426 A | 9/1981 | Luschen et al. |
| 4,434,153 A | 2/1984 | Urquhart et al. |
| 4,513,006 A | 4/1985 | Maryanoff et al. |
| 4,721,613 A | 1/1988 | Urquhart et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CN | 1130352 A | 9/1996 |
| WO | WO 93/21906 A1 | 11/1993 |

(Continued)

OTHER PUBLICATIONS

US 6,103,281, 08/2000, DelDuca et al. (withdrawn)
Adin et al., "Topiramate Serum Concentration-to-Dose Ratio," Therapeutic Drug Monitoring, Jun. 2004; 26(3):251-257.

(Continued)

*Primary Examiner* — Suzanne Ziska
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP; Sunit Talapatra

(57) **ABSTRACT**

Pharmaceutical compositions of topiramate for once-a-day oral administration are provided. The formulations comprise a sustained-release component and an optional immediate-release component, the compositions of which can be selectively adjusted, respectively, to release the active ingredient along a pre-determined release profile. Method of treating or preventing pathological disorders in mammalian subjects comprising the administration of the novel formulations disclosed herein is also provided.

**30 Claims, 6 Drawing Sheets**

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,727,064 A | 2/1988 | Pitha |
| 4,752,470 A | 6/1988 | Mehta |
| 4,757,128 A | 7/1988 | Domb et al. |
| 4,853,229 A | 8/1989 | Theeuwes |
| 4,938,763 A | 7/1990 | Dunn et al. |
| 4,997,904 A | 3/1991 | Domb |
| 5,030,447 A | 7/1991 | Joshi et al. |
| 5,133,974 A | 7/1992 | Paradissis et al. |
| 5,175,235 A | 12/1992 | Domb et al. |
| 5,180,589 A | 1/1993 | Joshi et al. |
| 5,225,202 A | 7/1993 | Hodges et al. |
| 5,256,440 A | 10/1993 | Appel et al. |
| 5,378,475 A | 1/1995 | Smith et al. |
| 5,470,584 A | 11/1995 | Hendrickson et al. |
| 5,478,577 A | 12/1995 | Sackler et al. |
| 5,500,227 A | 3/1996 | Oshlack et al. |
| 5,576,311 A | 11/1996 | Guy |
| 5,639,476 A | 6/1997 | Oshlack et al. |
| 5,753,693 A | 5/1998 | Shank |
| 5,760,007 A | 6/1998 | Shank et al. |
| 5,773,019 A | 6/1998 | Ashton et al. |
| 5,912,013 A | 6/1999 | Rudnic et al. |
| 5,935,933 A | 8/1999 | Shank et al. |
| 5,955,096 A | 9/1999 | Santos et al. |
| 5,968,552 A | 10/1999 | Sherman |
| 5,985,312 A | 11/1999 | Jacob et al. |
| 5,998,380 A | 12/1999 | Ehrenberg et al. |
| 6,066,339 A | 5/2000 | Stark et al. |
| 6,123,965 A | 9/2000 | Jacob et al. |
| 6,156,348 A | 12/2000 | Santos et al. |
| 6,159,501 A | 12/2000 | Skinhoj |
| 6,191,117 B1 | 2/2001 | Kozachuk |
| 6,197,346 B1 | 3/2001 | Mathiowitz et al. |
| 6,201,010 B1 | 3/2001 | Cottrell |
| 6,217,908 B1 | 4/2001 | Mathiowitz et al. |
| 6,235,311 B1 | 5/2001 | Ullah et al. |
| 6,248,363 B1 | 6/2001 | Patel et al. |
| 6,294,192 B1 | 9/2001 | Patel et al. |
| 6,319,903 B1 | 11/2001 | Carrazana et al. |
| 6,344,215 B1 | 2/2002 | Bettman et al. |
| 6,365,187 B2 | 4/2002 | Mathiowitz et al. |
| 6,368,586 B1 | 4/2002 | Jacob et al. |
| 6,479,467 B1 | 11/2002 | Buchanan et al. |
| 6,500,454 B1 | 12/2002 | Percel et al. |
| 6,503,884 B1 | 1/2003 | Ehrenberg et al. |
| 6,514,531 B1 | 2/2003 | Alaux et al. |
| 6,524,620 B2 | 2/2003 | Chen et al. |
| 6,528,090 B2 | 3/2003 | Qiu et al. |
| 6,559,293 B1 | 5/2003 | Almarsson et al. |
| 6,562,865 B1 | 5/2003 | Codd et al. |
| 6,569,463 B2 | 5/2003 | Patel et al. |
| 6,635,284 B2 | 10/2003 | Mehta et al. |
| 6,696,091 B2 | 2/2004 | Thakur et al. |
| 6,699,840 B2 | 3/2004 | Almarsson et al. |
| 6,797,283 B1 | 9/2004 | Edgren et al. |
| 6,923,988 B2 | 8/2005 | Patel et al. |
| 7,018,609 B2 | 3/2006 | Hwang Pun et al. |
| 7,195,778 B2 | 3/2007 | Fleshner-Barak et al. |
| 7,611,722 B2 | 11/2009 | Lerner et al. |
| 7,737,133 B2 | 6/2010 | Devane et al. |
| 7,763,635 B2 | 7/2010 | Kidane et al. |
| 2002/0044962 A1 | 4/2002 | Cherukuri et al. |
| 2002/0054907 A1 | 5/2002 | Devane et al. |
| 2002/0064563 A1 | 5/2002 | Thakur et al. |
| 2002/0150616 A1 | 10/2002 | Vandecruys |
| 2003/0017972 A1 | 1/2003 | Pun et al. |
| 2003/0064097 A1 | 4/2003 | Patel et al. |
| 2003/0072802 A1 | 4/2003 | Cutler |
| 2003/0091630 A1 | 5/2003 | Louie-Helm et al. |
| 2003/0133985 A1 | 7/2003 | Louie-Helm et al. |
| 2003/0147952 A1 | 8/2003 | Lim et al. |
| 2003/0157173 A1 | 8/2003 | Percel et al. |
| 2003/0166581 A1 | 9/2003 | Almarsson et al. |
| 2003/0215496 A1 | 11/2003 | Patel et al. |
| 2003/0225002 A1 | 12/2003 | Livingstone |
| 2004/0002462 A1 | 1/2004 | Najarian |
| 2004/0022844 A1 | 2/2004 | Hasenzahl et al. |
| 2004/0028729 A1 | 2/2004 | Shojaei et al. |
| 2004/0028735 A1 | 2/2004 | Kositprapa |
| 2004/0052843 A1 | 3/2004 | Lerner et al. |
| 2004/0053853 A1 | 3/2004 | Almarsson et al. |
| 2004/0082519 A1 | 4/2004 | Hedner et al. |
| 2004/0091529 A1 | 5/2004 | Edgren et al. |
| 2004/0096501 A1 | 5/2004 | Vaya et al. |
| 2004/0109894 A1 | 6/2004 | Shefer et al. |
| 2004/0115262 A1 | 6/2004 | Jao et al. |
| 2004/0122104 A1 | 6/2004 | Hirsh et al. |
| 2004/0132826 A1 | 7/2004 | Hirsh et al. |
| 2004/0156901 A1 | 8/2004 | Thakur et al. |
| 2004/0157785 A1 | 8/2004 | Connor |
| 2004/0185097 A1 | 9/2004 | Kannan et al. |
| 2004/0228912 A1 | 11/2004 | Chang et al. |
| 2004/0234601 A1 | 11/2004 | Legrand et al. |
| 2004/0258758 A1 | 12/2004 | Gustow et al. |
| 2005/0053653 A1 | 3/2005 | Kidane et al. |
| 2005/0058707 A1 | 3/2005 | Reyes et al. |
| 2005/0069587 A1 | 3/2005 | Modi et al. |
| 2005/0106242 A1 | 5/2005 | Yan et al. |
| 2005/0106247 A1 | 5/2005 | Venkatesh et al. |
| 2005/0106248 A1 | 5/2005 | Dixit et al. |
| 2005/0129765 A1 | 6/2005 | Li et al. |
| 2005/0136108 A1 | 6/2005 | Yam et al. |
| 2005/0169982 A1 | 8/2005 | Almarssoo et al. |
| 2005/0169992 A1 | 8/2005 | Jao et al. |
| 2005/0175697 A1 | 8/2005 | Edgren et al. |
| 2005/0191343 A1 | 9/2005 | Liang |
| 2005/0191351 A1 | 9/2005 | Kidane et al. |
| 2005/0220596 A1 | 10/2005 | Gaedy et al. |
| 2005/0245460 A1 | 11/2005 | Meyerson et al. |
| 2006/0018933 A1 | 1/2006 | Vaya et al. |
| 2006/0018934 A1 | 1/2006 | Vaya et al. |
| 2006/0024365 A1 | 2/2006 | Vaya et al. |
| 2006/0034927 A1 | 2/2006 | Casadevall et al. |
| 2006/0045912 A1 | 3/2006 | Truog |
| 2006/0078609 A1 | 4/2006 | Vandecruys et al. |
| 2006/0105045 A1 | 5/2006 | Buchanan et al. |
| 2006/0121112 A1 | 6/2006 | Jenkins et al. |
| 2006/0147527 A1 | 7/2006 | Bachmann et al. |
| 2006/0223762 A1 | 10/2006 | Ehrenberg et al. |
| 2006/0233892 A1 | 10/2006 | Hendrix |
| 2007/0212411 A1 | 9/2007 | Fawzy et al. |
| 2007/0264323 A1 | 11/2007 | Shojaei et al. |
| 2008/0085306 A1 | 4/2008 | Nangia et al. |
| 2008/0131501 A1 | 6/2008 | Liang et al. |
| 2011/0287099 A1 | 11/2011 | Liang et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 01/37808 A1 | 5/2001 |
| WO | WO 02/03984 A2 | 1/2002 |
| WO | WO 02/043731 A3 | 6/2002 |
| WO | WO-2004/002427 A1 | 1/2004 |
| WO | WO 2004/022037 A1 | 3/2004 |
| WO | WO 2004/078162 A1 | 9/2004 |
| WO | WO 2004/078163 A2 | 9/2004 |
| WO | WO-2004/108067 A3 | 12/2004 |
| WO | WO 2005/030166 A1 | 4/2005 |
| WO | WO-2005/046684 A1 | 5/2005 |
| WO | WO 2005/079748 A2 | 9/2005 |
| WO | WO 2006/009403 A1 | 1/2006 |
| WO | WO-2006/063078 A3 | 6/2006 |
| WO | WO-2006/075925 A2 | 7/2006 |
| WO | WO 2006/119153 A2 | 11/2006 |
| WO | WO 2007/002318 | 1/2007 |
| WO | WO 2008/060963 A2 | 5/2008 |

### OTHER PUBLICATIONS

Bahk et al., "Topiramate and divalproex in combination with risperidone for acute mania: a randomized open-label study," Progress in Neuropsychopharmacology & Biological Psychiatry, 2005, 29(1):115-121.

(56)          **References Cited**

OTHER PUBLICATIONS

Beaumanoir, Anne. "The Landau-Kleffner syndrome", In: Roger et al., Eds. *Epileptic Syndromes in Infancy, Childhood, and Adolescence*, 2nd Ed., London, England: John Libby, pp. 231-244, 1992.
Berge et al., "Pharmaceutical Salts", J. Pharm. Sci., Jan. 1977, 66(1): 1-19.
Berlant, Jeffery L., M.D., Ph.D., "Topiramate in Posttraumatic Stress Disorder: Preliminary Clinical Observations," J. Clin. Psychiatry, 2001, 62(Suppl 17):60-63.
Brandes et al., "Topiramate for Migraine Prevention," JAMA, Feb. 25, 2004, 291(8):965-973.
Carpenter et al., "Do obese depressed patients respond to topiramate? A retrospective chart review," J. Affect. Disord., 2002, 69(1-3):251-255.
Chen et al., "Combination Treatement of Clozapine and Topiramate in Resistant Rapid-Cycling Bipolar Disorder," Clin. Neuropharmacol., May-Jun. 2005, 28(3):136-138.
Coleman et al., "Polymer reviewed: A practical guide to polymer miscibility," Jul. 1990, 31:1187-1230.
Contin et al., "Topiramate Therapeutic Monitoring in Patients with Epilepsy: Effect of Concomitant Antiepileptic Drugs," Ther. Drug Monit., 2002, 24(3):332-337.
D'Amico et al., "Topiramate in migraine prophylaxis," Neurological Sciences, 2005, 26(Suppl 2):S130-S133.
Deckers et al., "Selection of Antiepileptic Drug Polytherapy Based on Mechanisms of Action: The Evidence Reviewed," Epilepsia, 2000, 41(11):1364-1374.
Diener et al., "Topiramate in migrain prophylaxis: Results from a placebo-controlled trail with propranolol as an active control," J. Neurol., 2004, 251(8):943-950.
Dorado et al., "Topiramato en enfermedades comorbidas: epilepsia y migrana," Rev. Neurol., 2006, 43(4):193-196.
Duchene et al., "Pharmaceutical and Medical Aspects of Bioadhesive Systems for Drug Administration," Drug Dev. Ind. Pharm., 1988, 14(2&3):283-318.
Erfurth et al., "Bupropion as Add-On Strategy in Difficult-to-Treat Bipolar Depressive Patients," Neuropsychobiology, 2002, 45(Suppl 1):33-36.
Felmeister, Alvin Ph.D., "Powders," Remington's Pharm. Sci., 14th Ed., 1970, Chapter 86, 1626-1628.
Ferrari et al., "Influence of Dosage, Age, and Co-Medication on Plasma Topiramate Concentrations in Children and Adults with Severe Epilepsy and Preliminary Observations on Correlations with Clinical Response," Therapeutic Drug Monitoring, 2003, 25(6):700-708.
Ferrari et al., "Rizatriptan: a new milestone in migraine treatment," Cephalalgia, 2000, 20(Suppl 1):1.
Fincher, Julian H., "Particle Size of Drugs and Its Relationship to Absorption and Activity," J. Pharm. Sci., Nov. 1968, 57(11):1825-1835.
Fisher et al., "Synergism between Topiramate and Budipine in Refractory Status Epilepticus in the Rat," Epilepsia, 2004, 45(11):1300-1307.
François et al., "The combination of topiramate and diazepam is partially neuroprotective in the hippocampus but not antiepileptogenic in the lithium-pilocarpine model of temporal lobe epilepsy," Epilepsy Research, 2006, 72:147-163.
Gurny et al., "Bioadhesive intraoral release systems: design, testing and analysis," Biomaterials, Nov. 1984, 5:336-340.
Hershey et al., "Effectiveness of Topiramate in the Prevention of Childhood Headaches," Headache, Sep. 2002;42(8):810-818.
Hoes et al., "The Application of Drug-Polymer Conjugates in Chemotherapy," Drug Carrier Systems, 1989, 9:57-109.
Hollander et al., "Topiramate plus paroxetine in treatment-resistant obsessive-compulsive disorder," Int. Clin. Psychopharmacol., 2006, 21(3): 189-191.
International Search Report and Written Opinion mailed Sep. 2, 2008, in PCT/US2007/19208, 10 pages.
Ioannides-Demos et al., "Pharmacotherapy for Obesity," Drugs, 2005, 65(10):1391-1418.

Johnson et al., "Oral topiramate for treatmetn of alcohol dependence: a randomised controlled trial," The Lancet, May 17, 2003, 361(9370):1677-1685.
Kellett et al., "Topiramate in clinical practice: first year's postlicensing experience in a specialist epilepsy clinic," J. Neurol. Neurosurg. and Psych., 1999;66:759-763.
Lainez et al., "Topiramate in the Prophylactic Treatment of Cluster Headache," Headache, Jul./Aug. 2003, 43(7):784-789.
Lalonde et al., "Additive effects of leptin and topiramate in reducing fat deposition in lean and obese ob/ob mice," Physiology & Behavior, 2004, 80(4):415-420.
Lee et al., "The Effects of Adjunctive Topiramate on Cognitive Function in Patients with Epilepsy," Epilepsia, 2003; 44(3):339-347.
Lehr et al., "Intestinal Transit of Bioadhesive Microspheres in an in situ Loop in the Rat—A Comparative Study with Copolymers and Blends Based on Poly(acrylic acid)," Journal of Controlled Release, 1990, 13:51-62.
Leong et al., "Polymeric controlled drug delivery," Adv. Drug Delivery Rev., 1987, 1:199-233.
Linhardt, Robert J. "Biodegradable Polymers for Controlled Release of Drugs," Controlled Release of Drugs, 1989, Chapter 2, 53-95.
Liu et al., "Preparation, characterization and in vivo evaluation of formulation of baicalein with hydroxypropyl-beta-cyclodextrin," International Journal of Pharmaceutics, 2006, 312:137-147.
Longer, Mark A., Ph.D., "Sustained-Release Drug Delivery Systems," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 91, 1676-1693.
Lu et al., "Dimensionless presentation for drug release from a coated pure drug bead: 1. Analysis," Inter. J. of Pharm., 1994, 112:105-116.
Lu et al., "Dimensionless presentation for drug release from a coated pure drug bead: 2. Experiment," Inter. J. of Pharm., 1994, 112:117-124.
Luszczki et al., "Interactions of Lamotrigine with Topiramate and First-Generation Antiepileptic Drugs in the Maximal Electroshock Test in Mice: An Isobolographic Analysis," Epilepsia, 2003; 44(8):1003-1013.
Mathew et al., "Prophylaxis of Migraine, Transformed Migraine, and Cluster Headache with Topiramate," Headache, Sep. 2002, 42(8):796-803.
McElroy et al., "Topiramate in the Treatment of Binge Eating Disorder Associated with Obesity: A Randomized, Placebo-Controlled Trial," Am. J. Psychiatry, Feb. 2003, 160(2):255-261.
Meador et al., "Cognitive and behavioral effects of lamotrigine and topiramate in healthy volunteers," Neurology, Jun. 2005, 64:2108-2114.
Mikos et al., "Interaction of Polymer Microspheres with Mucin Gels as a Means of Characterizing Polymer Retention on Mucus," Journal of Colloid and Interface Science, May 1991, 143(2): 366-373.
Morton et al., "Diagnosis and treatment of epilepsy in children and adolescents", Drugs, Mar. 1996, 51(3):399-414.
Mosek et. al., "Topiramate in the treatment of refractory chronic daily headache. An open trial," Journal of Headache and Pain, 2005, 6:77-80.
O'Connor et al., "Powders," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 88, 1615-1632.
Park et al., "Alternative Approaches to Oral Controlled Drug Delivery: Bioadhesives and In-Situ Systems," Recent Advances in Drug Delivery, Plenum Press, New York, 1984, 163-183.
Pascual et al., "Testing the combination beta-blocker plus topiramate in refractory migraine," Acta Neurol. Scand., 2007, 115(2):81-83.
Physician's Desk Reference, 60th Edition, 2006, pp. 2438-2447, entry for TOPAMAX®.
Physicians' Desk Reference 59th edition, 2541-2548 (2005).
Physician's Desk Reference, 56th ed., 2590-2595 (2002).
Pies, Ronald M.D., "Combining Lithium and Anticonvulsants in Bipolar Disorder: A Review," Annals of Clinical Psychiatry, Dec. 2002, 14(4):223-232.

(56) **References Cited**

OTHER PUBLICATIONS

Porter, Stuart C., Ph.D., "Coating of Pharmaceutical Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 90, 1666-1675.

Potter et al., "A Double-Blind, Randomized, Placebo-Controlled, Parallel Study to Determine the Efficacy of Topiramate in the Prophylactic Treatment of Migraine," Neurology, Apr. 2000, 54(Suppl 3):A15.

Rudnic et al., "Oral Solid Dosage Forms," Remington's Pharmaceutical Sciences, 18th Edition, 1990, Chapter 89, 1633-1665.

Silberstein et al., "Topiramate in Migraine Prevention," Arch. Neurol., Apr. 2004, 61(4):490-495.

Siniscalchi et al., "Combined topiramate and declorazepam therapy in a patient affected by essential tremor," Parkinsonism Relat. Disord., 2007, 13(2):129-130.

Smart et al., "An in-vitro investigation of mucosa-adhesive materials for use in controlled drug delivery," J. Pharm. Pharmacol., 1984, 36:295-299.

Sofuoglu et al., "Effects of topiramate in combination with intravenous nicotine in overnight abstinent smokers," Psychopharmacology, 2006, 184(3-4): 645-651.

Storey et al., "Topiramate in Migraine Prevention: A Double-Blind Placebo-Controlled Study," Headache, Nov./Dec. 2001, 41(10):968-975.

Thompson et al., "Effects of topiramate on cognitive function," J. Neurol. Neurosurg and Psych., 2000; 69:634-641.

Toplak et al., "Efficacy and safety of topiramate in combination with metformin in the treatment of obese subjects with type 2 diabetes: a randomized, double-blind placebo-controlled study," Int. J. Obes., 2007, 31(1):138-146.

Von Seggern et al., "Efficacy of Topiramate in Migraine Prophylaxis: A Retrospective Chart Analysis," Neurology, Apr. 2000, 54(Suppl 3):A267-A268.

Weber, Marcus Vinicius Keche, M.D., "Topiramate for Obstructive Sleep Apnea and Snoring," Am. J. Psychiatry, May 2002, 159(5):872-873.

Winkelman, John W., "Treatement of nocturnal eating syndrome and sleep-related eating disorder with topiramate," Sleep Medicine, 2003, 4(3):243-246.

Frohoff-Huelsmann et al., "Aqueous ethyl cellulose dispersions containing plasticizers of different water solubility and hydroxypropyl methylcellulose as coating material for diffusion pellets I. Drug release rates from coated pellets," International Journal on Pharmaceutics, 1999, 177:69-82.

Liu, Ying, "A Multi-Mechanistic Drug Release Approach in a Bead Dosage Form and In Vitro and In Vivo Evaluation, A Dissertation" (Liu Thesis), May 1, 2002, available online Oct. 2002, 158 pages.

Liu et al., "A Multimechanistic Drug Release Approach in a Bead Dosage Form and In Vivo Predictions," Pharmaceutical Development and Technology, 2003, 8(2):163-173.

Liu et al., "A Multi-mechanistic Drug Release Approach in a Bead Dosage Form and In Vitro/In Vivo Correlations," Pharmaceutical Development and Technology, 2003, 8(4)409-417.

Liu et al., "A Multi-mechanistic Drug Release Approach in a Bead Dosage Form and In Vivo Predictions," Pharmaceutical Development and Technology, 2003, 8(4):419-430.

Rege et al., "Predictability of Drug Release from Multiparticulate Systems Coated with an Aqueous Ethylcellulose Dispersion," Poster Reprint, Controlled Release Society Annual Meeting, Jun. 2005, 5 pages.

Allen et al., "Ansel's pharmaceutical dosage forms and drug delivery systems: Chapters 5 & 9", Lipponcott Williams & Wilkins, 2005, 63 pages.

Doose et al., "Single-dose pharmacokinetics and effect of food on the bioavailability of topiramate, A novel antiepileptic drug", Journal of Clinical Pharmacology, 1996, vol. 36, pp. 884-891.

FDA Approved Labeling for Adderall XR, 2001.

FDA Approved Labeling for Carbatrol, Jun. 2005.

FDA Approved Labeling for Oracea, May 26, 2006.

Ghebre-Sellassie, "Pharmaceutical pelletization technology", Marcel Dekker Inc., 1989, 17 pages.

Kibbe, "Handbook of pharmaceutical excipients", American Pharmaceutical Association, 3rd ed., 2000, 33 pages.

Kim, "Controlled release dosage form design: Chapter 1", CRC Press LLC, 2000, pp. 1-12.

Lachman et al., "The theory & practice of industrial pharmacy", Lea & Febiger, 1976, 29 pages.

Langtry et al., "Topiramate: a review of its pharmacodynamics and pharmacokinetic properties and clinical efficacy in the management of epilepsy", Drugs, Nov. 1997, vol. 54, No. 5, pp. 752-773.

Leeson et al., "The in vitro development of extended-release solid oral dosage forms", Journal of Pharmacokinetics and Biopharmaceutics, 1985, vol. 13, No. 5, pp. 493-514.

Pellock et al., "Extended-release formulations: simplifying strategies in the management of antiepileptic drug therapy," Epilepsy & Behavior, 2004, vol. 5, pp. 301-307.

Perucca et al., "The clinical pharmacokinetics of the newer antiepileptic drugs", Clinical Pharmacokinetics, Jul. 1996, vol. 1, pp. 29-46.

Rosenfeld et al., "Comparison of the steady-state pharmacokinetics of topiramate and valproate in patients with epilepsy during monotheraphy and concomitant therapy", Epilepsia, 1997, vol. 38, No. 3, pp. 324-333.

Sachdeo et al., "Steady-state pharmacokinetics of topiramate and carbamazepine in patients with epilepsy during monotherapy and concomitant therapy", Epilepsia, 1996, vol. 37, No. 8, pp. 774-780.

Shire Press Release on Carbatrol, "Shire launches Carbatrol(R) in U.S." Feb. 10, 2015.

Topamax Sprinkle Capsules Label, Jun. 29, 2005.

Topamax Sprinkle Capsules Label, Oct. 26, 1998.

Welling, "Oral controlled drug administration, pharmacokinetic considerations", Drug Development and Industrial Pharmacy, 1983, vol. 9, No. 7, pp. 1185-1225.

**Fig.1**

*80% release time vs. %Wt. gain of Release-Controlling Coating*

*For Surelease® coated Extended Release Beads*



Case: 24-1606   Document: 14   Page: 382   Filed: 06/06/2024

**Fig. 2**

*80% release time vs. % Wt. gain of Release-Controlling Coating*

*For Surelease®/ Opadry® coated Extended Release Beads*



**Fig. 3**

**Mean (n= 16) PK Profiles from Bead Populations XR1, XR2 and XR3**



**Fig. 4**

**Mean (n= 16) PK Profiles from the Immediate Release Formulations**



**Fig.5**

**Dissolution Profiles of Immediate Release Formulations**



Fig.6.  Mean PK Profiles for Sustained Release Formulations A, B, and C



US 9,622,983 B2

1

# SUSTAINED-RELEASE FORMULATIONS OF TOPIRAMATE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 14/630,099, filed Feb. 24, 2015; which is a Continuation of U.S. application Ser. No. 14/499,462, filed Sep. 29, 2014, now U.S. Pat. No. 8,992,989; which is a Continuation of U.S. application Ser. No. 14/330,423, filed Jul. 14, 2014, now U.S. Pat. No. 8,877,248; which is a Continuation of U.S. application Ser. No. 12/926,936, filed Dec. 17, 2010, now U.S. Pat. No. 8,889,191; which claims benefit of U.S. application Ser. No. 11/941,475, filed Nov. 16, 2007, now U.S. Pat. No. 8,298,576; which claims benefit of U.S. Provisional Application No. 60/859,502, filed Nov. 17, 2006, the entire contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Topiramate is a sulfamate substituted monosaccharide which under the trade name TOPAMAX® (Ortho-McNeil Pharmaceutical, Inc., Raritan, N.J., U.S.A.) has been approved for use as an antiepileptic agent, as an adjuvant therapy for patients with partial onset seizures or primary generalized tonic-clonic seizures, and for the prevention of migraine. See generally, Physician's Desk Reference, 60th ed., 2538-2447 (2006); see also, U.S. Pat. No. 4,513,006.

For the treatment of epilepsy, the recommended dose of Topamax® is 400 mg/day in one or multiple doses (Physician's Desk Reference, 60th ed., 2538-2447 (2006)). For adults with epilepsy, treatment is initiated with a dose of 25-50 mg/day, with the dose being titrated in increments of 25-50 mg at weekly intervals to the recommended or effective dose.

Topamax® is an immediate release formulation. Adverse effects associated with the administration of Topamax® include, but are not limited to, somnolence, dizziness, ataxia, speech disorders and related speech problems, psychomotor slowing, abnormal vision, difficulty with memory, paresthesia, diplopia, renal calculi (kidney stones), hepatic failure, pancreatitis, renal tubular acidosis, acute myopia and secondary angle closure glaucoma (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Hence, though topiramate has a relatively long half-life of 21 hours in vivo, it has not been prescribed (or formulated) as a single, daily-dose, in part due to severe side-effects that often result with peak plasma levels of the drug when taken in high doses. Instead, Topamax® is typically taken in multiple, "divided" doses, usually twice-daily ("BID"). However, administration of the medicament in this manner is cumbersome and patients can forget to take their medication in a timely manner. What is more, each administration of a dose is associated with a peak in plasma concentrations of the drug, and the fluctuations associated with the peaks and valleys of blood plasma levels of the drug are undesirable. Therefore, there is a need for a formulation of topiramate, which reduces or eliminates the side effects associated with peaking and fluctuating plasma levels of the drug and preferably may be administered in a once-daily regimen.

New, highly soluble and bioavailable forms of topiramate are also needed in order to increase the safety and effectiveness of the drug.

The instant invention addresses these and other needs by providing a modified formulation of topiramate character-

2

ized by a sustained, non-pulsatile release of an active ingredient. This invention additionally provides an effective, once-daily dosage form of topiramate or salts thereof, which not only enables an effective single daily dose regimen to improve patient compliance but may also reduce some of the side effects of topiramate compared to the current or higher daily doses of immediate release topiramate formulations.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a sustained release formulation of topiramate for the treatment or prevention of a pathological condition in a mammalian subject, characterized by a sustained rate of topiramate release along a pre-determined release profile.

It is yet another object of the present invention to provide topiramate formulation wherein topiramate is released at a rate which results in a reduction in the frequency or severity of at least one side effect associated with the topiramate treatment.

It is a further object of the present invention to provide a sustained release formulation of topiramate that can be administered orally once a day.

It is an object of the present invention to provide a sustained release formulation of topiramate for oral administration to a mammalian subject comprising topiramate as an active ingredient, wherein the active ingredient is released from the formulation at a sustained rate along a pre-determined release profile, and wherein the sustained release formulation comprises an extended release (XR) component and an optional immediate release (IR) component.

In one embodiment of the invention, the extended release component is contained in at least one population of beads coated with a release controlling coating. The above-mentioned coating is specific for every bead population and determines its rate of release. Thus, every given bead population included into the formulation is characterized by its own specific rate of release.

In another embodiment of the invention, the sustained release topiramate formulation comprises an immediate release component in addition to an extended release component.

In a preferred embodiment of the invention, the immediate release component is an enhanced immediate release (EIR) composition.

The formulation of the present invention may be incorporated in any oral dosage form such as represented by, but not limited to, a tablet, a pill, a capsule, a troche, a sachet, and sprinkles.

It is yet another object of the present invention to provide a method of preparation of a sustained release formulation of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile, the method comprising the steps of:

1. determining the desired release profile;
2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and
3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method of preparation additionally includes a process for providing an XR component contained in at least one population of beads, wherein every

3

population of beads is characterized by its own rate of release. This process comprises the steps of

1. forming at least one population of topiramate-containing beads;

2. coating each population of beads with its own coating solution;

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The method may optionally include a process for preparation of an IR component, which optionally is an enhanced immediate release (EIR) composition. The enhanced immediate release composition includes at least one agent selected from a group comprising complexing agents and enhancing agents. Without any limitations, the enhancing agents useful in the present invention may be selected from solubilizing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, stabilizing agents, enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors or combinations thereof.

It is yet another object of the present invention to provide a method of treatment or prevention of a pathological condition in a mammalian subject by orally administering to the subject a therapeutically effective amount of a sustained release topiramate formulation of the instant invention. The pathological conditions that may be treated by the method of the present invention include neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by topiramate administration.

DEFINITIONS

For the purposes of this invention, the term "topiramate" includes topiramate or any pharmaceutically acceptable salts thereof.

An "immediate release formulation" refers to a formulation that releases greater than or equal to about 80% of the pharmaceutical agent in less than or equal to about 1 hour.

For the purposes of this application, an enhancing agent ("enhancer") is defined as any non-pharmaceutically active ingredient that improves the therapeutic potential of a formulation.

The term "enhanced immediate release composition" as used herein describes an immediate release composition improved in terms of a therapeutic potential or treatment modality.

"Sustained release" is defined herein as release of a pharmaceutical agent in a continuous manner over a prolonged period of time.

By "prolonged period of time" it is meant a continuous period of time of greater than about 1 hour, preferably, greater than about 4 hours, more preferably, greater than about 8 hours, more preferably greater than about 12 hours, more preferably still, greater than about 16 hours up to more than about 24 hours.

As used herein, unless otherwise noted, "rate of release" or "release rate" of a drug refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr) or a percentage of a total drug dose released per hour. Drug release rates for dosage forms are typically measured as an in vitro rate of drug release, i.e., a quantity of drug released from the dosage form per unit time measured under appropriate conditions

4

and in a suitable fluid. The time at which a specified percentage of the drug within a dosage form has been released from the dosage form is referred to as the "T.sub.x" value, where "x" is the percent of drug that has been released.

The release rates referred to herein are determined by placing a dosage form to be tested in a medium in an appropriate dissolution bath. Aliquots of the medium, collected at pre-set intervals, are then injected into a chromatographic system fitted with an appropriate detector to quantify the amounts of drug released during the testing intervals.

"C" denotes the concentration of drug in blood plasma or serum, of a subject, and is generally expressed as mass per unit volume, for example nanograms per milliliter. For convenience, this concentration may be referred to herein as "drug plasma concentration", "plasma drug concentration" or "plasma concentration" which is intended to be inclusive of a drug concentration measured in any appropriate body fluid or tissue. The plasma drug concentration at any time following drug administration is referenced as Ctime, as in C9hr or C4hr, etc.

The maximum plasma drug concentration during the dosing period is referenced as Cmax, while Cmin refers to the minimum blood plasma drug concentration at the end of a dosing interval; and Cave refers to an average concentration during the dosing interval.

The "degree of fluctuation" is defined as a quotient (Cmax−Cmin)/Cave.

Persons of skill in the art will appreciate that blood plasma drug concentrations obtained in individual subjects will vary due to interpatient variability in the many parameters affecting drug absorption, distribution, metabolism and excretion. For this reason, unless otherwise indicated, when a drug plasma concentration is listed, the value listed is the calculated mean value based on values obtained from a groups of subjects tested.

The term "bioavailability" refers to an extent to which—and sometimes rate at which—the active moiety (drug or metabolite) enters systemic circulation, thereby gaining access to the site of action.

"AUC" is the area under the plasma concentration-time curve and is considered to be the most reliable measure of bioavailability. It is directly proportional to the total amount of unchanged drug that reaches the systemic circulation.

Side effect is defined herein as a secondary and usually adverse effect of a drug.

The term "beads", as used herein, includes, without any limitations on the nature and size thereof, any particles, spheres, beads, granules, pellets, particulates or any structural units that may be incorporated into an oral dosage form.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease® coated extended release beads.

FIG. 2 shows the time of release of 80% of the drug vs. % wt. gain of release controlling coating for cured Surelease®/Opadry® coated extended release beads.

FIG. 3 shows mean (n=16) pharmacokinetic profiles for bead populations XR1, XR2 and XR3.

FIG. 4 shows mean (n=16) pharmacokinetic profiles for the immediate release formulations.

FIG. 5 shows the dissolution profiles of Topamax®, topiramate IR beads, and topiramate enhanced immediate release beads.

US 9,622,983 B2

5

FIG. **6** shows mean PK Profiles for Sustained Release Formulations A, B, and C.

## DETAILED DESCRIPTION OF THE INVENTION

Topiramate is a sulfamate-substituted monosaccharide having the chemical name 2,3:4,5-Di-O-isopropylidene-beta-D-fructopyranose sulfamate. The molecular formula of topiramate is C12H21NO8S, and its chemical structure is represented by formula below:



Topiramate is a white crystalline powder that is soluble in alkaline solutions containing sodium hydroxide or sodium phosphate, soluble in acetone, dimethylsulfoxide and ethanol. However, the solubility of topiramate in water at room temperature is only about 9.8 mg/ml. Topiramate is not extensively metabolized and is excreted largely through the urine (Physician's Desk Reference, 60th ed., 2538-2447 (2006)).

Topiramate pharmacokinetics are linear, producing a dose proportional increase in blood plasma concentration levels with increased dosing, and is not significantly affected by food. Patients taking topiramate over prolonged period of time did not develop resistance to the drug. Following oral administration of an immediate release dosage form, topiramate is rapidly absorbed with plasma drug concentrations peaking in approximately 2 hours. The mean elimination half-life is reported to be about 21 hours.

Currently, topiramate is administered in multiple daily doses in part due to the severe side effects exhibited by the immediate release product, especially when taken in a high single dose.

A sustained release topiramate formulation that will be suitable for once-a-day administration and will result in the diminished level or severity of side effects is needed.

The present invention provides sustained release formulation of topiramate wherein the total daily dose of topiramate is provided in an effective once-daily dose while minimizing fluctuations in the blood plasma drug concentration.

The current invention also provides for formulations of topiramate wherein the maximum plasma concentration of topiramate is attenuated as compared to the same amount of topiramate administered as an immediate release formulation BID; therefore some of the side effects of topiramate, such as CNS side effects including but not limited to dizziness, paresthesia, nervousness, psychomotor slowing, confusion, and difficulty with concentration/attention, observed when taking the immediate release product, may be reduced or eliminated.

Formulations of the instant invention are characterized by a maximum steady state plasma concentration (Cmax) of topiramate which is higher than the minimal therapeutically effective concentration, and is in the range of 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. In one embodiment, the novel formula-

6

tions provide for a relative Cmax in the range of 80% to 125%, as compared to the same amount of topiramate administered as an immediate release formulation BID. In the other embodiment, the invention provides for the Cmax which is lower than the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID. The Cmin of the topiramate formulation of the present invention is about equal or higher than a Cmin of an equivalent amount of immediate release topiramate formulation given BID.

Compared to the immediate release topiramate formulation, the sustained release topiramate formulations attenuate the Cmax of topiramate while extending the coverage of plasma concentration above the minimum plasma concentration required therapeutic efficacy. The formulation of the current invention provides for a relative steady state AUC in the range of 80% to 125%, while minimizing the degree of fluctuation, which is preferably in the range of 25% to 90%, as compared to an equivalent amount of immediate release topiramate formulation given in two divided doses (Table 5 and 6).

The present invention additionally provides a sustained release topiramate formulation for the treatment or prevention of a pathological condition in a mammalian subject wherein topiramate is released from the formulation at a sustained rate along a pre-determined release profile. Such release is achieved by incorporation into the formulation of an extended release component (XR) and an optional immediate release component (IR).

The relative amount of each component in the topiramate formulation of the present invention is determined according to the purpose of administration and a pre-determined release profile, and the total amount of topiramate in the formulation varies from 0.5 mg to about 3000 mg. In other words, topiramate or its salt is present in the composition in an amount of from about 0.5% to about 85% by weight, and preferably of from about 2% to about 70% by weight. The term "about" has been recited here and throughout the specification to account for variations, which can arise from inaccuracies in measurement inherent and understood by those of ordinary skill in the chemical and pharmaceutical arts.

The XR component of the formulation of the present invention releases topiramate in a continuous manner and is adjusted in such a way that 80% of the active ingredient is released in vitro in the predetermined period of time. By way of example, and by no means limiting the scope of the invention, the period of time may be not more than 24 hours, not more than 16 hours, not more than 12 hours, not more than 8 hours, or not more than 4 hours, depending on desired attributes of the final product.

In one embodiment, the extended release (XR) component is contained in at least one population of beads coated with a coating that modifies and controls the release of topiramate from the beads (release controlling coating). The release controlling coating is specific for every population of beads and determines the rate of release of topiramate from the given bead population.

The beads useful in the formulation of the present invention comprise an inert carrier, topiramate, a binder, an afore-mentioned release controlling coating and optionally, an overcoat that provides additional protection from moisture, static charge reduction, taste masking and coloring attributes to the particulates.

The inert carriers useful in the present invention may be selected from, but are not limited to, a group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres.

US 9,622,983 B2

7

The inert carrier is present in an amount of from about 15% to about 99% by weight, and preferably in an amount of from about 40% to about 97% by weight.

Topiramate is introduced to the inert carrier by techniques known to one skilled in the art, such as drug layering, powder coating, extrusion/spheronization, roller compaction or granulation. Preferably, the introduction method is drug layering by spraying a suspension of topiramate and a binder onto the inert carrier.

The binder may be present in the bead formulation in an amount of from 0.1% to about 15% by weight, and preferably of from about 0.2% to about 10% by weight. Binders include, but are not limited to starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, or polyvinylpyrrolidone.

The release controlling coating specific for every bead population comprises a coating material, and, optionally, a pore former and other excipients. The coating material is preferably selected from a group comprising cellulosic polymers, such as ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, and cellulose acetate phthalate; polyvinyl alcohol; acrylic polymers such as polyacrylates, polymethacrylates and copolymers thereof, and other water-based or solvent-based coating materials. The release-controlling coating is population-specific in the sense that the rate of release of topiramate from every bead population is controlled by at least one parameter of the release controlling coating, such as the nature of the coating, coating level, type and concentration of a pore former, process parameters and combinations thereof. Thus, changing a parameter, such as a pore former concentration, or the conditions of the curing, as will be discussed in more details below, (see Example 5) allows to change the release of topiramate from any given bead population and to selectively adjust the formulation to the pre-determined release profile. The release profile, in its turn, may be chosen or modified in such a way as to achieve the best treatment modality depending on the specific needs of the patient population and the nature of the condition.

For example, with all things being equal, there exists a mathematical relationship between the release controlling coating level among the cured beads and the 80% in vitro release time. Pre-determined target profiles can therefore be achieved by the interpolation or extrapolation of the relationship curve. For example, when the release controlling coating comprises only ethylcellulose (Surelease®) as a coating material, a logarithmic relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 1):

Log ($T_{80\% \ release}$)=a (% coating)+b.

When ethylcellulose/HPMC (Surelease®/Opadry®) mixture is used, for example, 85:15 mixture or 80:20 mixture, a linear relationship exists between the % weight gain with the coating and the 80% release time in an in-vitro dissolution test (FIG. 2):

$T_{80\% \ release}$=a (% coating)+b.

Pore formers suitable for use in the release controlling coating herein can be organic or inorganic agents, and include materials that can be dissolved, extracted or leached from the coating in the environment of use. Examples of pore formers include but are not limited to organic compounds such as mono-, oligo-, and polysaccharides including sucrose, glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran; polymers soluble in the

8

environment of use such as water-soluble hydrophilic polymers, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, Carbowaxes, Carbopol, and the like, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols, or block polymers thereof, polyglycols, poly($\alpha$-$\omega$)alkylenediols; inorganic compounds such as alkali metal salts, lithium carbonate, sodium chloride, sodium bromide, potassium chloride, potassium sulfate, potassium phosphate, sodium acetate, sodium citrate, suitable calcium salts, and the like.

The release controlling coating in the current invention can further comprise other additives known in the art such as plasticizers, anti-adherents, glidants, and antifoams.

In some embodiments, it may be further desirable to optionally coat the XR beads with an "overcoat," to provide, e.g., moisture protection, static charge reduction, taste-masking, flavoring, coloring, and/or polish or other cosmetic appeal to the beads. Suitable coating materials for such an overcoat are known in the art, and include, but are not limited to, cellulosic polymers such as hydroxypropylmethylcellulose, hydroxypropylcellulose and microcrystalline cellulose, or combinations thereof (for example various Opadry® coating materials).

Topiramate-containing beads of the present invention may additionally contain enhancers that may be exemplified by, but not limited to, solubility enhancers, dissolution enhancers, absorption enhancers, permeability enhancers, stabilizers, complexing agents, enzyme inhibitors, p-glycoprotein inhibitors, and multidrug resistance protein inhibitors. Alternatively, the formulation can also contain enhancers that are separated from the topiramate beads, for example in a separate population of beads or as a powder. In yet another embodiment, the enhancer(s) may be contained in a separate layer on a topiramate-containing bead either under or above the release controlling coating.

The beads may further comprise other pharmaceutically active agents suitable for use in combination with topiramate for treatment or prevention of a pathological condition. The additional pharmaceutically active agents, without limitation, may be represented by analgesic and anti-inflammatory compounds such as COX-2 inhibitors, nonsteroidal anti-inflammatory drugs (NSAIDs), narcotic drugs such as opiates and morphinomimetics, synthetic drugs with narcotic properties such as tramadol; anticonvulsants such as valproic acid or its derivatives, carbamazepine, oxcarbazepine, gabapentin, and lamotrigine; anorectics or anti-obesity agents such as sibutramine or other, orlistat or other pancreatic lipase inhibitors, diethylpropion, fluoxetine, bupropion, amphetamine, methamphetamine, sertraline, zonisamide, and metformin, as well as medications associated with weight-gain, such as sulfonylurea derivatives, insulin, and thiazolidinediones whose weight-gain effect is tempered by topiramate; anti-hypertensive agents such as diuretics, anti-adrenergics, calcium channel blockers, ACE inhibitors, angiotensin II receptor antagonists, aldosterone antagonists, vasodilators, centrally acting adrenergic drugs, and adrenergic neuron blockers; mood stabilizers such as various forms/salts of lithium, Omega-3 fatty acids and others known in the art, drugs for treatment or prevention of migraines, such as ergot derivatives or triptans, or any other pharmaceutical or nutraceutical ingredient that can be safely and beneficially combined with topiramate.

A relative amount of every bead population in the complete formulation is determined on the basis of the pharma-

9
10

cokinetic data of the separate bead populations and the pre-determined release profile and will be discussed in more detail in Example 6.

In another embodiment, the formulation of the present invention comprises an extended release component as described above, and an immediate release component. The IR component may be an enhanced immediate release composition. The enhanced immediate release composition may be characterized by a faster in vitro topiramate release as compared to the IR formulation. Preferably, at least 80% of an active compound from the enhanced immediate release composition is released in a time period of not more than 30 minutes. More preferably, at least 50% of an active compound from the enhanced immediate release composition is released in a time period of not more than 10 minutes, and at least 25% is dissolved in a time period of not more than 5 minutes after the oral administration. In the most preferred embodiment of the present invention, at least 75% of the active compound is released from the EIR composition in a time period of not more than 10 minutes. The embodiment in which the IR component is an enhanced immediate release composition will be discussed in more details below.

In addition to topiramate and inactive excipients, the EIR composition of the present invention comprises at least one agent selected from a group consisting of complexing agents and enhancing agents.

Without any limitation, the enhancing agents suitable for the present invention may be selected from the solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives, buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. The representative, but non-limiting examples of these compounds are Vitamin E TPGS, amino acid such as glutamic acid and glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins such as maltodextrin, Cremophor RH40 (glycerol-polyethylene glycol oxystearate), Gelucire 50/13 (PEG-32 glyceryl palmitostearate), sodium lauryl sulfate, Tween 80 (polyoxyethylene sorbitan monooleate), benzyl alcohol, Span 20 (sorbitan monolaurate), Poloxamer 407, PEG3350, PVP K25, oleic acid, Capmul GMO (glyceryl monooleate), sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, crosscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, HPMC, substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, and menthol, among others. Enhancers can be combined to achieve multiple enhancement effects, for example, solubility enhancement combined with permeability enhancement and p-glycoprotein inhibition, or to provide a synergistic enhancement effect to achieve greater and more efficient enhancement. For example, polyglycolized glycerides (different grades of Gelucire) can be combined with sodium lauryl sulfate to achieve higher solubility enhancement as well as faster dissolution of topiramate.

In one embodiment, the EIR composition comprises a highly soluble complex of topiramate with a complexing agent that is represented by, but not limited to, cyclodextrins, including cyclodextrin derivatives, such as hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, and alpha-cyclodextrin. The ratio of cyclodextrin to topiramate in the EIR formulation is preferably less than 20:1 and more preferably less than 5:1. In the most preferred embodiment, the complexing agent is hydroxypropyl beta cyclodextrin.

The highly soluble complex of topiramate and cyclodextrin is prepared by mixing topiramate and cyclodextrin together in the presence of water. The concentration of cyclodextrin is preferably high to facilitate the formation of topiramate-enhancer complex. In the case when the complexing agent is hydroxypropyl-beta-cyclodextrin, the concentration of the hydroxypropyl-beta-cyclodextrin solution used for mixing with topiramate is greater than 2%, preferably greater than 20%, and more preferably at least about 40%. The amount of topiramate is determined by a desired ratio of hydroxypropyl-beta-cyclodextrin to topiramate, which is preferably less than 20:1, and more preferably less than 5:1. The mixing time of the complex solution is from about one hour to about 48 hours, and preferably from about 5 hours to about 24 hours. The addition of hydroxypropyl-beta-cyclodextrin and topiramate can be incremental to reduce the viscosity of the complex solution and to achieve better complexation.

In a further embodiment, the EIR component of the present invention is contained in at least one bead population. Topiramate EIR beads can be prepared using processes suitable for bead manufacturing, such as coating of a topiramate suspension, dispersion or solution onto an inert carrier, or by roller compaction, granulation, extrusion/spheronization, or powder coating, and are not limited by the examples cited therein. The enhancing agents of the present invention may be incorporated into the topiramate containing beads, or may be contained in other beads separated from the topiramate containing beads. By way of a non-limiting example, topiramate-containing EIR beads were prepared by coating topiramate dispersion onto an inert carrier such as sugar spheres. The topiramate dispersion, in addition to topiramate in the micronized form or in non-micronized form, can contain one or more enhancers, water and optionally a binder such as hydroxypropylcellulose, hydroxypropylmethylcellulose, polyvinylpyrrolidone and polyvinyl alcohol.

When the formulation is enhanced with complexing agents, the agents may be first mixed with topiramate and a suitable solvent such as water to form the complex. The topiramate-containing complex is then mixed with a binder solution prepared separately to give the coating dispersion. The coating dispersion is then sprayed onto the inert carrier such as sugar spheres using a fluid bed processor.

In an alternative embodiment of the invention, the formulation comprises at least one XR bead population, and at least one additional combination bead population consisting of the extended release beads that have an additional immediate release component layer coated on top of the release controlling coating. This layer may be formed by a suitable loading method such as solution/suspension/dispersion coating, powder coating or wet granulation.

In yet another embodiment, at least part (i.e., more than 0.01%, preferably at least 1%) of the active ingredient may be present in the formulation in a form of micronized particles with the size of from 1 μm to 1000 μm, preferably from 2 μm to about 200 μm, more preferably from 2 μm to about 100 μm. Further, one or more enhancers may be present in the formulations covered by this embodiment. The enhancers are selected from solubility enhancing agents, dissolution enhancing agents, absorption enhancing agents, penetration enhancing agents, surface active agents, such as non-ionic surfactants, ionic surfactants or combinations thereof; stabilizers that include antioxidants, preservatives,

US 9,622,983 B2

11
12

buffering agents, bases and other known in the art; enzyme inhibitors, p-glycoprotein inhibitors, multidrug resistance protein inhibitors, or any combinations thereof. Preferably, the enhancer is a solubility enhancer or a dissolution enhancer.

The topiramate formulation of the present invention may be formulated in a dosage form selected from a tablet, a pill, a capsule, a caplet, a troche, a sachet, a cachet, a pouch, sprinkles, or any other form suitable for oral administration.

In one embodiment of the invention, the dosage form is a gelatin capsule containing the XR component in a form of at least one population of beads, and an optional IR component. The IR component, when present, may be in a form of a powder, or may also be contained in at least one population of beads to achieve faster dissolution of topiramate (FIG. 5).

In an alternative embodiment, part of the total amount of the active ingredient may be incorporated into the afore-mentioned bead populations that will be contained inside an enclosure such as a capsule, and the rest of the active ingredient can be loaded on the outside of the enclosure by a suitable loading method such as solution/suspension/dis-persion coating or powder coating or wet granulation. For example, a part of the immediate release topiramate formu-lation can be loaded by coating on the outside of a capsule that contains within it other populations of topiramate such as extended release topiramate. This dosage form can pro-vide almost instantaneous dissolution of the initial portion of topiramate dose from the outside of the capsule, followed by a sustained release of the rest of topiramate from inside the capsule.

In a further embodiment of the invention, the dosage form is a tablet. Without imposing any limitations, this embodi-ment may be exemplified by a multilayered tablet that comprises at least one layer containing the extended release component, and at least one layer comprising the immediate release component, wherein the IR component may or may not be an EIR composition.

The last two embodiments are especially beneficial when fast onset of action followed by sustained release is pre-ferred, as is for example in the cases of a breakthrough migraine episode.

The current invention additionally encompasses a method of preparing formulations of topiramate, comprising an extended release component, and an optional immediate release component, wherein topiramate is released from the formulation at the sustained rate along the pre-determined release profile. The method comprises the following steps:

1. determining the desired release profile;

2. determining specific amounts of the extended release component and the immediate release component necessary to produce the pre-determined release profile; and

3. incorporating the specified amounts of the components into the formulation.

In one embodiment, the method comprises a step for providing an immediate release component, which may be an enhanced immediate release composition.

In another embodiment, the method includes a process for providing an extended release component contained in at least one population of beads characterized by its own rate of release, wherein the process includes the steps of:

1. forming at least one population of topiramate-contain-ing beads;

2. coating each population of beads with its own coating solution;

3. curing the coating for a period of time to produce a release controlling coating specific for each bead population, and

4. incorporating the beads into the formulation.

The exact amount of beads of every population incorpo-rated into the formulation and into the final dosage form is

determined using the linear superposition principle (Win-NonLin) on the basis of the pharmacokinetic data of the separate bead populations and the pre-determined release profile (Example 6).

Release profiles of XR topiramate beads can be selec-tively adjusted, modified or stabilized by curing the beads at an elevated temperature. This process is well known in the art. However, it was unexpectedly discovered that curing the beads in the curing apparatus in the presence of at least one suitable solvent dramatically reduces the curing time nec-essary to produce a desired release profile and a level of stability. The curing process that previously required up to two weeks can be carried out by the method of current invention in several hours.

The assisting solvents can be selected from those solvents that can dissolve or partially dissolve the coating material, or those that can induce or assist the coalescence or molecular relaxation of the coating material, or those that can reduce electrostatic charge on the dosage forms during curing and those that can facilitate curing at a higher temperature. Examples of these solvents include but are not limited to organic solvents, such as alcohols, ketones, ethers, esters, amides, amines, hydrocarbons including substituted hydro-carbons such as chlorinated hydrocarbons and aromatic hydrocarbons, furans, sulfoxides, organic acids, phenols, super-critical fluids; ammonia; and water, buffered water, or water solutions of other inorganic or organic compounds, and their combinations. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

The curing of the dosage form normally is done in an apparatus that can operate at elevated temperatures and that can deliver the assisting solvents by means such as spray, injection, or vaporization. In the embodiment of the inven-tion when the assisting solvent is sprayed or injected into the curing apparatus, the stream of solvent is introduced directly onto the coated beads. The amount of the solvent necessary to produce the desired effect, such as the desired release parameters and stabilization of the coating, depends on the nature of the solvent and the method of solvent delivery.

Typically, when the vaporization method is used, the organic solvents and aqueous solutions may be used in the wide range of vapor concentrations varying from 2% to more than 100%, providing an unsaturated, saturated or an oversaturated atmosphere. The pure water, however, has to be used in such an amount as to provide at least a saturated or, preferably, an oversaturated atmosphere in the curing apparatus. At least during the delivery of assisting solvents, the coated beads are mixed or agitated either continuously or in a pulsed manner.

In an alternative embodiment of the invention, hot water steam is introduced into the curing apparatus for a pre-selected period of time. The steam serves simultaneously as a solvent and as a source of heat for the beads. Introduction of steam is followed by a drying period.

This method of curing the release controlling coating results in many benefits including the dramatically shortened curing time, increased stability and modification of the release profile, and is not limited to topiramate containing beads, but includes the curing of any microparticles regard-less of the drug.

Specifically, active ingredient containing beads, with or without the optional over-coat, are charged to a fluid bed processor or a pan coater and heated to a desired curing temperature range, for example 40° C. to 80° C. for sus-tained release dosage forms containing ethylcellulose (Sure-

13

lease®), and 40° C. to 70° C. for sustained release dosage forms containing acrylic polymers (Eudragit® RS and Eudragit® RL). The assisting solvent or solvents, such as water or alcohol-water mixture, are sprayed onto the beads while mixing by, for example, fluidizing or rotating. Alternatively, the process is carried out in an oven where hot steam is introduced as previously discussed. Solvent-assisted curing is carried out to a desired curing time length, either in one curing period or in multiple, separate curing periods. The dosage forms can be further dried for a short period of time to remove residual solvents.

The solvent-assisted curing process significantly accelerates the curing of release controlling coating on active ingredient containing beads as compared to the heat-only curing of the same. In most instances, less than 4 hours of solvent-assisted curing resulted in more complete curing of the extended release dosage forms than 2 weeks of heat-only oven curing of the same dosage forms.

The present invention also presents a method of treatment or prevention of a pathological condition in a mammalian subject, comprising orally administering to the subject a therapeutically effective amount of a novel topiramate formulation of the instant invention, wherein topiramate is released from the formulation at a sustained rate along the pre-determined release profile. The method of the current invention possesses the flexibility to selectively adjust the pharmacokinetics of the administered formulations depending on the nature of the condition and needs of the patients due to the novel design of the topiramate formulation that comprises an extended release component and an optional immediate release component, and the release profiles of both components can be selectively modified during the preparation process as described above to comply with the predetermined release profile.

The pathological condition that may be treated by a method of the present invention is a neurological condition, psychiatric condition, diabetes and related disorders, cardiovascular condition, obesity, and any other condition or disorder that may be treated or prevented by the topiramate administration.

The neurological disorders that may be treated or prevented by a formulation of the present invention include, but are not limited to, epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, perinatal hypoxia ischemia and related damage, chronic neurodegenerative disorders, acute neurodegeneration, and ALS.

Psychiatric disorders that may be treated or prevented by a formulation of the present invention include, but are not limited to bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disor-

14

der, post-traumatic stress disorder, ADHD, impulse control disorders, border line personality disorder, addiction, and autism.

Formulations of the present invention may be also used for the treatment and prevention of diabetes and related disorders, such as type II diabetes mellitus, diabetic retinopathy, impaired oral glucose tolerance, diabetic skin lesions, diabetic neuropathy, Syndrome X and elevated blood glucose levels; ocular disorders, including but not limited to glaucoma and macular degeneration; cardiovascular disorders represented but not limited to elevated blood pressure and elevated lipids; obesity; asthma; autoimmune disorders; sleep apnea and sleep disorders. The formulations may be also used for inducing weight loss or promoting wound healing, or for any other condition, not specified above, wherein the use of topiramate is indicated.

The invention will be further illustrated by the following Examples, however, without restricting its scope to these embodiments.

EXAMPLES

Example 1

Extended Release Beads Preparation

Topiramate Drug Layering on Sugar Spheres—The "Core"

An aqueous suspension of 10-20% (w/w) topiramate (particle size 90% vol. NMT 30 micrometer, 50% vol. NMT 15 micrometer and 10% vol. NMT 5 micrometer) and 0.5-4% (w/w) HPMC or other aqueous binder can be used as the drug layering coating solution. A fluid bed suited for Wurster-spray is assembled and charged with inert carriers such as sugar spheres. The coating suspension is sprayed onto the bed to evenly coat the inert carriers to a desired topiramate loading level. Higher binder concentration in the coating solution may be used for smaller size inert carrier and higher topiramate loading. Inlet airflow rate and product temperature are adjusted to keep the batch from spray-drying the coating material or over-wetting the spheres.

Coating of the Core with a Release Controlling Coating

A dispersion of a cellulosic polymer such as ethylcellulose and methylcellulose can be used to coat the core in the current invention. Ethylcellulose dispersion (Surelease®) can be diluted to a final concentration of about 10% to about 20% and with or without the use of other ingredients such as pore formers. A fluid bed suited for Wurster-spray is assembled and charged with the cores prepared in Example 1. The release controlling coating dispersion is sprayed onto the bed to evenly coat the core to a desired coating level as exemplified in Table 1.

TABLE 1

| Composition and process Parameters for the extended Release Topiramate Beads | | | | | | | |
|---|---|---|---|---|---|---|---|
| | XR1a | XR1b | XR1c | XR2a | XR2b | XR2c | XR2d |
| RC* coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) |
| Pore-former | — | — | Opadry ® Clear | — | — | Opadry ® Clear | Opadry ® Clear |
| RC coating material to pore-former ratio | — | — | 80:20 | — | — | 80:20 | 80:20 |
| RC coating level | 2% | 4% | 3% | 3% | 3% | 6.5% | 6.5% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. |

US 9,622,983 B2

TABLE 1-continued

Composition and process Parameters for the extended Release Topiramate Beads

| | | | | | | |
|---|---|---|---|---|---|---|
| Over-coat material | — | Opadry ® AMB White | Opadry ® AMB White | — | Opadry ® AMB White | — | Opadry ® AMB White |
| Over-coat coating level | — | 1.5% | 1.5% | — | 1.5% | — | 1.5% |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven |

| | XR3 | XR4 | XR5 | XR6 | XR7 | XR8 |
|---|---|---|---|---|---|---|
| RC coating material | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Ethylcellulose (Surelease) | Acrylic polymers (Eudragit ® RL30D/RS30D) |
| Pore-former | — | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | Cellulosic polymers (Opadry ® Clear) | |
| RC coating material to pore-former ratio | — | 80:20 | 80:20 | 80:20 | 85:15 | — |
| RC coating level | 3.7% | 3.1% | 5.2% | 9.5% | 15% | 15% |
| Product temperature during coating | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. | 20° C.-60° C. |
| Over-coat material | — | — | — | — | — | — |
| Over-coat coating level | — | — | — | — | — | — |
| Curing method | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, or oven | Fluid bed/ water, fluid bed/5% alcohol-water, or oven | Fluid bed/ water, fluid bed/5% alcohol-water, or oven |

*RC—Release Controlling

### Example 2

### Method of Topiramate-Hydroxypropyl-Beta-Cyclodextrin Complex Bead Preparation

Approximately half of the intended amount of topiramate was added to the water with constant mixing followed by sprinkling of hydroxypropyl-beta-cyclodextrin into the dispersion. Once the dispersion became significantly less viscous, more drug substance was added followed by sprinkling of more hydroxypropyl-beta-cyclodextrin. The drug and hydroxypropyl-beta-cyclodextrin addition steps were repeated, and the dispersion was mixed for 12-18 hours. Separately, hydroxypropylmethylcellulose was dissolved in water. The above topiramate-hydroxypropyl-beta-cyclodextrin dispersion and hydroxypropylmethylcellulose solution were mixed together for 15 to 30 minutes and the mixture was screened through an 80-mesh sieve. The resultant dispersion was sprayed onto sugar spheres using a fluid bed processor to yield the enhanced immediate release beads (Table 2).

TABLE 2

Hydroxypropyl-beta-cyclodextrin - Topiramate EIR Bead Compositions

| | Percentage (w/w) in Beads | | | |
|---|---|---|---|---|
| Component | EIR-1 (HPBCD:Drug = 3:2)* | EIR-2 (HPBCD:Drug = 3:2)* | EIR-3 (HPBCD:Drug = 1:1)* | EIR-4 (HPBCD:Drug = 1:2)* |
| Topiramate | 25.0 | 3.3 | 28.9 | 33.3 |
| Hydroxypropyl-beta-cyclodextrin | 37.5 | 4.95 | 28.9 | 16.7 |
| Hydroxypropylmethylcellulose | 3.1 | 0.41 | 2.4 | 4.2 |
| Sugar spheres | 34.4 | 91.34 | 39.8 | 45.8 |

*HPBCD:Drug—Hydroxypropyl-beta-cyclodextrin to drug substance ratio

17

### Example 3

### Topiramate EIR Beads Containing Non-Complexing Enhancers

Topiramate is dispersed in a binder solution, such as hydroxypropylmethylcellulose solution, that contains an appropriate amount of enhancer or enhancers such as d-al-pha-tocopheryl polyethylene glycol 1000 succinate (vitamin E TPGS) and sodium lauryl sulfate combination, polyoxyl hydrogenated castor oil (different grades of Cremophor RH), polyglycolized glycerides (different grades of Gelucire), polyglycolized glycerides (different grades of Gelucire) combined with sodium lauryl sulfate, or combinations thereof. The resultant dispersion is sprayed onto an inert carrier such as sugar spheres using a fluid bed processor to achieve a desired drug load (Table 3).

TABLE 3

Enhanced Immediate Release Topiramate Bead Compositions

| Component | Percentage (w/w) in Beads | | |
|---|---|---|---|
| | EIR-5 | EIR-6 | EIR-7 |
| Topiramate | 36.8 | 37.9 | 36.4 |
| Sodium lauryl sulfate | 0.7 | 0.5 | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | 7.3 | — | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | 9.1 |
| Polyglycolized glycerides (Gelucire 50/13) | — | 4.7 | — |
| Hydroxypropylmethylcellulose | 4.6 | 4.8 | 4.5 |
| Sugar spheres | 50.6 | 52.1 | 50.0 |

### Example 4

### Topiramate EIR Beads Containing Micronized Particles

Miconized or non-micronized topiramate is dispersed in a solution with or without heating, optionally containing dis-solution enhancing agents such as mannose, maltose, man-nitol, lactose, maltodextrin and sodium starch glucolate, and optionally containing one or more additional enhancers such as PEG3350, sodium lauryl sulfate, sodium docusate, poly-oxyethylene sorbitan monooleate and Poloxamers, under such process parameters that topiramate particles that remain undissolved have a particle size of about 2 micron to about 30 micron. A particle size reduction device such as a homogenizer can also be used to reduce the particle size of undissolved topiramate. The resultant topiramate dispersion is then sprayed onto inert carriers such as sugar spheres in a coating processor such as a fluid bed processor. The formulations obtained are represented in the Table 4:

TABLE 4

Topiramate EIR Beads containing micronized particles

| | Percentage (w/w) in Beads | | | | | |
|---|---|---|---|---|---|---|
| | EIR-8 | EIR-9 | EIR-10 | EIR-11 | EIR-12 | EIR-13 |
| Topiramate | 3.2 | 26.0 | 25.0 | 3.2 | 26.0 | 26.0 |
| Mannose | 0.4 | 5.0 | 3.3 | 2.0 | 10.0 | 10.0 |

18

TABLE 4-continued

Topiramate EIR Beads containing micronized particles

| | Percentage (w/w) in Beads | | | | | |
|---|---|---|---|---|---|---|
| | EIR-8 | EIR-9 | EIR-10 | EIR-11 | EIR-12 | EIR-13 |
| Maltrin 250 | — | — | 1.0 | 1.0 | — | — |
| PEG3350 | 1.0 | 15.0 | — | — | — | 10.0 |
| Sodium lauryl sulfate | — | — | — | — | 0.5 | — |
| Hydroxypropyl-beta-cyclodextrin | — | — | 37.5 | — | — | — |
| D-alpha-tocopheryl polyethylene glycol 1000 succinate | — | — | — | — | 2.0 | — |
| Polyoxyl hydrogenated castor oil (Cremophor RH40) | — | — | — | — | — | 2.0 |
| Sugar spheres | 95.4 | 54.0 | 33.2 | 93.8 | 61.5 | 52.0 |

### Example 5

### Method of Curing Beads

The topiramate beads coated with a release controlling coating, with or without an overcoat, can be cured using the above-mentioned solvent-assisted curing process, or using the heat-only curing process, to a desired curing level and preferably to complete curing.

Specifically, the core is coated to a desired coating level with a solution or dispersion of the release controlling coating material, with or without the above-mentioned addi-tives such as pore-formers, using a fluid bed processor or any other suitable apparatus for coating of the core. Product temperature is controlled at a desirable range, for example 20° C. to 60° C. for the coating of ethylcellulose (Sure-lease®) and 20° C. to 60° C. for acrylic polymers (Eudragit® RL and Eudragit® RS grades). An optional overcoat with materials such as cellulosic polymers (various Opadry®) is applied thereafter. Curing of the sustained release topiramate beads is carried out either in an oven at 40° C. to 80° C. for Surelease® containing beads or at 40° C. to 70° C. for Eudragit® RL or RS containing beads, or in a fluid bed processor with or without the use of assisting solvents at similar product temperatures.

For curing that uses assisting solvents, the assisting sol-vent can be delivered through top spray, bottom spray, side spray or injection, or introduced by vaporization. Preferably, water, water-alcohol mixture, water-ketone mixture, water-ammonia mixture, or water-organic acid (for example water-acetic acid) mixture, or combinations thereof are used as the assisting solvents.

### Example 6

### Sustained Release Formulations of Topiramate

a. Plasma concentration versus time curves for the topi-ramate formulations containing extended release and imme-diate release bead populations are simulated using WinNon-lin Version 5.0.1 based on the pharmacokinetic data on the separate bead populations that were generated in a compara-tive randomized single-dose 6-way crossover study in healthy adult volunteers. The study included administration of a 50 mg oral dose of three extended release compositions, designated here as XR1, XR2 and XR3, two immediate

US 9,622,983 B2

19

release compositions ((Topamax®, Ortho-McNeil Neurologics, Inc.) (25 mg BID), and an immediate release bead formulation) and an enhanced immediate release (IR) bead composition. The single dose topiramate plasma concentration profiles for XR1, XR2 and XR3 are shown in FIG. 3. The single dose topiramate plasma concentration profiles for IR are shown in FIG. 4. The data are projected to a steady-state (SS) with a 24 h dosing interval for the sustained release compositions and a 12 h dosing interval for Topamax, using the linear superposition principle (WinNonlin). The extended release populations XR1, XR2 and XR3, and an immediate release (IR) population are selected in such a way as to be defined by at least one of the three following sets of conditions:

1. for the steady state,
   for XR1, $1.70C_{maxIR} >= C_{maxXR1} >= 1.30C_{maxIR}$
   for XR2, $0.40C_{maxIR} >= C_{maxXR2} >= 0.20C_{maxIR}$
   for XR3, $0.25C_{maxIR} >= C_{maxXR3} >= 0.05C_{maxIR}$
2. for in-vitro dissolution,
   for XR1, $1.5 h <= T_{80\%} <= 4 h$
   for XR2, $5 h <= T_{80\%} <= 8 h$
   for XR3, $8 h < T_{80\%} <= 10 h$
3. for a single initial dose in-vivo,
   for XR1, $4 h <= T_{max} <= 8.5 h$
   for XR2, $T_{max} >= 16 h$
   for XR3, $T_{max} >= 16 h.$

Optionally, the immediate release bead population is composed of enhanced immediate release (EIR) beads such that at least one condition is true: a. for the steady state, 2.40 CmaxIR >= CmaxEIR >= 1.20 CmaxIR; b. for in-vitro dissolution, T80% <= 30 min; c. for a single initial dose in-vivo, Tmax <= 2 h.

The results of the pharmacokinetic simulation for the seven exemplary formulations are summarized in Table 5 below. These formulations are selected as examples only, and in no way limit the range, compositions or properties of the formulations covered by the present invention.

TABLE 5

Composition and Pharmacokinetic data of Multi-bead Formulations

|  | #1 | #2 | #3 | #4 | #5 | #6 | #7 |
|---|---|---|---|---|---|---|---|
| % XR1 | 20 | 50 | 0 | 10 | 10 | 15 | 0 |
| % XR2 | 80 | 0 | 85 | 85 | 80 | 70 | 100 |
| % XR3 | 0 | 50 | 0 | 0 | 0 | 15 | 0 |
| % IR | 0 | 0 | 15 | 5 | 10 | 0 | 0 |
| Rel. BA (%), SS | 98.5 | 100.5 | 96.6 | 97.4 | 97.6 | 97.3 | 96.0 |
| Degree of fluctuation, SS | 0.15 | 0.22 | 0.14 | 0.14 | 0.15 | 0.13 | 0.09 |

b. based on the results of WinNonlin simulation discussed in part (a), formulations #1 (A), #3 (B), and #4 (C) were tested in the comparative randomized multi-dose 4-way study following a once a day 50 mg oral dose of three controlled release formulations and a 25 mg twice a day oral doses of Topamax® in healthy adult volunteers.

The results of the study are summarized in Table 6 and FIG. 6:

TABLE 6

Pharmacokinetic study data for Multi-bead Formulations

|  | #1 A | #3 B | #4 C | Control (Topamax ®) |
|---|---|---|---|---|
| % XR1 | 20 | 0 | 10 | — |
| % XR2 | 80 | 86 | 84 | — |

20

TABLE 6-continued

Pharmacokinetic study data for Multi-bead Formulations

|  | #1 A | #3 B | #4 C | Control (Topamax ®) |
|---|---|---|---|---|
| % XR3 | 0 | 0 | 0 | — |
| % IR | 0 | 14 | 6 | — |
| Rel. BA (%), SS | 92 | 93 | 95 | 100 |
| Relative Degree of fluctuation, SS | 73% | 72% | 66% | 100% |

What is claimed is:

1. A sustained release formulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, which topiramate is released immediately and continuously upon administration from the formulation, the formulation comprising:
   (a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,
   (b) an immediate release (IR) topiramate-containing component comprising:
      (i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or
      (ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerolpolyethylene glycol oxystearate, polyethylene glycol-32, glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylenepolypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,
   wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

2. The formulation of claim 1, wherein the XR component is contained in at least one population of beads.

3. The formulation of claim 1, comprising an IR component such that 80% of the topiramate is released in not more than 1 hour.

4. The formulation according to claim 1, wherein the XR component further comprises a binder selected from the group consisting of starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and polyvinylpyrrolidone.

5. The formulation according to claim 1, wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins,

21

polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly(a-w)alkylenediols, alkali metal salts, alkaline earth metal salts, and combinations thereof.

**6.** The formulation of claim **1**, wherein the formulation is in a dosage form of a capsule or sprinkles.

**7.** The formulation of claim **1**, wherein the total amount of topiramate in the formulation is from 0.5 to 3000 mg.

**8.** The formulation of claim **1**, wherein the XR component further comprises an inert carrier selected from the group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres.

**9.** The formulation of claim **1**, wherein the coating material comprises ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, cellulose acetate phthalate, polyvinyl alcohol, polyacrylates, polymethacrylates or copolymers thereof.

**10.** The formulation of claim **1**, wherein the formulation provides for a maximum steady state plasma concentration (Cmax) of topiramate which is in the range from 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID.

**11.** The formulation of claim **1**, wherein the formulation provides for a relative steady state AUC in the range of 80% to 125% of the AUC of the same amount of topiramate administered as an immediate release formulation BID.

**12.** The formulation of claim **1**, further comprising an active ingredient in combination with topiramate.

**13.** A sustained release formulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, which topiramate is released immediately and continuously upon administration from the formulation, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32, glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

22

**14.** A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotrophic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release formulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, the formulation comprising:

(a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally,

(b) an immediate release (IR) topiramate-containing component comprising:

(i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

(ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32, glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethylcellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo between 4 and 8.5 hours, inclusive, after a single initial dose.

**15.** The method of claim **14**, wherein the condition is epilepsy.

**16.** The method of claim **14**, wherein the condition is migraine.

**17.** A method of treatment of a neurological and/or psychiatric condition selected from the group consisting of epilepsy, migraine, essential tremor, restless limb syndrome, cluster headaches, neuralgia, neuropathic pain, Tourrette's syndrome, infantile spasms, bipolar disorder, dementia, depression, psychosis, mania, anxiety, schizophrenia, obsessive-compulsive disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorders, border line personality disorder, addiction, autism, chronic neurodegenerative disorders, acute neurodegeneration, and amyotrophic lateral sclerosis (ALS), comprising orally administering to a mammalian subject a therapeutically effective amount of a sustained release for-

23

24

mulation of topiramate comprising topiramate in the form of micronized particles ranging from 1 μm to 1000 μm in size, the formulation comprising:

  (a) an extended release (XR) topiramate-containing component, comprising a coating material selected from the group consisting of cellulosic polymers and acrylic polymers, and, optionally:

  (b) an immediate release (IR) topiramate-containing component comprising:

    (i) a complexing agent selected from the group consisting of hydroxypropyl-beta-cyclodextrin, beta-cyclodextrin, gamma-cyclodextrin, alpha-cyclodextrin, cyclodextrin, and cyclodextrin derivative, and/or

    (ii) an enhancing agent selected from the group consisting of Vitamin E TPGS, glutamic acid, glycine, sorbitol, mannose, amylose, maltose, mannitol, lactose, sucrose, glucose, xylitose, dextrins, glycerol-polyethylene glycol oxystearate, polyethylene glycol-32, glyceryl palmitostearate, sodium lauryl sulfate, polyoxyethylene sorbitan monooleate, benzyl alcohol, sorbitan monolaurate, polyethylene-polypropylene glycol, polyethylene glycol-3350, polyvinylpyrrolidone-K25, oleic acid, glyceryl monooleate, sodium benzoate, cetyl alcohol, sucrose stearate, crospovidone, sodium starch glycolate, croscarmellose sodium, carboxymethylcellulose, starch, pregelatinized starch, hydroxypropylmethyl-cellulose (HPMC), substituted hydroxypropylcellulose, microcrystalline cellulose, sodium bicarbonate, calcium citrate, sodium docusate, menthol, and combinations thereof,

wherein administration of the formulation releases topiramate immediately and continuously and wherein the XR component exhibits a maximum plasma concentration of topiramate in vivo at 16 or more hours after a single initial dose.

**18.** The method of claim **17**, wherein the condition is epilepsy.

**19.** The method of claim **17**, wherein the condition is migraine.

**20.** The formulation of claim **13**, wherein the XR component is contained in at least one population of beads.

**21.** The formulation of claim **13**, comprising an IR component such that 80% of the topiramate is released in not more than 1 hour.

**22.** The formulation according to claim **13**, wherein the XR component further comprises a binder selected from the group consisting of starches, microcrystalline cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and polyvinylpyrrolidone.

**23.** The formulation according to claim **13**, wherein the XR component further comprises a pore former selected from the group consisting of glucose, fructose, mannitol, mannose, galactose, sorbitol, pullulan, dextran, hydroxyalkylcelluloses, carboxyalkylcelluloses, hydroxypropylmethylcellulose, cellulose ethers, acrylic resins, polyvinylpyrrolidone, cross-linked polyvinylpyrrolidone, polyethylene oxide, carbomer, diols, polyols, polyhydric alcohols, polyalkylene glycols, polyethylene glycols, polypropylene glycols or block polymers thereof, polyglycols, poly(a-w)alkylenediols, alkali metal salts, alkaline earth metal salts, and combinations thereof.

**24.** The formulation of claim **13**, wherein the formulation is in a dosage form of a capsule or sprinkles.

**25.** The formulation of claim **13**, wherein the total amount of topiramate in the formulation is from 0.5 to 3000 mg.

**26.** The formulation of claim **13**, wherein the XR component further comprises an inert carrier selected from the group consisting of cellulose spheres, silicon dioxide, starch and sugar spheres.

**27.** The formulation of claim **13**, wherein the coating material comprises ethylcellulose, methylcellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose acetate, cellulose acetate phthalate, polyvinyl alcohol, polyacrylates, polymethacrylates or copolymers thereof.

**28.** The formulation of claim **13**, wherein the formulation provides for a maximum steady state plasma concentration (Cmax) of topiramate which is in the range from 50% to 125% of the maximum plasma concentration produced by the same amount of topiramate administered as an immediate release formulation BID.

**29.** The formulation of claim **13**, wherein the formulation provides for a relative steady state AUC in the range of 80% to 125% of the AUC of the same amount of topiramate administered as an immediate release formulation BID.

**30.** The formulation of claim **13**, further comprising an active ingredient in combination with topiramate.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 9,622,983 B2                                      Page 1 of 1
APPLICATION NO.  : 15/259856
DATED             : April 18, 2017
INVENTOR(S)      : Likan Liang et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

The Assignee's name should read as follows:
(73) Assignee: --**Supernus Pharmaceuticals, Inc., Rockville, MD (US)**--

Signed and Sealed this
Eleventh Day of July, 2017

*Joseph Matal*

Joseph Matal
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

This principal brief of Defendants-Appellants Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface and includes 13,562 words.